UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNIGROUP, C.A., and<br>MAYFLOWER TRANSIT, LLC<br><br>Plaintiffs,<br><br>v.<br><br>BRENDAMOUR MOVING & STORAGE,<br>INC., BRENDAMOUR LOGISTICS, LLC,<br>MICHAEL BRENDAMOUR, and<br>PAUL OWENS,<br><br>Defendants. | Case No. 4:23-cv-00708 |

## COMPLAINT

Plaintiffs UniGroup, C.A. and Mayflower Transit, LLC (collectively, "Plaintiffs"), by and through their undersigned counsel, state as follows for their Complaint against Defendants Brendamour Moving & Storage, Inc., Brendamour Logistics, LLC, Michael Brendamour, and Paul Owens (collectively, "Defendants"):

**The Parties, Jurisdiction, and Venue**

1. Plaintiff UniGroup, C.A. ("UniGroup") is a Missouri cooperative association with its principal place of business in Fenton, Missouri. UniGroup was founded in 1988 and, through its subsidiaries, is one of the nation's leading household goods and logistics transportation companies. UniGroup is the parent company of Plaintiff Mayflower Transit, LLC.

2. Plaintiff Mayflower Transit, LLC ("Mayflower") is a Missouri limited liability company with its principal place of business in Fenton, Missouri. Mayflower's sole member (Transportation Services Group, Inc., a wholly owned subsidiary of UniGroup) is a citizen of the

State of Missouri. Mayflower provides transportation services as a motor carrier by authority of the Department of Transportation.

3.  Defendant Brendamour Moving & Storage, Inc. ("Brendamour Moving") is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Brendamour Moving is a warehousing, moving, and storage company, and was an agent of Mayflower from 1991 until May 31, 2023, when Mayflower terminated Brendamour Moving's agency relationship due to the fraudulent scheme described below. The version of Brendamour Moving's Agency Agreement with Mayflower (the "Agency Agreement") in effect as of May 31, 2023 is attached hereto and incorporated hereby reference as **Exhibit 1**.

4.  Defendant Brendamour Logistics, LLC ("Brendamour Logistics") is an Ohio limited liability company with its principal place of business in Cincinnati, Ohio. On information and belief, no member of Brendamour Logistics is a resident of the State of Missouri. Brendamour Logistics provided certain services in connection with the logistics transactions for which Brendamour Moving reported inflated customer charges in the UniGroup system and was a necessary participant in the fraudulent scheme described below.

5.  Michael Brendamour is an individual who resides in the State of Ohio. At times relevant to the allegations below, Michael Brendamour held an ownership interest in Brendamour Moving.

6.  Paul Owens ("Owens") is an individual who resides in the State of Ohio. Owens is the Chief Operating Officer, General Manager, and Controller of Brendamour Moving.

7.  This Court has personal jurisdiction over Defendants because defendants transacted business and committed tortious acts within the State of Missouri, and this action arises out of such business and tortious acts. *See* Mo. Rev. Stat. § 506.500.

8. This Court has subject matter jurisdiction under 20 U.S.C. § 1332(a)(1) because this civil action is between citizens of different states and the amount in controversy exceeds the jurisdictional amount.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this matter occurred in this judicial district. Venue and jurisdiction are also proper based on the forum selection provision in the Agency Agreement. *See* **Ex. 1** at ¶ 5.N ("[T]he United States District Court for the Eastern District of Missouri shall be the exclusive forum for the resolution of any dispute arising from or under this Agreement").

## FACTS COMMON TO ALL COUNTS

10. UniGroup, through its subsidiaries, is one of the nation's largest household goods and logistics organizations, with a portfolio of world-class brands including United Van Lines, Mayflower Transit, UniGroup Logistics, and UniGroup Worldwide. UniGroup is a cooperative association committed to delivering industry-leading transportation solutions for its customers and members. As a cooperative association, UniGroup is owned by its members, commonly referred to as Mayflower (or United) agents. UniGroup provides back-office administrative and other support services and systems for its subsidiaries, including Mayflower.

11. Mayflower's agents book hundreds of moves every day, which primarily consist of household/residential moves and commercial (logistics) transportation services.

12. A logistics move typically involves transportation and fuel charges, as well as charges for services provided at origin and destination, typically referred to as "accessorial" charges.

13. Since around September 2016, in a typical logistics move, the agent receives 93.5% of certain accessorial service revenue as the service provider, and Mayflower retains 6.5% of that revenue as the carrier of record.

14. For all transactions, the agent is responsible for entering accurate transaction data into the UniGroup system, which includes all customer charges for service.

15. For all transactions, the customer should be invoiced the same amount that the agent enters into the UniGroup system.

16. For most transactions, Mayflower handles the billing and collects revenue directly from the customer.

17. For "direct bill" transactions, however, the agent handles the billing and collects the entire invoiced amount directly from the customer.

18. UniGroup's billing and reconciliation process varies depending on whether its subsidiary carriers or the agent handles the billing and collection.

19. When a *UniGroup subsidiary carrier* (Mayflower) handles the billing and collection, UniGroup immediately books 100% of the invoiced amount as revenue and records the appropriate expense, which is based on varying agent commissions applicable to a shipment. Approximately 93.5% of invoiced accessorial revenue is reflected as an expense (reflecting the agent's share of the revenue). UniGroup pays that share to the agent through a credit on the agent's agency statement. UniGroup will then generate an invoice for the transaction, record an account receivable for the transaction, and send an invoice to the customer. The customer will pay UniGroup, and UniGroup collects the receivable.

20. When *the agent* handles the billing and collection in a "direct bill" transaction, UniGroup still books 100% of the cost of the transaction (entered into the UniGroup system by the

agent) as revenue and records as an expense the appropriate amounts based on varying agent commissions applicable to a shipment, including 93.5% of invoiced accessorial service revenue, and pays the agent its share through a credit on the agent's agency statement. UniGroup will also generate the invoice and record an account receivable, but the agent sends the invoice (either the UniGroup-generated invoice or an agent-generated invoice where the amounts for services should match what was entered by the agent into the UniGroup system) to the customer. The customer should then pay the agent directly, though UniGroup does not know when or if payment occurs. After 45 days, the agent is charged back 100% of the invoiced amount that the agent was supposed to have collected through a debit on its agency statement.

21. Typically, weekly, UniGroup will settle the amounts owed to the agent and amounts owed to UniGroup based on the net debits and credits on the agency statement, resulting in a payment either from UniGroup to the agent (if the agent has a credit balance) or from the agent to UniGroup (if the agent has a debit balance).



**Defendants' Fraudulent Overreporting Scheme**

22. Over the years, Brendamour Moving has migrated from the household goods moving business into the logistics industry. Brendamour Moving holds itself out as the premier full-service turnkey provider in the kiosk deployment industry, and claims to have installed 10,000+ kiosks, or similar items, each year since 2005, including over 30,000 in the last two years. Its primary customers include several national kiosk-based distribution companies. The services

offered for the kiosk deployment process include site sourcing, site surveys, site preparation, warehousing, and other services.

23. Beginning in approximately 2005 and continuously since in or around 2010, and unbeknownst to UniGroup until recently (as discussed below), Defendants concocted a kiting (or lapping) scheme to manipulate the agency statement reconciliation process in their favor to avoid or minimize debit balances owed to UniGroup.

24. The scheme involved Brendamour Moving entering inflated customer charges in the UniGroup system. This amount was higher than the actual customer charges billed by Brendamour Moving to the customer. By inflating the total customer charge entered in the UniGroup system, Brendamour Moving generated enough UniGroup expenses (credits to Brendamour Moving) to outpace 45-day receivable chargebacks (debit balances owed to UniGroup) for prior transactions.

25. By way of example, assume that UniGroup's internal records showed a debit balance owed by Brendamour Moving of $1,000. All things being equal, settlement of the agency statement would require Brendamour Moving to write a check to UniGroup for $1,000. To wipe out that debit balance and avoid having to pay UniGroup, Brendamour Moving would inflate the revenue that it registered in UniGroup's system for subsequent moves so the amount owed to Brendamour Moving as reflected in UniGroup's system would exceed $1,000. This "lapping" scheme required that Brendamour Moving record larger and larger transactions to keep credits growing faster than debits.



26. As part of the scheme, Brendamour Moving also placed its settlement process indefinitely "on hold," so that rather than settling cash transactions routinely taking place between Brendamour Moving and UniGroup, the parties continued to operate based on the running balance of debits and (fraudulent) credits on the agency statement.

27. Brendamour Logistics willingly participated in the fraud by performing services that it knew Brendamour Moving would inflate in the UniGroup system.

28. The scheme allowed Brendamour Moving to wrongfully retain millions of dollars that otherwise should have been paid to UniGroup through the agency statement reconciliation process. The scheme also allowed Brendamour Moving to use its fraudulent "credits" to purchase goods and services from UniGroup and/or its affiliates. In other words, UniGroup was unknowingly acting as Brendamour Moving's bank, extending fraudulently-obtained credit.

29. Additionally, UniGroup paid Brendamour Moving more than $500,000 in incentive payments between 2012 and 2023, some (if not all) of which were based on overstated revenues.

30. Brendamour Moving's scheme also caused UniGroup to unwittingly misstate its own books and records for UniGroup's logistics business, of which Brendamour Moving was a substantial contributor. Put another way, Brendamour Moving's fraud caused UniGroup to believe its logistics business was performing significantly better than it was actually performing. This caused UniGroup to make certain capital investments in its logistics business that it would not have made if Brendamour Moving had accurately reported its revenue information to UniGroup. UniGroup is still in the process of ascertaining the direct investment costs and opportunity costs associated with those investment decisions.

### Owens Confesses to Brendamour Moving's Fraud

31. On or about April 22, 2023, Owens contacted a Regional Sales Manager for UniGroup and requested an in-person meeting. The Regional Sales Manager offered to meet Owens in Louisville, Kentucky, where he would be traveling for business.

32. On April 23, 2023, the meeting occurred at a restaurant in Louisville. Another Brendamour Moving employee, Art Whalen, also attended the meeting.

33. During the dinner, Owens confessed to the above-described fraudulent scheme. Owens stated that then-owner Michael Brendamour developed the fraudulent scheme beginning in 2005, which Owens then helped Brendamour Moving implement, with the assistance and cooperation of Art Whelan and Brendamour Logistics. Michael Brendamour did so, according to Owens, because Brendamour Moving owed money to the IRS and UniGroup at the time. Owens stated that the scheme has continued almost without interruption since 2005 and became more rampant around 2016 in response to UniGroup raising its commission rate on certain accessorial services that Brendamour Moving provided to its commercial customers.

34. After the meeting, UniGroup management immediately reached out to Brendamour Moving and requested financial books and records so that UniGroup could attempt to ascertain the full extent of the fraud and its implications. Brendamour Moving was obligated under the Agency Agreement to provide UniGroup access to its business records. Yet, Brendamour Moving refused to provide UniGroup the requested information and instead provided a limited set of cherry-picked records, obfuscating the full extent of Brendamour Moving's fraud.

35. Brendamour Moving's fraud was performed at the direction of and with the knowledge of Michael Brendamour, Paul Owens, and other yet-to-be identified owners and executives of Brendamour Moving.

36. On information and belief, the proceeds of the fraudulent scheme unjustly enriched the Brendamour family and other companies associated with the Brendamour family, including but not limited to Brendamour Logistics.

37. Defendants took affirmative acts to conceal their fraud from UniGroup.

### Count I – Fraud
(All Defendants)

38. Plaintiffs incorporate the allegations in paragraphs 1 through 37 as though fully set forth herein.

39. Since 2005 and continuing through April 2023, Defendants made false representations to Plaintiffs related to the revenue generated by thousands of logistics transactions handled by Brendamour Moving.

40. Defendants knew the revenue information they submitted to Plaintiffs as part of the scheme was false, and that Plaintiffs would rely on such false statements in calculating the debit and credit balances in connection with Brendamour Moving's agency statement.

41. Defendants intended for Plaintiffs to rely upon the false revenue information in calculating Brendamour Moving's debit and credit balances.

42. Plaintiffs did not know, and could not have known based on available information, that Brendamour Moving had been submitting false revenue information. Plaintiffs had a right to rely on the information received from Brendamour Moving as part of the agency reporting process, and Plaintiffs expressly relied upon the revenue information received from Brendamour Moving.

43. As a proximate result of Defendants' fraud, Plaintiffs have suffered damages.

### Count II – Civil Conspiracy
(All Defendants)

44. Plaintiffs incorporate the allegations in paragraphs 1 through 37 as though fully set forth herein.

45. Defendants and other yet-to-be identified owners or executives of Brendamour Moving, and parents and affiliates of Brendamour Moving, formed a meeting of the minds to accomplish the above-described fraudulent scheme.

46. Defendants each took one or more unlawful acts associated with the fraudulent scheme, including but not limited to submitting false revenue information to UniGroup and directing that such false revenue information be submitted to UniGroup.

47. Defendants' conspiracy caused Plaintiffs to suffer damages.

### Count III – Conversion
(Brendamour Moving)

48. Plaintiffs incorporate the allegations in paragraphs 1 through 37 as though fully set forth herein.

49. Defendants' fraudulent scheme resulted in Brendamour Moving exercising unauthorized control over Plaintiffs' intangible property, including funds that rightfully belonged

to Plaintiffs and fraudulent "credits" that Brendamour Moving used to finance its business operations.

50. Defendants, through their fraudulent scheme, deprived Plaintiffs of their intangible property such that Brendamour Moving is liable for conversion.

### Count IV – Unjust Enrichment
(Brendamour Moving and Michael Brendamour)

51. Plaintiffs incorporate the allegations in paragraphs 1 through 37 as though fully set forth herein.

52. Defendants' scheme caused them to receive and appreciate benefits at the expense of Plaintiffs, including fraudulently obtained credit for goods and/or services financed through Brendamour Moving's agency statement.

53. Brendamour Moving and Michael Brendamour accepted and retained those benefits, and allowing them to do so without compensating Plaintiffs would be unjust under the circumstances.

### Count V – Breach of Contract
(Brendamour Moving)

54. Plaintiffs incorporate the allegations in paragraphs 1 through 37 as though fully set forth herein.

55. Under the Agency Agreement, Brendamour Moving agreed to "keep accurate and detailed books, records and financial statements ('Records') that relate directly or indirectly to the performance of the Agent under this Agreement, which shall be kept and prepared in accordance with [UniGroup's] Carrier Policies, and [Mayflower and UniGroup] shall have the right at all times during normal business hours to inspect . . . such Records." **Ex. 1** at ¶ 3.f.

56. Brendamour Moving breached the above-referenced provision by maintaining books and records that inaccurately reflected charges for services to the customers associated with its fraudulent scheme.

57. Brendamour Moving additionally breached the above-referenced provision by refusing Plaintiffs' request to inspect Brendamour Moving's financial records after Owens confessed to the fraudulent scheme.

58. Plaintiffs have suffered damages as a result of Brendamour Moving's breach of contract.

WHEREFORE, UniGroup, C.A. and Mayflower Transit, LLC respectfully request the Court to enter judgment in their favor and against Defendants Brendamour Moving & Storage, Inc., Brendamour Logistics, LLC, Michael Brendamour, and Paul Owens and award Plaintiffs damages, including punitive damages, costs, interests, and attorneys' fees and any additional relief the Court deems just and proper.

Respectfully submitted,

THOMPSON COBURN LLP

By: *Sharon B. Rosenberg*
    Sharon B. Rosenberg, 54598MO
    Brian A. Lamping, 61054MO
    One US Bank Plaza
    St. Louis, MO  63101
    P: 314 552 6000
    F: 314 552 7000
    srosenberg@thompsoncoburn.com
    blamping@thompsoncbourn.com

*Attorneys for Plaintiffs UniGroup, C.A. and Mayflower Transit, LLC*