UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **MAYFLOWER TRANSIT, LLC** : | Case No. 4:23-cv-00708 |
| **Plaintiff,** : | Judge John Ross |
| v. : | |
| **BRENDAMOUR MOVING & STORAGE, LLC, et al.** : | |
| **Defendants.** : | |

### DEFENDANT MICHAEL BRENDAMOUR'S SUPPLEMENTAL MEMORANDUM TO MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO ORDER ON JURISDICTIONAL DISCOVERY

Now comes Defendant Michael Brendamour ("Defendant"), by and through the undersigned counsel, and for his Supplemental Memorandum to Defendant Michael Brendamour's Motion to Dismiss Amended Complaint ("Memorandum") pursuant to this Court's Order dated August 23, 2023 ("Order")(Doc. #65) providing that "on or before December 22, 2024 [sic], the parties shall file any supplemental evidence and arguments on the personal jurisdiction issues raised in Defendants' respective Motions to Dismiss. *See* Order ¶4.

Plaintiff in his Motion to Dismiss asserted that Plaintiff's Amended Complaint should be dismissed as to Defendant Michael Brendamour because this Court lacks personal jurisdiction. Entirely absent from the Amended Complaint are any allegations that Defendant is subject to the general or specific jurisdiction of the Missouri courts. Plaintiff Mayflower Transit, LLC ("Mayflower" or "Plaintiff"), in its Amended Complaint, attempts to shoehorn Michael Brendamour into this litigation with a single allegation that their representative was allegedly orally told by Paul Owens that Mr. Brendamour initiated the "scheme" in question. Plaintiff's flimsy and attenuated allegation attempting to add Michael Brendamour into this litigation is

insufficient and is entirely and wholly rebutted *consistently* by the testimony of *not only* Michael Brendamour, but also rebutted directly and consistently *by the testimony of Paul Owens himself.*

Plaintiff has asserted that Michael Brendamour's contacts with this state are the result of the *Calder* "effects test" which holds that the tortious acts must be <u>expressly aimed</u> at the forum. *N.C.C. Motorsports, Inc. v. K-VA-T Food Stores, Inc.,* 975 F. Supp. 2d 993, 1004 (E.D. Mo. September 27, 2013)(emphasis added). Only a defendant's extraterritorial acts taken for the express purpose of causing harm in the forum state are sufficient to satisfy *Calder*'s "express-aiming requirement." *Id.* Under the Eight Circuit's narrow construction of the "effects test" under *Calder,* there is no prima facie showing, here, that Defendant's alleged actions were so targeted and the only allegation.  Thus, the action against Defendant must be dismissed under this Circuits interpretation of *Calder*

As set forth extensively in the briefing on Defendant Michael Brendamour's Defendant Michael Brendamour's Motion to Dismiss Amended Complaint ("Motion to Dismiss"), the *only* allegation connecting Michael Brendamour to this litigation purports to relay what Paul Owens *allegedly* told a Mayflower representative. Plaintiff asserts that Paul Owens told Mayflower's representative that Michael Brendamour concocted the purported fraudulent scheme that is the basis of Mayflower's Complaint in 2005.  *See* Amended Complaint ¶¶ 32 & 34, Doc. 8, Page ID 44-45. In Plaintiff's Memorandum in Opposition to Defendant Michael Brendamour's Motion to Dismiss Amended Complaint ("Memorandum in Opposition") they further assert, "the scheme, originally implemented by Brendamour, had been ongoing since 2005. *Id*.at ¶ 32." *See* Memorandum in Opposition, p. 1. However, the evidence adduced through the course of jurisdictional discovery reveals that Paul Owens repeatedly and under oath *denies ever making this single oral statement* upon which Plaintiff relies to bring Michael Brendamour into this litigation.

Paul Owens further asserts, under oath, that Michael Brendamour had nothing to do with the alleged fraudulent scheme as set forth in the Complaint:

> Q. You are aware, and we'll get into some of the details in a bit, you are aware that at least according to Tim Grimes, you pointed the finger at Mike Brendamour as being one of the originators of the scheme. You are aware that Tim Grimes has made representations under oath that that's what you told him?
> A. I am aware of what I read in those documents, whether the legal part of it, I don't know, but I am aware of what I read in the documents.
> Q. And you adamantly deny telling Mr. Grimes that Mike Brendamour had any role in the scheme, fair?
> A. ***I am certain that Mike Brendamour had no role in the scheme. I would not have told not only Tim that, but anyone that***. However, you know, I also, that meeting at this place took place 7 months ago, but at no point, regardless to the meeting, ***at not point was Mike Brendamour aware of this***.
> Q. Okay, but, and this is an important point, so I just want to make sure we're very clear, I know you've testified that Mike Brendamour was not involved. As you sit here today ***do you have any recollection of telling Tim Grimes that Mike Brendamour was involved in the scheme***?
> A. ***No. At no point have I said that to anyone***.
> Q. And I'm sure you've replayed in your mind what was said at that dinner in Louisville 100 times. Can you think of anything that you would have said to Tim Grimes that would have even perhaps inadvertently left the impression on Tim Grimes that Mike Brendamour came up with the scheme?
> A. I have, you know, I guess a theory, because Tim Grimes isn't the only time that that has come up. There was another phone call where I got the perception that the people on the phone call were a little bit disbelieving, so I think it's, you know, there has always been a – the two companies never really had a really close relationship. They, you know, Mayflower didn't really have a real good feel for what we were doing and how we were doing it, ***and I think there is a perception or a misperception that Mike Brendamour, because of his title, had to have known, or the perception that he would have known, and I think that it's possible that that has created the assumption, if you will, and that's an aggressive word, but the assumption that he would have known***.
> Q. Okay.
> A. That is the only thing I can speculate. That's the only thing I can speculate.
>
> (Zoom Videotaped Deposition of Paul Owens, individually and as Corporate Representative of Brendamour Logistics, LLC, November 14, 2023 "Owens Depo ¶¶41:16-43:23 **attached as Exhibit 1**)(emphasis added).
>
> * * *
>
> Q. Okay. And I know you kind of answered some questions about Mike Brendamour and how he

3

> came up at that meeting or what was said, but what, if anything, did you say about Mike Brendamour to Tim Grimes at that meeting?
> A. Again, it's quite awhile ago, you know. As I recall, Tim asked, just simply asked how Mike was doing and I, you know, I recall sharing with him perhaps lightly that Mike was no longer with the company, and may be lightly, you know, what had happened in terms of the, you know, the transaction, as such, but that's about it. But again, it's -- the purpose of that meeting was what I was there to do and I outlined it in this. You know, we were there to -- for a specific purpose, and it didn't have anything to do with Mike.
> Q. Did you ever say that Mike knew anything about the over-reporting?
> A. Yeah, I've already stated that several times, no.
> Q. Or that he assisted with it?
> A. No. I've stated that several times here, then, and to any time that the matter has come up, with Mayflower's internal counsel, our counsel, both of them, and so on and so forth.
> MR. LUEPKE: Paul, just answer.
> If you didn't do so, then just say so. You don't need to give us any specifics of that.
> A. No, I did not.
> (Owens Depo ¶¶95:17-96:21) (emphasis added).

Owens adamantly denied that Michael Brendamour had *any* involvement in the purported fraudulent scheme that is the subject of this action:

> Q. (BY MR. LAMPING) Who was involved in the decision to pursue the scheme?
> A. You know, in my position as the General Manager of the company, I was mainly involved.
> The mechanics of doing that, I have never logged onto the Mayflower system, so the mechanics of doing so involved a conversation with an employee, but you know.
> Q. And which employee was that?
> A. ***Art Whalen,*** or Arthur Whalen, sorry.
> Q. ***So is this just something that you and Art came up with in 2010, or was there anyone else involved***?
> A. ***No, there was not***.
> (Owens Depo ¶40:2-15) (emphasis added).

\* \* \*

> Q. (BY MR. LAMPING) That's fair, Henry. Let me be a little bit more precise in my question, Mr. Owens, just in case you didn't understand it. At any point in time, are you aware of Jack Brendamour knowing about the scheme?
> A. No.
> Q. ***At any point in time before this lawsuit was filed, are you aware of Mike Brendamour knowing about the scheme***?
> A. ***No, absolutely not***.

4

(Owens Depo ¶41:5-15) (emphasis added).

\* \* \*

Q. (BY MS. GUGINO) So was Mike Brendamour involved in any way with the over-reporting scheme that as alleged in plaintiff's Complaint?
A. No, he was not.
(Owens Depo ¶¶96:24-97:2) (emphasis added).

Mr. Owens further testified that he never gave financial statements to Michael Brendamour:

Q. Okay. He also indicates he was not given financial, and the company's accounting personnel had been instructed not to release information to him unless approved by his father. Do you know anything about that?
A. I personally never gave financial statements to Mike Brendamour; however, the other part of that I cannot attest to, because I don't know. I don't specifically recall ever being told not to give him financial statements, but I will attest that I have never given him financial statements, that I recall.
(Owens Depo ¶¶99:21-100:8).

The *only* allegation contained in the Amended Complaint that involves Michael Brendamour *in any way* purports to tie him to this litigation and this jurisdiction is through the alleged "confession" of Paul Owens as provided below:

32. During the dinner, Owens confessed to the above-described fraudulent scheme. Owens stated that then-owner Michael Brendamour developed the fraudulent scheme beginning in 2005, which Owens then helped Brendamour Moving implement, with the assistance and cooperation of Art Whelan and Brendamour Logistics. Michael Brendamour did so, according to Owens, because Brendamour Moving owed money to the IRS and Mayflower at the time. Owens stated that the scheme has continued almost without interruption since 2005 and became more rampant around 2016 in response to Mayflower raising its commission rate on certain accessorial services that Brendamour Moving provided to its commercial customers. *See* Amended Complaint ¶ 32.

Finally, in Plaintiff's Answers and Objections to Michael Brendamour's First Set of Interrogatories and First Set of Requests for Production of Documents Directed to Plaintiff on the Issue of Personal Jurisdiction Over Michael Brendamour, Plaintiff asserts that on May 25, 2023 a video conference was held between Mayflower representative and representatives of Brendamour, stating that "Owens again confirmed…the scheme began at the direction of Mr. Brendamour." *See*

5

Response to Interrogatories, ¶7. Admittedly, there is no recording of this video conference. Mr. Owens also adamantly refutes this allegation:

> Q. Yeah, okay. So in plaintiff's responses to Mike Brendamour's discovery requests they referenced this May 25th, 2023, video conference which was held, and they name a bunch of people that were there, and they say that, "Owens again confirmed he helped Brendamour enter invalid inflated revenue amounts, and that the scheme began at the direction of Mr. Brendamour."
> A. That is on --
> Q. Did you say that?
> A. No, and, in fact, I stated clearly that Mike was my employee during that time.
> (Owens Depo ¶101:8-19).

As shown in the testimony of Paul Owens (as well as his Affidavit attached as Exhibit A to Defendant Michael Brendamour's Reply to Plaintiff's Memorandum in Opposition to Motion to Dismiss Amended Complaint) he has repeatedly refuted the very allegation in Plaintiff's Complaint attributed to him. In his Affidavit, Mr. Owens attests, specifically, that he never *at any time* suggested or made any statement indicating that Michael Brendamour developed a scheme that involved making any false statements to Mayflower. *See* Owens Aff. ¶9. Further, he attests that since at least 2005, Michael Brendamour has had no involvement in the division of the Company dealing with special product accounts, including kiosks and vending machines. *See* Owens Aff. ¶11. Thus, it is impossible that Mr. Brendamour was involved in the purported fraudulent scheme that as alleged by Plaintiff began in 2005. Further, Mr. Owens disputes *ever making* the only statement in the Amended Complaint connecting Michael Brendamour to this action.

Mr. Brendamour resigned as President of Brendamour Moving & Storage, Inc. (the "Company") in 2004. He further has attested that from 2005 until 2020, he only worked in sales of household goods for Ohio local moves, Ohio office moves and Mayflower household moves (very few orders per month). In that time, the household goods division of Brendamour consisted

6

only of Michael Brendamour and one other salesperson. Michael Brendamour was not involved in special product accounts, including kiosks, vending machines etc. *See* Brendamour Affidavit ¶¶9, 11, Exhibit 1 to Defendant Michael Brendamour's Motion to Dismiss. Only the special product accounts are the subject of this litigation. *See* Amended Complaint ¶¶22-26. Mr. Brendamour has also testified that he had nothing do with the purported scheme as alleged in Plaintiff's Complaint:

> Q. And so just to get to the point, it's your position that you had no idea that this over-reporting practice was going on at any point during your, I guess at any point until the lawsuit was filed; is that fair?
> A. I have never, nothing. I stuck. I sat in my office, and I sold, and I sold Mayflower orders and I sold local orders, I sold office moves, and at times I brought in some logistic companies for kiosk machines and so on, but those would be turned over to Paul and his team. I had no idea ever, not one inkling, because I wasn't involved in that part of the business.
> Q. I just need to get a straight answer on this, because I think everyone would agree it's a pretty important fact.
> A. Okay.
> Q. Is it your testimony, is it your testimony under oath that you did not know about the over-reporting issue until after the lawsuit was filed?
> A. As I swore with my right hand up today, everything is going to be the truth. I knew absolutely nothing of this scheme that you have now called -- in any way shape or form at any time.
> (Deposition of Michael Brendamour November 14, 2023 ¶¶23:20-24:21 **attached as Exhibit 2**).

In its Memorandum in Opposition, Plaintiff asserts:

In cases involving intentional tortious conduct, a court is guided by the "effects test" set forth in *Calder v. Jones*, 465 U.S. 783 (1984), which provides that a defendant's tortious conduct can establish personal jurisdiction:

> Where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state. *Bros. & Sisters in Christ*, 42 F.4th at 954. (Memorandum, p. 4).

> …Mayflower has alleged that Brendamour implemented (and continued to participate in) a fraud directed at Mayflower in Missouri. This supports a reasonable inference that Brendamour understood the harm caused by this fraud would likely be suffered by Mayflower in Missouri, where it is headquartered and conducts business.

7

However, the entirety of the allegations upon which Plaintiff relies to purportedly establish Mr. Brendamour's "minimum contacts" with this jurisdiction have already been refuted by the *very* individual which Plaintiff asserts in its Complaint *actually* made the "confession" both by Affidavit and by testimony.  Thus, Plaintiff's entire legal basis for establishing that Mr. Brendamour purposefully availed himself of this forum are completely and utterly eroded and *without any foundation* to bring Mr. Brendamour before this forum under the due process requirements set forth by the US Supreme Court.

Due process requires that a plaintiff show that a non-resident has "sufficient contacts" with the forum state and that the maintenance of the lawsuit does not offend "traditional notions of fair play and substantial justice." *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011). Due process requires that the defendant have engaged in some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *Deloney v. Chase*, 755 Fed. Appx. 592, 595 (8th App. 2018).

The only allegation purportedly tying Mr. Brendamour to this forum has been wholesale *refuted by the one who purportedly made it* and Mr. Brendamour has further attested that he has no contacts with the State of Missouri.  *See* Brendamour Affidavit ¶¶2-7. Thus, it is impossible that, in this action as to Mr. Brendamour, the threshold requirements for "minimum contacts" has been met as set forth in extensive case law.   With Mr. Brendamour and Mr. Owens' Affidavits together with their testimony there simply is *not any evidence* to support the one allegation against Michael Brendamour such to form the basis of jurisdiction over Mr. Brendamour who has had no involvement in the day-to-day operations of Brendamour Moving for the past 21 years and had no knowledge of the purported scheme as alleged in the Complaint.  It is evident that there is not a

8

single allegation in the Amended Complaint to demonstrate that Michael Brendamour "purposefully availed [himself] of the privilege" of doing business in the State of Missouri and thus under the principles of due process should be dismissed from the pending litigation in this forum.

Plaintiff's Complaint should be dismissed as to Defendant Michael Brendamour because this Court lacks personal jurisdiction. Plaintiff attempts to shoehorn Michael Brendamour into this litigation with a single allegation – *refuted by the purported source of that allegation* - that Paul Owens allegedly told its representative that Mr. Brendamour initiated the "scheme" in question. Paul Owens asserts that he made *no such statement.* Michael Brendamour's father, Jack Brendamour, died in 2015 and over the course of the past 21 years Michael Brendamour's involvement in Brendamour has only related to the household goods division, not special product accounts which is the subject of the pending action. *See* Brendamour Affidavit, ¶¶7-8, 11.

Michael Brendamour did not participate in any day to day management of the Company from 2002 to 2020. In 2004, Mr. Brendamour resigned from any leadership role with the company. *See* Brendamour Affidavit, ¶¶7-9. Michael Brendamour was not involved in special product accounts, including kiosks, vending machines etc. which is the subject of the pending litigation. *See* Brendamour Affidavit ¶¶11 & 13.

Plaintiff's flimsy and attenuated allegation – *which has been refuted by the claimed source* - attempting to shoehorn Michael Brendamour into this litigation is insufficient to assert personal jurisdiction. The Amended Complaint does not make a single allegation sufficient to demonstrate that Defendant availed himself of this Court's jurisdiction under due process considerations and the jurisdictional discovery as permitted by the Court has revealed that the very party which Plaintiff relied upon to tie Michael Brendamour to this action refutes the very allegation. After

9

the completion of jurisdictional discovery, Plaintiff has not made the showing necessary for this Court to exercise personal jurisdiction over Defendant and its Amended Complaint against Defendant Michael Brendamour should be dismissed.

It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff. A forum state's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum. *Walden,* 571 U.S. at 277.

The Eighth Circuit construes the *Calder* "effects test" narrowly and with respect to the second *Calder* factor holds that the tortious acts must be <u>expressly aimed</u> at the forum. *N.C.C. Motorsports, Inc. v. K-VA-T Food Stores, Inc.,* 975 F. Supp. 2d 993, 1004 (E.D. Mo. September 27, 2013)(emphasis added). Missouri courts have clearly set forth the standard for exercising jurisdiction over a defendant and that standard has not been met here.

Mayflower has not pled the minimum contacts necessary for this Court to exercise jurisdiction and it cannot rest on its bare and attenuated (and false) allegation without more. Mayflower's allegation as against Michael Brendamour "must be tested, not by pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.,* 648 F.3d 588, 590 (8th App. 2011).

The inclusion of Michael Brendamour in this action in this forum does not comport with the principles of fair play and substantial justice as set forth by the US Supreme Court to satisfy due process considerations. Thus, Defendant Michael Brendamour should be dismissed from this action for lack of personal jurisdiction pursuant to Rule 12(b)(2).

Respectfully submitted,

*/s/ Christopher P. Finney*
Christopher P. Finney (OH0038998)*
Julie M. Gugino (OH0074471)*
FINNEY LAW FIRM, LLC
4270 Ivy Pointe Blvd., Suite 225
Cincinnati, Ohio 45245
(513) 943-6650
(513) 943-6669 (fax)
Chris@FinneyLawFirm.com
Julie@FinneyLawFirm.com
*Admitted Pro Hac Vice*
*Attorneys for Defendant*
*Michael Brendamour*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing has been electronically filed on this 20th day of December and electronically served upon all counsel of record on the same date through the CM/ECF of the USDC for the Eastern District of Missouri.

*/s/ Christopher P. Finney*
Christopher P. Finney (OH0043)