**Exhibit 1**

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MISSOURI
2                 EASTERN DIVISION

3

4

   MAYFLOWER TRANSIT, LLC,     )
5                              )
                 Plaintiff,    )
6                              )
   v.                          ) Case No. 4:23-cv-00708
7                              )
   BRENDAMOUR MOVING &         )
8  STORAGE, INC., et al.,      )
                               )
9                Defendants.   )

10

11

12

13

14

15          ZOOM VIDEOTAPED DEPOSITION OF PAUL

16  OWENS, a Witness, taken individually and as

17  Corporate Representative of BRENDAMOUR LOGISTICS,

18  LLC, pursuant to Federal Rule of Civil Procedure

19  30(b)(6) on behalf of the Plaintiff before

20  Peggy E. Corbett, CSR, CCR, RDR, pursuant to

21  Notice on the 14th day of November, 2023, at the

22  residence of the witness in Cincinnati, Ohio.

23

24

25

Page 2

1              A P P E A R A N C E S
2  APPEARING FOR THE PLAINTIFF:
3          Mr. Brian A. Lamping
           Ms. Christine Schlegl
4          THOMPSON COBURN LLP
           One US Bank Plaza
5          St. Louis, MO 63101
           314.552.6000
6          blamping@thompsoncbourn.com
           cschlegl@thompsoncoburn.com
7
   APPEARING FOR THE DEFENDANT MICHAEL BRENDAMOUR:
8
           Ms. Julie M. Gugino
9          FINNEY LAW FIRM INC
           4270 Ivy Pointe Boulevard
10         Suite 225
           Cincinnati, OH 45245
11         513.943.5669
           julie@finneylawfirm.com
12
   APPEARING FOR THE DEFENDANT BRENDAMOUR MOVING &
13 STORAGE, BRENDAMOUR LOGISTICS AND PAUL OWENS:
14         Mr. Henry F. Luepke, III
           HEIN SCHNEIDER & BOND PC
15         2244 South Brentwood Boulevard
           St. Louis, MO 63144
16         hfl@hsbattorneys.com
17 VIDEOGRAPHER:  Ms. Beth Scutti
18               I N D E X
   WITNESS:                          PAGE
19   PAUL OWENS
   EXAMINATION BY MR. LAMPING          5
20 EXAMINATION BY MR. LUEPKE          93
   EXAMINATION BY MS. GUGINO          93
21 CERTIFICATE                       105
22
23
24
25

Page 3

```
1                    E X H I B I T S
     NO.              DESCRIPTION                    PAGE
2
     EXHIBIT 5        Plaintiff'S Notice of          14
3                     Deposition of Paul
                      Owens
4    EXHIBIT 6        Plaintiff's Notice of          14
                      Corporate
5                     Representative
                      Deposition
6                     pursuant to Federal
                      Rule of Civil Procedure
7                     30(b)(6)
     EXHIBIT 7        Plaintiff's Answers and        32
8                     Objections to Paul
                      Owens' First Set of
9                     Interrogatories
                      Directed to Plaintiff
10                    on the Issue of
                      Personal Jurisdiction
11                    over Paul Owens
     EXHIBIT 8        First Amended Complaint        96
12   EXHIBIT 9        Excel spreadsheet              71
     EXHIBIT 10       Paul Owens' Responses          77
13                    to Plaintiff'S
                      Interrogatories
14                    on the Issue of
                      Jurisdictional
15                    Discovery
     EXHIBIT 11       Invoice, BRENDAMOUR            80
16                    002553
     EXHIBIT 12       E-mail String,                 84
17                    MAYFLOWER_0000006
     EXHIBIT 13       Text Chain,                    84
18                    MAYFLOWER_0000008
     EXHIBIT 14       E-mail,                        85
19                    MAYFLOWER_0000001
     EXHIBIT 15       Text Chain,                    86
20                    MAYFLOWER_0000009
     EXHIBIT 16       Three memos beginning          94
21                    MB000022
22       E X H I B I T S (PREVIOUSLY MARKED)
     NO.              DESCRIPTION                    PAGE
23   EXHIBIT 2        Previously Marked Exhibit      82
```

```
     Reporter's Note:  The original exhibits were
24   submitted to the court reporter for copying and
     distribution with retention by Mr. Lamping
25   thereafter.
```

Page 4

1          (Deposition commenced at 2:05 p.m.)

2                  THE VIDEOGRAPHER:  Good afternoon.

3    We are going on the record at 2:05 p.m. Central

4    on November 14th, 2023.  Please note that this

5    deposition is being conducted virtually.  The

6    quality of recording depends on the quality of

7    camera and internet connection of participants.

8    What is seen from the witness and heard on screen

9    is what will be recorded.  Audio and video

10   recording will continue to take place, unless all

11   parties agree to go off the record.

12          This is Media Unit 1 of the video

13   recorded deposition of Paul Owens taken by

14   counsel for plaintiff in the matter of Mayflower

15   Transit, L.L.C. versus Brendamour Moving &

16   Storage, Inc. et al. filed in the United States

17   District Court, Eastern District of Missouri,

18   Eastern Division, Case Number 4:23-cv-00708.

19          This deposition is being conducted

20   remotely, using virtual technology.  My name is

21   Bethany Scutti representing Veritext, and I am

22   the videographer.  The court reporter is Peggy

23   Corbett from the firm Veritext.

24          I am not authorized to administer an

25   oath, I am not related to any party in this

Page 5

1    action, nor am I financially interested in the

2    outcome.  If there are any objections to

3    proceeding, please state them at the time of your

4    appearance.

5            Counsel and all present will now state

6    their appearances and affiliations for the

7    record, beginning with the noticing attorney, and

8    then will the court reporter please swear in the

9    witness.

10           MR. LAMPING:  Brian Lamping and

11   Christine Schlegl for the plaintiff.

12           MR. LUEPKE:   Henry Luepke for Paul

13   Owens.

14           MS. GUGINO:  Julie Gugino for

15   Michael Brendamour.

16                 PAUL OWENS,

17   a Witness, being first duly remotely sworn,

18   testified under oath as follows:

19                 EXAMINATION

20   BY MR. LAMPING:

21       Q.   Good afternoon, Mr. Owens.

22       A.   Good afternoon.

23       Q.   My name is Brian Lamping.  You and I

24   have never met, but I am one on the attorneys

25   representing Mayflower in this case.  Will you

1  please state your full name for the record.

2      A.   Paul Thomas Owens, II.

3      Q.   And I'll do my best to call you

4  Mr. Owens today, but if I slip up and call you

5  Paul, will you forgive me?

6      A.   Feel free to call me Paul if you would

7  like.

8      Q.   All right.  Mr. Owens, where are you

9  physically located right now?

10      A.   Cincinnati, Ohio.

11      Q.   And where specifically, at a residence,

12  at an office?

13      A.   Yes, in my residence.

14      Q.   Okay.  I've just got to ask but is

15  anyone else in the room with you?

16      A.   No, sir.

17      Q.   Okay.  And you are represented by

18  counsel here today who is in St. Louis; is that

19  right?

20      A.   I am represented by counsel.  I am

21  assuming that Bud is in St. Louis, yes.

22      Q.   Okay.  You understand that you are here

23  giving some testimony under oath related to a

24  lawsuit that my client filed a few months ago?

25      A.   Yes, sir.

1      Q.    And you understand you are under oath

2  here today similar to how you would be if you

3  were testifying live in trial?

4      A.    Yes, sir.

5      Q.    And have you ever given a deposition

6  before?

7      A.    No, sir.

8      Q.    All right.  Well, since it's your first

9  time, I will go over just some basic ground rules

10  just to make sure we all understand what's going

11  on, and to make sure we're on the same page.

12          First you understand, I assume you

13  understand that we have a court reporter that is

14  taking down everything you and I say.

15      A.    Yes, sir.

16      Q.    And I saw you nodding your head but you

17  did a good job following up with an affirmative

18  response, there may be times like in normal

19  conversation where you would nod your head or

20  shake your head as opposed to verbalizing a

21  response.  I would just ask if you do that and I

22  ask you to say "yes" or "no," I'm not trying to

23  be rude.  I'm just trying to make sure we have a

24  clean record.

25      A.    I did say "yes, sir," and I will

Page 8

1   continue to do so.

2        Q.   Yeah.  You did a good job with that.

3        A.   Okay, thank you.

4        Q.   And so sometimes in these remote

5   depositions, in particular, sometimes it's hard

6   to know when a questioning attorney is finished

7   with their question, and sometimes it's hard to

8   know when the deponent is finished with their

9   answer, and so sometimes we can talk over one

10  another which makes it really difficult for our

11  court reporter.  So can we agree just to do our

12  best today not to talk over each other?

13       A.   Yes, sir.

14       Q.   All right.  There may be some times

15  today where I ask just a bad, poorly worded

16  question that just doesn't make any sense.  I

17  would ask that if you don't understand a question

18  that I ask, that you ask me to rephrase it rather

19  than answer it.  Can you agree to do that today?

20       A.   Yes, sir.

21       Q.   So I'm going to assume if you answer one

22  of my questions, I'm going to assume that you

23  understood it; is that fair?

24       A.   Yes, sir.

25       Q.   All right.  I suspect we'll be here for

Page 9

1    a little bit today and if there comes a point in

2    time where you need to get up and stretch your

3    legs or take a break or do whatever, that's fine,

4    just let me know.  You're not chained to your

5    chair.  All I would ask is if there's a question

6    pending, that you answer that question before we

7    take a break; is that fair?

8         A.   Yes, sir.

9         Q.   I will try -- I do not want to know

10   about any communications that you had with your

11   lawyer.  I assume leading up to this deposition

12   you probably talked to your counsel.  If I ask a

13   question that is going to require you to disclose

14   confidential communications that you had with

15   your counsel, I don't want you to tell me that.

16   I'd like you to just say, "Hey, can I talk to

17   Henry or Bud."  I don't want to know about any

18   communications that you had with your counsel,

19   all right?

20        A.   Yes, sir.

21        Q.   Okay.  Mr. Owens, what did you do to

22   prepare for your deposition today?

23        A.   Henry and I had a conversation in regard

24   to the case.

25        Q.   I don't want to know about the

Page 10

1  conversation.

2       A.   Okay.

3       Q.   I don't want to know about the details

4  but --

5       A.   Well, I used my resources to become

6  educated on what a deposition is, and the

7  fundamentals of how it works, which are very

8  similar to what you just went over, sir.

9       Q.   Well, good, and I assume you learned

10  that Rule Number 1 is tell the truth, right?

11      A.   Yes, sir.

12      Q.   All right.  Other than meet and talk to

13  your counsel and maybe educate yourself on some

14  of the do's and don'ts for depositions, did you

15  do anything else to prepare for your deposition

16  today?

17      A.   No, sir.

18      Q.   Did you talk to anybody other than your

19  counsel regarding some of the topics that we

20  might be discussing?

21      A.   No, sir.

22      Q.   Did you go back and review any documents

23  to refresh your recollection on some of the

24  things that you suspected we may be talking about

25  today?

Page 11

1      A.    Very, very lightly.

2      Q.    And can you tell me what documents you

3  used to refresh your recollection?

4      A.    Specifically, I looked at a document

5  that was shared as part of discovery that just

6  showed an annual reconciliation, if you will, of

7  cash exchanged between the two organizations.

8      Q.    And was that a document that was -- what

9  was the source of that document, if you know?

10     A.    It's a document that I provided as part

11 of discovery.

12     Q.    And what specifically were you looking

13 at that document for?

14     A.    Just refreshing myself with the overall

15 numbers.

16     Q.    Okay.

17     A.    But again, not in overly extensive

18 detail.

19           MR. LUEPKE:    And Brian, if I could

20 maybe help move things along, I want to point out

21 because Mr. Owens may not understand exactly what

22 you mean by "documents," but he also reviewed his

23 affidavit previously filed in connection with

24 this, as well as his interrogatory responses.

25     Q.    (BY MR. LAMPING)   Good.   Is that

Page 12

1    accurate, Mr. Owens?

2        A.   Yes.

3        Q.   All right.  That's helpful, and we'll be

4    looking at those later today, so it's helpful

5    that you at least have some familiarity with

6    those documents.

7        A.   Okay.

8        Q.   Do you understand that you are

9    testifying today both as an individual and as a

10   what we call a corporate representative for

11   Brendamour Logistics, L.L.C.?

12       A.   I do understand that, yes, sir.

13       Q.   And are you aware or have you reviewed

14   some topics that were sent to your counsel,

15   topics of testimony on which you will provide

16   testimony and you may or may not know, we've

17   withdrawn a few of those, but are you aware

18   generally of the topics that you're going to be

19   testifying to today as a corporate

20   representative?

21       A.   I reviewed the documents that -- and I'm

22   sorry that my legal lingo is certainly not at

23   this level, but I reviewed the documents that

24   Henry just explained.

25       Q.   Okay, why don't we go ahead --

Page 13

1      A.    If you want to ask about what's in those

2    documents, then yes.

3      Q.    Let me show you one of them.  Let me

4    show it to you, just so we're on the same page.

5      A.    Okay.

6      Q.    First, do you have -- have you accessed

7    the Exhibit Share platform?

8      A.    I have not.

9      Q.    Okay, did somebody send you a link to

10   the Exhibit Share platform?  Have you seen that

11   come across your e-mail?

12     A.    I was doing a pretty good job to get --

13   I was doing a pretty good job to get to where we

14   are right now, but I will look.

15              (Off-the-record discussion.)

16     A.    Okay, thank you.

17     Q.    (BY MR. LAMPING)  And the alternative,

18   Ms. Schlegl just e-mailed you all of the

19   exhibits.

20              Ms. Schlegl just e-mailed you the first

21   two documents we're going to be looking at.  Did

22   you receive that e-mail?

23     A.    I did, yes, sir.

24     Q.    Okay.  Why don't you open up the first

25   one and we'll make that Exhibit 1, whichever one

Page 14

1    it is.

2         A.    It says Exhibit 0006 pdf.

3              (Exhibit 5 was marked by the

4    reporter for identification.)

5         Q.   (BY MR. LAMPING)  Why don't you look at

6    5.

7         A.    Okay.

8              MR. LAMPING:  So Henry, we're just

9    going to go ahead and pick up on the numbering

10   where we left off with Mike Brendamour.  Is that

11   all right with you?

12             MR. LUEPKE:   Yes, it is.

13             MR. LAMPING:  Okay.

14             THE WITNESS:  I have the document

15   up.

16             MR. LAMPING:  Is that the

17   individual or the corporate rep?

18             MS. SCHLEGL:  The individual.

19        Q.   (BY MR. LAMPING)  Exhibit 5 is the

20   Notice of Deposition that was served for your

21   individual deposition.  Are you familiar with

22   that document?

23        A.    Yes.

24             (Exhibit 6 was marked by the

25   reporter for identification.)

```
                                            Page 15

 1      Q.   (BY MR. LAMPING)  Now if you would

 2   please open up the document that's been marked as

 3   Exhibit 6.

 4      A.   Okay, it's open.

 5      Q.   And if you would scroll a page or two,

 6   do you see a list of topics?

 7      A.   Yes, I do.

 8      Q.   All right.  And just so we're all on the

 9   same page, is it your understanding that you are

10   being presented to testify on Topics 1, 2, 3, 6

11   and 9.  And your counsel may help us out if I got

12   something wrong there?

13                MR. LUEPKE:   That's correct.

14      A.   So for my part, I was not aware of

15   certain ones being excluded, but I see those

16   particular topics that you just mentioned.

17      Q.   (BY MR. LAMPING)  Okay.  So Topic 1

18   reads:  "The nature and extent of any business

19   between you," which is defined as Brendamour

20   Logistics, "and any person or entity located in

21   the State of Missouri."  Did I read that

22   correctly?

23      A.   Yes.

24      Q.   And what specifically did you do, if

25   anything, to prepare to testify on that topic
```

Page 16

1  today?

2      A.    Nothing beyond I had already responded

3  to that.

4      Q.    And when you say you had already

5  responded are you referring to answers you gave

6  for the company in the interrogatories?

7      A.    Yes, yes, sir.

8      Q.    And in connection with your answering

9  those interrogatories, did you confirm

10  essentially that Logistics -- can we refer to

11  Brendamour Logistics as Logistics today?

12      A.    Yes.

13      Q.    Did you confirm that Logistics had

14  engaged in no business with any person or entity

15  within the State of Missouri during the relevant

16  time period?

17      A.    That is correct.

18      Q.    And Topic 2 states, "The nature and

19  extent of any business between you," Logistics,

20  "and any agent or representative of plaintiff,"

21  Mayflower, "of UniGroup."  Did I read that

22  correctly?

23      A.    Yes.

24      Q.    And what did you do to prepare yourself

25  to answer questions on that topic?  The same

1  answer as before?

2      A.   Yes.

3      Q.   And did you, in fact, confirm that

4  Logistics during the relevant time period had

5  engaged in no business with Mayflower or

6  UniGroup?

7      A.   That is correct.

8      Q.   And what specifically did you do to make

9  that confirmation?

10      A.   I guess to rephrase that, am I permitted

11  to tell you what, can I say what I think you're

12  asking?

13      Q.   Sure.

14      A.   Okay, so you're asking how am I able to

15  confirm that there was no business between the

16  two parties?

17      Q.   Precisely.

18      A.   I, in my position as the General

19  Manager, would have been involved in such

20  interactions, and I can assert that there were

21  none, or I have asserted that there were none.

22      Q.   And when you say in your position as

23  General Manager, General Manager of what entity?

24      A.   I was the General Manager or am the

25  General Manager of Brendamour Moving & Storage,

Page 18

1    and basically by default, I would have also been

2    the General Manager of Brendamour Logistics.

3        Q.    Am I correct that Brendamour Logistics

4    essentially went out of business in 2012?

5        A.    Brendamour Logistics, yes.

6        Q.    And is it accurate to say, and I think

7    it's been represented in some filings and

8    discovery responses, that while Brendamour

9    Logistics was an operating business, its only

10   real customers were located in Pennsylvania?

11       A.    That's correct, specifically Pittsburgh.

12       Q.    Pittsburgh, okay.  And am I correct that

13   when that business went away, Brendamour

14   Logistics essentially ceased operations?

15       A.    That is correct.

16       Q.    And you know we're here today to talk

17   about some Logistics transactions handled by

18   Brendamour Moving & Storage?

19       A.    Yes, Logistics used in a different term

20   than it's being used here, but yes.

21       Q.    Okay.  Well, you understand that the

22   allegations in this case are that Brendamour

23   Moving & Storage misreported certain charges

24   associated with Amazon and Red Box transactions?

25       A.    Yes, yes.

```
                                                  Page 19
 1              MR. LUEPKE:   Outside the scope of
 2   this deposition; subject to that, you may answer.
 3       A.   Yeah.
 4       Q.   (BY MR. LAMPING)   Okay.  So is it your
 5   testimony that Logistics has never had any role
 6   or responsibility at all with any, with Logistics
 7   transactions entered into by Brendamour Moving &
 8   Storage, particularly for Amazon or Red Box?
 9       A.   That is correct.
10       Q.   Okay.
11       A.   Yes.
12       Q.   There has been a, I don't want to say a
13   dispute, but there has been an issue in this case
14   about a reference to Brendamour Logistics on the
15   Brendamour Moving & Storage website.  Are you
16   aware of that issue coming up?
17       A.   No, I'm not.
18       Q.   Do you know of any operating companies
19   that do business under a d/b/a Brendamour
20   Logistics?
21       A.   No.
22       Q.   Are you aware of any entity other than
23   Brendamour Logistics doing business under the
24   Brendamour Logistics d/b/a?
25       A.   No.
```

Page 20

1      Q.    Did Brendamour Logistics while it was an
2  operating company do business under any d/b/a's?
3      A.    No.
4      Q.    And Mr. Owens, you are located in
5  Cincinnati right now; is that right?
6      A.    Yes.
7      Q.    And is that where your full-time
8  residence is?
9      A.    Yes.
10     Q.    Can you walk me through your educational
11  background after high school?
12     A.    I have a Bachelor's degree in accounting
13  from Miami University of Ohio.
14     Q.    And what year did you obtain that
15  degree?
16     A.    Jimini, it would have been 1992 or '93,
17  and I apologize that I am not sure.
18     Q.    That's all right.
19     A.    I'm sure it's one of those two.
20     Q.    Okay.  When did you first go and work
21  for an entity that was affiliated or related to
22  the Brendamour let's sort of call it group of
23  companies?
24     A.    April 1st, 2003.
25     Q.    And what specific company did you go to

Page 21

```
 1   work for?

 2       A.    Brendamour Moving & Storage, Inc.

 3       Q.    And if I refer to that company as

 4   Brendamour Moving & Storage or Moving & Storage,

 5   we'll understand that I'm referring to that

 6   company?

 7       A.    Yes.

 8       Q.    Did you ever have a formal job title

 9   with Brendamour Logistics?

10       A.    No, it was not, no.

11       Q.    I understand sometimes when you were

12   dealing with a group of family companies,

13   sometimes folks that technically work for one

14   company often do work for the other companies,

15   even though they may not be technically employed

16   by other companies.  Is it fair to say that

17   before Logistics went out of business you

18   performed some work for Logistics, although you

19   weren't technically a Logistics employee?

20       A.    That's correct.

21       Q.    And what were your specific roles and

22   responsibilities for Logistics, before it went

23   out of business?

24       A.    The Logistics was set up specifically to

25   perform in-home delivery services in the
```

1  Pittsburgh market, and the employees that

2  coordinated such activity and completed such

3  activity reported to me.

4      Q.   Were those in-home delivery services,

5  were those performed under Mayflower's operating

6  authority?

7      A.   No, they were not.

8      Q.   Okay.  Were any of those shipments

9  registered with Mayflower in any way?

10     A.   No, they were not.

11     Q.   And you know what it means to register a

12  shipment with Mayflower?

13     A.   I do know what it means.

14     Q.   Okay.  And in April of 2003 when you

15  were first hired at Moving & Storage, what was

16  your first position?

17     A.   I was -- I don't know that I was given a

18  title per se, but I was responsible for

19  scheduling the In-Home Delivery Department that

20  was already in place at Brendamour Moving &

21  Storage.

22     Q.   And when you say the In-Home Delivery

23  Department, can you be a little bit more specific

24  and help me understand what that means?

25     A.   Yes, sir.  That is the act of delivering

1  consumer products such as TVs, mattresses,

2  exercise equipment, etc. for local retail stores

3  that do not have their own trucks.

4          So as an example, Ikea, you know, places

5  such as -- I'm not familiar with St. Louis, but

6  places such as Ikea, Babies R Us was one, like

7  that Pier 1 imports is an example.

8      Q.   At some point in time were you given a

9  formal title at Brendamour Moving & Storage?

10     A.   At some point, I was.  I became the

11 controller at a point, and unfortunately, I do

12 not recall the date, and then at a date after

13 that I became the General Manager, and

14 unfortunately I do not know the date of that

15 either.

16     Q.   Do you recall approximately how long you

17 worked as the controller?

18     A.   I still am, so it would have been from

19 roughly -- you know, roughly 2000-and -- maybe

20 sometime in 2006.  I'm sorry that I don't know.

21     Q.   No, that's okay.  This is not a memory

22 contest.  When you obtained the title and

23 responsibilities of controller, did you give up

24 any responsibilities or were those

25 responsibilities that were added to what you had

Page 24

1    previously done?

2        A.    I no longer had those responsibilities.

3        Q.    And I believe then as you said at some

4    point you obtained the title of General Manager?

5        A.    Correct.

6        Q.    And then when that happened you

7    maintained your responsibilities that you had

8    already had as controller?

9        A.    Yes.

10       Q.    Do you have any other or have you during

11   your time at Brendamour Moving & Storage had any

12   other job titles?

13       A.    No.

14       Q.    When you were controller before you had

15   been appointed as General Manager, who did you

16   report to?

17       A.    Jack Brendamour.

18       Q.    And at the time that you reported to

19   Jack Brendamour, what was his title at the

20   company?

21       A.    I don't know what his title was per se,

22   but he was the owner of the company.

23       Q.    Was he the only owner at that time?

24       A.    I'm not aware of what the ownership

25   distribution was, frankly, but it was my

Page 25

1    understanding, that was how I operated.

2        Q.    And my understanding, and please correct

3    me if I'm wrong, Jack Brendamour was the father

4    of Mike Brendamour; is that right?

5        A.    Yes.

6        Q.    And Mike Brendamour has some brothers?

7        A.    Yes.

8        Q.    And at some point while Jack Brendamour

9    was still alive, is it correct that he owned kind

10   of the biggest percentage of the company and then

11   Mike Brendamour and his brothers owned like small

12   pieces, about 10 percent?

13       A.    In a forum like this I cannot assert

14   that that was the case.

15       Q.    Okay.  -- but at least at one point in

16   time you understand or you agree that Jack and

17   his sons all owned at least some percentage of

18   Brendamour Moving & Storage?

19       A.    At some point in time, yes.

20       Q.    Yes, and then while Jack, at the time

21   that Jack Brendamour, and we'll sort of firm up

22   some of these dates later as we get into some of

23   the documents, at the time that Jack Brendamour

24   owned, was alive and owned the majority of the

25   ownership of Brendamour Moving & Storage, did you

Page 26

1    also report to Mike Brendamour or any of his

2    brothers?

3        A.    No.

4        Q.    All right.  Mike Brendamour had his

5    deposition taken earlier today.  Are you aware of

6    that?

7        A.    Yes, because I received, somehow or

8    another I received an e-mail that had the dates

9    and everything on it.

10        Q.    Okay.  Mike Brendamour talked about how

11    at some point in time there was a shift within

12    the business, moving more toward the logistics

13    side of the business at the expense of the

14    household goods side.  Are you aware of when that

15    shift happened at Brendamour Moving & Storage?

16        A.    Not specifically, but it would have been

17    around 2005.  I'm not sure that we really at that

18    point had a great presence in the household goods

19    business anyway, but it was right around 2005

20    late 2006.

21        Q.    What role, if any, did you play in kind

22    of the shift or the focus on logistics

23    transactions at Brendamour Moving & Storage?

24                MR. LUEPKE:    Objection, vague.

25        Q.    You can answer if you understand.

Page 27

1      A.   I don't know that it was -- I don't

2   recall it to be a quote "decision."  It was more

3   a matter of the effort of pursuing survival, and

4   household goods was not identified as the

5   direction to go for that purpose.

6      Q.   (BY MR. LAMPING)  Is it fair to say that

7   it was more of a decision to kind of go where the

8   business was taking you, as opposed to a

9   conscious decision to do one thing over the

10  other?

11     A.   Yes.

12     Q.   At some point were you aware of you

13  understand that at some point Mike Brendamour

14  resigned as President of Brendamour Moving &

15  Storage?

16     A.   Frankly, I was never abundantly worried

17  with what Mike Brendamour was or was not doing,

18  so that notification, if there was one, was not

19  made to me, so no.

20     Q.   As you sit here today, do you know -- if

21  I represented to you that in or around 2004 Mike

22  Brendamour resigned as president of the company,

23  if I make that representation to you, as you sit

24  here today do you know why he did that?

25     A.   No.  I don't know that he did do that,

Page 28

1    much less why.

2        Q.    That's fair.   There was some discussion

3    earlier with Mike Brendamour about some money

4    that Brendamour Moving & Storage owed to the IRS

5    in say the mid-2000s.  Do you know anything about

6    that?

7        A.    Yes.

8        Q.    And what can you tell me about that?

9        A.    When I became aware of the books, which

10   was when I became the controller, we had a, you

11   know, whatever you would want to describe it as,

12   an issue with the IRS, and that's -- was your

13   question when did I become aware of it or was I

14   aware of it?

15       Q.    Well, no, that's fine.  The question was

16   were you aware of it?  It sounds like you were.

17       A.    I became aware of it, yes, sir.

18       Q.    Which makes sense, because I think that

19   sounds like it would have been around the time

20   you would have became the controller.

21       A.    No, I inherited that situation, sir.

22       Q.    Sure, yeah, but in any event when you

23   became controller, the company had some IRS

24   issues?

25       A.    That is correct.

Page 29

```
 1      Q.   And did you make any effort to figure
 2  out or did you ultimately find out what the root
 3  cause of those problems were with the IRS?
 4      A.   It was failure, as I recall it was
 5  failure to pay payroll taxes either at all or
 6  timely.
 7      Q.   And do you recall what the size of the
 8  amount was that was owed to the IRS?
 9           MR. LUEPKE:   I object.  This is
10  far beyond the limited scope of this deposition.
11      Q.   (BY MR. LAMPING)  You can answer.
12      A.   I do not remember.  I do not recall the
13  specific amount, no, but I will say that in
14  relationship to where we were at the time as a
15  company, it was significant.
16      Q.   Do you know how, if ever, the IRS issue
17  was resolved?
18      A.   We -- I'm sorry.
19           MR. LUEPKE:   I said, "Same
20  objection."  Subject to that, Paul, you may
21  answer.
22      A.   Okay, we contacted the IRS, and well,
23  one, we started paying the payroll taxes timely,
24  and two, we contacted the IRS and worked out
25  something to resolve it.  I don't remember the
```

Page 30

```
 1   particulars, it's been awhile, but we worked out

 2   some sort of an arrangement to resolve the matter

 3   and then did so.

 4       Q.   (BY MR. LAMPING)   Okay.   What is your

 5   understanding as to just what the nature of the

 6   allegations are in this case, what is being

 7   alleged that you and Brendamour Moving & Storage

 8   did in this case?

 9             MR. LUEPKE:   I object, it's

10   overbroad, vague, confusing, overburdensome, and

11   unanswerable, but to the extent that you

12   understand it or can do so, Mr. Owens, please try

13   to do so.

14       A.   Can you repeat the question?

15       Q.   (BY MR. LAMPING)   Sure.   What's your

16   understanding as to why this lawsuit was filed?

17       A.   Versus --

18             MR. LUEPKE:   Let me object, that's

19   a different question.   I think it's beyond the

20   limited scope of this deposition.   It's also

21   beyond this witness' knowledge.

22             There's no foundation as to why somebody

23   else did what they did.

24       Q.   (BY MR. LAMPING)   Let me rephrase, let

25   me rephrase.   What is your understanding as to
```

```
 1    what my client is accusing you of doing in this

 2    lawsuit?

 3                    MR. LUEPKE:    Same objection,

 4    subject to that, you may answer.

 5                    THE WITNESS:   I'm sorry, Henry, you

 6    said I may answer?

 7                    MR. LUEPKE:    You may answer, yes,

 8    sir.

 9        A.    Okay.  So as, you know, anything that I

10    have done in my role as the General Manager of

11    the company, so in terms of myself, being which

12    my understanding of what we're talking about

13    here, I may have misunderstood the question, as

14    far as myself being included, I'm not sure that I

15    can really respond to that.

16        Q.    (BY MR. LAMPING)   Okay.  So you're

17    making -- okay, let me make sure I understand

18    where you're going.  Do you understand everything

19    you have been accused of doing, and we'll get

20    into the Logistics charges here in a minute, all

21    of those allegations are being made against you

22    as an employee and representative of Brendamour

23    Moving & Storage, fair?

24        A.    That is not -- again, I'm not an

25    attorney, but no, that is not my understanding.
```

1          (Exhibit 7 was marked by the

2   reporter for identification.)

3      Q.   (BY MR. LAMPING)  Well, okay, all right,

4   let's go ahead and mark this.  I'm going to be

5   asking you about some conversations and meetings

6   with some folks at UniGroup and in order to kind

7   of guide our discussion I'm going to show you

8   Mayflower's answers to some interrogatories, just

9   to make sure we're on the same plane as far as

10  chronology, and it might make the conversation go

11  a little easier, so Ms. Schlegl, can you go ahead

12  and mark that as Exhibit 7.

13          MS. SCHLEGL:  I just e-mailed that.

14          MR. LAMPING:  And Henry, am I

15  correct, you're able to get on Exhibit Share?

16          MR. LUEPKE:  I believe so.  I've

17  got it up on my screen in front of me here.

18          MR. LAMPING:  Okay.

19      A.   Okay, I have it.

20      Q.   (BY MR. LAMPING)  So Mr. Owens, Exhibit

21  7 are answers that Mayflower submitted in

22  response to some interrogatories that you served

23  on Mayflower in this case.  Have you seen Exhibit

24  7 before?

25      A.   You know, not being an attorney, I

1   cannot say that I have or haven't.

2       Q.   Okay.  Why don't you go ahead and

3   scroll, that's fine, why don't you go ahead and

4   scroll to Page 2 of Exhibit 7 --

5       A.   Okay, I'm on it.

6       Q.   -- and then do you see Number 2 --

7       A.   Yes.

8       Q.   -- that sentence?  Okay.  So

9   Interrogatory Number 2 states, "State on what

10  facts you base any claim Owens is subject to

11  personal jurisdiction in the Federal District

12  Court for the Eastern District of Missouri and,

13  for each such fact, identify each person known by

14  you to have knowledge of such fact."  Did I read

15  that correctly?

16      A.   Yes.

17      Q.   And having read that, does that refresh

18  your memory as to whether you have seen this

19  document before?

20      A.   Yes.

21      Q.   Okay, and you have seen it before?

22      A.   I believe so, yes.  It's been quite

23  awhile, but yes.

24      Q.   Okay.  So I want you to move or scroll

25  to the next page.

Page 34

1     A.    Yep.

2     Q.    And then at the top of the next page

3  there's a paragraph that starts, "Answering

4  further," do you see that?

5     A.    I do.

6     Q.    All right.  And that paragraph states,

7  "Answering further, on or about April 9th, 2023

8  Owens sent an e-mail to Tim Grimes (Subject:

9  Meet in Louisville???) requesting the dates that

10  Grimes would be in Louisville, Kentucky for

11  business."  Did I read that correctly?

12     A.    Yes.

13     Q.    And do you recall, in fact, sending such

14  an e-mail to Mr. Grimes?

15     A.    I recall trying to meet with Mr. Grimes

16  during that timeframe, yes.

17     Q.    Why did you want to meet with Mr. Grimes

18  during that time period?

19     A.    Because I wanted to, you know, in my

20  position as the General Manager of the company I

21  wanted to make him aware of the accounting

22  situation and I wanted to also at that same

23  time -- I'm sorry.

24     Q.    You can keep going.

25     A.    Oh, I'm sorry, something was -- so I

Page 35

1    wanted to make him aware of that situation and

2    then also, you know, work towards trying to

3    maintain a relationship with Mayflower going

4    forward, and the reason why I met with Tim

5    Grimes, is because he was the only person that I

6    really felt like I had a relationship with at

7    Mayflower.

8         Q.   Okay, and so naturally because

9    Mr. Grimes was the only one you knew at

10   Mayflower, you thought he would be a logical

11   person to reach out to?

12        A.   That's correct.

13        Q.   And the first reason you gave for

14   requesting this meeting was you wanted to make

15   him aware of an accounting situation.  What

16   accounting situation did you want to make him

17   aware of?

18        A.   I mean, in essence, it's the one that's

19   being outlined as the reason that we're here.

20        Q.   All right.  That's kind of what I was

21   trying to get at earlier?

22        A.   Okay, I apologize.

23        Q.   That's all right.  Just so we're all on

24   the same page when you said "the accounting

25   situation that brings us here," what's your

Page 36

1    understanding as to the accounting situation that

2    brings us here?

3        A.    I mean in essence, you know, as the

4    General Manager of the company we were in a

5    situation where, you know, we had an opportunity

6    to grow a particular segment of business which,

7    if successful, or when it actually was successful

8    would have benefitted ourselves and also

9    Mayflower, and at the time in my position we made

10   the direction of basically for lack of a better

11   way to put it procuring those funds via the

12   Mayflower statement.

13       Q.    And how specifically did you go about

14   procuring the funds through the Mayflower

15   statement?

16       A.    We basically had billed upon line items

17   that -- billed inaccurately upon line items at

18   that time, that Mayflower did not receive a

19   percentage of, and you know, basically made it so

20   that we received monies via the Mayflower

21   statement.

22       Q.    The information that was entered, that

23   you all entered into the Mayflower system was not

24   accurate, fair?

25       A.    That's correct, that's correct.

1     Q.   And was the, when you say the line

2     items, there's been a lot of talk about

3     accessorial charges.  Do you know what those are?

4     A.   I do.

5     Q.   And were accessorial charges, were those

6     some of the line items there were entered

7     inaccurately into the Mayflower system?

8     A.   There were specific billing codes.  I'm

9     not -- I have no privacy in my office at work, so

10    I am not at work, and I also had limited, or

11    actually no interaction in the Mayflower system

12    directly, so sitting here right now, I do not

13    recall those billing codes, but they are outlined

14    very clearly as part of discovery.

15    Q.   Okay.

16    A.   But there are certain billing codes that

17    were utilized.

18    Q.   And as we sit here today can you tell me

19    any of these billing codes?

20    A.   I mean I would be guessing.  Not with

21    accuracy, no, sir.

22    Q.   All right.

23    A.   I apologize.

24    Q.   That's okay, and you and I are on the

25    same page.  That's also why I believe that we're

1   here today.  Mr. Brendamour, this morning, used

2   the term "scheme."  That was his word.

3          Are you comfortable using that word to

4   describe the practice of the inflated charges

5   that were reported or is there another shorthand

6   term that you would prefer we use just for

7   simplicity?

8      A.   In the interest of being aware of what

9   we're talking about, we can use that one.

10     Q.   Okay.  When did the scheme start?

11     A.   Well, again, that's outlined in the

12   discovery, which I didn't realize, I guess I

13   didn't realize that this is where we were.

14          I guess I'm a little confused on -- I

15   have sadly misjudged what I thought we were doing

16   today as it relates to me personally, so I

17   apologize for that.  I probably would have been

18   better prepared but --

19               MR. LUEPKE:   Just do your best.

20     A.   -- roughly September of 2010.

21     Q.   (BY MR. LAMPING)  Why did the scheme

22   start in September of 2010?

23     A.   Well, again, we were in a position of

24   capitalizing on an opportunity within a growing

25   industry, specifically the kiosk industry, and we

Page 39

1    had an opportunity to grow the business and

2    needed capital to do so.

3        Q.   And the net result of the scheme through

4    the agency statement process would be essentially

5    the scheme would result in more credits to

6    Brendamour than it otherwise would have had the

7    charges been accurately represented to Mayflower,

8    fair?

9              MR. LUEPKE:   I object.  That

10    mischaracterizes his testimony, doesn't put a

11    timeframe on it and it's beyond the scope of this

12    limited deposition.

13        Q.   (BY MR. LAMPING)  You can answer.

14        A.   I guess, I'm sorry, can you repeat the

15    question?

16        Q.   Sure.  You mentioned that you tried to

17    capitalize.  The bottom line is, and it shouldn't

18    be controversial, the scheme, what the scheme

19    allowed Brendamour Moving & Storage to do is to

20    obtain through the agency statement

21    reconciliation process credits for payments that

22    it otherwise would not have received had all of

23    these charges been accurately reported to

24    Mayflower.  I mean that's why you did it, right?

25              MR. LUEPKE:   Same objection.

1    A.   Yes.

2    Q.   (BY MR. LAMPING)  Who was involved in

3    the decision to pursue the scheme?

4    A.   You know, in my position as the General

5    Manager of the company, I was mainly involved.

6    The mechanics of doing that, I have never logged

7    onto the Mayflower system, so the mechanics of

8    doing so involved a conversation with an

9    employee, but you know.

10    Q.   And which employee was that?

11    A.   Art Whalen, or Arthur Whalen, sorry.

12    Q.   So is this just something that you and

13    Art came up with in 2010, or was there anyone

14    else involved?

15    A.   No, there was not.

16    Q.   What, if any, conversations did you have

17    with the ownership of Brendamour Moving & Storage

18    regarding the scheme?

19    A.   None, because that would at the time in

20    my perception that would have been Jack

21    Brendamour.

22    Q.   Okay.  But to the best of your

23    knowledge, did Jack Brendamour know about the

24    scheme?

25    A.   He did not, to the best of my knowledge.

Page 41

1              MR. LUEPKE:   Brian, just for

2    clarification, are you speaking at the outset of

3    the so-called scheme, or at any point during the

4    so-called scheme?

5         Q.   (BY MR. LAMPING)   That's fair, Henry.

6    Let me be a little bit more precise in my

7    question, Mr. Owens, just in case you didn't

8    understand it.

9              At any point in time, are you aware of

10   Jack Brendamour knowing about the scheme?

11        A.   No.

12        Q.   At any point in time before this lawsuit

13   was filed, are you aware of Mike Brendamour

14   knowing about the scheme?

15        A.   No, absolutely not.

16        Q.   You are aware, and we'll get into some

17   of the details in a bit, you are aware that at

18   least according to Tim Grimes, you pointed the

19   finger at Mike Brendamour as being one of the

20   originators of the scheme.  You are aware that

21   Tim Grimes has made representations under oath

22   that that's what you told him?

23        A.   I am aware of what I read in those

24   documents, whether the legal part of it, I don't

25   know, but I am aware of what I read in the

Page 42

1   documents.

2       Q.    And you adamantly deny telling

3   Mr. Grimes that Mike Brendamour had any role in

4   the scheme, fair?

5       A.    I am certain that Mike Brendamour had no

6   role in the scheme.  I would not have told not

7   only Tim that, but anyone that.

8            However, you know, I also, that meeting

9   at this place took place 7 months ago, but at no

10  point, regardless to the meeting, at not point

11  was Mike Brendamour aware of this.

12      Q.    Okay, but, and this is an important

13  point, so I just want to make sure we're very

14  clear, I know you've testified that Mike

15  Brendamour was not involved.  As you sit here

16  today do you have any recollection of telling Tim

17  Grimes that Mike Brendamour was involved in the

18  scheme?

19      A.    No.  At no point have I said that to

20  anyone.

21      Q.    And I'm sure you've replayed in your

22  mind what was said at that dinner in Louisville

23  100 times.  Can you think of anything that you

24  would have said to Tim Grimes that would have

25  even perhaps inadvertently left the impression on

Page 43

1  Tim Grimes that Mike Brendamour came up with the
2  scheme?
3      A.   I have, you know, I guess a theory,
4  because Tim Grimes isn't the only time that that
5  has come up.  There was another phone call where
6  I got the perception that the people on the phone
7  call were a little bit disbelieving, so I think
8  it's, you know, there has always been a -- the
9  two companies never really had a really close
10 relationship.
11          They, you know, Mayflower didn't really
12 have a real good feel for what we were doing and
13 how we were doing it, and I think there is a
14 perception or a misperception that Mike
15 Brendamour, because of his title, had to have
16 known, or the perception that he would have
17 known, and I think that it's possible that that
18 has created the assumption, if you will, and
19 that's an aggressive word, but the assumption
20 that he would have known.
21     Q.   Okay.
22     A.   That is the only thing I can speculate.
23 That's the only thing I can speculate.
24     Q.   That's fine, and you don't know.  I'm
25 not asking you to get inside Tim's head but --

Page 44

1      A.    No.  Tim is a very good person.

2      Q.    Okay.  Now you said that the two

3   companies were separate.  I assume while you were

4   and are General Manager of Brendamour Moving &

5   Storage, you're primarily physically located in

6   Cincinnati, Ohio, right?

7      A.    Yes.

8      Q.    And you understand that Brendamour

9   Logistics was an agent of Mayflower?

10     A.    No.  Brendamour Moving & Storage is an

11  agent of Mayflower.

12     Q.    Oh, what did I say?

13     A.    You said Brendamour Logistics, yes, sir.

14     Q.    I'm sorry, I think we're done with

15  Logistics.  I don't have any more questions about

16  Logistics.

17     A.    I apologize.

18     Q.    And no, no, and I promise you I was not

19  trying to sneak something in there, but if I

20  refer to Logistics again for the rest of the day,

21  I beg your pardon.

22     A.    Okay.

23     Q.    Let me back up.

24     A.    It was just a little confusing.  Yes, I

25  am aware that --

Page 45

```
 1            MR. LUEPKE:   Paul, just wait for

 2    the question.

 3        Q.   (BY MR. LAMPING)  Yeah, yeah, yeah.  Up

 4    until June of this year, or thereabouts,

 5    Brendamour Moving & Storage was an agent of

 6    Mayflower, correct.

 7        A.   Yes.

 8        Q.   Okay.

 9        A.   I think it was sooner than that, but

10    technically, yes, I understand your point, yes.

11        Q.   Okay.  Mayflower is based in Missouri.

12        A.   Yes.

13        Q.   UniGroup, do you know what UniGroup is?

14        A.   I was never a, you know, the most

15    well-versed person on the UniGroup/Mayflower

16    situation, but I felt like, yes, I was aware of

17    who UniGroup is.

18        Q.   And like Mayflower, you understood that

19    UniGroup was also headquartered in Missouri?

20        A.   Yes.

21        Q.   That's where Tim Grimes worked

22    primarily.

23        A.   I have assumed that.  I'm not -- I can't

24    say that I'm aware of that.

25        Q.   In connection with your work for
```

1    Brendamour Moving & Storage, did you ever have

2    occasion to come to Missouri to visit Mayflower?

3        A.   Once.

4        Q.   When was that?

5        A.   I don't know, right around sometime in

6    2005 would be my guess.

7        Q.   Okay.

8        A.   Yeah, I think it was 2005.

9        Q.   Okay.  In order for, kind of switching

10   gears a little bit, in order for the scheme to

11   work, somebody had to enter transaction data into

12   the Mayflower system, correct?

13       A.   Yes.

14       Q.   While the scheme was on-going, who was

15   responsible for doing that?

16       A.   The -- again, I have never personally

17   logged into the Mayflower system, so I don't

18   know.  I don't know the intricacies of how it

19   worked, but people, I provided in the discovery

20   the systems that have had access, but as I'm

21   recalling the names were Terry Harrell, Rianna or

22   Ri, George, and then Art Whalen, and then Chuck

23   Wolfe did, as well, until he passed away in 2012.

24       Q.   Obviously, we've established that the

25   owners of Brendamour didn't know about the

Page 47

```
 1   scheme.  Was there a concerted effort amongst --
 2               MR. LUEPKE:   I object to that,
 3   that mischaracterizes his testimony.  That's not
 4   what he testified to, but subject to that, you
 5   may proceed with your questioning, but that's not
 6   what he said.
 7       Q.   (BY MR. LAMPING)  I thought you said the
 8   owners didn't know about the scheme.  Am I wrong?
 9               MR. LUEPKE:   At what timeframe?
10       Q.   (BY MR. LAMPING)  At any time before the
11   lawsuit was filed, did any of the owners know
12   about the scheme?
13       A.   Yes.
14       Q.   Which ones?
15       A.   Well, the current ones, Doug and Dave.
16       Q.   And Doug and Dave, their last names are
17   both Brendamour?
18       A.   Yes.
19       Q.   When did Doug and Dave learn about the
20   scheme?
21       A.   Roughly probably a week or so before I
22   met with Mr. Grimes.
23       Q.   Okay.  All right, so let's say before
24   February of 2023, are you aware of any of the
25   owners of Brendamour Moving & Storage knowing
```

Page 48

1    about the scheme?

2        A.    No.

3        Q.    All right.  Before February of 2023, was

4    there a concerted effort amongst the folks who

5    knew about the scheme to conceal it from others

6    within Brendamour Moving & Storage?

7        A.    No.  I can't say that there was.

8        Q.    All right.  But the folks who actually

9    entered in the inflated charges into the

10   Mayflower system, who did those folks report to?

11       A.    Myself.

12       Q.    All right.  Okay, so tell me about what

13   happened.  You talked about Doug and David

14   Brendamour learning about the scheme.  Are you

15   the one that told them about it?

16       A.    Yes, I am.

17       Q.    When and how did you communicate the

18   details regarding the scheme to Doug and Dave

19   Brendamour?

20       A.    I don't recall the dates I gave you;

21   roughly shortly before I had the meeting with Tim

22   Grimes, and I had a brief meeting with Dave,

23   unscheduled.  It was an unexpected visit by him

24   on another topic, and I mentioned it to Dan, and

25   I think the next day I met with both of them.

Page 49

1      Q.   And what do you recall telling them
2   about the schemes?
3      A.   I just basically made them aware of the
4   situation and I mean that was pretty much it.
5      Q.   Who else other than you, Doug and Dave
6   was present during the meeting?
7      A.   Just us.
8      Q.   How did they react when you told them
9   about the scheme?
10      A.   Well, as you can imagine, first and
11   foremost it's not very simple to understand for
12   someone who is not well versed in the Mayflower
13   process, so there was some, you know, there was a
14   significant amount of initial difficulty in
15   understanding, and then there was also a
16   significant level of, you know, whatever word
17   you'd want to use, anger, disappointment,
18   somewhere in there, and that was pretty much it.
19      Q.   And you, in your position as general
20   manager, you were well versed in the Mayflower
21   agency reconciliation process, fair?
22      A.   Other than the fact that I had never
23   logged into the Mayflower system, correct.
24      Q.   Yeah.  You may not have logged into the
25   system, you may not have actually entered in some

1  of the charges, but you understood generally how

2  entering the inflated charges is part of the

3  scheme would benefit Mayflower Moving & Storage.

4      A.   Yes, I understood how it would have

5  benefitted the company.

6      Q.   If it would have hurt the company,

7  obviously, you wouldn't have done it, fair?

8      A.   Correct.

9      Q.   After your meeting with Doug and Dave

10  Brendamour, did you talk to anyone else about the

11  scheme before you went and met with Tim Grimes?

12      A.   I spoke to Doug and Dave again the next

13  business -- as I recall, the first meeting was on

14  a Friday, the next one was on a Monday, and

15  during that meeting, and it might have been the

16  first meeting, I'm not sure, but as I recall it,

17  there was a second meeting and at that point it

18  was decided that I would call and reach out to

19  Tim to try to schedule a meeting, with the

20  objective again to make them aware of the

21  situation, gain his knowledge and expertise in

22  how to best interact with Mayflower regarding the

23  situation, and then to hopefully lay the

24  groundwork to move forward in an on-going

25  business with Mayflower.

Page 51

1    Q.    Did you make any, either during your

2    meeting with Tim Grimes or during any of the

3    subsequent meeting with the folks at Mayflower,

4    did you make any proposals to, you know, try to

5    move forward and work through the issues that the

6    scheme caused?

7    A.    Well, I mean a "yes" and "no" answer

8    can't really properly answer that question, so if

9    I can expound.

10    Q.    Sure.

11    A.    No, I did not make a proposal; however,

12    I did supply an abundant, and this was prior to

13    discovery, prior to the filing of the lawsuit I

14    provided an abundance of detail, and I expressed

15    a desire to work it out.

16         I asked for information that would help

17    me refine the detail.  I offered to come to

18    St. Louis and help the people that I was

19    interacting with understand the detail, and

20    frankly I thought, as ignorant as this may seem

21    now, I thought that that was the avenue we were

22    headed, until all of a sudden a lawsuit shows up.

23         So no, we never got to that point, but I

24    was genuinely hopeful of working out an amicable

25    solution.

Page 52

1       Q.   At any point in time -- let me back up.

2   Are you -- let me back up again.  As you sit here

3   today, are you aware of the financial impact to

4   the UniGroup and Mayflower internal company

5   finances that the scheme caused?

6       A.   No.

7       Q.   You would agree that as a general

8   principle, the net result of the scheme is that

9   it made the logistics business at Brendamour

10  Moving & Storage look a heck of a lot busier and

11  profitable than it otherwise was in reality,

12  fair?

13              MR. LUEPKE:   If you would put a

14  timeframe on it.  At any timeframe maybe?

15      Q.   (BY MR. LAMPING)  Yeah, at any point,

16  have you been made aware or are you aware of --

17  well, strike that.

18          The inaccurate data that was reported to

19  Mayflower as part of the scheme all related to

20  Logistics transactions, fair?

21      A.   I'm sorry?

22      Q.   The transactions that were part of the

23  scheme where you had the charges being

24  inaccurately entered into the Mayflower system,

25  those were all for Logistics transactions?

1        A.    That is correct.

2        Q.    The lion's share of those Logistics

3    transactions involved Amazon and Red Box?

4        A.    Those were our two biggest customers

5    during the timeframe, yes.

6        Q.    Okay, and the net result of the scheme,

7    because charges for Logistics transactions are

8    being inflated in the system, the net result is

9    that's going to make the Logistics business at

10   Brendamour Moving & Storage look a lot busier and

11   profitable than it was in reality, right?

12       A.    It would make it look busier for sure.

13       Q.    Okay.  And while the scheme was

14   on-going, did you have any understanding as to

15   what Mayflower was doing with the numbers that

16   were reported for Mayflower and whether -- I'm

17   sorry, for Brendamour Moving & Storage, and

18   whether Mayflower was making general business

19   decisions based on the inflated charges that were

20   reported?  Did you have any awareness of that?

21       A.    No, I did not.  Again, frankly, there

22   was little relationship between the two

23   companies, very honestly.

24       Q.    During the, and I guess your testimony

25   is the scheme went from September of 2010 up

1   until presumably April of this year --

2       A.   Yes.

3       Q.   -- so let's just call it 12 and-a-half

4   years to be fair; is that right?

5       A.   Okay.

6       Q.   Just about.

7       A.   Sure.

8       Q.   Okay.  During those 12 and-a-half years

9   was Brendamour Moving & Storage reporting

10  inaccurate data for all Logistics transactions or

11  just some of them?

12      A.   Just some of them.

13      Q.   And how would Brendamour Moving &

14  Storage go about deciding which Logistics

15  transactions it wanted to record accurately, and

16  which ones it wanted to record inaccurately?

17      A.   Well, there was one account that was

18  handled the way a traditional Mayflower account

19  would be handled.

20      Q.   And which account was that?

21      A.   I don't know what it was called on

22  Mayflower's side, but Lenscrafters or Luxottica

23  Retail, it's the same account.

24      Q.   Yeah.

25      A.   Those invoices went as the traditional

1    Mayflower system would desire, and so those were

2    not subject to this, and then, you know, the

3    other ones, it would have been somewhat arbitrary

4    really in terms of selection.

5        Q.   And am I correct that over time, in

6    order to keep the debits and credits going in

7    Brendamour Moving & Storage's favor, the

8    mis-reported transactions had to grow larger and

9    larger?

10            MR. LUEPKE:   Object to form,

11   that's beyond the limited scope of this

12   deposition, it also mischaracterizes the

13   testimony and mischaracterizes the evidence.

14            Subject to that, if you understand the

15   question, Mr. Owens, you may do your best to try

16   to answer it.

17       A.   Okay, do you mind to repeat it?

18       Q.   (BY MR. LAMPING)  Yeah, and I think some

19   of the spreadsheets that you produced bears this

20   out, but correct me if I'm wrong, over that 12

21   and-a-half year time period, the amount by which

22   Brendamour Moving & Storage mis-reported,

23   transaction values grew.  It didn't get smaller,

24   right?

25       A.   Well, yes, yes, technically.  Well, so I

Page 56

1  can't answer it with a "yes" or "no" answer, but

2  technically, yes; however, a major impact to this

3  was in September, roughly September of 2016,

4  Mayflower started taking a percentage against

5  those particular billing codes that we are

6  speaking which essentially caused the numbers to

7  go, for lack of a better word, wild.

8        And so that played a role in it getting

9  what ended up being out of hand.  We had,

10 essentially we were, we have actually, so if you

11 take the charges out, the charges out that we put

12 through, you know, the inaccurate charges that we

13 put through, we actually paid Mayflower more over

14 this period of time than what they would have

15 earned.

16    Q.   Yeah, no, I understand that's your

17 position, but I guess what I'm getting at, and I

18 think you've acknowledged it, but if you go from,

19 if you look at 2010 to 2023 as a spectrum, the

20 scheme grew in scale over time and really grew in

21 scale after the accessorial percentages changed

22 in 2016?

23    A.   Right, it did, but there was also, it

24 would be important to note that at that point

25 cash wasn't changing hands.

Page 57

1      Q.    I understand.

2      A.    Brendamour, the company, was sending

3   money back to Mayflower at that point and

4   essentially dwindling what would have been, you

5   know, the earned difference if you will.

6      Q.    Okay.  So was your decision to go and

7   talk to Doug and Dave Brendamour and then

8   ultimately talk to Tim Grimes based on the fact

9   that the scheme was essentially getting out of

10  control as you put it?

11     A.    Yes, in essence, yes.

12     Q.    All right.  So and I think I covered

13  this, but I just want to make sure, the Luxottica

14  Lenscrafters accounts, the charges that were

15  agreed upon with the customer were accurately

16  entered into the Mayflower system; is that right?

17     A.    Yes, and Mayflower, the Mayflower

18  invoice was sent to the customer and the customer

19  paid Mayflower.

20     Q.    Perfect, all right, and you've led me to

21  kind of my next topic, which is for the -- in a

22  given transaction, when it's logged into the

23  system, initially am I correct that Mayflower

24  will generate an invoice?

25     A.    Yes.

Page 58

1    Q.   And two of the accounts that at least to

2  my understanding were part of the scheme were

3  Amazon and Red Box; is that right?

4    A.   Yes.

5    Q.   And for Amazon and Red Box Brendamour

6  Moving & Storage used its own invoice, rather

7  than the Mayflower-generated invoice?

8    A.   That is correct.

9    Q.   For the invoice, for the transactions

10  that were part of the scheme, let's just use a

11  hypothetical Amazon transaction, would Amazon's

12  invoice have the actual price of the transaction

13  or the higher price that was reported into

14  Mayflower's system?

15    A.   It would have the actual price.

16    Q.   Okay.  So as far as Amazon or Red Box is

17  concerned, the amount -- they had no reason, to

18  your knowledge did they have any reason to be

19  aware of this scheme?

20    A.   No.

21    Q.   So let's, in this hypothetical Amazon

22  transaction, let's say that the invoice that

23  Amazon receives is $100 grand, okay?

24    A.   Yes.

25    Q.   Who decides what amount above that gets

Page 59

1    entered into, or who decided what amount above
2    that got entered the Mayflower system?
3                    MR. LUEPKE:  If any, is that what
4    you're asking about, Brian?
5                    MR. LAMPING:  Pardon?
6                    MR. LUEPKE:   If any amount above
7    that amount gets entered, who decides?
8        Q.   (BY MR. LAMPING)  Well, I don't think
9    it's -- I am pretty sure it's been established at
10   this point that higher amounts were inputted into
11   the Mayflower system for a sub-set or some of
12   these Logistics transactions, I think that's been
13   acknowledged.
14          So my question is how was it decided as
15   to the amount, for a transaction that's part of
16   the scheme, how was the amount that was reported
17   to Mayflower determined?
18       A.   Again, so we came up with that number.
19   I guess I've already said who was involved in
20   that.  I don't understand, I guess.
21       Q.   My question is a little different.  You
22   told me who, and let's say in this hypothetical
23   transaction, that $100,000 Amazon transaction was
24   reported to Mayflower as being a $200,000
25   transaction.  Okay?

Page 60

1      A.    Okay.

2      Q.    Who decided the inflated amount that was

3   represented to Mayflower, how was that amount

4   determined?

5      A.    Well, we were aware of what the, in

6   short, we were aware of what the numbers needed

7   to be, and so we made the numbers what they

8   needed to be.

9      Q.    Precisely.  So when you say you knew

10  what the numbers needed to be, you knew what the

11  value of that transaction needed to be to have an

12  offset on an agency statement that would work in

13  Brendamour Moving & Storage's favor?

14     A.    For a period of time, and then there

15  came a time where we started basically paying the

16  monies back.  So at some, you know, at that point

17  we were making it so that there was a specified

18  shortfall.

19     Q.    So is it your testimony that at some

20  point, the scheme started benefitting Mayflower?

21     A.    Well, the -- okay, so during the time,

22  during the timeframe that we were in a, basically

23  borrowing money from Mayflower if you will,

24  Mayflower on earned revenue, not inflated

25  revenue, but earned revenue made about $3 million

Page 61

1   dollars on our work.

2           So I would argue, you know, and we would

3   not have had the work, we could not have serviced

4   the work without capital.  So I am unaware of

5   Mayflower's financial statements, and how they

6   published them and all of those kind of things.

7   So for me to speak on the impact of the

8   inaccurate entries, I cannot do that.

9           But on the act of securing the business

10  and servicing the business, yes, I would say that

11  had we not done this, we would not have had the

12  business, and Mayflower would not have earned

13  that money.

14      Q.   Well, in fairness, there are a lot of

15  different ways that a company can obtain capital,

16  fair?

17      A.   Yes.

18      Q.   And do you ever remember saying to

19  Mr. Grimes that the way this scheme worked, was

20  essentially like using Mayflower as a bank?

21      A.   I have used that, not just to

22  Mr. Grimes, but to others, as well.

23      Q.   Okay.

24      A.   However, however, please realize that I

25  am doing that merely to expedite the curve of

Page 62

1  understanding; in other words, I'm doing that to

2  -- it's a very convoluted situation to try to

3  explain to someone that is not intimately

4  familiar with the Mayflower system, and in some

5  cases, even those that are.

6        So when I have used that statement I

7  have done so just to make it, for lack of a

8  better way, to put it into layman's terms, just

9  for the interest of understanding.  Sorry.

10     Q.   Sure, and one way that Brendamour

11  Moving  & Storage benefitted from the scheme is

12  that they were able to finance certain capital

13  expenditures with credits that had built up in

14  their agency statement through the scheme, fair?

15     A.   I'm not sure I follow.

16     Q.   And just to be clear, and I believe you

17  said this, but I just want to confirm, the

18  invoices that the customers received were the

19  actual charges for the transactions and not the

20  inflated amounts that were entered into the

21  Mayflower system?

22     A.   That is correct.

23     Q.   Okay.  And so for a given transaction,

24  the amount that Amazon, for example, would pay to

25  Brendamour Moving & Storage matched the amount of

1   the invoice that would have been provided to

2   Amazon?

3                   MR. LUEPKE:    Objection, beyond the

4   limited scope of this deposition.  Subject to

5   that, you may try to answer, Mr. Owens.

6        A.    That's correct.

7        Q.    (BY MR. LAMPING)  Okay, so I want to go

8   back to Exhibit 7.  By the way, we have been

9   going about a little over an hour.  Does anyone

10  need a break?  Do we want to take a short break

11  or keep going?

12       A.    I'm good.

13       Q.    (BY MR. LAMPING)  Okay.

14                  MR. LAMPING:  Ms. Court reporter,

15  are you okay?

16                  THE REPORTER:  It would be nice to

17  have a rest room for 5 minutes.

18                  MR. LAMPING:  Okay.  Let's take a

19  5-minute break.  Is that all right?

20                  THE REPORTER:  Certainly.

21                  THE VIDEOGRAPHER:  We're going off

22  the record.  This ends Media 1.  The time is 3:35

23  p.m.

24                      (Brief recess taken.)

25                  THE VIDEOGRAPHER:  Going back on

Page 64

1  the record, this begins Media 2.  Time is 3:49

2  p.m.

3      Q.   (BY MR. LAMPING)  All right, Mr. Owens,

4  of the transactions that were mis-reported in the

5  Mayflower system as part of the scheme, were all

6  of those real transactions or were any of them

7  just completely fabricated?

8      A.   I believe you're asking if there were

9  any order numbers in their entirety that were

10  fabricated; is that correct?

11      Q.   Correct.

12      A.   No; every order that was entered was an

13  actual order.

14      Q.   Okay, and with respect to the false

15  information that was entered into the Mayflower

16  system, did you start with an actual order and

17  then inflate the services provided on that order

18  to get to the inflated number?

19      A.   Yes, using specific billing codes, three

20  specific billing codes, yes.

21      Q.   And what were those three specific

22  billing codes?

23      A.   As I stated earlier, I don't have them

24  committed to memory.  I was not the one doing

25  the -- making the entries.  I'm sorry.

Page 65

1      Q.    That's okay, and as far as --

2      A.    It's in the discovery repeatedly.

3      Q.    Got it.  And as far as the amount by

4  which the charges were inflated, was there a

5  specific formula or methodology that was used or

6  did you just kind of look at the agency statement

7  and just make sort of an imprecise measure of the

8  inflation?

9      A.    Yes, more or less.

10     Q.    The latter?

11     A.    Yes.

12     Q.    Okay.  And is there any way -- so you're

13  aware that -- let me back up.  On the

14  transactions at issue, were purchase orders

15  generated for any of the Amazon or Red Box

16  transactions that were entered into the Mayflower

17  system?

18     A.    Amazon uses a purchase order.  Red Box

19  does not use a purchase order system.  Amazon

20  does, however, it's a blanket --

21     Q.    Okay, got it.

22     A.    -- so at the beginning of each year,

23  they just issue a blanket PO.

24     Q.    Yeah.  Do you know the services that are

25  associated with those codes that were the primary

Page 66

1    codes that were inflated?

2        A.    I do not.   Again, I didn't realize that

3    we were going to be getting into this type of

4    detail today, or I would not have taken the call

5    from where I am, so no, I do not.

6        Q.    Okay, and do you have records somewhere

7    that would tell us what the specific -- I think

8    you said the billing codes have already been

9    produced in discovery.

10       A.    Yes, absolutely, yes, I do.   I just

11   don't have access to my files where I'm sitting

12   right now.   I apologize.

13       Q.    Okay, and you are aware that invoices, a

14   whole bunch of invoices have been produced in

15   this case?

16       A.    Yes, I am.

17       Q.    Is there any way to reconcile those

18   invoices with what was entered into the Mayflower

19   system?

20       A.    No.   Well, yes, there is, but not

21   without an extensive amount of work beyond what

22   could possibly be done within any reasonable

23   amount of time.

24       Q.    So just tell me, if I had an unlimited

25   amount of time, what would I need to do to

Page 67

1   reconcile what was in the Mayflower account with

2   the invoices?

3       A.    This is an example of --

4               MR. LUEPKE:    Object, this is

5   beyond the scope, the limited scope of this

6   deposition.  Subject to that, Mr. Owens, you may

7   try to answer if you can.

8       A.    I will try.  This is an example of what

9   I tried to do during the interim period of my

10  bringing this to the attention of Tim and then

11  the Mayflower Accounting Department.

12              I made efforts to go over with them an

13  example.  You know, they asked for -- they asked

14  me to do just that for a number of orders, and I

15  sent the information with which to do it and I

16  offered to try to demonstrate that, and then

17  there was no -- there did not -- the ball was not

18  hit back, so it did not seem like there was an

19  interest in doing so.

20              But can it be done?  Yes.  But it is a

21  an extensive amount of time to do it, extensive.

22      Q.    Okay, and the date would be different,

23  the date that's entered on the Mayflower system

24  would be different than the date that's reflected

25  on the invoice, right?

Page 68

1      A.    That is correct.   There is not a

2   one-to-one relationship.   The Mayflower system,

3   and again and I don't want to get lost in the

4   weeds here, but the Mayflower system is

5   generated, is designed to operate on an order by

6   order, or a load by load basis, if you will, and

7   many of our billings were cumulative.

8           So one of our billings may include, you

9   know, 7, 8, 9 loads.   And you know, and on top of

10  that, a couple of those may have had 3 or 4

11  different customers on it on the same truckload.

12  Very confusing.

13     Q.    Okay.   I want to go back to Exhibit 7,

14  the interrogatory answer, and the next paragraph,

15  after the paragraph we just looked at, is

16  basically Mr. Grimes' version of what transpired

17  during the April 23rd meeting at the restaurant,

18  and you've read that before, right?

19     A.    Yeah.   Let me bring it back up again.

20  I'm sorry.

21     Q.    Yeah, no worries.   It's a paragraph that

22  begins on April 23rd, 2023.

23     A.    Yeah.   During the break I answered some

24  e-mails and apparently I moved along from that

25  one.   Would it be possible for someone to send me

Page 69

1   that again?  I apologize.

2            No, no, wait a minute.  Number 7, I have

3   it.  I apologize.

4        Q.    That's all right.  No worries.

5        A.    Where do you want me to be?

6        Q.    It's Page 3 of the pdf.  It's the

7   paragraph that starts, "On April 23rd, 2023."

8        A.    I'm here.

9        Q.    All right.  So I'm just going to read

10  along.  I just want you to read along with me.

11  I'm just essentially going to ask you to confirm,

12  basically let me know you agree with and what you

13  don't agree with and I'll call out some specific

14  things to kind of move us along.  Is that all

15  right?

16       A.    Okay, sure.

17       Q.    So the paragraph starts, "On April 23rd,

18  2023, Grimes, Owens and Art Whalen met at a

19  restaurant in Louisville."  That's correct,

20  right?

21       A.    Yes.

22       Q.    And then, "While at the restaurant Owens

23  admitted that Brendamour Moving & Storage had

24  been entering inflated customer charges in the

25  UniGroup system for Logistics transactions."

Page 70

1    That's also accurate, correct?

2         A.    Yes, yes.

3         Q.    And then it goes on to state, "Owens

4    stated that the scheme began in approximately

5    2006."  I assume you would dispute that.

6         A.    Yes, absolutely.

7         Q.    And your testimony was did you tell Tim

8    Grimes that it actually started in 2010?

9         A.    I didn't tell him anything.

10        Q.    Okay, you didn't give him a date.

11        A.    I had the information with me, but we

12   never got into that level.  I had it available,

13   should he have wished to, but the conversation

14   didn't go like that.

15        Q.    What information did you have with you

16   to --

17        A.    The same information that I sent as part

18   of the discovery, a spreadsheet of all the orders

19   and what happened on each order.

20             But Tim is not an accounting guy.  I had

21   it with me just in case he wanted to go that

22   direction, but I knew going into it that he was

23   not an accounting guy, and that's not necessarily

24   what I was expecting to happen.

25        Q.    The spreadsheet you're referring to, is

Page 71

1    that the one that was called Problem Master that

2    we've talked about?

3        A.   Yes, yes, sir.

4        Q.   Who prepared that Problem Master

5    spreadsheet?

6        A.   I did.

7        Q.   How did you go about preparing that

8    spreadsheet?

9        A.   I got the order numbers and the amount

10   of money that we received from our accounting

11   software company who interacts with the UniGroup

12   system.  So it's an automated system, if you

13   will, and so I got a spreadsheet of every order

14   number and the billing codes and the monies that

15   we received, and then I applied our understanding

16   of the Mayflower percentages to it, and basically

17   then went -- so anyway, that's how I got the

18   numbers.

19               (Exhibit 9 was marked by the

20   reporter for identification.)

21       Q.   (BY MR. LAMPING)  Okay, and do you still

22   have the Excel spreadsheet in its native format?

23       A.   Yes.

24       Q.   And so was that spreadsheet generated

25   from data that you obtained from this accounting

Page 72

1   software, this accounting program?

2       A.   I obtained the, I obtained some columns

3   of it.  There is some information that I do not

4   have access to, specifically information that

5   would be housed in the Mayflower's system, I'm

6   assuming, and again, during that interim period,

7   I had "efforted" on numerous occasions to get

8   Mayflower to participate with me in updating and

9   making that document even more accurate, and was

10  never able to gain their interest in doing so.

11      Q.   What would you need, what information

12  would you need to understand the full financial

13  scope and impact of the scheme?

14           MR. LUEPKE:  I object, it's vague

15  and confusing and overbroad, but subject to that,

16  you may try to answer, Mr. Owens.

17      A.   Well, what I did not have was the

18  invoiced amount that's on the Mayflower invoice,

19  and then also I would need the percentages that

20  Mayflower earns on each billing code.

21      Q.   (BY MR. LAMPING)  Okay.

22      A.   Which again, I had asked for numerous

23  times.  As foolish as it sounds now, it was my

24  effort to again, you know, put this together and

25  actually sit down with someone and try to work

                                                        Page 73

1    through it amicably.  This situation was not my

2    intent, obviously.

3         Q.    Okay, yeah.  I want you to jump to the

4    next page of Exhibit 7 --

5         A.    Okay.

6         Q.    -- and let me know when you're there.

7         A.    On Page 4?

8         Q.    On Page 4, yes.

9         A.    I'm here.

10         Q.    Okay, and in the middle of Page 4, do

11    you see a paragraph that begins, "On May 8th,

12    2023"?

13         A.    Yes, I do.

14         Q.    Do you recall participating in a

15    teleconference on that date?

16         A.    I don't.  I mean there was a

17    teleconference right around that date, yes.  I

18    can't see it was that date, but it seems about

19    right.

20         Q.    The last sentence of that paragraph

21    states, "Owens stated that Brendamour Moving &

22    Storage logged $448 million in revenue into the

23    Mayflower system during the scheme, but only had

24    $54 million in actual invoiced revenue for those

25    transactions."

Page 74

1          Do you recall making a statement to that

2    effect during that meeting?

3         A.   We were reading the spreadsheet, and it

4    was a very difficult meeting to navigate and yes,

5    I do remember, you know, referring to and reading

6    numbers off of the spreadsheet that I had

7    provided them, provided Mayflower quite some time

8    prior to that, but I cannot say that I remember

9    those specific numbers, because again, I don't

10   have that spreadsheet with me sitting here right

11   now to recall that spreadsheet.

12        Q.   We're going to e-mail you a document

13   that was produced by Mayflower, and let me know

14   when it comes across.  It will be -- it's an

15   Excel spreadsheet.  It will be Exhibit 9, okay.

16        A.   If it's that very large spreadsheet, it

17   may not come through.  I'm sorry.

18        Q.   Okay, that's okay.  Let me move on.  Do

19   you understand that the spreadsheet that you

20   shared with --

21        A.   Yes.

22        Q.   -- UniGroup, it was called Problem

23   Master or something along those lines?

24        A.   Yes.

25        Q.   And the first column, do you remember it

Page 75

```
 1   having a whole big list of order numbers?
 2        A.   Yes.
 3        Q.   And those order numbers would not appear
 4   on the invoices, for example, the Amazon invoices
 5   for those transactions.
 6        A.   That is correct, that is correct.
 7        Q.   And how were the invoice order numbers
 8   generated?
 9        A.   Well, the invoice order numbers that are
10   on that spreadsheet?
11        Q.   No.  So the spreadsheet has the
12   Mayflower order numbers that would be reflected
13   in the Mayflower system, right?
14        A.   Sure.
15        Q.   But then the invoice that was sent to
16   Amazon would have a different order number.
17        A.   A different Invoice Number, yes.
18        Q.   The Invoice Number on the Amazon
19   invoice, how was that number generated?
20        A.   It's just sequential in our accounting
21   system.
22        Q.   All right.  So for example, if there's
23   an order number on an Amazon invoice that says
24   like 01- --
25        A.   Yes.
```

Page 76

1     Q.    -- and a bunch of numbers --

2     A.    Yes, that is in our system.

3     Q.    What does the O1 refer to?

4     A.    Nothing.  It's just a numbering,

5 nothing.

6     Q.    Got it.  All right, and so going back to

7 Exhibit 7, on May 9th, at least according to this

8 answer, you sent Theresa Dawkins the Problem

9 Master spreadsheet, right?

10     A.    Yes.

11     Q.    And is that spreadsheet something that

12 you offered to send to Ms. Dawkins during your

13 teleconference a day earlier?

14     A.    I don't remember how exactly all of that

15 worked, but yes, I did send it to her.  I believe

16 I sent it to her prior to this, though, because

17 obviously during this call we were reviewing it.

18     Q.    Okay, and then this answer goes on to

19 mention a text message that you sent to

20 Mr. Grimes on May 16th that stated, "Remind me

21 again, what is the date that UniGroup started

22 taking the percentage on those accessorial lines

23 that I messed with."

24     A.    Yes.

25     Q.    Do you recall sending that text message

Page 77

1   to Mr. Grimes?

2        A.   I recall requesting that information,

3   yes.

4        Q.   Why did you request that information?

5        A.   Because in order to accurately complete

6   the spreadsheet, I would have needed to know

7   exactly what date that started, which at that

8   point I would have probably have been confirming

9   it, not asking what it was.

10       Q.   Okay.

11       A.   But the answer was consistent with what

12  I had already done --

13       Q.   Okay.

14       A.   -- which is September 1st of 2016.

15       Q.   Got it.  Let's pull up Mr. Owens'

16  interrogatory answers.

17       A.   Am I watching for an e-mail again?

18       Q.   Yes.

19       A.   Sorry.

20       Q.   That's all right.

21            (Exhibit 10 was marked by the

22  reporter for identification.)

23       Q.   (BY MR. LAMPING)  Do you recognize that

24  Exhibit 10 is a copy of your answers to some

25  interrogatories that were served by my client.

1        A.    Yes.

2        Q.    And when was the last time you read

3    those answers?

4        A.    Shortly after I filled them out, I

5    believe, unless, is it one of the ones that I was

6    asked to review, Henry?

7        Q.    Why don't we do this.  I don't want to

8    get into any of your --

9        A.    I'm not an attorney, so it's difficult.

10        Q.    Why don't we do this, I just have a

11    couple of quick questions for you.  First, if

12    you'll scroll down to Page 3.

13        A.    Okay.

14        Q.    Towards the bottom of Page 3 or I guess

15    in the last full paragraph that starts, "In or

16    about the Fall of 2010," you state, "BMAY started

17    entering customer order information that did not

18    reflect the actual charges BMAY had invoiced to

19    its customers." Did I read that correctly?

20        A.    Yes.

21        Q.    That's consistent with what you had

22    talked about earlier, you said September of 2010

23    earlier, and that's consistent with what you

24    testified to earlier today, correct?

25        A.    Yes.

Page 79

1     Q.   And then if we jump down to Page 5 --

2     A.   I'm there.

3     Q.   -- there's a paragraph that starts

4  toward the top, "I made Tim aware," do you see

5  that?

6     A.   Yes.

7     Q.   And this answer states, "I made Tim

8  aware that the accounting records were inaccurate

9  and needed to be corrected." Did I read that

10  correctly?

11     A.   Yes.

12     Q.   All right, and just to be clear, the

13  accounting records you are referring to are

14  Mayflower's internal system records that were

15  based on what you all had entered into the

16  system?

17     A.   I'm not in any way referring -- I'm not

18  aware of Mayflower's financial statements.

19     Q.   Okay.  Well, let me ask a better

20  question then.  When you say, "I made Tim aware

21  that the accounting records were

22  inaccurate," what accounting records were you

23  referring to?

24     A.   The billings that we -- the items that

25  we're talking about here the billings that we had

```
1   entered into the Mayflower system.
2        Q.   Okay.  All right, we can set that aside.
3   Let's pull up the invoices Brendamour 2553.
4        A.   I have it.  I have the e-mail.
5             (Exhibit 11 was marked by the
6   reporter for identification.)
7        Q.   (BY MR. LAMPING)  Okay.  And can you
8   identify Exhibit 11 for me.
9        A.   Is that the one she just sent me?
10       Q.   It is.
11       A.   Okay.  It's an invoice that we sent to
12  Amazon for new installs that took place in
13  January of it would appear to be 2019.
14       Q.   And when you say new installs, would
15  this have been a new install of a kiosk?
16       A.   Yeah, an Amazon locker, yes.
17       Q.   So up at the top do you see where it
18  says Invoice Number?
19       A.   Yes.
20       Q.   Is that the Invoice Number that we
21  talked about earlier that would just be
22  automatically generated?
23       A.   Out of our accounting system, yes.
24       Q.   Okay, and then the invoice date, is that
25  the date that you transmit the invoice to the
```

1  customer?

2      A.   Yes, yes.

3      Q.   And then order number, does that always

4  correspond with the Invoice Number?

5      A.   In our case it does, with the exception,

6  with the possible exception of it -- I don't know

7  what, frankly, I don't know what the

8  Lenscrafters' orders, order numbers might look

9  like.  Well, we wouldn't have an invoice for

10 those, so yeah, the order number would all be the

11 same.

12     Q.   And then on the left-hand column where

13 it says code, what does code refer to?

14     A.   That means, well, in theory it would be

15 like the Mayflower system has accounting codes,

16 our system, in theory, would have accounting

17 codes, in this case it doesn't really mean

18 anything.

19     Q.   Okay.  Would your accounting codes and

20 Mayflower's accounting codes match up at all or

21 are they just --

22     A.   No, not at all.

23     Q.   And then to the right under

24 "Description," this, PO number what does that

25 refer to?

Page 82

1    A.   That is Amazon's PO number for installs

2 for that year.

3    Q.   Okay, and would you typically enter into

4 a new blanket PO with Amazon every year?

5    A.   Yeah, definitely every year.  Sometimes

6 they would get, a new one will get issued toward

7 the end of the year, like if it gets overran.

8 Sometimes they will increase the amounts, so

9 there are a couple of years where there would

10 have been two different PO numbers for that line

11 item.

12    Q.   All right.  Why don't you, I am going to

13 kind of switch gears, and just have you

14 authenticate some documents that have been

15 produced.  I may have a couple of questions about

16 them.

17         Christine, can you go ahead and e-mail

18 Mayflower 67, Mayflower 8, Mayflower 1, Mayflower

19 9, and Exhibit 2 from the deposition this

20 morning.

21    A.   Sir?

22    Q.   Yes, sir.

23    A.   I don't want to be rude, but I need to

24 text -- respond to my wife's text just very

25 quickly.

1    Q.   Well, why don't we do this.  Why don't

2    we just take a 5-minute break and then you take

3    care of whatever you need to take care of, in the

4    meantime, we'll e-mail you.

5    A.   Well, I mean we can.  I just don't -- I

6    didn't expect to go beyond this, so I don't want

7    to be -- I just want to be responsive, that's

8    all.  I don't need a break.  I just didn't want

9    to be --

10   Q.   Do you want to go on mute and check in

11   with your wife, and let us know when you're

12   ready?

13   A.   I'm ready.  I can be ready right now.  I

14   just needed to give --

15   Q.   We're in the home stretch, don't worry.

16   We're in the home stretch, don't worry.

17   A.   Okay.

18        MR. LUEPKE:   Brian, as we

19   indicated, Mr. Owens' wife is gravely ill and he

20   is her caretaker, and that's what's created this

21   sort of urgency.

22        MR. LAMPING:   Honestly --

23        MR. LUEPKE:   If we could be done

24   soon, I'd appreciate it.

25        MR. LAMPING:   Yeah.

Page 84

1      A.   Okay, we're good.  Thank you, I'm back.

2      Q.   (BY MR. LAMPING)  You're welcome.  Let

3  me know when the e-mails come through.

4      A.   Okay, sorry.  I've got them.  Which one

5  would you like me to open?

6            (Exhibit 12 was marked by the

7  reporter for identification.)

8      Q.   (BY MR. LAMPING)  Exhibit 12 first.

9      A.   I've got it.

10     Q.   Mayflower 6, there we go.

11     A.   Yep.

12     Q.   And take a look at this.  I just want

13  you to confirm that this is an e-mail chain

14  between you and Tim Grimes in April of 2023.

15     A.   Let's see, yes, that corresponds with

16  what he said he was going to do.  He had asked

17  me -- I had shared with him that the only other

18  person at Mayflower really that I had ever spoken

19  to was Tammi Woodruff, and that's who he elected

20  to -- that's who he said he was going to talk to

21  first.

22     Q.   Okay, and why don't you go ahead and

23  open up Mayflower 8.

24     A.   Okay, got it.

25            (Exhibit 13 was marked by the

Page 85

```
 1    reporter for identification.)
 2         Q.    (BY MR. LAMPING)  Do you recognize this
 3    as a text chain or a series of text messages
 4    between you and Tim Grimes?
 5         A.    Yes.
 6         Q.    Okay.  And the top text message -- and
 7    I'll represent to you the top message is between
 8    you and Tim Grimes.
 9         A.    Yes.
10         Q.    Tim says, "Paul got one clarification
11    question for you, if you have a minute."  And
12    then you responded, "Yes."  Do you recall what
13    Mr. Grimes' question was for you?
14         A.    I'm sorry, I do not.
15         Q.    Okay.  Let's go to Mayflower, I'm sorry,
16    let's go to Mayflower 1.
17         A.    Okay, I've got it.
18               (Exhibit 14 was marked by the
19    reporter for identification.)
20         Q.    (BY MR. LAMPING)  And do you recall or
21    do you recognize Mayflower 1 as an e-mail from
22    you to Ms. Dawkins on May 9th, 2023 transmitting
23    the Problem Master spreadsheet?
24         A.    Obviously, this is an e-mail from me.
25    I'm sure that I sent her the document and these
```

1    are consistent with the questions that I was

2    asking of her, which I outlined to you earlier

3    during this deposition, so yes.

4        Q.   Okay, and then take a look at Mayflower

5    9.

6        A.   Okay.

7             (Exhibit 15 was marked by the

8    reporter for identification.)

9        Q.   (BY MR. LAMPING)  And do you identify or

10   do you recognize Mayflower 9 as a text exchange

11   between you and Tim Grimes --

12       A.   Okay.

13       Q.   -- and this one is the one we read

14   earlier.

15       A.   This is the same one we read earlier,

16   yes.

17       Q.   Correct, yes, got it, and then can you

18   go to pull up the document that was marked

19   Exhibit 2?

20       A.   I have it.

21       Q.   And I will represent to you that that

22   document was marked as Exhibit 2 at Michael

23   Brendamour's deposition earlier today.

24       A.   Okay.

25       Q.   I'd like you to scroll to the first

Page 87

1    e-mail in the chain?

2         A.    All the way at the bottom then in this

3    case.

4         Q.    All the way at the bottom.

5         A.    Okay, I'm there.

6         Q.    And in the e-mail you state to Mike

7    Brendamour, "In the interest of not ignoring

8    this, I did all I can do by meeting with you in

9    the conference room at BMAY recently.  My

10   position has not changed."

11        A.    Yes.

12        Q.    My first question is do you see how the

13   subject line has a "Re:"?

14        A.    Yes.

15        Q.    And my understanding of how e-mails work

16   is that unless you are to physically type "Re:"

17   into the subject line, "Re:" does not appear

18   unless you are replying to a message.

19              MR. LUEPKE:    I object, counsel is

20   testifying.  Wait for a question, Mr. Owens.  He

21   has not asked any question.

22        Q.    (BY MR. LAMPING)  So is that your -- let

23   me back up.  Do you know if there was a prior

24   e-mail to which you are responding in this e-mail

25   chain?

Page 88

1       A.    I do not know.

2       Q.    Do you recall in this typing "Re:" and

3    then the case name in the subject line?

4       A.    Obviously, I would not have done that.

5       Q.    Okay.

6       A.    Well, I most likely would not have done

7    that.  As you said earlier, it really wouldn't

8    make any sense.

9       Q.    Yeah.  So do you know why there is not

10   an earlier e-mail in this?

11      A.    No, I do not.  I mean no, I do not.

12      Q.    Okay.

13      A.    Where would it -- I'm not -- where would

14   it have been, on his side or my side?

15      Q.    That's something we can sort out later.

16      A.    Okay, but no, I am not familiar with it.

17      Q.    That's fine.  What do you recall about

18   your meeting with Michael Brendamour in the

19   conference room at Brendamour Moving & Storage?

20      A.    Well, first and foremost, I had no

21   interest in meeting with Mike ever, after he left

22   the company, but that being said he was very

23   angry at the context of the case.

24           I was also disappointed in his

25   inclusion, and so he was adamant in talking about

Page 89

1    it.  We have a history of -- it has been my

2    desire to keep Mike away from our employees for

3    quite a period of time, and so basically he

4    showed up at the office and we had a

5    conversation, during which he expressed some

6    displeasure, and I assured him that I had not

7    indicated his involvement.

8        Q.   Okay.  Do you recall anything else from

9    that meeting?

10       A.   Not that meeting, nope.

11       Q.   Okay.  Tell you what, let us just take

12   another short break.  Let me get my notes

13   together and see how much, if anything, I have

14   left.  All right?  Can we go off the record for 5

15   minutes or so?

16             THE VIDEOGRAPHER:  Going off --

17   Henry, is that all right?

18             MR. LUEPKE:   Yes, yes, it is.

19   That's fine, Brian.

20             MR. LAMPING:  Okay.

21             THE VIDEOGRAPHER:  Going off the

22   record.  This ends Media 2.  The time is 4:30

23   p.m.

24             (Brief recess taken.)

25             THE VIDEOGRAPHER:  Going back on

Page 90

1    the record.  This begins Media 3.  The time is
2    4:38 p.m.
3        Q.   (BY MR. LAMPING)  Just a couple of more
4    follow-up questions, Mr. Owens, and then we'll
5    let you out of here.  We talked a lot about
6    invoices, about how Brendamour Moving & Storage
7    would generate its own invoice that it would send
8    to a customer like Amazon.  Did Brendamour
9    Moving  & Storage also generate its own bills of
10   lading?
11       A.   No, no.
12       Q.   Would the customer, and let's use Amazon
13   as an example, for a given transaction, would
14   there be any documentation exchanged between
15   Brendamour Moving & Storage and Amazon, other
16   than the transaction invoice and a blanket
17   purchase order?
18            MR. LUEPKE:   I object.  This is
19   far beyond the scope of this deposition.  Subject
20   to that you may try to answer, Mr. Owens.
21       A.    No, there is no paperwork.  Any job that
22   is completed is captured with pictures by the
23   driver that does the install, and those are
24   available to our customer, in this case Amazon,
25   so there is no paperwork.

1    Q.   (BY MR. LAMPING)  When Amazon would need

2  you to go install a kiosk or do something like

3  that, would they just e-mail a request to the

4  company?

5    A.   We would go through the process --

6         MR. LUEPKE:   Basically, I want a

7  continuing objection based on what I just said to

8  this whole line of questioning.  Subject to that,

9  you may try to answer again.

10   A.   Yes, there is a process, but yes, in

11  general.

12   Q.   (BY MR. LAMPING)  And the same with Red

13  Box, did Red Box have blanket purchase orders or

14  would they issue a purchase order for each

15  transaction?

16   A.   No, there was not a purchase order

17  system.  Basically during this time period the

18  installs were -- a batch of installs were sent

19  out each week to bid between us and a competitor,

20  and we bid on that set of work and we invoiced

21  accordingly.

22   Q.   Okay, and then for the last question,

23  for the Logistics transactions that were part of

24  the scheme, were all elements of that transaction

25  performed, were all elements of those

Page 92

1    transactions performed under Mayflower's

2    operating authority?

3        A.    No, they were not.

4        Q.    Which elements were not?

5        A.    Well, there are many different potential

6    components to an order, and so to start from the

7    beginning, typically there's a process called a

8    site survey, where someone goes out to the site

9    to determine where a kiosk is going to go.

10            That is not performed by any of our

11    drivers and has nothing to do with the UniGroup.

12    We receive items into the warehouse, inspect

13    them, we build things in the warehouse, we test

14    things in the warehouse.  That has nothing to do

15    with UniGroup.  That's a billable item.

16            And then eventually we deliver it and

17    install it.  That is typically done under

18    Mayflower's authority, and that is, of course,

19    billable and was entered into the Mayflower

20    system.

21            And then there was also times where we

22    ran electric cord cement pads, installed bollards

23    and items such as that, none of which were

24    performed by our drivers, and thus, none of which

25    has anything to do with UniGroup's authority.

Page 93

1      Q.   Okay.

2      A.   And those items, the one invoice that

3   you showed me earlier as an example, all of those

4   items are rolled up into that number.

5      Q.   Okay.  All right, Mr. Owens, I

6   appreciate your time this afternoon.  At this

7   time, I have no more questions.

8             MR. LUEPKE:  Julie, do you have any

9   questions.

10             MS. GUGINO:  Yeah, I do have a few

11   questions, but I didn't know if you wanted to ask

12   any questions, Henry.

13                    EXAMINATION

14   BY MR. LUEPKE:

15      Q.   My only question, Mr. Owens, is these

16   transactions that you discussed, the actions that

17   you took, did you take any of these actions or

18   engage in any of these transactions in any role

19   other than as General Manager of Brendamour

20   Moving & Storage?

21      A.   No.  Everything that I -- that was done

22   here was done as a part of my role as the General

23   Manager of Brendamour Moving & Storage.

24      Q.   I have no further questions.

25                    EXAMINATION

Page 94

1   BY MS. GUGINO:

2       Q.    Okay.   I sent, actually I have three

3   exhibits I wanted to ask Mr. Owens about.

4             Julie Gugino, for defendant Michael

5   Brendamour.   So I just e-mailed those and I

6   included Peggy Corbett.   Is that the right

7   person, the court reporter, that could log those

8   with the deposition?

9             (Off-the-record discussion.)

10            MR. LAMPING:   Julie, could I make a

11  suggestion?   Maybe we just identify, because I

12  see you sent them in a single pdf file.

13            MS. GUGINO:   Uh-huh.

14            MR. LAMPING:   Maybe we could just

15  mark those as a group exhibit, as one group

16  exhibit, and that would be the next exhibit.

17            MS. GUGINO:   I'm fine, because they

18  already have the number on it, so if she can fix

19  that.

20            MR. LAMPING:   Well, I think maybe

21  the official, we could put the official exhibit

22  designation on it, and I'm sure -- however you

23  want to do it, but yeah.

24            MS. GUGINO:   Are we at 11 now?

25            (Exhibit 16 was marked by the

Page 95

1    reporter for identification.)

2                    MR. LAMPING:   16.

3                    MS. GUGINO:   Okay.  So this would

4    be Exhibit 16 or 17.

5                    MR. LAMPING:   16.

6        Q.   (BY MS. GUGINO)  So I have a couple of

7    questions really before I even get to those, and

8    I don't have a lot.  This should not take long.

9             I know you've testified to some of this

10   today, Mr. Owens, in terms of this, going back to

11   this April 23rd, 2023 meeting that you had with

12   Tim Grimes, you mentioned that Art Whelan was

13   also at that meeting.  Who else, if anyone, was

14   at that meeting besides Tim Grimes and Art

15   Whelan?

16       A.   It was just us three.

17       Q.   Okay.  And I know you kind of answered

18   some questions about Mike Brendamour and how he

19   came up at that meeting or what was said, but

20   what, if anything, did you say about Mike

21   Brendamour to Tim Grimes at that meeting?

22       A.   Again, it's quite awhile ago, you know.

23   As I recall, Tim asked, just simply asked how

24   Mike was doing and I, you know, I recall sharing

25   with him perhaps lightly that Mike was no longer

1   with the company, and may be lightly, you know,

2   what had happened in terms of the, you know, the

3   transaction, as such, but that's about it.

4           But again, it's -- the purpose of that

5   meeting was what I was there to do and I outlined

6   it in this.  You know, we were there to -- for a

7   specific purpose, and it didn't have anything to

8   do with Mike.

9       Q.   Did you ever say that Mike knew anything

10  about the over-reporting?

11      A.   Yeah, I've already stated that several

12  times, no.

13      Q.   Or that he assisted with it?

14      A.   No.  I've stated that several times

15  here, then, and to any time that the matter has

16  come up, with Mayflower's internal counsel, our

17  counsel, both of them, and so on and so forth.

18              MR. LUEPKE:   Paul, just answer.

19  If you didn't do so, then just say so.  You don't

20  need to give us any specifics of that.

21      A.   No, I did not.

22              (Exhibit 8 was marked by the

23  reporter for identification.)

24      Q.   (BY MS. GUGINO)  So was Mike Brendamour

25  involved in any way with the over-reporting

Page 97

```
 1   scheme that as alleged in plaintiff's Complaint?
 2        A.   No, he was not.
 3        Q.   What involvement did Mike Brendamour
 4   have in the Logistics side of Brendamour?
 5        A.   Frankly, I don't know what Mike did.
 6        Q.   Okay.
 7        A.   Mike did whatever Mike wanted to do.
 8        Q.   Okay.  So in your affidavit, you
 9   testified that prior to becoming General Manager,
10   Michael Brendamour had resigned as President of
11   the company, so I guess I just to want pull up
12   this exhibit.  If you'll look at the first page
13   of that exhibit?
14        A.   Give me one second, please.
15        Q.   Okay.
16        A.   Okay.
17        Q.   So it's dated April 10th, 2023 and it is
18   signed Jack Brendamour, chairman and CEO.
19        A.   Okay.
20        Q.   So at this point would it be safe to say
21   that Mike Brendamour was no longer acting as
22   President of the company when this would have
23   been dated?
24        A.   Ma'am, I'm not trying to be
25   disrespectful to you or your client.  I never had
```

Page 98

1   any real idea what Mike Brendamour was doing and

2   not doing.

3       Q.   Okay.  So Page 2 is a memo from Jack

4   Brendamour, July 22nd, 2003, and it states,

5   "Effective immediately, Paul Owens will be in

6   charge of operations," so is this the date -- I'm

7   going back to your affidavit when I say that.

8       A.   Yeah.

9       Q.   Mike signed as President, prior to

10  becoming General Manager.  Is this the date that

11  you would be referring to when you say you became

12  General Manager?

13      A.   No, it is not.  In fact, I can't even

14  say that I ever have even seen this e-mail.  I

15  find it very interesting, or this memorandum

16  actually.

17           I was in charge of -- I don't know how

18  Jack -- you know, Jack may have spun my arrival

19  to these people in a certain way, I don't know,

20  but what I do know is I, for a year-plus I just

21  sat back in an office and scheduled 7 in-home

22  delivery trucks.  I wasn't in charge of these

23  people on July the 22nd, that is for certain.

24      Q.   Okay.

25      A.   I wasn't in charge, I was not.  Go

Page 99

1   ahead.

2        Q.    The last page here is this memo that

3   Mike Brendamour sent to SBG and Jack Brendamour

4   and his mother and brothers essentially --

5        A.    Uh-huh.

6        Q.    -- saying that he was -- he had already

7   resigned as President of the company June 14th,

8   2004.  Would you have received a copy of this?

9        A.    No.

10       Q.    Okay.  He also says in that that he had

11  been acting in his capacity as the President of

12  the company in name only since the Spring of

13  2022.  Do you have any understanding that that is

14  accurate?

15       A.    Again, ma'am, I guess technically there

16  was a point where, I guess technically Mike was

17  supposed to be my employee, but from the time I

18  arrived to the time he departed, I have no idea

19  what Mike Brendamour was doing, nor was I overly

20  worried about it.

21       Q.    Okay.  He also indicates he was not

22  given financial, and the company's accounting

23  personnel had been instructed not to release

24  information to him unless approved by his father.

25  Do you know anything about that?

Page 100

1      A.    I personally never gave financial

2   statements to Mike Brendamour; however, the other

3   part of that I cannot attest to, because I don't

4   know.

5            I don't specifically recall ever being

6   told not to give him financial statements, but I

7   will attest that I have never given him financial

8   statements, that I recall.

9      Q.    So this sort of goes along with your

10  response to a lot of these questions, and he's

11  indicated that from 2002 to 2020 he didn't

12  participate in day-to-day management of

13  Brendamour.  Is that correct to your

14  understanding?

15     A.    Well, roughly until 2007, or so, '06,

16  whatever, I for sure had no idea what he was

17  doing, and then after that I had a -- you know, I

18  never really knew, so I apologize.  It makes

19  sense, but I don't know what he was doing.

20     Q.    You had very little involvement?

21     A.    With Mike, right.

22     Q.    On any kind of day-to-day operations of

23  the company?

24     A.    No.

25     Q.    For since you started there?

Page 101

1      A.    Correct.

2      Q.    Okay.  He also indicated that to his

3   knowledge in the past 20 years no Board meetings

4   were held.  Do you know anything about that?

5      A.    I've never participated in a board

6   meeting.  I'm not a Board member.  I don't even

7   know that there is one.

8      Q.    Yeah, okay.  So in plaintiff's responses

9   to Mike Brendamour's discovery requests they

10   referenced this May 25th, 2023, video conference

11   which was held, and they name a bunch of people

12   that were there, and they say that, "Owens again

13   confirmed he helped Brendamour enter invalid

14   inflated revenue amounts, and that the scheme

15   began at the direction of Mr. Brendamour."

16      A.    That is on --

17      Q.    Did you say that?

18      A.    No, and, in fact, I stated clearly that

19   Mike was my employee during that time.

20      Q.    This statement says that a paralegal,

21   Nancy, attended on behalf of Brendamour.  Do you

22   know the last name of that person?

23      A.    I do not.  I have only met her once, or

24   twice, I should say, and that was one of them.

25   She works for our Ohio-based attorney.

Page 102

1      Q.   Jim Farris?

2      A.   Yes.

3      Q.   So this says that the people who were

4   there were, okay, representatives of Mayflower

5   and Brendamour, M & S, Bob McCabe, Valerie Pacer,

6   Mark Velanski, James Brendamour, Doug Brendamour,

7   Paul Owens, David Brendamour, Jim Farris and

8   Nancy.

9      A.   Yes.

10     Q.   So I guess they don't mention a

11   Mayflower rep as a part of that call.  Do you

12   know who else was there?

13     A.   Yeah, all of those first people that you

14   named were Mayflower people.

15     Q.   Bob McCabe, Valerie Pacer, Mark

16   Velanski?

17     A.   Correct.

18     Q.   Do you know if anyone took like notes or

19   minutes of that call?

20     A.   No.

21     Q.   Do you know if there was a recording of

22   it?

23     A.   Not on our side.

24          MS. GUGINO:  Okay, I don't have any

25   other questions.

```
                                               Page 103

 1                  MR. LAMPING:  I have nothing.

 2                  MR. LUEPKE:   I have nothing

 3      further.

 4                  THE REPORTER:   Mr. Luepke, does

 5      the witness want to read and sign?

 6                  MR. LUEPKE:  Yes, we'll read and

 7      sign; is that correct, Paul?

 8                  THE WITNESS:  Yes.

 9                  THE REPORTER:  And Julie, did you

10      want a copy?  You did not want a copy of the

11      other witness.

12                  MS. GUGINO:  I guess I just need to

13      speak to my client and let you know.

14                  THE REPORTER:  Thank you all.

15                  MR. LUEPKE:  And we would like a

16      recording of the video as well as a full

17      transcript and a condensed version, both

18      electronic.

19                  MR. LAMPING:  And we don't need a

20      video, just an E-Tran.

21                  THE VIDEOGRAPHER:  That was

22      Mr. Luepke that was saying you do want a video a

23      moment ago; is that correct?

24                  MR. LUEPKE:   That is correct.

25                  THE VIDEOGRAPHER:  Okay.  All
```

Page 104

1  right.

2          MR. LAMPING:  We don't need a

3  video.

4          THE VIDEOGRAPHER:  All right, I'm

5  going to read us off the record, sorry.  We are

6  off the record at 4:58 p.m. Central Time and this

7  concludes today's testimony given by Paul Owens.

8  The number of media used was three and will be

9  retained by Veritext.

10          (Deposition ended at 4:58 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 105

1              C E R T I F I C A T E

2

3         I, Peggy E. Corbett, a Certified Court

4    Reporter of the State of Missouri, do hereby

5    certify:

6              That prior to being examined the

7    witness was by me duly sworn;

8              That said deposition was taken down by

9    me in shorthand at the time and place

10   hereinbefore stated and was thereafter reduced to

11   writing under my direction;

12             That I am not a relative or employee or

13   attorney or counsel of any of the parties, or a

14   relative or employee of such attorney or counsel,

15   or financially interested in the action.

16             WITNESS my hand and seal this 16th day

17   of November, 2023.

18

19

            *Peggy E. Corbett*

20        _____

          PEGGY E. CORBETT,

21        CCR No. 143, RDR, CRR

22

23

24

25

```
                                                        Page 106
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                          Suite 1820
                        Cleveland, Ohio 44114
 3                     Phone: 216-523-1313
 4   November 28, 2023
 5   To: Mr. Luepke
 6   Case Name: Mayflower Transit, Llc v. Brendamour Moving & Storage,
     Inc., Et Al.
 7
     Veritext Reference Number: 6311599
 8
     Witness:  Paul Owens        Deposition Date:  11/14/2023
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 6311599
3       CASE NAME: Mayflower Transit, Llc v. Brendamour Moving &
   Storage, Inc., Et Al.
        DATE OF DEPOSITION: 11/14/2023
4       WITNESS' NAME: Paul Owens
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____          _____
9  Date                     Paul Owens
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
              Statement; and
14      Their execution of this Statement is of
              their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20_____.
17
              _____
18            Notary Public
19            _____
              Commission Expiration Date
20
21
22
23
24
25

Page 108

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2
           ASSIGNMENT REFERENCE NO: 6311599
3          CASE NAME: Mayflower Transit, Llc v. Brendamour Moving &
     Storage, Inc., Et Al.
           DATE OF DEPOSITION: 11/14/2023
4          WITNESS' NAME: Paul Owens
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Paul Owens
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date

Page 109

1                          ERRATA SHEET

                VERITEXT LEGAL SOLUTIONS MIDWEST

2                    ASSIGNMENT NO: 6311599

3       PAGE/LINE(S) /          CHANGE          /REASON

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19

        _____          _____

20      Date                      Paul Owens

21      SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22      DAY OF _____, 20_____ .

23                        _____

                          Notary Public

24

                          _____

25                        Commission Expiration Date

**[& - 44114]**

| & | 1 | 1st 20:24 77:14 | 2023 1:21 4:4 |
|---|---|---|---|

**&**   1:7 2:12,14
4:15 17:25
18:18,23 19:7
19:15 21:2,4,4
22:15,20 23:9
24:11 25:18,25
26:15,23 27:14
28:4 30:7
31:23 39:19
40:17 44:4,10
45:5 46:1
47:25 48:6
50:3 52:10
53:10,17 54:9
54:13 55:7,22
58:6 60:13
62:11,25 69:23
73:21 88:19
90:6,9,15
93:20,23 102:5
106:6 107:3
108:3

**1**   4:12 10:10
13:25 15:10,17
23:7 63:22
82:18 85:16,21
**10**   3:12 25:12
77:21,24
**100**   42:23
58:23
**100,000**   59:23
**105**   2:21
**10th**   97:17
**11**   3:15 80:5,8
94:24
**11/14/2023**
106:8 107:3
108:3
**1100**   106:1
**12**   3:16 54:3,8
55:20 84:6,8
**13**   3:17 84:25
**14**   3:2,4,18
85:18
**143**   105:21
**14th**   1:21 4:4
99:7
**15**   3:19 86:7
**16**   3:20 94:25
95:2,4,5
**16th**   76:20
105:16
**17**   95:4
**1820**   106:2
**1992**   20:16

**1st**   20:24 77:14

| 2 |
|---|

**2**   3:23 15:10
16:18 33:4,6,9
64:1 82:19
86:19,22 89:22
98:3
**20**   101:3
107:16 108:22
109:22
**200,000**   59:24
**2000**   23:19
**2000s**   28:5
**2002**   100:11
**2003**   20:24
22:14 98:4
**2004**   27:21
99:8
**2005**   26:17,19
46:6,8
**2006**   23:20
26:20 70:5
**2007**   100:15
**2010**   38:20,22
40:13 53:25
56:19 70:8
78:16,22
**2012**   18:4
46:23
**2016**   56:3,22
77:14
**2019**   80:13
**2020**   100:11
**2022**   99:13

**2023**   1:21 4:4
34:7 47:24
48:3 56:19
68:22 69:7,18
73:12 84:14
85:22 95:11
97:17 101:10
105:17 106:4
**216-523-1313**
106:3
**2244**   2:15
**225**   2:10
**22nd**   98:4,23
**23rd**   68:17,22
69:7,17 95:11
**24960**   105:19
**2553**   80:3
**25th**   101:10
**28**   106:4
**2:05**   4:1,3

| 3 |
|---|

**3**   15:10 60:25
68:10 69:6
78:12,14 90:1
**30**   1:19 3:7
**314.552.6000**
2:5
**32**   3:7

| 4 |
|---|

**4**   68:10 73:7,8
73:10
**4270**   2:9
**44114**   106:2

| 0 |
|---|

**0000001**   3:19
**0000006**   3:17
**0000008**   3:18
**0000009**   3:20
**0006**   14:2
**002553**   3:16
**00708**   1:6 4:18
**01**   75:24
**06**   100:15

**448** 73:22
**45245** 2:10
**4:23** 1:6 4:18
**4:38** 90:2
**4:58** 104:6,10

**5**

**5** 2:19 3:2 14:3
  14:6,19 63:17
  63:19 79:1
  83:2 89:14
**513.943.5669**
  2:11
**54** 73:24

**6**

**6** 1:19 3:4,7
  14:24 15:3,10
  84:10
**63101** 2:5
**6311599** 106:7
  107:2 108:2
  109:2
**63144** 2:15
**67** 82:18

**7**

**7** 3:7 32:1,12
  32:21,24 33:4
  42:9 63:8 68:9
  68:13 69:2
  73:4 76:7
  98:21
**71** 3:12
**77** 3:12

**8**

**8** 3:11 68:9
  82:18 84:23
  96:22
**80** 3:15
**82** 3:23
**84** 3:16,17
**85** 3:18
**86** 3:19
**8th** 73:11

**9**

**9** 3:12 15:11
  68:9 71:19
  74:15 82:19
  86:5,10
**93** 2:20,20
  20:16
**94** 3:20
**96** 3:11
**9th** 34:7 76:7
  85:22

**a**

**able** 17:14
  32:15 62:12
  72:10
**above** 58:25
  59:1,6 106:17
**absolutely**
  41:15 66:10
  70:6
**abundance**
  51:14
**abundant**
  51:12

**abundantly**
  27:16
**access** 46:20
  66:11 72:4
**accessed** 13:6
**accessorial**
  37:3,5 56:21
  76:22
**accordance**
  107:5 108:5
**account** 54:17
  54:18,20,23
  67:1
**accounting**
  20:12 34:21
  35:15,16,24
  36:1 67:11
  70:20,23 71:10
  71:25 72:1
  75:20 79:8,13
  79:21,22 80:23
  81:15,16,19,20
  99:22
**accounts** 57:14
  58:1
**accuracy** 37:21
**accurate** 12:1
  18:6 36:24
  70:1 72:9
  99:14
**accurately** 39:7
  39:23 54:15
  57:15 77:5
**accused** 31:19

**accusing** 31:1
**acknowledge**
  107:11 108:16
**acknowledged**
  56:18 59:13
**act** 22:25 61:9
  107:14 108:20
**acting** 97:21
  99:11
**action** 5:1
  105:15
**actions** 93:16
  93:17
**activity** 22:2,3
**actual** 58:12,15
  62:19 64:13,16
  73:24 78:18
**actually** 36:7
  37:11 48:8
  49:25 56:10,13
  70:8 72:25
  94:2 98:16
**adamant** 88:25
**adamantly**
  42:2
**added** 23:25
**address** 106:15
**administer**
  4:24
**admitted** 69:23
**affidavit** 11:23
  97:8 98:7
**affiliated** 20:21
**affiliations** 5:6

**affirmative**
7:17
**affixed** 107:15
108:21
**afternoon** 4:2
5:21,22 93:6
**agency** 39:4,20
49:21 60:12
62:14 65:6
**agent** 16:20
44:9,11 45:5
**aggressive**
43:19
**ago** 6:24 42:9
95:22 103:23
**agree** 4:11 8:11
8:19 25:16
52:7 69:12,13
**agreed** 57:15
**ahead** 12:25
14:9 32:4,11
33:2,3 82:17
84:22 99:1
**al** 1:8 4:16
106:6 107:3
108:3
**alive** 25:9,24
**allegations**
18:22 30:6
31:21
**alleged** 30:7
97:1
**allowed** 39:19
**alternative**
13:17

**amazon** 18:24
19:8 53:3 58:3
58:5,11,16,21
58:23 59:23
62:24 63:2
65:15,18,19
75:4,16,18,23
80:12,16 82:4
90:8,12,15,24
91:1
**amazon's** 58:11
82:1
**amended** 3:11
**amicable** 51:24
**amicably** 73:1
**amount** 29:8,13
49:14 55:21
58:17,25 59:1
59:6,7,15,16
60:2,3 62:24
62:25 65:3
66:21,23,25
67:21 71:9
72:18
**amounts** 59:10
62:20 82:8
101:14
**anger** 49:17
**angry** 88:23
**annual** 11:6
**answer** 8:9,19
8:21 9:6 16:25
17:1 19:2
26:25 29:11,21
31:4,6,7 39:13

51:7,8 55:16
56:1,1 63:5
67:7 68:14
72:16 76:8,18
77:11 79:7
90:20 91:9
96:18
**answered**
68:23 95:17
**answering** 16:8
34:3,7
**answers** 3:7
16:5 32:8,21
77:16,24 78:3
**anybody** 10:18
**anyway** 26:19
71:17
**apologize** 20:17
35:22 37:23
38:17 44:17
66:12 69:1,3
100:18
**apparently**
68:24
**appear** 75:3
80:13 87:17
107:11 108:15
**appearance** 5:4
**appearances**
5:6
**appearing** 2:2
2:7,12
**appended**
108:11,18

**applied** 71:15
**appointed**
24:15
**appreciate**
83:24 93:6
**approved**
99:24
**approximately**
23:16 70:4
**april** 20:24
22:14 34:7
54:1 68:17,22
69:7,17 84:14
95:11 97:17
**arbitrary** 55:3
**argue** 61:2
**arrangement**
30:2
**arrival** 98:18
**arrived** 99:18
**art** 40:11,13
46:22 69:18
95:12,14
**arthur** 40:11
**aside** 80:2
**asked** 51:16
67:13,13 72:22
78:6 84:16
87:21 95:23,23
**asking** 17:12,14
32:5 43:25
59:4 64:8 77:9
86:2
**assert** 17:20
25:13

**[asserted - bid]**

| | | | |
|---|---|---|---|
| **asserted** 17:21 | **authorized** | **bachelor's** | **began** 70:4 |
| **assignment** | 4:24 | 20:12 | 101:15 |
| 107:2 108:2 | **automated** | **back** 10:22 | **beginning** 3:20 |
| 109:2 | 71:12 | 44:23 52:1,2 | 5:7 65:22 92:7 |
| **assisted** 96:13 | **automatically** | 57:3 60:16 | **begins** 64:1 |
| **associated** | 80:22 | 63:8,25 65:13 | 68:22 73:11 |
| 18:24 65:25 | **available** 70:12 | 67:18 68:13,19 | 90:1 |
| **assume** 7:12 | 90:24 | 76:6 84:1 | **behalf** 1:19 |
| 8:21,22 9:11 | **ave** 106:1 | 87:23 89:25 | 101:21 |
| 10:9 44:3 70:5 | **avenue** 51:21 | 95:10 98:7,21 | **believe** 24:3 |
| **assumed** 45:23 | **aware** 12:13,17 | 106:15 | 32:16 33:22 |
| **assuming** 6:21 | 15:14 19:16,22 | **background** | 37:25 62:16 |
| 72:6 | 24:24 26:5,14 | 20:11 | 64:8 76:15 |
| **assumption** | 27:12 28:9,13 | **bad** 8:15 | 78:5 |
| 43:18,19 | 28:14,16,17 | **ball** 67:17 | **benefit** 50:3 |
| **assured** 89:6 | 34:21 35:1,15 | **bank** 2:4 61:20 | **benefitted** 36:8 |
| **attached** 108:7 | 35:17 38:8 | **base** 33:10 | 50:5 62:11 |
| **attended** | 41:9,13,16,17 | **based** 45:11 | **benefitting** |
| 101:21 | 41:20,23,25 | 53:19 57:8 | 60:20 |
| **attention** 67:10 | 42:11 44:25 | 79:15 91:7 | **best** 6:3 8:12 |
| **attest** 100:3,7 | 45:16,24 47:24 | 101:25 | 38:19 40:22,25 |
| **attorney** 5:7 | 49:3 50:20 | **basic** 7:9 | 50:22 55:15 |
| 8:6 31:25 | 52:3,16,16 | **basically** 18:1 | **beth** 2:17 |
| 32:25 78:9 | 58:19 60:5,6 | 36:10,16,19 | **bethany** 4:21 |
| 101:25 105:13 | 65:13 66:13 | 49:3 60:15,22 | **better** 36:10 |
| 105:14 | 79:4,8,18,20 | 68:16 69:12 | 38:18 56:7 |
| **attorneys** 5:24 | **awareness** | 71:16 89:3 | 62:8 79:19 |
| **audio** 4:9 | 53:20 | 91:6,17 | **beyond** 16:2 |
| **authenticate** | **awhile** 30:1 | **basis** 68:6 | 29:10 30:19,21 |
| 82:14 | 33:23 95:22 | **batch** 91:18 | 39:11 55:11 |
| **authority** 22:6 | **b** | **bears** 55:19 | 63:3 66:21 |
| 92:2,18,25 | **b** 1:19 3:1,7,22 | **becoming** 97:9 | 67:5 83:6 |
| **authorize** | 19:19,24 20:2 | 98:10 | 90:19 |
| 108:11 | **babies** 23:6 | **beg** 44:21 | **bid** 91:19,20 |

[big - capital]

**big** 75:1
**biggest** 25:10
  53:4
**billable** 92:15
  92:19
**billed** 36:16,17
**billing** 37:8,13
  37:16,19 56:5
  64:19,20,22
  66:8 71:14
  72:20
**billings** 68:7,8
  79:24,25
**bills** 90:9
**bit** 9:1 22:23
  41:6,17 43:7
  46:10
**blamping** 2:6
**blanket** 65:20
  65:23 82:4
  90:16 91:13
**bmay** 78:16,18
  87:9
**board** 101:3,5
  101:6
**bob** 102:5,15
**bollards** 92:22
**bond** 2:14
**books** 28:9
**borrowing**
  60:23
**bottom** 39:17
  78:14 87:2,4
**boulevard** 2:9
  2:15

**box** 18:24 19:8
  53:3 58:3,5,16
  65:15,18 91:13
  91:13
**break** 9:3,7
  63:10,10,19
  68:23 83:2,8
  89:12
**brendamour**
  1:7,17 2:7,12
  2:13 3:15 4:15
  5:15 12:11
  14:10 15:19
  16:11 17:25
  18:2,3,5,8,13
  18:18,22 19:7
  19:14,15,19,23
  19:24 20:1,22
  21:2,4,9 22:20
  23:9 24:11,17
  24:19 25:3,4,6
  25:8,11,18,21
  25:23,25 26:1
  26:4,10,15,23
  27:13,14,17,22
  28:3,4 30:7
  31:22 38:1
  39:6,19 40:17
  40:21,23 41:10
  41:13,19 42:3
  42:5,11,15,17
  43:1,15 44:4,8
  44:10,13 45:5
  46:1,25 47:17
  47:25 48:6,14

  48:19 50:10
  52:9 53:10,17
  54:9,13 55:7
  55:22 57:2,7
  58:5 60:13
  62:10,25 69:23
  73:21 80:3
  87:7 88:18,19
  90:6,8,15
  93:19,23 94:5
  95:18,21 96:24
  97:3,4,10,18,21
  98:1,4 99:3,3
  99:19 100:2,13
  101:13,15,21
  102:5,6,6,7
  106:6 107:3
  108:3
**brendamour's**
  86:23 101:9
**brentwood**
  2:15
**brian** 2:3 5:10
  5:23 11:19
  41:1 59:4
  83:18 89:19
**brief** 48:22
  63:24 89:24
**bring** 68:19
**bringing** 67:10
**brings** 35:25
  36:2
**brothers** 25:6
  25:11 26:2
  99:4

**bud** 6:21 9:17
**build** 92:13
**built** 62:13
**bunch** 66:14
  76:1 101:11
**busier** 52:10
  53:10,12
**business** 15:18
  16:14,19 17:5
  17:15 18:4,9
  18:13 19:19,23
  20:2 21:17,23
  26:12,13,19
  27:8 34:11
  36:6 39:1
  50:13,25 52:9
  53:9,18 61:9
  61:10,12

**c**

**c** 2:1 105:1,1
**ca** 106:25
**call** 6:3,4,6
  12:10 20:22
  43:5,7 50:18
  54:3 66:4
  69:13 76:17
  102:11,19
**called** 41:3,4
  54:21 71:1
  74:22 92:7
**camera** 4:7
**capacity** 99:11
**capital** 39:2
  61:4,15 62:12

[capitalize - company]                                                                  Page 6

**capitalize**
  39:17
**capitalizing**
  38:24
**captured**  90:22
**care**  83:3,3
**caretaker**
  83:20
**case**  1:6 4:18
  5:25 9:24
  18:22 19:13
  25:14 30:6,8
  32:23 41:7
  66:15 70:21
  81:5,17 87:3
  88:3,23 90:24
  106:6 107:3
  108:3
**cases**  62:5
**cash**  11:7 56:25
**cause**  29:3
**caused**  51:6
  52:5 56:6
**ccr**  1:20 105:21
**ceased**  18:14
**cement**  92:22
**central**  4:3
  104:6
**ceo**  97:18
**certain**  15:15
  18:23 37:16
  42:5 62:12
  98:19,23
**certainly**  12:22
  63:20

**certificate**  2:21
  108:11
**certification**
  107:1 108:1
**certified**  105:3
**certify**  105:5
**chain**  3:17,19
  84:13 85:3
  87:1,25
**chained**  9:4
**chair**  9:5
**chairman**
  97:18
**change**  106:13
  106:14 108:8
  109:3
**changed**  56:21
  87:10
**changes**  106:12
  107:7 108:7,9
**changing**  56:25
**charge**  98:6,17
  98:22,25
**charges**  18:23
  31:20 37:3,5
  38:4 39:7,23
  48:9 50:1,2
  52:23 53:7,19
  56:11,11,12
  57:14 62:19
  65:4 69:24
  78:18
**check**  83:10
**christine**  2:3
  5:11 82:17

**chronology**
  32:10
**chuck**  46:22
**cincinnati**  1:22
  2:10 6:10 20:5
  44:6
**civil**  1:18 3:6
  107:5 108:5
**claim**  33:10
**clarification**
  41:2 85:10
**clean**  7:24
**clear**  42:14
  62:16 79:12
**clearly**  37:14
  101:18
**cleveland**  106:2
**client**  6:24 31:1
  77:25 97:25
  103:13
**close**  43:9
**coburn**  2:4
**code**  72:20
  81:13,13
**codes**  37:8,13
  37:16,19 56:5
  64:19,20,22
  65:25 66:1,8
  71:14 81:15,17
  81:19,20
**column**  74:25
  81:12
**columns**  72:2
**come**  13:11
  43:5 46:2

  51:17 74:17
  84:3 96:16
**comes**  9:1
  74:14
**comfortable**
  38:3
**coming**  19:16
**commenced**  4:1
**commission**
  107:19 108:25
  109:25
**committed**
  64:24
**communicate**
  48:17
**communicati...**
  9:10,14,18
**companies**
  19:18 20:23
  21:12,14,16
  43:9 44:3
  53:23
**company**  16:6
  20:2,25 21:3,6
  21:14 24:20,22
  25:10 27:22
  28:23 29:15
  31:11 34:20
  36:4 40:5 50:5
  50:6 52:4 57:2
  61:15 71:11
  88:22 91:4
  96:1 97:11,22
  99:7,12 100:23

**company's**
  99:22
**competitor**
  91:19
**complaint**  3:11
  97:1
**complete**  77:5
**completed**  22:2
  90:22 106:15
**completely**
  64:7
**components**
  92:6
**conceal**  48:5
**concerned**
  58:17
**concerted**  47:1
  48:4
**concludes**
  104:7
**condensed**
  103:17
**conducted**  4:5
  4:19
**conference**
  87:9 88:19
  101:10
**confidential**
  9:14
**confirm**  16:9
  16:13 17:3,15
  62:17 69:11
  84:13
**confirmation**
  17:9

**confirmed**
  101:13
**confirming**
  77:8
**confused**  38:14
**confusing**
  30:10 44:24
  68:12 72:15
**connection**  4:7
  11:23 16:8
  45:25
**conscious**  27:9
**consistent**
  77:11 78:21,23
  86:1
**consumer**  23:1
**contacted**
  29:22,24
**contest**  23:22
**context**  88:23
**continue**  4:10
  8:1
**continuing**
  91:7
**control**  57:10
**controller**
  23:11,17,23
  24:8,14 28:10
  28:20,23
**controversial**
  39:18
**conversation**
  7:19 9:23 10:1
  32:10 40:8
  70:13 89:5

**conversations**
  32:5 40:16
**convoluted**
  62:2
**coordinated**
  22:2
**copy**  77:24
  99:8 103:10,10
**copying**  3:24
**corbett**  1:20
  4:23 94:6
  105:3,20
**cord**  92:22
**corporate**  1:17
  3:4 12:10,19
  14:17
**correct**  15:13
  16:17 17:7
  18:3,11,12,15
  19:9 21:20
  24:5 25:2,9
  28:25 32:15
  35:12 36:25,25
  45:6 46:12
  49:23 50:8
  53:1 55:5,20
  57:23 58:8
  62:22 63:6
  64:10,11 68:1
  69:19 70:1
  75:6,6 78:24
  86:17 100:13
  101:1 102:17
  103:7,23,24

**corrected**  79:9
**corrections**
  106:12 108:17
**correctly**  15:22
  16:22 33:15
  34:11 78:19
  79:10
**correspond**
  81:4
**corresponds**
  84:15
**counsel**  4:14
  5:5 6:18,20
  9:12,15,18
  10:13,19 12:14
  15:11 87:19
  96:16,17
  105:13,14
**county**  107:10
  108:15
**couple**  68:10
  78:11 82:9,15
  90:3 95:6
**course**  92:18
**court**  1:1 3:24
  4:17,22 5:8
  7:13 8:11
  33:12 63:14
  94:7 105:3
  107:7
**covered**  57:12
**created**  43:18
  83:20
**credits**  39:5,21
  55:6 62:13

crr  105:21
cschlegl  2:6
csr  1:20
cumulative
  68:7
current  47:15
curve  61:25
customer  57:15
  57:18,18 69:24
  78:17 81:1
  90:8,12,24
customers
  18:10 53:4
  62:18 68:11
  78:19
cv  1:6 4:18

**d**

d  2:18 19:19,24
  20:2
dan  48:24
data  46:11
  52:18 54:10
  71:25
date  23:12,12
  23:14 67:22,23
  67:24 70:10
  73:15,17,18
  76:21 77:7
  80:24,25 98:6
  98:10 106:8
  107:3,9,19
  108:3,13,25
  109:20,25
dated  97:17,23

dates  25:22
  26:8 34:9
  48:20
dave  47:15,16
  47:19 48:18,22
  49:5 50:9,12
  57:7
david  48:13
  102:7
dawkins  76:8
  76:12 85:22
day  1:21 44:20
  48:25 76:13
  100:12,12,22
  100:22 105:16
  107:16 108:22
  109:22
days  106:18
dealing  21:12
dear  106:10
debits  55:6
decided  50:18
  59:1,14 60:2
decides  58:25
  59:7
deciding  54:14
decision  27:2,7
  27:9 40:3 57:6
decisions  53:19
deed  107:14
  108:20
deemed  106:19
default  18:1
defendant  2:7
  2:12 94:4

defendants  1:9
defined  15:19
definitely  82:5
degree  20:12
  20:15
deliver  92:16
delivering
  22:25
delivery  21:25
  22:4,19,22
  98:22
demonstrate
  67:16
deny  42:2
departed  99:18
department
  22:19,23 67:11
  106:22
depends  4:6
deponent  8:8
deposition  1:15
  3:3,5 4:1,5,13
  4:19 7:5 9:11
  9:22 10:6,15
  14:20,21 19:2
  26:5 29:10
  30:20 39:12
  55:12 63:4
  67:6 82:19
  86:3,23 90:19
  94:8 104:10
  105:8 106:8,11
  107:1,3 108:1
  108:3

depositions  8:5
  10:14
describe  28:11
  38:4
description  3:1
  3:22 81:24
designation
  94:22
designed  68:5
desire  51:15
  55:1 89:2
detail  11:18
  51:14,17,19
  66:4
details  10:3
  41:17 48:18
determine  92:9
determined
  59:17 60:4
difference  57:5
different  18:19
  30:19 59:21
  61:15 67:22,24
  68:11 75:16,17
  82:10 92:5
difficult  8:10
  74:4 78:9
difficulty  49:14
dinner  42:22
directed  3:9
direction  27:5
  36:10 70:22
  101:15 105:11
directly  37:12

[disappointed - enter]                                                    Page 9

| | | e | effective 98:5 |
|---|---|---|---|

**disappointed**
88:24
**disappointment**
49:17
**disbelieving**
43:7
**disclose** 9:13
**discovery** 3:15
11:5,11 18:8
37:14 38:12
46:19 51:13
65:2 66:9
70:18 101:9
**discussed** 93:16
**discussing**
10:20
**discussion**
13:15 28:2
32:7 94:9
**displeasure**
89:6
**dispute** 19:13
70:5
**disrespectful**
97:25
**distribution**
3:24 24:25
**district** 1:1,1
4:17,17 33:11
33:12
**division** 1:2
4:18
**do's** 10:14
**document** 11:4
11:8,9,10,13

14:14,22 15:2
33:19 72:9
74:12 85:25
86:18,22
**documentation**
90:14
**documents**
10:22 11:2,22
12:6,21,23
13:2,21 25:23
41:24 42:1
82:14
**doing** 13:12,13
19:23 27:17
31:1,19 38:15
40:6,8 43:12
43:13 46:15
53:15 61:25
62:1 64:24
67:19 72:10
95:24 98:1,2
99:19 100:17
100:19
**dollars** 61:1
**don'ts** 10:14
**doug** 47:15,16
47:19 48:13,18
49:5 50:9,12
57:7 102:6
**driver** 90:23
**drivers** 92:11
92:24
**duly** 5:17 105:7
**dwindling** 57:4

**e**

**e** 1:20 2:1,1,18
3:1,16,18,22
13:11,18,20,22
26:8 32:13
34:8,14 68:24
74:12 77:17
80:4 82:17
83:4 84:3,13
85:21,24 87:1
87:6,15,24,24
88:10 91:3
94:5 98:14
103:20 105:1,1
105:3,20
**earlier** 26:5
28:3 35:21
64:23 76:13
78:22,23,24
80:21 86:2,14
86:15,23 88:7
88:10 93:3
**earned** 56:15
57:5 60:24,25
61:12
**earns** 72:20
**easier** 32:11
**eastern** 1:1,2
4:17,18 33:12
**educate** 10:13
**educated** 10:6
**educational**
20:10
**effect** 74:2

**effective** 98:5
**effort** 27:3 29:1
47:1 48:4
72:24
**efforted** 72:7
**efforts** 67:12
**either** 23:15
29:5 51:1
**elected** 84:19
**electric** 92:22
**electronic**
103:18
**elements** 91:24
91:25 92:4
**email** 106:17
**employed**
21:15
**employee** 21:19
31:22 40:9,10
99:17 101:19
105:12,14
**employees** 22:1
89:2
**enclosed**
106:11
**ended** 56:9
104:10
**ends** 63:22
89:22
**engage** 93:18
**engaged** 16:14
17:5
**enter** 46:11
82:3 101:13

entered 19:7
36:22,23 37:6
48:9 49:25
52:24 57:16
59:1,2,7 62:20
64:12,15 65:16
66:18 67:23
79:15 80:1
92:19 108:9
entering 50:2
69:24 78:17
entire 107:5
108:5
entirety 64:9
entity 15:20
16:14 17:23
19:22 20:21
entries 61:8
64:25
equipment
23:2
errata 106:13
106:18 108:7
108:10,18
109:1
essence 35:18
36:3 57:11
essentially
16:10 18:4,14
39:4 56:6,10
57:4,9 61:20
69:11 99:4
established
46:24 59:9

et 1:8 4:16
106:6 107:3
108:3
event 28:22
eventually
92:16
evidence 55:13
exactly 11:21
76:14 77:7
examination
2:19,20,20
5:19 93:13,25
examined
105:6
example 23:4,7
62:24 67:3,8
67:13 75:4,22
90:13 93:3
excel 3:12
71:22 74:15
exception 81:5
81:6
exchange 86:10
exchanged 11:7
90:14
excluded 15:15
executed
108:10
execution
107:14 108:19
exercise 23:2
exhibit 3:2,4,7
3:11,12,12,15
3:16,17,18,19
3:20,23,23

13:7,10,25
14:2,3,19,24
15:3 32:1,12
32:15,20,23
33:4 63:8
68:13 71:19
73:4 74:15
76:7 77:21,24
80:5,8 82:19
84:6,8,25
85:18 86:7,19
86:22 94:15,16
94:16,21,25
95:4 96:22
97:12,13
exhibits 3:23
13:19 94:3
expect 83:6
expecting
70:24
expedite 61:25
expenditures
62:13
expense 26:13
expertise 50:21
expiration
107:19 108:25
109:25
explain 62:3
explained
12:24
expound 51:9
expressed
51:14 89:5

extensive 11:17
66:21 67:21,21
extent 15:18
16:19 30:11

**f**

f 2:14 105:1
fabricated 64:7
64:10
fact 17:3 33:13
33:14 34:13
49:22 57:8
98:13 101:18
facts 33:10
failure 29:4,5
fair 8:23 9:7
21:16 27:6
28:2 31:23
36:24 39:8
41:5 42:4
49:21 50:7
52:12,20 54:4
61:16 62:14
fairness 61:14
fall 78:16
false 64:14
familiar 14:21
23:5 62:4
88:16
familiarity
12:5
family 21:12
far 29:10 31:14
32:9 58:16
65:1,3 90:19

**farris** 102:1,7
**father** 25:3
  99:24
**favor** 55:7
  60:13
**february** 47:24
  48:3
**federal** 1:18 3:6
  33:11
**feel** 6:6 43:12
**felt** 35:6 45:16
**figure** 29:1
**file** 94:12
**filed** 4:16 6:24
  11:23 30:16
  41:13 47:11
**files** 66:11
**filing** 51:13
**filings** 18:7
**filled** 78:4
**finance** 62:12
**finances** 52:5
**financial** 52:3
  61:5 72:12
  79:18 99:22
  100:1,6,7
**financially** 5:1
  105:15
**find** 29:2 98:15
  106:11
**fine** 9:3 28:15
  33:3 43:24
  88:17 89:19
  94:17

**finger** 41:19
**finished** 8:6,8
**finney** 2:9
**finneylawfir...**
  2:11
**firm** 2:9 4:23
  25:21
**first** 3:8,11
  5:17 7:8,12
  13:6,20,24
  20:20 22:15,16
  35:13 49:10
  50:13,16 74:25
  78:11 84:8,21
  86:25 87:12
  88:20 97:12
  102:13
**fix** 94:18
**focus** 26:22
**folks** 21:13
  32:6 48:4,8,10
  51:3
**follow** 62:15
  90:4
**following** 7:17
**follows** 5:18
**foolish** 72:23
**foregoing**
  107:13 108:18
**foremost** 49:11
  88:20
**forgive** 6:5
**form** 55:10
**formal** 21:8
  23:9

**format** 71:22
**formula** 65:5
**forth** 96:17
**forum** 25:13
**forward** 35:4
  50:24 51:5
  106:15
**foundation**
  30:22
**frankly** 24:25
  27:16 51:20
  53:21 81:7
  97:5
**free** 6:6 107:14
  108:20
**friday** 50:14
**front** 32:17
**full** 6:1 20:7
  72:12 78:15
  103:16
**fundamentals**
  10:7
**funds** 36:11,14
**further** 34:4,7
  93:24 103:3

**g**

**gain** 50:21
  72:10
**gears** 46:10
  82:13
**general** 17:18
  17:23,23,24,25
  18:2 23:13
  24:4,15 31:10
  34:20 36:4

40:4 44:4
  49:19 52:7
  53:18 91:11
  93:19,22 97:9
  98:10,12
**generally** 12:18
  50:1
**generate** 57:24
  90:7,9
**generated** 58:7
  65:15 68:5
  71:24 75:8,19
  80:22
**genuinely**
  51:24
**george** 46:22
**getting** 56:8,17
  57:9 66:3
**give** 23:23
  70:10 83:14
  96:20 97:14
  100:6
**given** 7:5 22:17
  23:8 57:22
  62:23 90:13
  99:22 100:7
  104:7
**giving** 6:23
**go** 4:11 7:9
  10:22 12:25
  14:9 20:20,25
  27:5,7 32:4,10
  32:11 33:2,3
  36:13 54:14
  56:7,18 57:6

[go - hypothetical]

Page 12

63:7 67:12
68:13 70:14,21
71:7 82:17
83:6,10 84:10
84:22 85:15,16
86:18 89:14
91:2,5 92:9
98:25
**goes** 70:3 76:18
92:8 100:9
**going** 4:3 7:10
8:21,22 9:13
12:18 13:21
14:9 31:18
32:4,7 34:24
35:3 46:14
50:24 53:9,14
55:6 63:9,11
63:21,25 66:3
69:9,11 70:22
74:12 76:6
82:12 84:16,20
89:16,21,25
92:9 95:10
98:7 104:5
**good** 4:2 5:21
5:22 7:17 8:2
10:9 11:25
13:12,13 43:12
44:1 63:12
84:1
**goods** 26:14,18
27:4
**grand** 58:23

**gravely** 83:19
**great** 26:18
**grew** 55:23
56:20,20
**grimes** 34:8,10
34:14,15,17
35:5,9 41:18
41:21 42:3,17
42:24 43:1,4
45:21 47:22
48:22 50:11
51:2 57:8
61:19,22 68:16
69:18 70:8
76:20 77:1
84:14 85:4,8
85:13 86:11
95:12,14,21
**ground** 7:9
**groundwork**
50:24
**group** 20:22
21:12 94:15,15
**grow** 36:6 39:1
55:8
**growing** 38:24
**guess** 17:10
38:12,14 39:14
43:3 46:6
53:24 56:17
59:19,20 78:14
97:11 99:15,16
102:10 103:12
**guessing** 37:20

**gugino** 2:8,20
5:14,14 93:10
94:1,4,13,17,24
95:3,6 96:24
102:24 103:12
**guide** 32:7
**guy** 70:20,23

**h**

**h** 3:1,22
**half** 54:3,8
55:21
**hand** 56:9
81:12 105:16
**handled** 18:17
54:18,19
**hands** 56:25
**happen** 70:24
**happened** 24:6
26:15 48:13
70:19 96:2
**hard** 8:5,7
**harrell** 46:21
**head** 7:16,19
7:20 43:25
**headed** 51:22
**headquartered**
45:19
**heard** 4:8
**heck** 52:10
**hein** 2:14
**held** 101:4,11
**help** 11:20
15:11 22:24
51:16,18

**helped** 101:13
**helpful** 12:3,4
**henry** 2:14 5:12
9:17,23 12:24
14:8 31:5
32:14 41:5
78:6 89:17
93:12
**hereinbefore**
105:10
**hey** 9:16
**hfl** 2:16
**high** 20:11
**higher** 58:13
59:10
**hired** 22:15
**history** 89:1
**hit** 67:18
**home** 21:25
22:4,19,22
83:15,16 98:21
**honestly** 53:23
83:22
**hopeful** 51:24
**hopefully** 50:23
**hour** 63:9
**housed** 72:5
**household**
26:14,18 27:4
**hsbattorneys....**
2:16
**huh** 94:13 99:5
**hurt** 50:6
**hypothetical**
58:11,21 59:22

| **i** | | | |
|---|---|---|---|

**idea** 98:1 99:18
  100:16
**identification**
  14:4,25 32:2
  71:20 77:22
  80:6 84:7 85:1
  85:19 86:8
  95:1 96:23
**identified** 27:4
**identify** 33:13
  80:8 86:9
  94:11
**ignorant** 51:20
**ignoring** 87:7
**ii** 6:2
**iii** 2:14
**ikea** 23:4,6
**imagine** 49:10
**immediately**
  98:5
**impact** 52:3
  56:2 61:7
  72:13
**important**
  42:12 56:24
**imports** 23:7
**imprecise** 65:7
**impression**
  42:25
**inaccurate**
  52:18 54:10
  56:12 61:8
  79:8,22

**inaccurately**
  36:17 37:7
  52:24 54:16
**inadvertently**
  42:25
**include** 68:8
**included** 31:14
  94:6 106:13
**inclusion** 88:25
**incorporated**
  108:12
**increase** 82:8
**indicated** 83:19
  89:7 100:11
  101:2
**indicates** 99:21
**indicating**
  106:13
**individual** 12:9
  14:17,18,21
**individually**
  1:16
**industry** 38:25
  38:25
**inflate** 64:17
**inflated** 38:4
  48:9 50:2 53:8
  53:19 60:2,24
  62:20 64:18
  65:4 66:1
  69:24 101:14
**inflation** 65:8
**information**
  36:22 51:16
  64:15 67:15

  70:11,15,17
  72:3,4,11 77:2
  77:4 78:17
  99:24
**inherited** 28:21
**initial** 49:14
**initially** 57:23
**inputted** 59:10
**inside** 43:25
**inspect** 92:12
**install** 80:15
  90:23 91:2
  92:17
**installed** 92:22
**installs** 80:12
  80:14 82:1
  91:18,18
**instructed**
  99:23
**intent** 73:2
**interact** 50:22
**interacting**
  51:19
**interaction**
  37:11
**interactions**
  17:20
**interacts** 71:11
**interest** 38:8
  62:9 67:19
  72:10 87:7
  88:21
**interested** 5:1
  105:15

**interesting**
  98:15
**interim** 67:9
  72:6
**internal** 52:4
  79:14 96:16
**internet** 4:7
**interrogatories**
  3:9,13 16:6,9
  32:8,22 77:25
**interrogatory**
  11:24 33:9
  68:14 77:16
**intimately** 62:3
**intricacies**
  46:18
**invalid** 101:13
**invoice** 3:15
  57:18,24 58:6
  58:7,9,12,22
  63:1 67:25
  72:18 75:7,9
  75:15,17,18,19
  75:23 80:11,18
  80:20,24,25
  81:4,9 90:7,16
  93:2
**invoiced** 72:18
  73:24 78:18
  91:20
**invoices** 54:25
  62:18 66:13,14
  66:18 67:2
  75:4,4 80:3
  90:6

**involved**   17:19
40:2,5,8,14
42:15,17 53:3
59:19 96:25
**involvement**
89:7 97:3
100:20
**irs**   28:4,12,23
29:3,8,16,22,24
**issue**   3:10,14
19:13,16 28:12
29:16 65:14,23
91:14
**issued**   82:6
**issues**   28:24
51:5
**item**   82:11
92:15
**items**   36:16,17
37:2,6 79:24
92:12,23 93:2
93:4
**ivy**   2:9

**j**

**jack**   24:17,19
25:3,8,16,20,21
25:23 40:20,23
41:10 97:18
98:3,18,18
99:3
**james**   102:6
**january**   80:13
**jim**   102:1,7
**jimini**   20:16

**job**   7:17 8:2
13:12,13 21:8
24:12 90:21
**julie**   2:8,11
5:14 93:8 94:4
94:10 103:9
**july**   98:4,23
**jump**   73:3 79:1
**june**   45:4 99:7
**jurisdiction**
3:10 33:11
**jurisdictional**
3:14

**k**

**keep**   34:24 55:6
63:11 89:2
**kentucky**   34:10
**kind**   25:9 26:21
27:7 32:6
35:20 46:9
57:21 61:6
65:6 69:14
82:13 95:17
100:22
**kiosk**   38:25
80:15 91:2
92:9
**knew**   35:9 48:5
60:9,10 70:22
96:9 100:18
**know**   8:6,8 9:4
9:9,17,25 10:3
11:9 12:16
18:16 19:18
22:11,13,17

23:4,14,19,20
24:21 27:1,20
27:24,25 28:5
28:11 29:16
31:9 32:25
34:19 35:2
36:3,5,19 37:3
40:4,9,23
41:25 42:8,14
43:3,8,11,24
45:13,14 46:5
46:18,18,25
47:8,11 49:13
49:16 51:4
54:21 55:2
56:12 57:5
60:16 61:2
65:24 67:13
68:9,9 69:12
72:24 73:6
74:5,13 77:6
81:6,7 83:11
84:3 87:23
88:1,9 93:11
95:9,17,22,24
96:1,2,6 97:5
98:17,18,19,20
99:25 100:4,17
100:19 101:4,7
101:22 102:12
102:18,21
103:13
**knowing**   41:10
41:14 47:25

**knowledge**
30:21 33:14
40:23,25 50:21
58:18 101:3
**known**   33:13
43:16,17,20

**l**

**l.l.c.**   4:15 12:11
**lack**   36:10 56:7
62:7
**lading**   90:10
**lamping**   2:3,19
3:24 5:10,10
5:20,23 11:25
13:17 14:5,8
14:13,16,19
15:1,17 19:4
27:6 29:11
30:4,15,24
31:16 32:3,14
32:18,20 38:21
39:13 40:2
41:5 45:3 47:7
47:10 52:15
55:18 59:5,8
63:7,13,14,18
64:3 71:21
72:21 77:23
80:7 83:22,25
84:2,8 85:2,20
86:9 87:22
89:20 90:3
91:1,12 94:10
94:14,20 95:2
95:5 103:1,19

104:2
**large** 74:16
**larger** 55:8,9
**late** 26:20
**law** 2:9
**lawsuit** 6:24
30:16 31:2
41:12 47:11
51:13,22
**lawyer** 9:11
**lay** 50:23
**layman's** 62:8
**leading** 9:11
**learn** 47:19
**learned** 10:9
**learning** 48:14
**led** 57:20
**left** 14:10 42:25
81:12 88:21
89:14
**legal** 12:22
41:24 106:1
109:1
**legs** 9:3
**lenscrafters**
54:22 57:14
81:8
**letter** 106:19
**level** 12:23
49:16 70:12
**lightly** 11:1
95:25 96:1
**likely** 88:6
**limited** 29:10
30:20 37:10

39:12 55:11
63:4 67:5
**line** 36:16,17
37:1,6 39:17
82:10 87:13,17
88:3 91:8
106:13 108:7
109:3
**lines** 74:23
76:22
**lingo** 12:22
**link** 13:9
**lion's** 53:2
**list** 15:6 75:1
**listed** 108:7,17
**listing** 108:7
**little** 9:1 22:23
32:11 38:14
41:6 43:7
44:24 46:10
53:22 59:21
63:9 100:20
**live** 7:3
**llc** 1:4,18 106:6
107:3 108:3
**llp** 2:4
**load** 68:6,6
**loads** 68:9
**local** 23:2
**located** 6:9
15:20 18:10
20:4 44:5
**locker** 80:16
**log** 94:7

**logged** 40:6
46:17 49:23,24
57:22 73:22
**logical** 35:10
**logistics** 1:17
2:13 12:11
15:20 16:10,11
16:11,13,19
17:4 18:2,3,5,9
18:14,17,19
19:5,6,14,20,23
19:24 20:1
21:9,17,18,19
21:22,24 26:12
26:22 31:20
44:9,13,15,16
44:20 52:9,20
52:25 53:2,7,9
54:10,14 59:12
69:25 91:23
97:4
**long** 23:16 95:8
**longer** 24:2
95:25 97:21
**look** 13:14 14:5
52:10 53:10,12
56:19 65:6
81:8 84:12
86:4 97:12
**looked** 11:4
68:15
**looking** 11:12
12:4 13:21
**lost** 68:3

**lot** 37:2 52:10
53:10 61:14
90:5 95:8
100:10
**louis** 2:5,15
6:18,21 23:5
51:18
**louisville** 34:9
34:10 42:22
69:19
**luepke** 2:14,20
5:12,12 11:19
14:12 15:13
19:1 26:24
29:9,19 30:9
30:18 31:3,7
32:16 38:19
39:9,25 41:1
45:1 47:2,9
52:13 55:10
59:3,6 63:3
67:4 72:14
83:18,23 87:19
89:18 90:18
91:6 93:8,14
96:18 103:2,4
103:6,15,22,24
106:5
**luxottica** 54:22
57:13

| m |
|---|

**m** 2:8 102:5
**ma'am** 97:24
99:15

madam   106:10
made   27:19
  31:21 36:9,19
  41:21 49:3
  52:9,16 60:7
  60:25 67:12
  79:4,7,20
  107:7
mail   3:16,18
  13:11,22 26:8
  34:8,14 74:12
  77:17 80:4
  82:17 83:4
  84:13 85:21,24
  87:1,6,24,24
  88:10 91:3
  98:14
mailed   13:18
  13:20 32:13
  94:5
mails   68:24
  84:3 87:15
maintain   35:3
maintained
  24:7
major   56:2
majority   25:24
make   7:10,11
  7:23 8:16
  13:25 17:8
  27:23 29:1
  31:17 32:9,10
  34:21 35:1,14
  35:16 42:13
  50:20 51:1,4

51:11 53:9,12
57:13 62:7
65:7 88:8
94:10
makes   8:10
  28:18 100:18
making   31:17
  53:18 60:17
  64:25 72:9
  74:1
management
  100:12
manager   17:19
  17:23,23,24,25
  18:2 23:13
  24:4,15 31:10
  34:20 36:4
  40:5 44:4
  49:20 93:19,23
  97:9 98:10,12
mark   32:4,12
  94:15 102:6,15
marked   3:22
  3:23 14:3,24
  15:2 32:1
  71:19 77:21
  80:5 84:6,25
  85:18 86:7,18
  86:22 94:25
  96:22
market   22:1
master   71:1,4
  74:23 76:9
  85:23

match   81:20
matched   62:25
matter   4:14
  27:3 30:2
  96:15
mattresses   23:1
mayflower   1:4
  3:17,18,19,20
  4:14 5:25
  16:21 17:5
  22:9,12 32:21
  32:23 35:3,7
  35:10 36:9,12
  36:14,18,20,23
  37:7,11 39:7
  39:24 40:7
  43:11 44:9,11
  45:6,11,15,18
  46:2,12,17
  48:10 49:12,20
  49:23 50:3,22
  50:25 51:3
  52:4,19,24
  53:15,16,18
  54:18 55:1
  56:4,13 57:3
  57:16,17,17,19
  57:23 58:7
  59:2,11,17,24
  60:3,20,23,24
  61:12,20 62:4
  62:21 64:5,15
  65:16 66:18
  67:1,11,23
  68:2,4 71:16

72:8,18,20
73:23 74:7,13
75:12,13 80:1
81:15 82:18,18
82:18,18 84:10
84:18,23 85:15
85:16,21 86:4
86:10 92:19
102:4,11,14
106:6 107:3
108:3
mayflower's
  22:5 32:8
  54:22 58:14
  61:5 72:5
  79:14,18 81:20
  92:1,18 96:16
mb000022   3:21
mccabe   102:5
  102:15
mean   11:22
  35:18 36:3
  37:20 39:24
  49:4 51:7
  73:16 81:17
  83:5 88:11
means   22:11,13
  22:24 81:14
measure   65:7
mechanics   40:6
  40:7
media   4:12
  63:22 64:1
  89:22 90:1
  104:8

**[meet - name]**

**meet** 10:12
34:9,15,17
**meeting** 35:14
42:8,10 48:21
48:22 49:6
50:9,13,15,16
50:17,19 51:2
51:3 68:17
74:2,4 87:8
88:18,21 89:9
89:10 95:11,13
95:14,19,21
96:5 101:6
**meetings** 32:5
101:3
**member** 101:6
**memo** 98:3
99:2
**memorandum**
98:15
**memory** 23:21
33:18 64:24
**memos** 3:20
**mention** 76:19
102:10
**mentioned**
15:16 39:16
48:24 95:12
**merely** 61:25
**message** 76:19
76:25 85:6,7
87:18
**messages** 85:3
**messed** 76:23

**met** 5:24 35:4
47:22 48:25
50:11 69:18
101:23
**methodology**
65:5
**miami** 20:13
**michael** 2:7
5:15 86:22
88:18 94:4
97:10
**mid** 28:5
**middle** 73:10
**midwest**
106:17 109:1
**mike** 14:10
25:4,6,11 26:1
26:4,10 27:13
27:17,21 28:3
41:13,19 42:3
42:5,11,14,17
43:1,14 87:6
88:21 89:2
95:18,20,24,25
96:8,9,24 97:3
97:5,7,7,21
98:1,9 99:3,16
99:19 100:2,21
101:9,19
**million** 60:25
73:22,24
**mind** 42:22
55:17
**minute** 31:20
63:19 69:2

83:2 85:11
**minutes** 63:17
89:15 102:19
**mis** 55:8,22
64:4
**mischaracteri...**
39:10 47:3
55:12,13
**misjudged**
38:15
**misperception**
43:14
**misreported**
18:23
**missouri** 1:1
4:17 15:21
16:15 33:12
45:11,19 46:2
105:4
**misunderstood**
31:13
**mo** 2:5,15
**moment** 103:23
**monday** 50:14
**money** 28:3
57:3 60:23
61:13 71:10
**monies** 36:20
60:16 71:14
**months** 6:24
42:9
**morning** 38:1
82:20
**mother** 99:4

**move** 11:20
33:24 50:24
51:5 69:14
74:18
**moved** 68:24
**moving** 1:7
2:12 4:15
17:25 18:18,23
19:7,15 21:2,4
21:4 22:15,20
23:9 24:11
25:18,25 26:12
26:15,23 27:14
28:4 30:7
31:23 39:19
40:17 44:4,10
45:5 46:1
47:25 48:6
50:3 52:10
53:10,17 54:9
54:13 55:7,22
58:6 60:13
62:11,25 69:23
73:21 88:19
90:6,9,15
93:20,23 106:6
107:3 108:3
**mute** 83:10

**n**

**n** 2:1,18
**name** 4:20 5:23
6:1 88:3 99:12
101:11,22
106:6 107:3,4
107:15 108:3,4

**[name - okay]** Page 18

108:21

**named** 102:14

**names** 46:21
47:16

**nancy** 101:21
102:8

**native** 71:22

**naturally** 35:8

**nature** 15:18
16:18 30:5

**navigate** 74:4

**necessarily**
70:23

**need** 9:2 63:10
66:25 72:11,12
72:19 82:23
83:3,8 91:1
96:20 103:12
103:19 104:2

**needed** 39:2
60:6,8,10,11
77:6 79:9
83:14

**net** 39:3 52:8
53:6,8

**never** 5:24 19:5
27:16 40:6
43:9 45:14
46:16 49:22
51:23 70:12
72:10 97:25
100:1,7,18
101:5

**new** 80:12,14
80:15 82:4,6

**nice** 63:16

**nod** 7:19

**nodding** 7:16

**nope** 89:10

**normal** 7:18

**notarized**
106:14

**notary** 106:25
107:10,18
108:15,23
109:23

**note** 3:23 4:4
56:24 106:12

**notes** 89:12
102:18

**notice** 1:21 3:2
3:4 14:20

**noticing** 5:7

**notification**
27:18

**november** 1:21
4:4 105:17
106:4

**number** 4:18
10:10 33:6,9
59:18 64:18
67:14 69:2
71:14 75:16,17
75:18,19,23
80:18,20 81:3
81:4,10,24
82:1 93:4
94:18 104:8
106:7,13

**numbering**
14:9 76:4

**numbers** 11:15
53:15 56:6
60:6,7,10 64:9
71:9,18 74:6,9
75:1,3,7,9,12
76:1 81:8
82:10 108:7

**numerous** 72:7
72:22

**o**

**o1** 76:3

**oath** 4:25 5:18
6:23 7:1 41:21

**object** 29:9
30:9,18 39:9
47:2 55:10
67:4 72:14
87:19 90:18

**objection** 26:24
29:20 31:3
39:25 63:3
91:7

**objections** 3:8
5:2

**objective** 50:20

**obtain** 20:14
39:20 61:15

**obtained** 23:22
24:4 71:25
72:2,2

**obviously**
46:24 50:7
73:2 76:17

85:24 88:4

**occasion** 46:2

**occasions** 72:7

**offered** 51:17
67:16 76:12

**office** 6:12 37:9
89:4 98:21

**official** 94:21
94:21 107:15
108:21

**offset** 60:12

**oh** 2:10 34:25
44:12

**ohio** 1:22 6:10
20:13 44:6
101:25 106:2

**okay** 6:14,17
6:22 8:3 9:21
10:2 11:16
12:7,25 13:5,9
13:16,24 14:7
14:13 15:4,17
17:14 18:12,21
19:4,10 20:20
22:8,14 23:21
25:15 26:10
29:22 30:4
31:9,16,17
32:3,18,19
33:2,5,8,21,24
35:8,22 37:15
37:24 38:10
40:22 42:12
43:21 44:2,22
45:8,11 46:7,9

47:23 48:12
53:6,13 54:5,8
55:17 57:6
58:16,23 59:25
60:1,21 61:23
62:23 63:7,13
63:15,18 64:14
65:1,12,21
66:6,13 67:22
68:13 69:16
70:10 71:21
72:21 73:3,5
73:10 74:15,18
74:18 76:18
77:10,13 78:13
79:19 80:2,7
80:11,24 81:19
82:3 83:17
84:1,4,22,24
85:6,15,17
86:4,6,12,24
87:5 88:5,12
88:16 89:8,11
89:20 91:22
93:1,5 94:2
95:3,17 97:6,8
97:15,16,19
98:3,24 99:10
99:21 101:2,8
102:4,24
103:25
**once** 46:3
101:23
**ones** 15:15
47:14,15 54:16

55:3 78:5
**open** 13:24
15:2,4 84:5,23
**operate** 68:5
**operated** 25:1
**operating** 18:9
19:18 20:2
22:5 92:2
**operations**
18:14 98:6
100:22
**opportunity**
36:5 38:24
39:1
**opposed** 7:20
27:8
**order** 32:6 46:9
46:10 55:6
64:9,12,13,16
64:17 65:18,19
68:5,6 70:19
71:9,13 75:1,3
75:7,9,12,16,23
77:5 78:17
81:3,8,10
90:17 91:14,16
92:6
**orders** 65:14
67:14 70:18
81:8 91:13
**organizations**
11:7
**original** 3:23
**originators**
41:20

**outcome** 5:2
**outlined** 35:19
37:13 38:11
86:2 96:5
**outset** 41:2
**outside** 19:1
**overall** 11:14
**overbroad**
30:10 72:15
**overburdenso...**
30:10
**overly** 11:17
99:19
**overran** 82:7
**owed** 28:4 29:8
**owens** 1:16
2:13,19 3:3,8
3:11 4:13 5:13
5:16,21 6:2,4,8
9:21 11:21
12:1 20:4
30:12 32:20
33:10 34:8
41:7 55:15
63:5 64:3 67:6
69:18,22 70:3
72:16 73:21
77:15 83:19
87:20 90:4,20
93:5,15 94:3
95:10 98:5
101:12 102:7
104:7 106:8
107:4,9 108:4
108:13 109:20

**owens'** 3:12
**own** 23:3 58:6
90:7,9
**owned** 25:9,11
25:17,24,24
**owner** 24:22,23
**owners** 46:25
47:8,11,25
**ownership**
24:24 25:25
40:17

**p**

**p** 2:1,1
**p.m.** 4:1,3
63:23 64:2
89:23 90:2
104:6,10
**pacer** 102:5,15
**pads** 92:22
**page** 2:18 3:1
3:22 7:11 13:4
15:5,9 33:4,25
34:2 35:24
37:25 69:6
73:4,7,8,10
78:12,14 79:1
97:12 98:3
99:2 106:13,15
108:7 109:3
**paid** 56:13
57:19
**paperwork**
90:21,25
**paragraph**
34:3,6 68:14

[paragraph - please]                                                      Page 20

| | | | |
|---|---|---|---|
| 68:15,21 69:7 | **passed** 46:23 | **percentage** | **personnel** |
| 69:17 73:11,20 | **past** 101:3 | 25:10,17 36:19 | 99:23 |
| 78:15 79:3 | **paul** 1:15 2:13 | 56:4 76:22 | **phone** 43:5,6 |
| **paralegal** | 2:19 3:3,8,11 | **percentages** | 106:3 |
| 101:20 | 3:12 4:13 5:12 | 56:21 71:16 | **physically** 6:9 |
| **pardon** 44:21 | 5:16 6:2,5,6 | 72:19 | 44:5 87:16 |
| 59:5 | 29:20 45:1 | **perception** | **pick** 14:9 |
| **part** 11:5,10 | 85:10 96:18 | 40:20 43:6,14 | **pictures** 90:22 |
| 15:14 37:14 | 98:5 102:7 | 43:16 | **pieces** 25:12 |
| 41:24 50:2 | 103:7 104:7 | **perfect** 57:20 | **pier** 23:7 |
| 52:19,22 58:2 | 106:8 107:4,9 | **perform** 21:25 | **pittsburgh** |
| 58:10 59:15 | 108:4,13 | **performed** | 18:11,12 22:1 |
| 64:5 70:17 | 109:20 | 21:18 22:5 | **place** 4:10 |
| 91:23 93:22 | **pay** 29:5 62:24 | 91:25 92:1,10 | 22:20 42:9,9 |
| 100:3 102:11 | **paying** 29:23 | 92:24 | 80:12 105:9 |
| 108:9 | 60:15 | **period** 16:16 | **places** 23:4,6 |
| **participants** | **payments** | 17:4 34:18 | **plaintiff** 1:5,19 |
| 4:7 | 39:21 | 55:21 56:14 | 2:2 3:9 4:14 |
| **participate** | **payroll** 29:5,23 | 60:14 67:9 | 5:11 16:20 |
| 72:8 100:12 | **pc** 2:14 | 72:6 89:3 | **plaintiff's** 3:7 |
| **participated** | **pdf** 14:2 69:6 | 91:17 | 97:1 101:8 |
| 101:5 | 94:12 | **permitted** | **plaintiff's** 3:2,4 |
| **participating** | **peggy** 1:20 | 17:10 | 3:13 |
| 73:14 | 4:22 94:6 | **person** 15:20 | **plane** 32:9 |
| **particular** 8:5 | 105:3,20 | 16:14 33:13 | **platform** 13:7 |
| 15:16 36:6 | **pending** 9:6 | 35:5,11 44:1 | 13:10 |
| 56:5 | **pennsylvania** | 45:15 84:18 | **play** 26:21 |
| **particularly** | 18:10 | 94:7 101:22 | **played** 56:8 |
| 19:8 | **people** 43:6 | **personal** 3:10 | **plaza** 2:4 |
| **particulars** | 46:19 51:18 | 33:11 | **please** 4:4 5:3,8 |
| 30:1 | 98:19,23 | **personally** | 6:1 15:2 25:2 |
| **parties** 4:11 | 101:11 102:3 | 38:16 46:16 | 30:12 61:24 |
| 17:16 105:13 | 102:13,14 | 100:1 107:11 | 97:14 106:11 |
| **party** 4:25 | **percent** 25:12 | 108:15 | 106:11 |

**plus** 98:20
**po** 65:23 81:24
   82:1,4,10
**point** 9:1 11:20
   23:8,10,11
   24:4 25:8,15
   25:19 26:11,18
   27:12,13 41:3
   41:9,12 42:10
   42:10,13,19
   45:10 50:17
   51:23 52:1,15
   56:24 57:3
   59:10 60:16,20
   77:8 97:20
   99:16
**pointe** 2:9
**pointed** 41:18
**poorly** 8:15
**position** 17:18
   17:22 22:16
   34:20 36:9
   38:23 40:4
   49:19 56:17
   87:10
**possible** 43:17
   68:25 81:6
**possibly** 66:22
**potential** 92:5
**practice** 38:4
**precise** 41:6
**precisely** 17:17
   60:9
**prefer** 38:6

**prepare** 9:22
   10:15 15:25
   16:24
**prepared** 38:18
   71:4
**preparing** 71:7
**presence** 26:18
**present** 5:5
   49:6
**presented**
   15:10
**president** 27:14
   27:22 97:10,22
   98:9 99:7,11
**presumably**
   54:1
**pretty** 13:12,13
   49:4,18 59:9
**previously** 3:22
   3:23 11:23
   24:1
**price** 58:12,13
   58:15
**primarily** 44:5
   45:22
**primary** 65:25
**principle** 52:8
**prior** 51:12,13
   74:8 76:16
   87:23 97:9
   98:9 105:6
**privacy** 37:9
**probably** 9:12
   38:17 47:21
   77:8

**problem** 71:1,4
   74:22 76:8
   85:23
**problems** 29:3
**procedure** 1:18
   3:6 107:5
   108:5
**proceed** 47:5
**proceeding** 5:3
**process** 39:4,21
   49:13,21 91:5
   91:10 92:7
**procuring**
   36:11,14
**produced**
   55:19 66:9,14
   74:13 82:15
**production**
   106:15,17,22
**products** 23:1
**profitable**
   52:11 53:11
**program** 72:1
**promise** 44:18
**properly** 51:8
**proposal** 51:11
**proposals** 51:4
**provide** 12:15
**provided** 11:10
   46:19 51:14
   63:1 64:17
   74:7,7
**public** 107:10
   107:18 108:15
   108:23 109:23

**published** 61:6
**pull** 77:15 80:3
   86:18 97:11
**purchase** 65:14
   65:18,19 90:17
   91:13,14,16
**purpose** 27:5
   96:4,7
**pursuant** 1:18
   1:20 3:6
**pursue** 40:3
**pursuing** 27:3
**put** 36:11 39:10
   52:13 56:11,13
   57:10 62:8
   72:24 94:21

**q**

**quality** 4:6,6
**question** 8:7,16
   8:17 9:5,6,13
   28:13,15 30:14
   30:19 31:13
   39:15 41:7
   45:2 51:8
   55:15 59:14,21
   79:20 85:11,13
   87:12,20,21
   91:22 93:15
**questioning** 8:6
   47:5 91:8
**questions** 8:22
   16:25 44:15
   78:11 82:15
   86:1 90:4 93:7
   93:9,11,12,24

95:7,18 100:10
102:25
**quick** 78:11
**quickly** 82:25
**quite** 33:22
74:7 89:3
95:22
**quote** 27:2

**r**

**r** 2:1 23:6 105:1
**ran** 92:22
**rather** 8:18
58:6
**rdr** 1:20 105:21
**reach** 35:11
50:18
**react** 49:8
**read** 15:21
16:21 33:14,17
34:11 41:23,25
68:18 69:9,10
78:2,19 79:9
86:13,15 103:5
103:6 104:5
107:5,6,12
108:5,6,17
**reading** 74:3,5
106:19
**reads** 15:18
**ready** 83:12,13
83:13
**real** 18:10
43:12 64:6
98:1

**reality** 52:11
53:11
**realize** 38:12
38:13 61:24
66:2
**really** 8:10
26:17 31:15
35:6 43:9,9,11
51:8 55:4
56:20 81:17
84:18 88:7
95:7 100:18
**reason** 35:4,13
35:19 58:17,18
106:14 108:8
109:3
**reasonable**
66:22
**recall** 23:12,16
27:2 29:4,7,12
34:13,15 37:13
48:20 49:1
50:13,16 73:14
74:1,11 76:25
77:2 85:12,20
88:2,17 89:8
95:23,24 100:5
100:8
**recalling** 46:21
**receipt** 106:18
**receive** 13:22
36:18 92:12
**received** 26:7,8
36:20 39:22
62:18 71:10,15

99:8
**receives** 58:23
**recently** 87:9
**recess** 63:24
89:24
**recognize**
77:23 85:2,21
86:10
**recollection**
10:23 11:3
42:16
**reconcile** 66:17
67:1
**reconciliation**
11:6 39:21
49:21
**record** 4:3,11
5:7 6:1 7:24
13:15 54:15,16
63:22 64:1
89:14,22 90:1
94:9 104:5,6
108:9
**recorded** 4:9
4:13
**recording** 4:6
4:10 102:21
103:16
**records** 66:6
79:8,13,14,21
79:22
**red** 18:24 19:8
53:3 58:3,5,16
65:15,18 91:12
91:13

**reduced** 105:10
**refer** 16:10
21:3 44:20
76:3 81:13,25
**reference** 19:14
106:7 107:2
108:2
**referenced**
101:10 107:11
108:15
**referring** 16:5
21:5 70:25
74:5 79:13,17
79:23 98:11
**refine** 51:17
**reflect** 78:18
**reflected** 67:24
75:12
**refresh** 10:23
11:3 33:17
**refreshing**
11:14
**regard** 9:23
**regarding**
10:19 40:18
48:18 50:22
**regardless**
42:10
**register** 22:11
**registered** 22:9
**related** 4:25
6:23 20:21
52:19
**relates** 38:16

**relationship**
29:14 35:3,6
43:10 53:22
68:2
**relative**  105:12
105:14
**release**  99:23
**relevant**  16:15
17:4
**remember**
29:12,25 61:18
74:5,8,25
76:14
**remind**  76:20
**remote**  8:4
**remotely**  4:20
5:17
**rep**  14:17
102:11
**repeat**  30:14
39:14 55:17
**repeatedly**  65:2
**rephrase**  8:18
17:10 30:24,25
**replayed**  42:21
**replying**  87:18
**report**  24:16
26:1 48:10
**reported**  22:3
24:18 38:5
39:23 52:18
53:16,20 55:8
55:22 58:13
59:16,24 64:4

**reporter**  3:24
4:22 5:8 7:13
8:11 14:4,25
32:2 63:14,16
63:20 71:20
77:22 80:6
84:7 85:1,19
86:8 94:7 95:1
96:23 103:4,9
103:14 105:4
107:7
**reporter's**  3:23
**reporting**  54:9
96:10,25
**represent**  85:7
86:21
**representation**
27:23
**representations**
41:21
**representative**
1:17 3:5 12:10
12:20 16:20
31:22
**representatives**
102:4
**represented**
6:17,20 18:7
27:21 39:7
60:3
**representing**
4:21 5:25
**request**  77:4
91:3 108:9,11

**requesting**  34:9
35:14 77:2
**requests**  101:9
**require**  9:13
**required**
106:25
**residence**  1:22
6:11,13 20:8
**resigned**  27:14
27:22 97:10
99:7
**resolve**  29:25
30:2
**resolved**  29:17
**resources**  10:5
**respect**  64:14
**respond**  31:15
82:24
**responded**  16:2
16:5 85:12
**responding**
87:24
**response**  7:18
7:21 32:22
100:10
**responses**  3:12
11:24 18:8
101:8
**responsibilities**
21:22 23:23,24
23:25 24:2,7
**responsibility**
19:6
**responsible**
22:18 46:15

**responsive**  83:7
**rest**  44:20
63:17
**restaurant**
68:17 69:19,22
**result**  39:3,5
52:8 53:6,8
**retail**  23:2
54:23
**retained**  104:9
**retention**  3:24
**returned**
106:18
**revenue**  60:24
60:25,25 73:22
73:24 101:14
**review**  10:22
78:6 106:12
107:1 108:1
**reviewed**  11:22
12:13,21,23
**reviewing**
76:17
**ri**  46:22
**rianna**  46:21
**right**  6:8,9,19
7:8 8:14,25
9:19 10:10,12
12:3 13:14
14:11 15:8
20:5,5,18 25:4
26:4,19 32:3
34:6 35:20,23
37:12,22 39:24
44:6 46:5

**[right - served]**                                                      Page 24

| | **s** | 58:19 59:16 | **seem** 51:20 |
|---|---|---|---|
| 47:23 48:3,8 | | 60:20 61:19 | 67:18 |
| 48:12 53:11 | **s** 2:1 3:1,22 | 62:11,14 64:5 | **seems** 73:18 |
| 54:4 55:24 | 102:5 106:15 | 70:4 72:13 | **seen** 4:8 13:10 |
| 56:23 57:12,16 | 108:8,8 109:3 | 73:23 91:24 | 32:23 33:18,21 |
| 57:20 58:3 | **sadly** 38:15 | 97:1 101:14 | 98:14 |
| 63:19 64:3 | **safe** 97:20 | **schemes** 49:2 | **segment** 36:6 |
| 66:12 67:25 | **sat** 98:21 | **schlegl** 2:3 5:11 | **selection** 55:4 |
| 68:18 69:4,9 | **saw** 7:16 | 13:18,20 14:18 | **send** 13:9 68:25 |
| 69:15,20 73:17 | **saying** 61:18 | 32:11,13 | 76:12,15 90:7 |
| 73:19 74:10 | 99:6 103:22 | **schneider** 2:14 | **sending** 34:13 |
| 75:13,22 76:6 | **says** 14:2 75:23 | **school** 20:11 | 57:2 76:25 |
| 76:9 77:20 | 80:18 81:13 | **scope** 19:1 | **sense** 8:16 |
| 79:12 80:2 | 85:10 99:10 | 29:10 30:20 | 28:18 88:8 |
| 81:23 82:12 | 101:20 102:3 | 39:11 55:11 | 100:19 |
| 83:13 89:14,17 | **sbg** 99:3 | 63:4 67:5,5 | **sent** 12:14 34:8 |
| 93:5 94:6 | **scale** 56:20,21 | 72:13 90:19 | 57:18 67:15 |
| 100:21 104:1,4 | **schedule** 50:19 | **screen** 4:8 | 70:17 75:15 |
| **role** 19:5 26:21 | **scheduled** | 32:17 | 76:8,16,19 |
| 31:10 42:3,6 | 98:21 | **scroll** 15:5 33:3 | 80:9,11 85:25 |
| 56:8 93:18,22 | **scheduling** | 33:4,24 78:12 | 91:18 94:2,12 |
| **roles** 21:21 | 22:19 | 86:25 | 99:3 |
| **rolled** 93:4 | **scheme** 38:2,10 | **scutti** 2:17 4:21 | **sentence** 33:8 |
| **room** 6:15 | 38:21 39:3,5 | **se** 22:18 24:21 | 73:20 |
| 63:17 87:9 | 39:18,18 40:3 | **seal** 105:16 | **separate** 44:3 |
| 88:19 | 40:18,24 41:3 | 107:15 108:21 | **september** |
| **root** 29:2 | 41:4,10,14,20 | **second** 50:17 | 38:20,22 53:25 |
| **roughly** 23:19 | 42:4,6,18 43:2 | 97:14 | 56:3,3 77:14 |
| 23:19 38:20 | 46:10,14 47:1 | **securing** 61:9 | 78:22 |
| 47:21 48:21 | 47:8,12,20 | **see** 15:6,15 | **sequential** |
| 56:3 100:15 | 48:1,5,14,18 | 33:6 34:4 | 75:20 |
| **rude** 7:23 82:23 | 49:9 50:3,11 | 73:11,18 79:4 | **series** 85:3 |
| **rule** 1:18 3:6 | 51:6 52:5,8,19 | 80:17 84:15 | **served** 14:20 |
| 10:10 | 52:23 53:6,13 | 87:12 89:13 | 32:22 77:25 |
| **rules** 7:9 107:5 | 53:25 56:20 | 94:12 | |
| 108:5 | 57:9 58:2,10 | | |

serviced   61:3
services   21:25
   22:4 64:17
   65:24
servicing   61:10
set   3:8 21:24
   59:11 80:2
   91:20
several   96:11
   96:14
shake   7:20
share   13:7,10
   32:15 53:2
shared   11:5
   74:20 84:17
sharing   95:24
sheet   106:13
   108:7,10,18
   109:1
shift   26:11,15
   26:22
shipment   22:12
shipments   22:8
short   60:6
   63:10 89:12
shortfall   60:18
shorthand   38:5
   105:9
shortly   48:21
   78:4
show   13:3,4
   32:7
showed   11:6
   89:4 93:3

shown   106:16
shows   51:22
side   26:13,14
   54:22 88:14,14
   97:4 102:23
sign   103:5,7
signature
   105:19 106:14
signed   97:18
   98:9 107:13
   108:18
significant
   29:15 49:14,16
signing   106:19
similar   7:2 10:8
simple   49:11
simplicity   38:7
simply   95:23
sincerely
   106:21
single   94:12
sir   6:16,25 7:4
   7:7,15,25 8:13
   8:20,24 9:8,20
   10:8,11,17,21
   12:12 13:23
   16:7 22:25
   28:17,21 31:8
   37:21 44:13
   71:3 82:21,22
   106:10
sit   27:20,23
   37:18 42:15
   52:2 72:25

site   92:8,8
sitting   37:12
   66:11 74:10
situation   28:21
   34:22 35:1,15
   35:16,25 36:1
   36:5 45:16
   49:4 50:21,23
   62:2 73:1
size   29:7
slip   6:4
small   25:11
smaller   55:23
sneak   44:19
software   71:11
   72:1
solution   51:25
solutions   106:1
   109:1
somebody   13:9
   30:22 46:11
somewhat   55:3
sons   25:17
soon   83:24
sooner   45:9
sorry   12:22
   23:20 29:18
   31:5 34:23,25
   39:14 40:11
   44:14 52:21
   53:17 62:9
   64:25 68:20
   74:17 77:19
   84:4 85:14,15
   104:5

sort   20:22
   25:21 30:2
   65:7 83:21
   88:15 100:9
sounds   28:16
   28:19 72:23
source   11:9
south   2:15
speak   61:7
   103:13
speaking   41:2
   56:6
specific   20:25
   21:21 22:23
   29:13 37:8
   64:19,20,21
   65:5 66:7
   69:13 74:9
   96:7
specifically
   6:11 11:4,12
   15:24 17:8
   18:11 21:24
   26:16 36:13
   38:25 72:4
   100:5
specifics   96:20
specified   60:17
spectrum   56:19
speculate   43:22
   43:23
spoke   50:12
spoken   84:18
spreadsheet
   3:12 70:18,25

| | | | |
|---|---|---|---|
| 71:5,8,13,22,24 | 62:6,14 65:6 | **stores**   23:2 | 32:9 39:16 |
| 74:3,6,10,11,15 | 74:1 101:20 | **stretch**   9:2 | 42:13,21 50:16 |
| 74:16,19 75:10 | 107:13,14 | 83:15,16 | 51:10 53:12 |
| 75:11 76:9,11 | 108:19,19 | **strike**   52:17 | 54:7 57:13 |
| 77:6 85:23 | **statements** | **string**   3:16 | 59:9 62:10,15 |
| **spreadsheets** | 61:5 79:18 | **sub**   59:11 | 69:16 75:14 |
| 55:19 | 100:2,6,8 | **subject**   19:2 | 85:25 94:22 |
| **spring**   99:12 | **states**   1:1 4:16 | 29:20 31:4 | 100:16 |
| **spun**   98:18 | 16:18 33:9 | 33:10 34:8 | **survey**   92:8 |
| **st**   2:5,15 6:18 | 34:6 73:21 | 47:4 55:2,14 | **survival**   27:3 |
| 6:21 23:5 | 79:7 98:4 | 63:4 67:6 | **suspect**   8:25 |
| 51:18 | **storage**   1:8 | 72:15 87:13,17 | **suspected** |
| **start**   38:10,22 | 2:13 4:16 | 88:3 90:19 | 10:24 |
| 64:16 92:6 | 17:25 18:18,23 | 91:8 | **swear**   5:8 |
| **started**   29:23 | 19:8,15 21:2,4 | **submitted**   3:24 | **switch**   82:13 |
| 56:4 60:15,20 | 21:4 22:15,21 | 32:21 | **switching**   46:9 |
| 70:8 76:21 | 23:9 24:11 | **subscribed** | **sworn**   5:17 |
| 77:7 78:16 | 25:18,25 26:15 | 107:10 108:14 | 105:7 107:10 |
| 100:25 | 26:23 27:15 | 109:21 | 107:13 108:14 |
| **starts**   34:3 69:7 | 28:4 30:7 | **subsequent** | 108:18 109:21 |
| 69:17 78:15 | 31:23 39:19 | 51:3 | **system**   36:23 |
| 79:3 | 40:17 44:5,10 | **successful**   36:7 | 37:7,11 40:7 |
| **state**   5:3,5 6:1 | 45:5 46:1 | 36:7 | 46:12,17 48:10 |
| 15:21 16:15 | 47:25 48:6 | **sudden**   51:22 | 49:23,25 52:24 |
| 33:9 70:3 | 50:3 52:10 | **suggestion** | 53:8 55:1 |
| 78:16 87:6 | 53:10,17 54:9 | 94:11 | 57:16,23 58:14 |
| 105:4 107:10 | 54:14 55:22 | **suite**   2:10 | 59:2,11 62:4 |
| 108:15 | 58:6 62:11,25 | 106:2 | 62:21 64:5,16 |
| **stated**   64:23 | 69:23 73:22 | **superior**   106:1 | 65:17,19 66:19 |
| 70:4 73:21 | 88:19 90:6,9 | **supply**   51:12 | 67:23 68:2,4 |
| 76:20 96:11,14 | 90:15 93:20,23 | **supposed**   99:17 | 69:25 71:12,12 |
| 101:18 105:10 | 106:6 107:3 | **sure**   7:10,11,23 | 72:5 73:23 |
| **statement** | 108:3 | 17:13 20:17,19 | 75:13,21 76:2 |
| 36:12,15,21 | **storage's**   55:7 | 26:17 28:22 | 79:14,16 80:1 |
| 39:4,20 60:12 | 60:13 | 30:15 31:14,17 | 80:23 81:15,16 |

[system - timeframe]                                           Page 27

| | | | |
|---|---|---|---|
| 91:17 92:20 | **tell** 9:15 10:10 | **theory** 43:3 | 43:4 44:1 |
| **systems** 46:20 | 11:2 17:11 | 81:14,16 | 45:21 48:21 |
| **t** | 28:8 37:18 | **thereabouts** | 50:11,19 51:2 |
| | 48:12 66:7,24 | 45:4 | 57:8 67:10 |
| **t** 3:1,22 105:1,1 | 70:7,9 89:11 | **theresa** 76:8 | 70:7,20 79:4,7 |
| **take** 4:10 9:3,7 | **telling** 42:2,16 | **thing** 27:9 | 79:20 84:14 |
| 56:11 63:10,18 | 49:1 | 43:22,23 | 85:4,8,10 |
| 83:2,2,3 84:12 | **term** 18:19 | **things** 10:24 | 86:11 95:12,14 |
| 86:4 89:11 | 38:2,6 | 11:20 61:6 | 95:21,23 |
| 93:17 95:8 | **terms** 31:11 | 69:14 92:13,14 | **tim's** 43:25 |
| **taken** 1:16 4:13 | 55:4 62:8 | **think** 17:11 | **time** 5:3 7:9 9:2 |
| 26:5 63:24 | 95:10 96:2 | 18:6 28:18 | 16:16 17:4 |
| 66:4 89:24 | **terry** 46:21 | 30:19 42:23 | 20:7 23:8 |
| 105:8 | **test** 92:13 | 43:7,13,17 | 24:11,18,23 |
| **talk** 8:9,12 9:16 | **testified** 5:18 | 44:14 45:9 | 25:16,19,20,23 |
| 10:12,18 18:16 | 42:14 47:4 | 46:8 48:25 | 26:11 28:19 |
| 37:2 50:10 | 78:24 95:9 | 55:18 56:18 | 29:14 34:18,23 |
| 57:7,8 84:20 | 97:9 | 57:12 59:8,12 | 36:9,18 40:19 |
| **talked** 9:12 | **testify** 15:10,25 | 66:7 94:20 | 41:9,12 43:4 |
| 26:10 48:13 | **testifying** 7:3 | **thirty** 106:18 | 47:10 52:1 |
| 71:2 78:22 | 12:9,19 87:20 | **thomas** 6:2 | 55:5,21 56:14 |
| 80:21 90:5 | **testimony** 6:23 | **thompson** 2:4 | 56:20 60:14,15 |
| **talking** 10:24 | 12:15,16 19:5 | **thompsoncbo...** | 60:21 63:22 |
| 31:12 38:9 | 39:10 47:3 | 2:6 | 64:1 66:23,25 |
| 79:25 88:25 | 53:24 55:13 | **thompsoncob...** | 67:21 74:7 |
| **tammi** 84:19 | 60:19 70:7 | 2:6 | 78:2 89:3,22 |
| **taxes** 29:5,23 | 104:7 107:6,7 | **thought** 35:10 | 90:1 91:17 |
| **technically** | 108:6,9,12 | 38:15 47:7 | 93:6,7 96:15 |
| 21:13,15,19 | **text** 3:17,19 | 51:20,21 | 99:17,18 |
| 45:10 55:25 | 76:19,25 82:24 | **three** 3:20 | 101:19 104:6 |
| 56:2 99:15,16 | 82:24 85:3,3,6 | 64:19,21 94:2 | 105:9 |
| **technology** | 86:10 | 95:16 104:8 | **timeframe** |
| 4:20 | **thank** 8:3 13:16 | **tim** 34:8 35:4 | 34:16 39:11 |
| **teleconference** | 84:1 103:14 | 41:18,21 42:7 | 47:9 52:14,14 |
| 73:15,17 76:13 | | 42:16,24 43:1 | 53:5 60:22 |

**timely** 29:6,23
**times** 7:18 8:14
  42:23 72:23
  92:21 96:12,14
**title** 21:8 22:18
  23:9,22 24:4
  24:19,21 43:15
**titles** 24:12
**today** 6:4,18
  7:2 8:12,15,19
  9:1,22 10:16
  10:25 12:4,9
  12:19 16:1,11
  18:16 26:5
  27:20,24 37:18
  38:1,16 42:16
  52:3 66:4
  78:24 86:23
  95:10
**today's** 104:7
**together** 72:24
  89:13
**told** 41:22 42:6
  48:15 49:8
  59:22 100:6
**took** 42:9 80:12
  93:17 102:18
**top** 34:2 68:9
  79:4 80:17
  85:6,7
**topic** 15:17,25
  16:18,25 48:24
  57:21
**topics** 10:19
  12:14,15,18

15:6,10,16
**toward** 26:12
  79:4 82:6
**towards** 35:2
  78:14
**traditional**
  54:18,25
**tran** 103:20
**transaction**
  46:11 55:23
  57:22 58:11,12
  58:22 59:15,23
  59:23,25 60:11
  62:23 90:13,16
  91:15,24 96:3
**transactions**
  18:17,24 19:7
  26:23 52:20,22
  52:25 53:3,7
  54:10,15 55:8
  58:9 59:12
  62:19 64:4,6
  65:14,16 69:25
  73:25 75:5
  91:23 92:1
  93:16,18
**transcribed**
  107:7
**transcript**
  103:17 106:11
  106:12 107:5
  107:12 108:5
  108:11,17
**transit** 1:4 4:15
  106:6 107:3

108:3
**transmit** 80:25
**transmitting**
  85:22
**transpired**
  68:16
**trial** 7:3
**tried** 39:16
  67:9
**truckload**
  68:11
**trucks** 23:3
  98:22
**truth** 10:10
**try** 9:9 30:12
  50:19 51:4
  55:15 62:2
  63:5 67:7,8,16
  72:16,25 90:20
  91:9
**trying** 7:22,23
  34:15 35:2,21
  44:19 97:24
**tvs** 23:1
**twice** 101:24
**two** 11:7 13:21
  15:5 17:16
  20:19 29:24
  43:9 44:2 53:4
  53:22 58:1
  82:10
**type** 66:3 87:16
**typically** 82:3
  92:7,17

**typing** 88:2

**u**

**uh** 94:13 99:5
**ultimately** 29:2
  57:8
**unanswerable**
  30:11
**unaware** 61:4
**under** 5:18
  6:23 7:1 19:19
  19:23 20:2
  22:5 41:21
  81:23 92:1,17
  105:11
**understand**
  6:22 7:1,10,12
  7:13 8:17
  11:21 12:8,12
  18:21 21:5,11
  22:24 25:16
  26:25 27:13
  30:12 31:17,18
  41:8 44:8
  45:10 49:11
  51:19 55:14
  56:16 57:1
  59:20 72:12
  74:19
**understanding**
  15:9 25:1,2
  30:5,16,25
  31:12,25 36:1
  49:15 53:14
  58:2 62:1,9
  71:15 87:15

99:13 100:14
**understood**
  8:23 45:18
  50:1,4
**unexpected**
  48:23
**unfortunately**
  23:11,14
**unigroup** 16:21
  17:6 32:6
  45:13,13,15,17
  45:19 52:4
  69:25 71:11
  74:22 76:21
  92:11,15
**unigroup's**
  92:25
**unit** 4:12
**united** 1:1 4:16
**university**
  20:13
**unlimited**
  66:24
**unscheduled**
  48:23
**updating** 72:8
**urgency** 83:21
**use** 38:6,9
  49:17 58:10
  65:19 90:12
**used** 10:5 11:3
  18:19,20 38:1
  58:6 61:21
  62:6 65:5
  104:8

**uses** 65:18
**using** 4:20 38:3
  61:20 64:19
**utilized** 37:17

**v**

**v** 1:6 106:6
  107:3 108:3
**vague** 26:24
  30:10 72:14
**valerie** 102:5
  102:15
**value** 60:11
**values** 55:23
**velanski** 102:6
  102:16
**verbalizing**
  7:20
**veritext** 4:21,23
  104:9 106:1,7
  109:1
**veritext.com.**
  106:17
**versed** 45:15
  49:12,20
**version** 68:16
  103:17
**versus** 4:15
  30:17
**video** 4:9,12
  101:10 103:16
  103:20,22
  104:3
**videographer**
  2:17 4:2,22
  63:21,25 89:16

89:21,25
  103:21,25
  104:4
**videotaped**
  1:15
**virtual** 4:20
**virtually** 4:5
**visit** 46:2 48:23

**w**

**wait** 45:1 69:2
  87:20
**waived** 106:19
**walk** 20:10
**want** 9:9,15,17
  9:25 10:3
  11:20 13:1
  19:12 28:11
  33:24 34:17
  35:16 42:13
  49:17 57:13
  62:17 63:7,10
  68:3,13 69:5
  69:10 73:3
  78:7 82:23
  83:6,7,8,10
  84:12 91:6
  94:23 97:11
  103:5,10,10,22
**wanted** 34:19
  34:21,22 35:1
  35:14 54:15,16
  70:21 93:11
  94:3 97:7
**warehouse**
  92:12,13,14

**watching** 77:17
**way** 22:9 36:11
  54:18 61:19
  62:8,10 63:8
  65:12 66:17
  79:17 87:2,4
  96:25 98:19
**ways** 61:15
**we've** 12:16
  46:24 71:2
**website** 19:15
**weeds** 68:4
**week** 47:21
  91:19
**welcome** 84:2
**went** 10:8 18:4
  18:13 21:17,22
  50:11 53:25
  54:25 71:17
**whalen** 40:11
  40:11 46:22
  69:18
**whelan** 95:12
  95:15
**whichever**
  13:25
**wife** 83:11,19
**wife's** 82:24
**wild** 56:7
**wished** 70:13
**withdrawn**
  12:17
**witness** 1:16,22
  2:18 4:8 5:9,17
  14:14 30:21

**[witness - zoom]**                                                            Page 30

31:5 103:5,8
103:11 105:7
105:16 106:8
106:11 107:1,4
107:11 108:1,4
108:15
**witness'**  106:14
**wolfe**  46:23
**woodruff**  84:19
**word**  38:2,3
43:19 49:16
56:7
**worded**  8:15
**words**  62:1
**work**  20:20
21:1,13,14,18
35:2 37:9,10
45:25 46:11
51:5,15 60:12
61:1,3,4 66:21
72:25 87:15
91:20
**worked**  23:17
29:24 30:1
45:21 46:19
61:19 76:15
**working**  51:24
**works**  10:7
101:25
**worried**  27:16
99:20
**worries**  68:21
69:4
**worry**  83:15,16

**writing**  105:11
**wrong**  15:12
25:3 47:8
55:20

| x |
| --- |

**x**  2:18 3:1,22

| y |
| --- |

**yeah**  8:2 19:3
28:22 45:3,3,3
46:8 49:24
52:15 54:24
55:18 56:16
65:24 68:19,21
68:23 73:3
80:16 81:10
82:5 83:25
88:9 93:10
94:23 96:11
98:8 101:8
102:13
**year**  20:14 45:4
54:1 55:21
65:22 82:2,4,5
82:7 98:20
**years**  54:4,8
82:9 101:3
**yep**  34:1 84:11

| z |
| --- |

**zoom**  1:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.