**Exhibit 2**

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
2                      EASTERN DIVISION

3

4

    MAYFLOWER TRANSIT, LLC,     )
5                               )
                Plaintiff,      )
6                               )
    v.                          ) Case No. 4:23-cv-00708
7                               )
    BRENDAMOUR MOVING &         )
8   STORAGE, INC., et al.,      )
                                )
9               Defendants.     )

10

11

12

13

14

15

16

17

18          ZOOM VIDEOTAPED DEPOSITION OF MICHAEL
19   BRENDAMOUR, a Witness, taken on behalf of the
20   Plaintiff before Peggy E. Corbett, CSR, CCR, RDR,
21   pursuant to Notice on the 14th day of November,
22   2023, at the offices of Finney Law Firm Inc., 225
23   South Meramec, Suite 1200, St. Louis, MO 63105.

24

25

Page 2

```
 1              A P P E A R A N C E S
 2   APPEARING FOR THE PLAINTIFF:
 3           Mr. Brian A. Lamping
             Ms. Christine Schlegl
 4           THOMPSON COBURN LLP
             One US Bank Plaza
 5           St. Louis, MO 63101
             314.552.6000
 6           blamping@thompsoncoburn.com
             cschlegl@thompsoncoburn.com
 7
     APPEARING FOR THE DEFENDANT MICHAEL BRENDAMOUR:
 8
             Mr. Christopher P. Finney
 9           FINNEY LAW FIRM INC
             225 South Meramec
10           Suite 1200
             St. Louis, MO 63105
11           513.943.6655
             chris@finneylawfirm.com
12               And
             Ms. Julie M. Gugino
13           FINNEY LAW FIRM INC
             4270 Ivy Pointe Boulevard
14           Suite 225
             Cincinnati, OH 45245
15           513.943.5669
             julie@finneylawfirm.com
16
     APPEARING FOR THE DEFENDANT BRENDAMOUR MOVING &
17   STORAGE, BRENDAMOUR LOGISTICS AND PAUL OWENS:
18           Mr. Henry F. Luepke, III
             HEIN SCHNEIDER & BOND PC
19           2244 South Brentwood Boulevard
             St. Louis, MO 63144
20           hfl@hsbattorneys.com
21   VIDEOGRAPHER:  Ms. Beth Scutti
22
23
24
25
```

Page 3

1                    I N D E X
2   WITNESS:                              PAGE
3     MICHAEL BRENDAMOUR
4   EXAMINATION BY MR. LAMPING              5
5   CERTIFICATE                           92
6
7                  E X H I B I T S
8   NO.            DESCRIPTION            PAGE
9   EXHIBIT 1      Plaintiff's Notice of    68
                   Deposition of Michael
10                 Brendamour
    EXHIBIT 2      E-mail Chain, 10/4/23,   71
11                 No Bates
    EXHIBIT 3      Affidavit                81
12  EXHIBIT 4      Defendant Michael        86
                   Brendamour's Responses
13                 and Objections to
                   Plaintiff's
14                 Interrogatories
                   Directed to Defendant
15                 on the Issue
                   of Jurisdictional
16                 Discovery
17  NOTE: Submitted to the court reporter for copying
    and distribution with retention by Mr. Lamping
18  thereafter.
19
20
21
22
23
24
25

```
                                            Page 4

 1          (Deposition commenced at 10:21 a.m.)

 2                  THE VIDEOGRAPHER:  Good morning.

 3    We were going on the record at 10:21 a.m. Central

 4    Time on November 14th, 2023.  Please note that

 5    this deposition is being conducted virtually,

 6    quality of recording depends on the quality of

 7    camera and internet connection of participants.

 8    What is seen from the witness and heard on screen

 9    is what will be recorded.

10          Audio and video recording will continue

11    to take place unless all parties agree to go off

12    the record.  This is Media Unit 1 of the video

13    recorded deposition of Michael Brendamour taken

14    by counsel for plaintiff in the matter of

15    Mayflower Transit, L.L.C. vs. Brendamour Moving &

16    Storage, Inc. et al. filed in the United States

17    District Court, Eastern District of Missouri,

18    Eastern Division, Case Number 4:23-cv-00708.

19    This deposition is being conducted remotely using

20    virtual technology.

21          My name is Bethany Scutti representing

22    Veritext and I'm the videographer.  The court

23    reporter is Peggy Corbett from the firm Veritext.

24    I am not authorized to administer an oath, I am

25    not related to any party in this action nor am I
```

Page 5

1   financially interested in the outcome.

2           If there are any objections to

3   proceeding, please state them at the time of your

4   appearance.  Counsel and all present about will

5   now state their appearances and affiliations for

6   the record, beginning with the noticing attorney,

7   and then will the court reporter please swear in

8   the witness.

9              MR. LAMPING:  Brian Lamping for

10  Mayflower Transit, L.L.C.

11             MR. FINNEY:  Christopher Finney for

12  Mike Brendamour, and Mike Brendamour, and along

13  with me is Julie Gugino.

14             THE WITNESS:  There's something

15  here that says got it.

16             MR. FINNEY:  That just means that

17  you're being videotaped.

18             MR. LUEPKE:  And Henry Luepke on

19  behalf of Brendamour Moving & Storage, Brendamour

20  Logistics and Paul Owens.

21             EDMUND MICHAEL BRENDAMOUR,

22  a Witness, being first duly sworn, testified

23  under oath as follows:

24                     EXAMINATION

25  BY MR. LAMPING:

                                              Page 6

1        Q.    Good morning, sir.  I stated my name

2    just a few minutes, on the record a few minutes

3    ago.  But I'm Brian Lamping and I represent the

4    plaintiff in this case.  Can you please state

5    your full name for the record?

6        A.    Edmund Michael Brendamour.

7        Q.    And if I call you Mr. Brendamour today,

8    is that okay?

9        A.    That's fine.

10       Q.    Mr. Brendamour where do you currently

11   live?

12       A.    In Cincinnati, Ohio.

13       Q.    And you understand that you're here

14   providing testimony at a video deposition today?

15       A.    I do.

16       Q.    And you understand that you're under

17   oath, your testimony here today is under oath?

18       A.    I had something right in the middle of

19   my eye there.  Okay, yes, I do understand.

20       Q.    And is there anything that's going to

21   prevent you from telling the truth today?

22       A.    There is nothing that will prevent me

23   from telling the truth today.

24       Q.    Sir, have you ever given a deposition

25   before?

                                                      Page 7

1          A.    No, I have not.

2          Q.    All right.  Well, let me just go over

3     some of the ground rules and you may or may not

4     have covered some of these with your counsel, but

5     you do understand we have a court reporter,

6     Peggy, who is here on the line and is typing out

7     everything that you and I say today?

8          A.    I understand.

9          Q.    And because we're here doing this

10    remotely, sometimes there's a tendency to speak

11    over one another because you may not really know

12    when I'm finished with my question, I may not

13    know when you're finished with your answer,

14    sometimes there's a lag, so can we just agree to

15    do our best today not to talk over each other to

16    make Peggy's job as easy as possible?

17         A.    That's not a problem on my part.

18         Q.    All right.  And then I may ask a

19    question or two or 10 that just are poorly worded

20    or otherwise just don't make a whole lot of

21    sense.  I would just ask that if I ask a question

22    that you don't understand, that you ask me to

23    clarify it rather than answer it; is that fair?

24         A.    Yes.

25         Q.    I don't think we're going to be here too

Page 8

1   long today, but if at any point in time you need
2   to take a break or talk to your counsel, that's
3   fine.  I'm happy to accommodate that.  All I
4   would ask is that if there's a question pending
5   that you answer the question before we break; is
6   that fair?
7        A.   That's fair.
8        Q.   Okay.  And there will probably be some
9   times this morning where Mr. Finney makes an
10  objection.  Those types of things are generally
11  just for the record for a judge to sort out down
12  the line.  Unless Mr. Finney instructs you not to
13  answer a question and you choose to follow his
14  instruction, just go ahead and let Mr. Finney
15  make his objection, and then go ahead and answer
16  the question after that, assuming that you have
17  not been instructed not to answer the question;
18  is that fair?
19       A.   Yes, it is.
20       Q.   I'm going to be asking you some
21  questions about --
22       A.   Just a second.  There's this word search
23  right in the middle of the screen here.  Does
24  that have to stay?  I'm looking right at that as
25  I try to concentrate.

1         Thank you.  Okay, now I can move back in
2    the middle here for everybody.  Okay, go ahead,
3    please.  You can tell my computer is -- I'm 72.
4         Q.   I understand.  Sometimes the technology
5    can be a little wonky but we'll all do our best.
6              On that note, we are going to be
7    utilizing sort of a related piece of technology
8    called Exhibit Share where we can publish
9    exhibits to you right on your screen and we'll be
10   walking through those.  Is there any reason why
11   you would be unable to read documents on the
12   screen as part of that Exhibit Share platform?
13        A.   No.  There should not be any problems.
14        Q.   Okay.  If at any point in time if we
15   publish an exhibit and you're unable to read it,
16   just let us know and we can e-mail pdf copies to
17   your counsel.  I don't think there's going to be
18   a ton of exhibits for you today, but if at any
19   point in time, if there's a document that you
20   just cannot read, just let us know and we're
21   happy to accommodate.  All right?
22        A.   Okay.
23        Q.   I'm going to be asking you some
24   questions today about your preparation for the
25   deposition, maybe some conversations that you had

1   with Mr. Paul Owens after this lawsuit was filed.

2           If I ask you a question and it requires

3   you to provide information or requires you to

4   disclose communications that you had just with

5   your counsel, I don't want to know that.  I don't

6   want to know any of your conversations with Julie

7   or Chris or any of the other folks at their firm.

8           So if I ask you a question, and there

9   may be an objection in response to a question or

10  two that might elicit some of those questions,

11  but I just want to caution you from the get-go,

12  because I am going to be asking you some

13  questions about things that happened after this

14  lawsuit, and I just want to make sure you're not

15  disclosing any confidential communications that

16  you had with Chris or Julie; is that fair?

17      A.   That's fair.

18      Q.   All right.  Sir, what did you do to

19  prepare for your deposition today?

20      A.   My wife and I have done a lot of

21  soul-searching.  You know, we thought we were

22  retired, and settling in with our kids and our

23  grandkids and our great-granddaughters, and we

24  had to cancel a cruise because of this, we've had

25  to cancel a vacation, and we had one fun planning

Page 11

1   for January.

2          This whole -- and the surprise of this,

3   of being served this has been devastating.  My

4   wife is a very ill lady.  She's been to almost 14

5   doctors this year, 7 procedures, including a few

6   of them in the last 10 days.  So it's taken its

7   mental toll and physical toll on us.  So

8   obviously, we have been speaking a lot about this

9   whole situation.

10      Q.   In addition to -- in addition to

11  conversations with your wife, have you talked to

12  anyone else to get ready to testify today?

13      A.   My brothers have not talked to me since

14  this happened, and my one brother Dave is turning

15  65 this weekend and he's having a big party and

16  my sons and myself and my wife are not going to

17  be going.

18          They believe, like Mayflower believed,

19  that I was part of this, and that I sold the

20  company to them, and the truth is that they are

21  both successful people.  My one brother is an

22  attorney and a CPA and has very successful

23  companies, and my other brother has his own

24  company, he's a mechanical engineer.  They did

25  not need to buy me out.  They did it as a

Page 12

```
 1   brotherly love so I could retire, so I have had
 2   no conversations with my brothers.
 3          The only conversation I had with
 4   anybody, I even have two sons that still work for
 5   the company, one that's on full disability that's
 6   42 years-old, has been since he was in preschool,
 7   and his older brother takes care of him, and I
 8   have not carried on any conversations with either
 9   one of them through this whole situation since
10   this took place.
11      Q.   You said you have --
12      A.   Paul is the only person I've talked to
13   regarding this.  I needed to know:  "Paul, did
14   you say something to Tim Grimes and why did you
15   say something?"
16          And Paul has insisted all along he's
17   never said anything, so it makes me wonder if Tim
18   didn't say anything and didn't hear it, but
19   somebody he reported to at Mayflower, and then
20   somebody at Mayflower, like the corporate
21   attorneys, and they went into the paperwork and
22   saw:  Oh, there's Michael Brendamour, and my name
23   just came up and it's been in here through this
24   whole situation; just thoughts on my part.
25      Q.   And I appreciate that, sir, and I can
```

Page 13

1  tell you have got a lot to get off your chest

2  today, and I will just caution you and I'm sure

3  your counsel has, or may caution you if -- you

4  know, I would just encourage you to just listen

5  to my question, answer my question, answer the

6  question I'm asking for, and then I think that

7  will help us kind of get through this a little

8  bit more efficiently.

9          Now you had mentioned that you have two

10 sons that currently work at Brendamour Moving &

11 Storage.

12      A.   Yes, one that is 42 and he's on full

13 disability, he only works part-time because

14 that's the law and he can only make so much

15 money, and the other one is one of the managers.

16      Q.   And --

17      A.   And has never been a part of the office

18 or accounting.  He's been the warehouse manager

19 for years.

20      Q.   Okay.

21      A.   He's my oldest son.  I have four sons.

22 They all worked for the company off and on over

23 the years.

24      Q.   And the son who is on disability, what

25 is his name?

Page 14

```
 1      A.    His name is Ryan Michael Brendamour.  He
 2   goes by Ryan.
 3      Q.    And the son that is the warehouse
 4   manager, what is his name?
 5      A.    Edmund Jeffrey Brendamour, and goes by
 6   Jeff.
 7      Q.    Okay.  Have you talked to, outside the
 8   presence of counsel -- let me ask you this.  Have
 9   you had any conversations with -- can I refer to
10   them as Ryan and Jeff?  Is that all right?
11      A.    That's fine.  That's what we call them.
12      Q.    Okay.  Have you talked to Ryan or Jeff
13   about the allegations in this lawsuit?
14      A.    Ryan would not understand any of it.  He
15   lives in our house, he's always lived at home.
16   He knows that there's something going on.
17           Again, you've got to go through my
18   history.  I've never had anything like this.  I
19   have been a good honest person and never was
20   involved in anything.
21           Jeff knows about it, and obviously, he's
22   infected.  He had to take all the Mayflower names
23   off the trucks, and the list goes on and on, what
24   he had to do, what had to be done when Mayflower
25   dropped Brendamour, but I have not had any
```

Page 15

1   conversations.  He has no idea this is even

2   taking place today.

3           I have been very careful not to let --

4   not to bring him into this.  He has children and

5   grandchildren.  He doesn't need to -- need this

6   in his life.

7       Q.   So just to be clear, I assume generally

8   do you understand that the allegations in this

9   lawsuit involve what Mayflower has described as

10  fraudulent reporting of charges that had been

11  entered into the Mayflower system associated with

12  logistics transactions?

13      A.   Of course I've heard what took place,

14  and you will find today that I have never knew a

15  single thing about it from Day 1.  I just did my

16  job as a salesperson.  I have a real estate

17  license, and I worked that business, and I never

18  collected anything but my paycheck, never any

19  bonus money, no dividends, nothing, throughout my

20  work there.

21      Q.   So have you had any discussions with

22  Ryan or Jeff specifically about the allegations

23  that have been made against the company in this

24  lawsuit?

25      A.   I have not had one conversation with

1    either one of them throughout this whole probably

2    6 months.

3        Q.   Okay.  And I assume that you have had

4    communications with your counsel regarding the

5    allegations in this case and your deposition

6    today.  I don't know what you talked about, but I

7    assume you have talked to your counsel about this

8    case and the deposition?

9        A.   Obviously --

10              MR. FINNEY:  Stop.  The answer to

11   that is "yes."

12       Q.   (BY MR. LAMPING)  Just a "yes" or "no"?

13       A.   Yes.

14       Q.   Okay, and I believe you testified

15   earlier that you had had conversations with

16   Mr. Owens about the allegations in the lawsuit,

17   fair?

18       A.   Well, yes, yes, not very often, not very

19   often but at the beginning and, obviously, we as

20   in my counsel and I asked Paul if he had put it

21   in writing, and he signed an affidavit stating

22   that I never knew about it.  He never said

23   anything in that meeting with Tim Grimes and I

24   think you all have that affidavit.

25       Q.   And when you say "never knew about it"

Page 17

1   what's the "it" that you are referring to?

2       A.   It's in the lawsuit that you sent out.

3       Q.   Okay.  Do you have any position one way

4   or the other whether Brendamour Moving & Storage

5   actually did inflate charges that it entered into

6   the Mayflower system?

7               MR. FINNEY:  I'm sorry, you need to

8   give him a timeframe.  Are you saying sitting

9   here today is he now aware of those allegations?

10              I want to know when you're asking that

11  question, you have a duty to tell us when and in

12  what context we're talking about because,

13  obviously, he read the Complaint.

14              MR. LAMPING:  Chris, Chris, your

15  objection, Chris.

16              MR. FINNEY:  No.

17              MR. LAMPING:   It's well taken.

18  I'll clarify.  Okay, we don't have to get into

19  a -- I will clarify.  That's fine.

20      A.   I can answer that question.

21      Q.   (BY MR. LAMPING)  That's fine.  Let me

22  address your counsel's objection.  We don't need

23  to --

24              MR. FINNEY:  Rephrase.

25      Q.   (BY MR. LAMPING)  Okay, as you sit here

Page 18

1    today, do you have a position, have you formed an

2    opinion as to whether or not Brendamour Moving &

3    Storage did or did not submit inflated charges

4    associated with logistics transactions into the

5    Mayflower system?

6              MR. FINNEY:  Sitting here today --

7    hold on, hold on, hold on, he's read the

8    allegations.  He's talked to other people.  He

9    had nothing to do with it and he's never seen the

10   books.

11        Are you saying based upon what he's

12   seen, read and heard, does he believe that to be

13   true?

14        A.   I believe that to be true, because I

15   understand Paul called Tim Grimes and they met me

16   in Louisville because Paul, and I don't even know

17   that reason, wanted to come clean, but the way I

18   understand it, he wanted to come clean and work

19   out a payment plan to reimburse Mayflower over a

20   period of time, and then I understand there was

21   some kind of video conference with Mayflower and

22   my brothers and Paul and then all of a sudden the

23   next thing Brendamour knew, they were cancelled

24   as an agent.

25              But the idea of Paul -- I'm just

Page 19

```
 1   guessing, that Paul wanted to come clean and have
 2   Brendamour pay Mayflower back.  So, yeah, he
 3   wouldn't come and have met in Louisville if he
 4   knew he hadn't done something that was wrong.
 5           You have been using the word a "scheme."
 6   He came up with a scheme, and then I have no idea
 7   why he came forward, but that's why we're here
 8   today.
 9       Q.   Okay.  I appreciate that.  When you say
10   "he came up with a scheme," the "he" that you are
11   referring to is Mr. Owens?
12       A.   Oh, absolutely.  He's even admitted
13   that, and you'll be talking to him later on today
14   and he's going to admit that.  He's --
15       Q.   Okay.
16       A.   And from what I understand from Paul,
17   he's the only one that knew it.  Even his
18   accountant didn't know it, even his dispatcher
19   didn't know how Paul was doing.
20       Q.   And you testified that --
21       A.   Paul is the accountant.  He does the P&L
22   statements.  He did the billing.  He's the
23   salesperson, you know, there's jobs that I sold
24   over the years, he took over, took them over.
25           I just did my job, which was sales, so
```

Page 20

1  from the time my father -- and you've left my

2  father out of this thing.  I mean my gosh, from

3  2005 to 2015, who knows what dad knew.

4          But I backed off for certain reasons,

5  and I have sent you letters that I sent to my

6  brothers and my dad when I dropped being the

7  President of the company and took my name off of

8  Fifth Third Bank checking accounts because I

9  wasn't wanting to be involved any more with the

10  company, other than my duty of sales.

11      Q.   You testified that you believe Mr. Owens

12  reached out to Tim Grimes to talk about entering

13  into a payment plan whereby Brendamour Moving &

14  Storage would pay back the money it owed to

15  Mayflower.

16      A.   Sure.

17      Q.   Where did you get that understanding as

18  to Paul wanting to do that?

19      A.   The only person I have ever talked to is

20  Paul.  You know, Paul didn't expect Mayflower

21  to -- would cancel-cancel.

22          I mean I started out without Al Nash

23  Mayflower in 1977, as a helper, a packer, a

24  driver.  I ran a warehouse and I went into sales.

25  I left Al Nash, and they were one of the original

NONE

Page 21

1    Mayflower agents.  So I have been with Mayflower
2    a long time.
3            I bought a truck for $500 in 1981,
4    became a global agent in 1985, and bought a
5    company-owned store from Mayflower in 1991, and
6    from 1991 until my wife retired and I retired, we
7    spent our life with Mayflower.
8            So most of my working career was
9    involved with Mayflower.  The only person I have
10   talked to about this is Paul, and I'm assuming
11   from what Paul has said, he didn't want to be
12   dropped as an agent.  He wanted to make amends
13   and pay Mayflower back with some kind of an
14   agreement that everybody would have come up with,
15   and the company --
16       Q.   Okay, and this notion about Mr. Owens
17   wanting to enter into a payment plan with
18   UniGroup, is that something that Mr. Owens told
19   you, that he was planning to propose?
20       A.   No, I'm assuming --
21            MR. FINNEY:  No, hold on, Mike,
22   hold on, objection.
23            MR. LAMPING:  You can answer.
24            MR. FINNEY:  I just think you need
25   to give a timeframe.

Page 22

```
 1              MR. LAMPING:  Mr. Finney, I'd ask
 2    that you to stop.
 3              MR. FINNEY:  No, I want you to
 4    listen to me.
 5              MR. LAMPING:  Your speaking
 6    objections are inappropriate.
 7              MR. FINNEY:  Good, good.
 8              MR. LAMPING:  Please limit your
 9    objections to form as required under the Rules.
10              MR. FINNEY:  Mr. Brendamour
11    thereafter spoke to Mr. Owens, and the timeframe
12    within which you're asking these questions is
13    utterly critical.
14              MR. LAMPING:  Mr. Finney, I would
15    again ask you to limit your objections to form as
16    required under the applicable rules.
17              MR. FINNEY:  I'll do my job and you
18    do yours, and if I do something that you think
19    you need to bring to the attention to the judge,
20    then you, by gum, should do it.
21         Q.   (BY MR. LAMPING)  Mr. Brendamour, you
22    have referred a couple of times to as you sit
23    here today it's your belief that Mr. Owens
24    reached out to Mr. Grimes to talk about a payment
25    plan.  Where did you form that belief?
```

```
                                          Page 23

 1            MR. FINNEY:  Listen to the

 2   question.

 3       A.   Why would Paul Owens go to Louisville

 4   and tell Tim Grimes something that nobody knew

 5   about, but Paul?  Others who -- I mean, you know,

 6   Paul had to want to work something out.  We all

 7   do.

 8       Q.   (BY MR. LAMPING)  And the "it" that you

 9   are referring to is the inflated charges that

10   were reported in the UniGroup system, Mayflower

11   system?

12       A.   Yes, yes.  My brothers didn't even know

13   this was going on.  It was their company.  Paul

14   ran this company for 20 years and built it and

15   paid back -- I mean at one point I owed Mayflower

16   a lot of money and Mayflower got paid back, and

17   Paul did a lot of good things but, obviously,

18   this thing is -- wasn't, wasn't right.  It was

19   dishonest.

20       Q.   And so just to get to the point, it's

21   your position that you had no idea that this

22   over-reporting practice was going on at any point

23   during your, I guess at any point until the

24   lawsuit was filed; is that fair?

25       A.   I have never, nothing.  I stuck.  I sat
```

Page 24

1  in my office, and I sold, and I sold Mayflower

2  orders and I sold local orders, I sold office

3  moves, and at times I brought in some logistic

4  companies for kiosk machines and so on, but those

5  would be turned over to Paul and his team.

6         I had no idea ever, not one inkling,

7  because I wasn't involved in that part of the

8  business.

9     Q.   I just need to get a straight answer on

10 this, because I think everyone would agree it's a

11 pretty important fact.

12    A.   Okay.

13    Q.   Is it your testimony, is it your

14 testimony under oath that you did not know about

15 the over-reporting issue until after the lawsuit

16 was filed?

17    A.   As I swore with my right hand up today,

18 everything is going to be the truth.  I knew

19 absolutely nothing of this scheme that you have

20 now called -- in any way shape or form at any

21 time.

22    Q.   Okay.  You made the comment earlier that

23 Paul Owens was the only one who knew about the

24 scheme.  How do you know that Mr. Owens was the

25 only one affiliated with the company that knew

Page 25

1    about the scheme?

2        A.    From everything I have read, and Julie

3    has been helping.  There's been a lot of stuff

4    written, and Paul says there was nobody else, and

5    I think he has even told y'all that.

6        Q.    Do you know art Whelan?

7        A.    Art Whelan was with me in 1991 when I

8    started, when we bought the Mayflower of Ohio, so

9    yes, of course, I knew Art Whelan.

10        Q.    Do you know whether Mr. Whelan knew

11    about the scheme while it was on-going?

12        A.    From what I understand, and I think you

13    do, too, from what's been written, Art did not

14    know.

15        Q.    Do you have any understanding as --

16    bless you, bless you.

17        A.    Would you repeat that, please.

18        Q.    Yes, yeah.  Do you have any

19    understanding as to how the agent reporting

20    process works, and when I say agent reporting,

21    I'm referring to Mayflower agents entering

22    information or providing information into the

23    Mayflower system regarding transactions.

24                MR. FINNEY:  Hold on.  Once again,

25    after we received this Complaint, Mr. Brendamour

Page 26

```
 1   has done a lot of forensic digging to find things
 2   out.
 3           You need to specify what he -- if you're
 4   going to ask him the question of what he knows,
 5   you need to say:  Does he know today, did he know
 6   at the time the lawsuit was filed, did he know at
 7   the time he worked for the company.
 8       Q.   (BY MR. LAMPING)  Unless I tell you
 9   otherwise, if I am asking, "Do you know
10   something," I want to know if you know it right
11   now.  If I want to specify whether you knew
12   something at a specific date I will ask a
13   follow-up question.  Okay?
14       A.   I am a salesperson, I have been from the
15   time I was at Boy Scouts.  I sold more candy
16   bars, and in school I sold more magazines than
17   anybody else.
18           I am very weak in accounting and I have
19   never known the Mayflower system, even when I
20   started the company and ran it.
21           I had people that were my accountants,
22   Paul was a CPA, and so from 2002 or '03 when Paul
23   came on board, he was the one that handled all
24   the statements from Mayflower.  Before that, I
25   had another gentleman Chuck, that he passed away,
```

Page 27

1    and I never was strong in that part of the

2    company.

3        Q.   Let me try that again.

4        A.   I had -- I am -- I have never been

5    throughout my career knowledgeable of the

6    percents and the accessorials and all the other

7    things that -- how Mayflower paid us and how we

8    were paid.

9            I knew how to sell those accessorials,

10   line haul and packing charges, but my accountant,

11   and of course once again Paul for roughly

12   20-something years handled the accounting.

13       Q.   Okay, so you used the term "accessorial

14   charges."  Just to make sure we're all on the

15   same page, can you tell me what's an accessorial,

16   what's your understanding of an accessorial

17   charge?

18       A.   Oh, my gosh.  It's additional charge.

19   If it's a household move, it's disconnecting a

20   washer and dryer, an icemaker.  I mean there's

21   just so many accessorials.  It could be an extra

22   long carry.  It could be a piano.

23           On the logistics side, I was never very

24   much involved on the logistics side, but I guess

25   it could be how many stops there are, or if there

Page 28

1   was something installed above -- in other words,

2   you used the word "line haul."  That's how you

3   get paid, but then there's the accessorial

4   charges, you know.

5        Q.   Okay.

6        A.   Again there's an endless of the

7   different types of accessorial charges that are

8   out there.

9        Q.   You've used the term --

10       A.   I don't even use that word today.

11   Remember, I have been in this business since '77.

12       Q.   You've used the term "household" and

13   "logistics."  Would you agree that generally

14   speaking those are two of the primary different

15   types of moves that a United or Mayflower agent

16   would typically handle?

17       A.   Well, yeah, on their logistics, my gosh,

18   there's new furniture.  I mean there's so many

19   logistic types of hauling, but household goods is

20   household goods.

21       Q.   And you understand as you sit here today

22   that for a logistics transaction, sometimes there

23   will be accessorial charges associated with that

24   transaction?

25       A.   Oh, absolutely.

1       Q.    And do you have an understanding as you

2   sit here today that charges associated with a

3   logistics transaction are supposed to be entered

4   by the agent into the UniGroup system?

5                   MR. FINNEY:  Hold on.  You're

6   asking him, who hasn't worked for the company for

7   years, what the interface is between Mayflower

8   and Brendamour today.  Are you asking what his

9   understanding was when he worked there or how the

10  software works today?

11                  MR. LAMPING:  Chris if you'd listen

12  to my question I said, "Do you understand today"

13  so stop being an obstructionist.

14              You know what, listen to my question.

15  You could have avoided this whole colloquy, so

16  listen to my question, please.

17                  MR. FINNEY:  I want precision in

18  the questions, I don't think --

19                  MR. LAMPING:  And it was precise.

20                  MR. FINNEY:  Do you understand the

21  difference, Mike?

22                  MR. LAMPING:  Let me ask it again?

23                  MR. FINNEY:  If you haven't worked

24  there for 5 years, you wouldn't have any

25  understanding today of how it works.

Page 30

```
 1               MR. LAMPING:  Well, no, I
 2   appreciate you coaching the witness, and we'll
 3   have to bring this to Judge Ross, all right?
 4   Okay?
 5               THE WITNESS:  Ask me the question.
 6               MR. LAMPING:  Limit your objections
 7   to form, Chris.
 8               MR. FINNEY:  Yeah, that, too.
 9       A.   Just ask me the question.  I don't even
10   know the question.
11       Q.   (BY MR. LAMPING)  Well, you probably
12   forgot it because your attorney jumped in, but
13   let me try it again, all right.  As you sit here
14   today, do you have an understanding as to whether
15   charges for logistics transactions are entered by
16   the agent into the Mayflower system?
17       A.   I can say that I think in some cases the
18   Mayflower would do the entering, depending on the
19   order, and in some cases the agent would do it,
20   and I believe today that's probably the same as
21   it was 25 years ago.
22       Q.   Okay.  Do you know as you sit here today
23   who at Brendamour Moving & Storage was
24   responsible for entering charges into the
25   Mayflower system for logistics transactions at
```

1   any point in time during your tenure at

2   Brendamour?

3       A.   Oh, there was lots of different people

4   over the years.

5       Q.   Tell me their names, please.

6       A.   I actually saw somewhere I read that

7   somebody already gave you all of those names, so

8   I -- there was one Vicki, there was one Chuck,

9   there was one, I don't know.  Again, you're

10  talking a lot of years, but they would input the

11  household goods, too.  They would input an office

12  or library move, if that was taking place, or an

13  international move.  They were just doing their

14  job.  They would do whatever they were told to

15  input, but at least it's in the Mayflower manual

16  on how to input orders.

17      Q.   Are you familiar with the Mayflower

18  manual?

19      A.   I don't even know if there is a manual.

20  I'm sure there's some kind of rule book that

21  Mayflower has that agents have to follow.

22      Q.   At any point in time when you had

23  responsibilities for Brendamour Moving & Storage

24  did you ever read an agency manual or see one?

25      A.   I know there to be some kind of agency

Page 32

1    manual.  It's probably on the computer today.

2    It's probably not even a manual that they send.

3    There used to be agency directories that you sent

4    out.

5           I mean everything is on the computer

6    today, but did I read from start to cover a

7    manual?  No.  Did I open up a manual and read

8    anything, over my career?  I can't imagine I

9    didn't.

10    Q.   Do you have an understanding now or at

11    any point during your tenure at Brendamour

12    Moving & Storage did you have an understanding

13    about what the agency manual says about agents

14    accurately reporting information regarding

15    transactions into the Mayflower system?

16    A.    Keep in mind in 2005, don't hold me to

17    this date, but in 2005 my dad purchased the

18    company, a company that he had that my brothers

19    and I owned 10 percent of that we inherited, and

20    he signed a whole new contract, agreement,

21    whatever you want to call it with Mayflower, and

22    that took anything that I signed over the years

23    away, because dad signed a new contract with

24    Mayflower.

25           And he died in 2015, and that's the only

Page 33

1    reason my brothers and I own 33 and a third

2    percent of the company, is because we inherited

3    it equally.

4         Q.   Sir, that wasn't responsive to my

5    question, but I appreciate that.

6         A.   Well, if you ask --

7         Q.   My question is at any point in time --

8         A.   Okay.

9         Q.   -- sir, at any point in time were you

10   familiar with what the agency manual says, if

11   anything, about whether agents are required to

12   accurately report information to Mayflower?  Were

13   you aware of what the agency manual says about

14   that specific topic, yes or no?

15        A.   I don't ever remember that, but I know

16   when I was in charge I counted on my accounting

17   people to be honest people and do it right, and

18   nothing ever came up that we didn't do it right,

19   so obviously, when I was in charge back in the

20   since '91 when we bought the Mayflower of Ohio

21   agency from Mayflower, I did it honest and

22   correct.

23        Q.   Okay.  For the scheme, as we've talked

24   about today, do you know who was responsible for

25   entering the inflated charges into the Mayflower

1    system?  As you sit here today, do you know the

2    name of that person who entered inflated charges

3    into the UniGroup system?

4        A.   There's a good chance Paul Owens enters

5    that stuff.  I have no idea, to answer your

6    question.

7        Q.   Okay.  Why do you believe that Mr. Owens

8    would be the likely person that would have done

9    that?

10       A.   Because from what I understand --

11            MR. FINNEY:  First of all, Hold on,

12   that assumes a statement that's not in the

13   record.  I don't think he said it was likely.  He

14   said it may have been Paul Owens.  He doesn't

15   know.  It's all speculation.

16            MR. LAMPING:  You can answer the

17   question, sir.

18            MR. FINNEY:  Did you say likely?

19       A.   What's the question again?

20       Q.   (BY MR. LAMPING) Sir?

21       A.   Yes.

22       Q.   You said that, and we can have it read

23   back, you testified that it was either probably

24   or likely or may have been Mr. Owens that entered

25   the inflated information into the UniGroup, or

Page 35

1  Mayflower system.  What was the basis for that

2  testimony?

3                    MR. LUEPKE:    Objection, assumes

4  facts not in evidence, misstates the testimony.

5                    MR. FINNEY:  Agreed.

6      Q.   (BY MR. LAMPING)   What was the basis for

7  your testimony, sir?

8      A.   I am just guessing.  I mean if Paul has

9  a lady or a man that sits in one of the offices

10  nearby him and he tells them to input something,

11  I wouldn't know that, but I guarantee you that

12  whatever was inputted, Paul knows about, because

13  Paul has admitted to the scheme.

14      Q.   Do you know as you sit here today why

15  Mr. Owens came up with this scheme?

16      A.   Well, again, I've read the same thing

17  that I think everybody listening today has read.

18  Paul said that the company owed money, owed

19  taxes, was struggling, and I think it said -- I'm

20  guessing, I think it said something that he saw a

21  way to bring in some profits to pay all of those

22  bills off, including Mayflower.

23      Q.   And what was the thing that --

24      A.   At one time he owed Mayflower a half a

25  million dollars, and that's been paid back.

1      Q.    And one of the things that's been

2   alleged in the lawsuit is that the genesis of the

3   scheme, one of the reasons the scheme was

4   developed is because Brendamour Moving & Storage

5   owed money to the IRS.  You've seen that alleged,

6   correct?

7      A.    I read it just like everybody else.

8      Q.    And in fact, in one of the exhibits to

9   the affidavit --

10      A.    I even said that it's important that

11   Paul pays that money, so I remember it being

12   owed.

13      Q.    You remember what being owed?

14      A.    I remember that Paul had neglected to

15   pay the IRS, or the government, and when I got

16   some kind of notice in the mail or a phone call,

17   I know what it was, I started getting phone calls

18   from I think it was attorneys wanting to

19   represent us on the tax money that was due.

20   That's when I went in to Paul and found out that

21   he hadn't been paying taxes.

22      Q.    When did that happen?

23      A.    Oh, geez, I don't know, 2005, '06, '07.

24      Q.    Did Mr. Owens tell you why he had not

25   been paying taxes?

Page 37

1     A.   The company was not making enough money
2  at that time to pay the taxes.  He didn't tell me
3  that.  That's a given, I would think, for any
4  company.
5     Q.   Now Mr. Owens has never been an owner of
6  Brendamour Moving & Storage, correct?
7     A.   Correct.
8     Q.   What did Mr. Owens say, if anything,
9  about how he was going to pay back the IRS what
10  the company owed them?
11    A.   I didn't get involved in the accounting.
12  I did my job, which was sales.  I didn't, you
13  know -- outside of work, I got along with my dad
14  and my mom was a beautiful person.
15         Inside the office, my dad, and that's
16  why even when I got my real estate license, I was
17  going to work with my dad in the real estate
18  company, and that didn't work out, and that's how
19  I ended up being a helper on the moving trucks
20  with Mayflower.  I was not involved in that and
21  cannot answer any question in that area, and I'm
22  telling you the truth.
23    Q.   As you sit here today, do you have any
24  belief as to how much Brendamour Moving & Storage
25  owes to Mayflower as a result of the scheme?

Page 38

1      A.    I know one thing, everybody involved

2  here should get together and put an end to this

3  lawsuit and work out a payment plan that

4  Brendamour can pay, even though they dropped

5  Brendamour.

6          Brendamour is operating and probably

7  making more money than they were because they

8  didn't have to pay Mayflower a percentage.

9          But, you know, to end this thing would

10  be just to get with Paul and work out a payment

11  plan and let Brendamour pay Mayflower back and

12  drop me from the case.  That's the most thing to

13  me and my wife and my family.  It's affected all

14  of us.

15      Q.    Well, I can assure you that Mayflower

16  accepts all forms of payment.  My question, sir,

17  was as you sit here today, do you know one way or

18  the other or do you have an opinion or a belief

19  as to how much Brendamour Moving & Storage owes

20  to Mayflower as a result of the scheme?

21      A.    I have no idea.

22              MR. LUEPKE:  Objection, lacks

23  foundation.

24      A.    I can tell you this, Mayflower says one

25  figure and Paul says another.  Why don't they get

Page 39

1  together and figure it out.

2      Q.    (BY MR. LAMPING)  What has Paul told you

3  as far as what he believes Brendamour Moving &

4  Storage owes to Mayflower?

5      A.    I haven't asked Paul that.  I've

6  concentrated on Paul.  Did you say something?

7  Did you use my name, or didn't you?  Those have

8  been our conversations.

9          Because each time I think I'm going to

10  be off of this case and my attorneys thought I

11  was going to be off of it, it's gone on to the

12  next level.

13          And then I'd call Paul again and say,

14  "What do you mean, Paul?  You were in an

15  conference and my name came up again?"

16          And I tried, Julie tried to find out who

17  said that.  In fact, you know, you guys kept me

18  in here, and of course, trust me, my attorneys

19  are billing me and I'm the only one that the

20  company is not paying for.  Paul is being paid

21  for.  My brothers are being paid for.  The

22  company is being paid for by Brendamour Moving.

23  I'm paying it personally, my wife and I, and it's

24  costing our savings.

25      Q.    What is the -- let me back up.  Before

1    we went down that lovely rabbit hole, I want to

2    go back and just make sure that I'm clear on the

3    people that you talked to or the people that you

4    have talked to regarding this lawsuit and your

5    deposition, just to confirm that the only people

6    that you have talked to is your counsel and

7    Mr. Owens; is that fair?

8        A.    No, my other two sons know what's

9    happened.  Like I said, the one son that's on

10   full disability doesn't understand any of it, and

11   doesn't, you know, but Jeff knows that I'm

12   involved in his, and my other son, if you want

13   their names are Scott and Jack, and of course,

14   they know and they are hurting with their parents

15   on this thing.

16       Q.    Have you had any discussions --

17       A.    Do I keep them informed week after week?

18   No.  They all know I'm here today.

19       Q.    Okay.  So other than your sons and

20   Mr. Owens and your counsel, have you talked to

21   anyone else just about the lawsuit or your

22   deposition?

23       A.    No, no.  It's embarrassing.

24       Q.    Tell you what, sir, we have been going

25   almost an hour here.  Maybe we'll just take a

                                                  Page 41

1    short break and everyone kind of stretch their

2    legs; is that fair?

3                 MR. FINNEY:  Sure, how long?

4                 THE WITNESS:  Make it short.  I'm

5    being charged.

6                 MR. LAMPING:  All right.  Why don't

7    we say 5 minutes.

8                 THE WITNESS:  Okay.

9                 THE VIDEOGRAPHER:  Going off the

10   record.  This ends Media 1.  The time is 11:10

11   a.m.

12                       (Brief recess taken.)

13                 THE VIDEOGRAPHER:  Going back on

14   the record.  This begins Media 2.  The time is

15   11:19 a.m.

16        Q.   (BY MR. LAMPING)  Mr. Brendamour, a

17   little while ago we talked about the amounts or

18   the fact that Brendamour Moving & Storage owed

19   money to the IRS back in or around 2005.  Do you

20   recall talking about that?

21        A.   Yes.

22        Q.   Do you know how that issue was resolved,

23   if at all?

24        A.   Yeah, when I walked into Paul's office

25   and said, "Paul, what's this?"  I never heard

Page 42

1   another word about it.  I never asked again.  I
2   never got another phone call from companies,
3   trying to see if we needed help to reduce our
4   debt, so Paul paid it.
5       Q.   And --
6       A.   I'm assuming Paul paid it.  Now whether
7   he had an account or somebody write out a check,
8   you know what I'm saying.
9       Q.   Yeah.  There is an allegation in this
10  case that at some point in time Brendamour
11  Moving & Storage put an agency statement on hold.
12  Are you familiar with that, that that allegation
13  has been made in this case?
14      A.   I don't understand what "putting an
15  agency statement on hold" is.
16      Q.   Okay.  That was going to be my next
17  question.
18      A.   I've heard the term.
19      Q.   I just want to be clear.  Are you aware
20  as you sit here today that the allegation has
21  been made that at some point the agency statement
22  was put on hold?  Are you aware that that
23  allegation has been made?
24      A.   I still don't know what that means.
25                  MR. FINNEY:  The question is in the

Page 43

1   Complaint, he says that claim was made.  Did you
2   read that paragraph or you --
3                    THE WITNESS:  Oh, I don't know.
4   There have been so many things.
5                    MR. FINNEY:  You have no
6   recollection of that?
7                    THE WITNESS:  I have no
8   recollection of what you're talking about.
9        Q.   (BY MR. LAMPING)  Okay.  But if I were
10  to show you that allegation right here and now
11  today, you have no idea what it means because you
12  don't know what it means to put an agency
13  statement on hold; is that fair?
14       A.   That's very fair.
15       Q.   Okay.
16       A.   And if it's something that took place
17  after my brothers bought me out, I would have
18  never seen it anyway.
19       Q.   And just let me make sure we're all on
20  the same page.  What year did your brothers buy
21  you out?
22       A.   I have sent you the contract that you've
23  asked for that gives you the exact date.  I think
24  was it 2020?
25       Q.   Okay.

Page 44

1      A.   Whenever it was.  COVID and a few other

2   things have taken place the last few years.

3      Q.   Sure, and am I correct that you resigned

4   from the company as I think President or an

5   executive level officer in or around 2004, 2005;

6   does that sound about right?

7      A.   I actually have sent you the letter to

8   my brothers and my mom and dad resigning, so that

9   is correct.

10      Q.   That time period is correct, give or

11   take?

12      A.   Yes.

13      Q.   Okay.  And so can you describe for me

14   what, if any, day-to-day activities you had at

15   Brendamour Moving & Storage between the time that

16   you sent your resignation letter and then when

17   you were ultimately out were bought out in or

18   around November of 2020?

19      A.   I was a salesperson, and I was a

20   salesperson of one other -- I think the internet

21   said, and I'm very upset with my dad that that's

22   what he referred me to, but he called me, I

23   think, his senior sales manager, and Brendamour

24   had one other salesperson, that was my -- which

25   he has been in the business for 20-something

Page 45

1   years, he's still with the company, David Malloy,

2   so he's 30 years into it, and there was no

3   managing him, so basically my job was to handle

4   my sales of the customers, local moves, office

5   moves, library moves, long distance moves with

6   Mayflower, at one time we did international

7   moves, and that was it.  I opened and closed.

8        Q.    Were you employed as a salesperson

9   during that entire, you know, 15-year period

10  between the resignation and the buyout?

11       A.    Yes, I was employed.  I think I

12  mentioned earlier today the only thing -- the

13  only money I have ever collected from the company

14  was my paycheck and a Christmas bonus of $300

15  with all the other employees.

16       Q.    What were your primary responsibilities

17  as a salesperson during that period of time?

18       A.    To sell the orders sell the job, the

19  local moves, sell the job the office moves and on

20  so on.  I was very good at it.

21       Q.    What if any sales responsibilities did

22  you have for logistics transactions?

23       A.    I had no responsibilities.  I did not

24  sell logistics jobs.

25       Q.    So is it fair to say the entirety of

1    your sales responsibilities involved household

2    goods, transactions?

3         A.   Office moves, household moves, correct.

4    Just if it's something you're talking from 20

5    some years ago, I think the first few years of

6    Paul starting to sell, because we were at one

7    time a total household move company, as Paul

8    started building the logistics side, I think they

9    put -- used my sales number for a little while

10   until I found out, and then I think Paul started

11   using his own sales number, or got a sales

12   number, just so you're not trying to catch me in

13   something there, but I did not sell those jobs at

14   the very beginning of the company starting to do

15   logistic work.

16        Q.   On the jobs that you did work on,

17   whether it's office moves or household moves, who

18   would be the primary point of contact between the

19   company and the customer?  Would that have been

20   you?

21        A.   Oh, yes, yeah, 100 percent.  I mean I

22   had a lady that worked for many, many years.

23   She's still there as a receptionist.  She learned

24   how to work with my customers, we worked as a

25   team, but yes, it was my job to work with the

Page 47

1    customers I sold.

2        Q.    On the moves that you worked on, how

3    would the customer invoices be generated?

4        A.    Almost everything I worked on was

5    generated through the Mayflower system, if it was

6    a Mayflower order and Mayflower collected.  I can

7    tell you right now there was none of the

8    household good orders that were ever a part of

9    any scheme, because those orders were put in the

10   system, and like all the other Mayflower United

11   agents, that's controlled by Mayflower.

12       Q.    For the moves that you worked on, who

13   was responsible for entering information

14   regarding those transactions into the Mayflower

15   system?

16       A.    Well, if it was a long distance move it

17   would have been one of the ladies in our office.

18   If it was a local move -- oh, you're only looking

19   at Mayflower.

20            Since it was somebody -- I didn't know

21   how to do it.  You know, I learned how to do

22   computer -- it says your battery is running low

23   here.

24       Q.    And I just want to be clear, there are

25   transactions that an agent can handle that don't

Page 48

1    necessarily involve Mayflower, that aren't sort

2    of registered with Mayflower; is that accurate to

3    your understanding?

4         A.   If you can hear me, they just plugged

5    the battery in and you lost me.

6         Q.   Okay.  Let me start over.  Can you hear

7    me now?

8              (Off the record discussion.)

9                   THE REPORTER:  Bethany, you may as

10   well go off.

11                  THE VIDEOGRAPHER:  Mr. Lamping, do

12   you want me to go off the record?

13                  MR. LAMPING:  Sure.

14                  THE VIDEOGRAPHER:  Going off the

15   record.  This ends Media 2.

16                  MR. FINNEY:  We're back.

17                  THE WITNESS:  They are going to get

18   a cord to plug me in.

19                  THE VIDEOGRAPHER:  Do you want to

20   just stay on the record then?

21                  MR. FINNEY:  If you don't mind,

22   yeah.

23                  THE VIDEOGRAPHER:  Mr. Lamping, are

24   we going to stay on the record?

25                  MR. LAMPING:  We can stay on.  It

Page 49

1  doesn't matter to me.

2          THE VIDEOGRAPHER:  I was in the

3  middle of reading off and then they came back on.

4          MR. LAMPING:  Okay.

5          THE VIDEOGRAPHER:  So I didn't

6  actually finish.

7          MS. GUGINO:  Hold on a second.

8          THE WITNESS:  There's the

9  conference room.

10          (Off the record discussion.)

11          MR. FINNEY:  Are we back?  Can you

12  guys hear?  We're ready to roll.

13          MR. LAMPING:  I'm here.

14          THE WITNESS:  I'm not looking at

15  myself.  I'm looking at the conference room.

16          THE VIDEOGRAPHER:  I need to put

17  the spotlight back on the witness.  One moment,

18  please.

19          THE WITNESS:  All right.

20     Q.   (BY MR. LAMPING)   Can you hear me, sir?

21     A.   I can hear you.

22     Q.   Great.  At any point in time when you

23  had responsibilities for the business of

24  Brendamour Moving & Storage did you have, have

25  you ever had any role whatsoever in logistics

Page 50

1    transactions?

2              MR. FINNEY:  Mike, listen to the

3    timeframe he's asking you about.  Can you restate

4    the question so we're clear on the timeframe

5    you're asking about.

6         Q.   (BY MR. LAMPING)  At any point in time

7    have you ever had any responsibility at all in

8    connection with logistics transactions?

9         A.   No, none.

10        Q.   While you were at Brendamour Moving &

11   Storage, either as an owner, an executive or a

12   salesperson, who was primarily responsible for

13   the sales component of logistics transactions?

14        A.   Paul Owens.

15        Q.   And do you know who some of the largest

16   logistics customers were for Brendamour Moving &

17   Storage while you were at -- during the time you

18   were at the company?

19              MR. LUEPKE:   Objection, no

20   foundation.

21        A.   That's, I mean Mayflower knows the

22   names.  I mean my gosh, Red Box, Amazon, Teamy,

23   there were lots of -- yeah, the company does all

24   kinds and still to this day of vending machines

25   and kiosks.

1          Q.    (BY MR. LAMPING) As you sit here

2     today --

3          A.    And the warehouses are full of them.  I

4     can just read the names as I walk by in the

5     warehouse.

6          Q.    Sure.  As you sit here today, do you

7     know how the pricing would be set for logistics

8     transactions involving, say, Amazon or Red Box?

9          A.    Not, no, nothing.

10          Q.    To the best of your knowledge was

11     Mr. Owens responsible for setting prices

12     associated with Amazon or Red Box transactions?

13          A.    As far as I know.

14          Q.    And if we wanted to know how Amazon or

15     Red Box orders were originated and how the terms,

16     the pricing terms were set, to the best of your

17     knowledge we would need to ask Mr. Owens?

18          A.    Yes.

19          Q.    Going back, I had asked you a question

20     essentially wanting to know who you knew to the

21     best of your knowledge would have been

22     responsible for entering information regarding

23     logistics transactions into the Mayflower system,

24     and you gave me two first names, Vicki and Chuck.

25     Do you recall that?

Page 52

1      A.    Yes, and I don't even know if Vicki is

2    the name.  I stopped at that point because

3    there's been four or five ladies over the

4    20-something years, and Chuck, who passed away.

5      Q.    Okay.  During your time at Brendamour,

6    Brendamour Moving & Storage, at any given time

7    how many different people would be involved in

8    entering information into the Mayflower system

9    for logistics transactions?

10              MR. FINNEY:  Objection, asked and

11    answered.

12      Q.    (BY MR. LAMPING)  And just let me

13    clarify.  I'm trying to understand if this was a

14    job that only one person handled, multiple

15    people, and I'm specifically talking about the

16    act of entering data into the Mayflower system

17    regarding logistics transactions; so is that

18    something that one person or multiple people

19    would handle at a given time or did it vary?

20      A.    The office wasn't that big.  There had

21    been a couple of people, I guess, over the years,

22    but keep in mind there are also, there were

23    logistic orders that there was no accessorial, so

24    it was just a -- and those weren't part of the

25    scheme.

1      Q.    Yeah.

2      A.    So the dispatcher would put those in.

3  One of the ladies could have done that.  I don't

4  think the accounting person that, you know,

5  billed the local storage and local moves and so

6  on would have done it, but again, I can't imagine

7  Paul not having the knowledge to do it.

8      Q.    So I'm just talking about the

9  transactions that were part of the scheme, okay.

10  What is the job title of the person who would

11  have physically entered information into the

12  Mayflower system?

13      A.    By now you've found out that this

14  company was a -- they had just a lot of good, and

15  still does, a lot of hard working people.  There

16  really weren't job titles, so it was just a lady

17  or a man that did his job or her job at a

18  computer, inputting whatever they were told to

19  input and do whatever job they were told to do.

20      Q.    And who did that man or woman report to?

21      A.    Everybody reports to Paul.  I reported

22  to Paul.

23      Q.    Okay.

24      A.    And Paul has even I think mentioned that

25  in something that we discussed and shared with

1   you that I --

2        Q.   Yeah?

3        A.   I reported to Paul.  Everyone reports to

4   Paul.

5        Q.   So it's your testimony that --

6        A.   Even when my dad was alive, dad wasn't

7   even part of running the company, and of course,

8   my brothers today aren't part of running the

9   company.  Paul runs the company.

10       Q.   So it's your testimony that the

11  transactions that were part of the scheme, for

12  the transactions that were part of the scheme,

13  whoever manually entered information into the

14  Mayflower system would have been reporting up to

15  Mr. Owens?

16       A.   I mean basically, yeah.  I mean

17  everybody, even the warehouse.  I mean, okay, the

18  office people report to, and the management

19  people report to Paul.  The warehouse guys that

20  load and unload the trucks or whatever report to

21  my son Jeff, and my son Jeff reports to Paul,

22  so --

23       Q.   And I'm just trying to make sure --

24       A.   Right now, the truck drivers reported to

25  their dispatcher, and their dispatcher reports to

1    Paul, so he --

2        Q.    Just to be clear, I'm not asking about

3    the truck drivers.  I just want to be very clear.

4    It's your testimony that the folks who would have

5    been responsible for manually entering data into

6    the Mayflower system regarding the transactions

7    that were part of the scheme would have reported

8    to Mr. Owens?

9        A.    They wouldn't have known they were doing

10   any scheme.

11       Q.    I'm not asking, sir, if they did

12   anything wrong.  I'm asking who they reported to.

13       A.    Every employee in the office reports to,

14   and did for over 20 years, Paul.

15       Q.    Including the folks who entered data

16   into the Mayflower system regarding the

17   transactions and the scheme?

18       A.    They would have worked in the office and

19   they would have reported to Paul.

20       Q.    Was there anybody in between those folks

21   and Mr. Owens, so for example, did they report to

22   somebody who then reported to Mr. Owens, or was

23   there a straight-line report directly to

24   Mr. Owens?

25       A.    This was a small office with 5 or 6

1    people.   Everybody reports to Paul.

2        Q.    During the 15 years or so where you

3    worked as a salesperson/owner, you know, 2005-ish

4    to 2020, what type of financial reports did you

5    receive regarding the company's performance?

6        A.    None.

7        Q.    Did you know --

8        A.    I wasn't interested in them.  I wouldn't

9    have known how to read them truthfully, wouldn't

10   have known how to read them anyway.

11       Q.    And is it true, would you agree that at

12   some point in time logistics moves started to

13   become a very significant part of Brendamour

14   Moving & Storage's business?

15       A.    Oh, my gosh, yes.

16            MR. FINNEY:  Objection, lack of

17   foundation.

18       A.    We -- Brendamour quit doing co-ops for

19   other Mayflower agents.  Brendamour quit doing

20   international.  Brendamour stopped doing

21   household moves, that we couldn't put in the

22   system and someone else haul, so, yeah, as

23   logistics took over the company, the house -- and

24   that's one of the reasons I decided it was time

25   to retire and move on with my life.

Page 57

1    Q.    (BY MR. LAMPING)  At what point in
2    time --
3    A.    And we stopped doing household storage.
4    Can you imagine a moving company not doing
5    household storage?
6    Q.    I don't think there's a disagreement on
7    this point, but you agree that at some point
8    logistics business became the central focus of
9    the company's operations?
10   A.    I agree.
11   Q.    Who made that decision going to sort of
12   pivot in that direction?
13                MR. FINNEY:  Objection, lack of
14   foundation.
15   A.    Paul.
16   Q.    (BY MR. LAMPING)   If you know.
17   A.    Paul.
18   Q.    Were you present or do you have
19   knowledge, do you have personal knowledge of any
20   discussions regarding making the logistics
21   business a central focus of Brendamour Moving &
22   Storage?
23   A.    Yeah, for years I complained because I
24   didn't want to give up the household goods side.
25   That was how I started again, as a helper and a

Page 58

1    packer and a driver and a salesperson for Al Nash

2    Mayflower, it was in my blood, but how do you

3    argue when they are making more money, the

4    company was making more money doing logistics

5    than it was household?

6         So I lost the argument, and as I was

7    approaching 70 years of age, you know, they are

8    all in their 40s and 50s.

9    Q.    Well, isn't it true that -- well, if you

10   can tell me, other than yourself did anyone else

11   say maybe offer a dissenting voice as far as

12   pivoting primarily to the logistics side, and not

13   being as heavily involved in household goods?

14   A.    Paul, you know, in other words, we

15   needed the room.  The household goods, I mean the

16   list goes on, less packing material taking up

17   room, less storage vaults taking up storage,

18   less -- you know, it needed that room as the

19   company needed room for all the different kiosks

20   and vending machines that were coming in.

21        I mean at one time there were 40, 50,

22   trailers out on the lot because there was no room

23   in the warehouses.

24   Q.    And am I correct that, I mean this seems

25   intuitive, but am I correct that the reason the

Page 59

1  company decided to say pivot more to the

2  logistics transactions, is because there was a

3  belief that that would be more profitable for the

4  company than being more primarily a household

5  goods company; is that fair?

6      A.    I would think that's fair for any

7  company that does logistics, and I know there's

8  numerous companies in the Mayflower United

9  systems that stopped doing household goods and

10  started doing more logistics.

11      Q.    Sure.

12      A.    I can name some.

13      Q.    And although you may have preferred to

14  continue to have a significant presence in the

15  household goods sort of sector, you would

16  acknowledge as I think you did earlier that the

17  logistics business was very profitable for

18  Brendamour Moving & Storage?

19      A.    I mean, yeah, it was profitable.

20      Q.    And the company's profitability, or that

21  profitability associated with the logistics

22  transactions occurred while you had an ownership

23  interest in Brendamour Moving & Storage, correct?

24      A.    Well, it still kept happening after I

25  sold the company to my brothers, until Paul went

Page 60

1    to Louisville.

2        Q.    Just let me make sure we're clear.

3    Well, I'll move on.

4        A.    Well, I can't imagine -- I mean that was

5    a given question.

6              MR. FINNEY:  Mike, there's no

7    question on the table.  There's no question on

8    the table.  Please ask your next question.  Let's

9    go.

10       Q.    (BY MR. LAMPING)  You testified earlier

11   that Brendamour Moving & Storage is paying

12   Mr. Owens' legal fees in this case.  What is the

13   source of your knowledge on that point?

14       A.    Isn't one of the Brendamour's attorneys

15   listening today?

16       Q.    I'm just asking you, sir, you testified

17   that Brendamour Moving & Storage is paying

18   Mr. Owens' legal fees, and they are not paying

19   your legal fees.  I'm just wondering what is the

20   factual basis for your belief that Brendamour

21   Moving & Storage is paying Mr. Owens' legal fees?

22       A.    I hadn't heard anything different.

23       Q.    Well, has anyone ever told you that that

24   was, in fact, the case?

25       A.    No, I have not heard that.

Page 61

1        Q.    Have you ever had a conversation with

2    any of Mr. Owens' attorneys?

3        A.    I personally, yes, the very -- at the

4    very beginning when I was hoping that my brothers

5    were going to pay my attorney's fees, and I asked

6    to have my attorney who has been with me through

7    22 years, not criminal cases, but we have real

8    estate and a will, and I can go on, and the

9    different things that Chris Finney who is sitting

10   here right now had done for me, I asked my

11   brothers if he could at least be part of and

12   watch out for me.

13            And my brothers got upset with that and

14   said, "You're on your own," and that's how that

15   took place.  If not, I would be -- they would be

16   paying my bill if I had not asked permission for

17   Chris to watch over what was happening to my wife

18   and I.

19        Q.    Okay.  So your understanding is that the

20   company would be paying your legal fees if you

21   had agreed to have been represented by one of the

22   company's lawyers, and not Mr. Finney and his

23   firm?

24        A.    My brothers didn't want to do it,

25   because again at that point they felt like I, you

Page 62

1    know, knew about it, and they didn't like the

2    idea then that they had said to -- they didn't

3    want to say they would pay for it.

4           I argued with them quite a bit, begging

5    them, and when they said no, Chris could not be

6    part of it, they would not pay Chris, I chose to

7    make sure that I had someone helping me out and,

8    of course, Chris and I didn't think, and Julie

9    got involved, did not think that I would be in it

10   at this point still.

11       Q.   Who, if anyone, did your brother -- let

12   me strike that.   What, if anything, have your

13   brothers told you about who they believe were

14   originally responsible for the scheme?

15       A.   My brothers have not talked to me

16   through this whole thing.

17       Q.   Have you had any conversations with

18   anybody, outside of your counsel, regarding the

19   identity of the persons or person who was

20   originally responsible for the scheme?

21       A.   I've already told you my 4 sons, minus

22   Ryan, is one that -- my three healthy sons know

23   about it.   That's it.   I'm sure they told their

24   wives.

25       Q.   So has anybody -- strike that.   Have you

Page 63

1  ever been a part of a conversation, excluding

2  conversations with counsel, where someone other

3  than Mr. Owens was identified as the person who

4  developed the scheme?

5      A.   No.  Paul Owens has admitted to

6  everybody from what I understand.

7              MR. FINNEY:  But Mike, that's not

8  the question he asked.  Hold on, that's not the

9  question he asked you.

10     A.   No, I have not heard that anybody else

11  was part of the scheme.

12     Q.   (BY MR. LAMPING)  So you understand that

13  Mayflower has taken the position that Mr. Owens

14  has pointed the finger at you as the one who

15  originally came up with the scheme.  You're aware

16  that that is Mayflower's position?

17             MR. FINNEY:  It's a yes or no

18  question.

19     A.   Yes, I've heard that.

20             MR. FINNEY:  Next question.  Go

21  ahead.

22     Q.   (BY MR. LAMPING)  Okay, and as we

23  established, it's your testimony under oath that

24  Mayflower is just wrong, that you were not the

25  initiator of the scheme, fair?

Page 64

```
 1      A.   Tim Grimes worked for Mayflower, yes.
 2   It's fair to say.
 3      Q.   Okay.  You are aware that -- and I think
 4   you alluded to it earlier, there was a video call
 5   about a month or so after Mr. Owens' dinner with
 6   Tim Grimes where the topic of the scheme was
 7   discussed.
 8              MR. FINNEY:  You're talking about
 9   the phone call with the clients, is that what
10   you're talking about?
11              THE WITNESS:  Yes.
12              MR. FINNEY:  Hold on, just was
13   there a call?  That's the question.
14      A.   Yes, I'm aware of that call.
15              MR. FINNEY:  Yes.
16      Q.   (BY MR. LAMPING)  Okay, and you are
17   aware that at least it is Mayflower's position
18   that during that call, Mr. Owens again blamed you
19   for the origination of the scheme?
20      A.   That's what we're going to find out,
21   because Paul Owens has told me he's never said
22   that in that meeting and to Tim Grimes.
23              Now he did say to Tim Grimes -- or Tim
24   Grimes did say, since I have known him for so
25   many years:  "How is Mike doing?"
```

```
 1          And Paul said, "He's fine, he's
 2    retired," and that's the only thing Paul said
 3    ever came up with my name in Louisville.
 4       Q.   Okay.
 5       A.   And I don't know the facts of that
 6    meeting between Mayflower and my brothers and
 7    Paul.
 8       Q.   Have you had any conversations with your
 9    brothers about what went on during that call?
10               MR. FINNEY:  Asked and answered.
11       A.   I have not talked to my brothers to -- I
12    understand there was some lady that did the --
13    that recorded that meeting.
14          I'd love to hear where it says that Paul
15    said it, because at that meeting that they had,
16    somebody was recording it.  Can everyone listen
17    to that?
18       Q.   (BY MR. LAMPING)  I'll get to that in a
19    minute.  Have you talked to your brothers about
20    what went on?
21               MR. FINNEY:  Hold on, listen to the
22    question.
23       A.   No.
24       Q.   (BY MR. LAMPING)  Let me finish my
25    question, Chris.
```

Page 66

1    A.   I've not answered, I have not talked to

2    my brothers.

3    Q.   About that call.  All right?

4    A.   I have not talked to them about that

5    call.

6          MR. FINNEY:  He's never talked to

7    his brothers about any of this, including that

8    call.  Next question.

9    Q.   (BY MR. LAMPING)  Who told you that

10   somebody recorded that call?

11   A.   Julie?  Was that you?

12   Q.   Well, I don't want to know what your

13   counsel has told you.  If anyone has a recording,

14   we'd love to see it.

15   A.   I don't remember.

16          MR. FINNEY:  Next question.

17   A.   Wait a minute, it was on some of the

18   paperwork.  I saw her name.  I saw her last name.

19   It's somewhere in -- I read it from something

20   that somebody wrote.  Mayflower's attorney or

21   Brendamour's attorney put that in writing, in her

22   first name, that she recorded in the video to me.

23   That's where I finally found it.

24          MR. FINNEY:  Great, next question.

25   Q.   (BY MR. LAMPING)  Let me switch gears

Page 67

1   for a minute.  Are you familiar with a company

2   called Brendamour Logistics, L.L.C.?

3       A.   I wasn't, again I wasn't privy to it.

4   They landed an Ikea account up in Pittsburgh is

5   what I have found out over the years, and in

6   order to set up the payroll --

7               MR. FINNEY:  It's a simple

8   question.  Have you heard of Brendamour

9   Logistics?

10              THE WITNESS:  Oh, okay, yes, I have

11  heard of Brendamour Logistics.

12              MR. FINNEY:  Okay.  Next question.

13              MR. LAMPING:  You know what,

14  Chris, you don't have to say, "Next question,"

15  after every question.  All right. Act like you

16  have been in a deposition before, okay.  I know

17  you have been doing this longer than I have, I

18  assume.

19      Q.   (BY MR. LAMPING)  All right,

20  Mr. Brendamour, during your time as either an

21  employee or owner for Brendamour Moving & Storage

22  what role, if any, did Brendamour Logistics play

23  on logistics transactions?

24      A.   Repeat that, please.

25      Q.   Sure.  Do you have an understanding what

1  if any, role Brendamour Logistics had on

2  logistics transactions for Brendamour Moving &

3  Storage, specifically transactions involving

4  Amazon and Red Box?

5      A.   Only by being around, I think the

6  Brendamour Logistics account, the name was only

7  used in Pittsburgh only, and when Pittsburgh

8  closed, it was never used for any transaction of

9  any type.  I could be wrong.

10     Q.   Okay.  I'm going to mark a depo exhibit,

11 the depo notice, and publish it.  All right,

12 Mr. Brendamour we are going to publish our first

13 exhibit.  Let me know, please, when it pops up on

14 your screen.

15             (Exhibit 1 was marked by the

16 reporter for identification.)

17             MR. FINNEY:  We're not seeing

18 anything.

19     Q.   (BY MR. LAMPING)  Does the witness have

20 the Exhibit Share platform pulled up?

21             MR. FINNEY:  I tried to log in

22 through whatever link you gave me.  It didn't

23 work.  We ended up going in through Zoom, so I

24 have no idea about the technology, but the

25 technology provided us was totally inadequate,

Page 69

1    and I have no e-mail from you.

2                    MR. LAMPING:  All right.  Christine

3    is going to e-mail you a copy.

4                    MR. LUEPKE:   Could you please

5    e-mail a copy to me, as well.  I don't see it on

6    my screen either.

7                    MR. LAMPING:  Sure.

8                    MR. LUEPKE:  Thank you.

9                    MR. LAMPING:  It's the Deposition

10   Notice, for everyone's convenience.

11                   MR. LUEPKE:   You bet.

12        A.   I'm reading it now.

13        Q.   (BY MR. LAMPING)  Okay.  Mr. Brendamour,

14   do you have, are you reading or looking at a

15   Notice of Deposition that is what brings us here

16   today?

17        A.   I am looking at it.

18        Q.   Have you seen that before?

19        A.   Let me read it.  Okay, I just read it.

20                   MR. FINNEY:  The question is have

21   you seen that before?

22                   THE WITNESS:  Yes, Julie sent that

23   to me.

24                   MR. FINNEY:  Yes, he's seen it.

25        Q.   (BY MR. LAMPING)  All right.  Let's

Page 70

```
1   e-mail them -- you can set that aside and we'll
2   mark that as Exhibit 1, and we're going to be
3   e-mailing you guys another document here in a
4   minute.  Please let me know when you receive it.
5                   (Off-the-record discussion.)
6                   MR. FINNEY:  No document has come
7   through, no e-mail, no exhibit.
8                   MR. LAMPING:  Henry, have you
9   received yours?
10                  MR. LUEPKE:  No, I have not yet
11  received it either.  I've got it now.
12                  MR. FINNEY:  Nothing.  Do you want
13  us to break for lunch, and you can send us all
14  the exhibits.  What are we doing?
15          Okay, we have another exhibit that's an
16  e-mail.  It's a multi-page e-mail.  Do you want
17  us to start at the bottom or do you want us to
18  start at the top, what do you want us to do?
19                  MR. LAMPING:  You can start at the
20  bottom.
21                  MR. FINNEY:  The first e-mail down
22  here, Mike.  Can you read that from where you're
23  sitting?  Is this going to be marked as a certain
24  exhibit?
25                  THE WITNESS:  These are e-mails
```

1   that I sent to Julie --

2            MR. LAMPING:  Yeah.

3            THE WITNESS:  -- and said that she

4   could send to you all, so it's not a surprise I

5   haven't read them.

6       Q.  (BY MR. LAMPING)  I appreciate it, and

7   these are going to be marked as, this document

8   marked as Exhibit 2.  The Exhibit Share platform

9   automatically marks them.  We will make sure all

10  counsel have the marked copies.  But in the

11  meantime, we will just go off of this one.

12           So Mr. Brendamour, am I correct that the

13  first e-mail chain at the bottom of Exhibit 2 is

14  an e-mail from Mr. Owens to you on Sunday,

15  July 9th at 7:58 a.m.; is that right?

16      A.  Yes.

17      Q.  And the subject is, "Re:  UniGroup, C.A.

18  and Mayflower Transit, LLC v. Brendamour Moving &

19  Storage, Inc., et al.;" is that right?

20      A.  Yeah.

21      Q.  And you understand generally when

22  someone replies to an e-mail, the subject will

23  have a "Re:" on it, right?

24      A.  I don't know what that means, but okay.

25      Q.  Okay.

```
                                         Page 72

 1                MR. FINNEY:  Well, if you don't
 2    know, the answer is I don't know.
 3                THE WITNESS:  What's a "Re:"?
 4                MR. FINNEY:  "Re:" right here.
 5                THE WITNESS:  Oh, I never pay any
 6    attention to that.  Now I know what that means.
 7        Q.   (BY MR. LAMPING)  Do you know if there
 8    was an earlier e-mail as part of this thread
 9    between you and Mr. Owens that we did not
10    receive?
11        A.   I couldn't tell you that, but I don't
12    think so.  I think it was Paul -- I called Paul
13    and said, in the interests of --
14                MR. FINNEY:  Just answer the
15    question.  You don't know.
16        A.   Oh, okay.  What was the question?  I
17    don't know if there was.  No, I don't think so.
18        Q.   (BY MR. LAMPING)  Okay.  So in this
19    e-mail Mr. Owens says to you -- by the way, do
20    you remember receiving this e-mail?
21        A.   Yes.
22        Q.   In this e-mail Mr. Owens --
23        A.   I'm the one that sent this e-mail, yes.
24                MR. FINNEY:  Next question.
25        Q.   (BY MR. LAMPING)  In the e-mail
```

Page 73

1    Mr. Owens states, "In the interest of not

2    ignoring this, I did all I can do by meeting with

3    you in the conference room @ Bmay recently.  My

4    position has not changed."  Did I read that

5    correctly?

6        A.    Correct.

7        Q.    And what meeting is Mr. Owens referring

8    to in his e-mail?

9        A.    Well, when I found out that I received

10   this package from Mayflower, UniGroup at the

11   time, I called him and he told me he never sent

12   anything.

13           And then I guess that meeting took place

14   that we were just talking about a little bit ago,

15   so I called him again and said, "Why did my name

16   come up again?"

17       Q.    Did you actually have a meeting, a

18   physical meeting with Mr. Owens at Brendamour?

19       A.    That's what that says.

20       Q.    Well, did it happen?

21       A.    Yes.

22       Q.    Who all was in that meeting?

23       A.    Paul and myself, which I stated a long

24   time ago in this, on this today.

25       Q.    And this e-mail is dated July 9th.

Page 74

1    Mr. Owens says that the meeting happened

2    recently.

3              Do you know how many days before this

4    e-mail you met with Mr. Owens at Brendamour?

5         A.   No, I don't remember that.  I mean no.

6         Q.   Do you have any notes that would reflect

7    what was discussed during your meeting with

8    Mr. Owens?

9         A.   No.  I have no notes.

10        Q.   Did you bring any documents to that

11   meeting?

12        A.   No, I brought no documents.

13        Q.   Did Mr. Owens bring any documents to

14   your knowledge?

15        A.   No, he did not.

16        Q.   How long did the meeting last?

17        A.   I don't remember, half an hour.  It was

18   just a conference room across from Paul's office.

19        Q.   Did anyone else join you two during that

20   meeting?

21        A.   Nobody else joined me.

22        Q.   Was anyone else on the phone on a

23   conference call, a conference line?

24        A.   Nobody was on the phone or on a

25   conference line.

Page 75

1      Q.   All right.  And I assume during that

2  meeting Mr. Owens told you that he did not blame

3  you for the scheme as reflected in the Complaint;

4  is that right?

5      A.   He's saying it a second time, that he

6  did not, correct.

7      Q.   But he did acknowledge that the scheme

8  actually did happen.

9      A.   He's acknowledged that to you.

10     Q.   Well, I'm asking you did he acknowledge

11 that to you during that meeting?

12     A.   I would imagine we talked about the

13 scheme.  That's what I -- that's what the lawsuit

14 states.

15               MR. FINNEY:  No.

16               MR. LAMPING:  I'm just asking.

17               MR. FINNEY:  Did he discuss it?

18 Yes, no, or I don't remember.

19     A.   I don't remember, I don't remember.

20     Q.   (BY MR. LAMPING)  Okay.  Do you remember

21 anything else about what you and Mr. Owens

22 discussed during that meeting?

23     A.   No.  It didn't last very long.  I just

24 needed to hear him say it again.

25     Q.   All right.  And then if we go --

Page 76

1      A.   I want to finish reading that e-mail.  I

2   know I've --

3                 MR. LAMPING:  Sure.

4                 MR. FINNEY:  He wants to read all

5   of it, so we're going to go through it a little

6   bit at a time, and it might take awhile.  Tell me

7   when you're ready for me to scroll up again,

8   Mike.

9                 THE WITNESS:  Okay.

10                MR. FINNEY:  I'll scroll up to the

11  next page.  When you're done with that, let me

12  know and I'll scroll up to the next page.

13                THE WITNESS:  Okay, do you have any

14  questions on this page?

15                MR. FINNEY:  No, no.

16                THE WITNESS:  Am I supposed to read

17  it.

18                MR. FINNEY:  You said you wanted to

19  read the whole thing.  I'm going to let you read

20  the whole thing and then we'll go back and answer

21  his questions.  When you're done reading, which

22  is going to take awhile, then he'll start asking

23  you questions about it again.

24      Q.   (BY MR. LAMPING)  I actually just have

25  one more question, and it's at the e-mail at the

Page 77

1    top of the exhibit, so after you've read the

2    whole thread, you can go ahead and stop at the

3    top.

4                    MR. FINNEY:  Are you ready for the

5    next one?

6                    THE WITNESS:  I want to read the

7    red stuff that Paul wrote back.

8                    MR. FINNEY:  Take your time.

9                    THE WITNESS:  I started reading the

10   other one again.  Okay.

11           That was something I sent to Julie that

12   she sent to you in red that Paul wrote.

13                   MR. FINNEY:  That's not what he's

14   asking.

15                   THE WITNESS:  Ask the question.

16                   MR. FINNEY:  There's no question on

17   the table and you're not done reading yet.

18                   THE WITNESS:  I'm done reading now.

19                   MR. FINNEY:  No, keep going up,

20   you're going to read everything and then you're

21   going to answer a question.  So when you're done

22   with that page, let me know and I'll scroll up

23   some more.

24                   THE WITNESS:  Okay, go ahead.  Yes,

25   I wrote that to Paul.

Page 78

```
 1              MR. FINNEY:  Don't say a word.
 2   Just tell me when you're ready to scroll up
 3   again.  Ready?
 4              THE WITNESS:  Yes.  Okay.
 5              MR. FINNEY:  That's it.  So now he
 6   wants to ask you a question about this one
 7   apparently, so go ahead.
 8              THE WITNESS:  Okay.
 9       Q.   (BY MR. LAMPING)  All right.  Just to
10   make sure we're on the same page I am at the top
11   e-mail of Exhibit 2, which is from Paul Owens to
12   you on October 4th at 11:24 a.m.  Are you on that
13   e-mail?
14       A.   I am.
15       Q.   Okay, and do you see the middle
16   paragraph of that e-mail where it states, "As I
17   have stated many times over, I, at no time, in
18   the presence of anyone from Mayflower placed any
19   blame nor any responsibility for this on anyone
20   other than myself."  Did I read that correctly?
21       A.   Yes.
22              MR. FINNEY:  Tell you what you can
23   do to save you a lot of time, is you don't need
24   to read these e-mails.  They say what they say.
25   We'll agree that it says what it says.
```

Page 79

1            MR. LAMPING:  Chris, hey, Chris,

2   let me take my deposition, you'll object to form.

3   This is absurd.

4            Have you ever litigated in Federal

5   Court?  Do you know how a deposition works,

6   Chris?  All right, let me ask my damn questions

7   and you object to form and you can stop your

8   speaking objections.  All right?  This is absurd.

9       Q.   (BY MR. LAMPING)  All right,

10  Mr. Brendamour?

11      A.   Yes.

12      Q.   Does the statement from Mr. Owens in

13  this e-mail about him not blaming anyone other

14  than himself, does that refresh your recollection

15  on whether Mr. Owens had ever acknowledged to you

16  that he was responsible for the fraud?

17            MR. LUEPKE:   I'm sorry, could you

18  repeat that, was he responsible for the what?

19      A.   Yes, yes, that reads perfect.  Paul is

20  saying he's the responsible party.

21      Q.   (BY MR. LAMPING)  And did he admit that

22  to you, that he was responsible for the fraud?

23      A.   In writing.

24      Q.   Of course, other than this e-mail had

25  Mr. Owens ever communicated to you that he was

Page 80

1    responsible for the fraud?

2              MR. LUEPKE:    I object, calls for a

3    legal conclusion.

4              THE WITNESS:  I don't remember.

5              MR. LUEPKE:    Misstates the e-mail

6    and is beyond the scope of this witness'

7    knowledge.  I object to the term, in particular,

8    fraud.  That calls for a legal conclusion.

9         Q.   (BY MR. LAMPING)  Sure, let me use the

10   word "scheme" which is how we have been referring

11   to it today.

12             Except for this e-mail, had Mr. Owens

13   ever communicated to you that he was responsible

14   for the scheme?

15        A.   I don't remember.  Yeah, I don't

16   remember.

17        Q.   Okay.  All right, let's go ahead.  Do

18   you want to e-mail him the affidavit.  All right,

19   we're going to be e-mailing another exhibit here

20   and publishing it into Exhibit Share for the

21   court reporter to be marked.

22             MR. FINNEY:  Let me know when I can

23   close that Exhibit 2.  Are we done with that?

24             MR. LAMPING:  You can close Exhibit

25   2.  Go ahead and e-mail him the interrogatories,

Page 81

1    too.

2                    MR. FINNEY:  We have something

3    marked up as Exhibit A.  Is that going to be

4    Exhibit 3 for the purposes of this deposition?

5                    MR. LAMPING:  It is, and then

6    Christine is going to go ahead and e-mail the

7    next exhibit, and what probably is going to be

8    the last exhibit, as well.  Do you have Exhibit

9    3?

10                   MR. FINNEY:  It's right up on the

11   screen.  What do you want to know?

12                   (Exhibit 3 was marked by the

13   reporter for identification.)

14       Q.   (BY MR. LAMPING)  All right,

15   Mr. Brendamour you have been e-mailed what was

16   marked as Exhibit 3 for this deposition, what was

17   marked as Exhibit A to a Motion To Dismiss that

18   was filed in this case, and do you recognize this

19   as an Affidavit that you submitted in this case?

20       A.   Yes.

21       Q.   And is everything in this affidavit true

22   and accurate to your knowledge?

23                   MR. FINNEY:  Why don't you give him

24   a minute to read it through so he can familiarize

25   himself.

Page 82

1                    MR. LAMPING:  Sure.

2                    MR. FINNEY:  Mike, let me know when

3      you're done with the first page and I'll scroll

4      down.

5                    THE WITNESS: Okay.

6                    MR. FINNEY:  Are you ready?

7                    THE WITNESS: Uh-huh.

8                    MR. FINNEY:  Are you familiar with

9      this, the last page?

10                    THE WITNESS:  I am familiar with

11     it.

12                    MR. FINNEY:  Are you familiar with

13     this?

14                    THE WITNESS:  Everything in it is

15     true.

16        Q.   (BY MR. LAMPING)  Let me ask again.  Is

17     everything in this affidavit true and correct to

18     the best of your knowledge?

19        A.    To the best of my knowledge everything

20     is true and accurate.

21        Q.    Did you read this affidavit while you

22     were -- during your preparation for the

23     deposition today?

24        A.    No, I didn't read anything for today.

25        Q.    Okay, and then if we look at Exhibit 1,

Page 83

1   I'm just going to have you identify Exhibit 1 to

2   this affidavit.  You can see a letter that you

3   sent to --

4              MR. FINNEY:  Do you see what was

5   marked as Exhibit 1?  And we'll go ahead and

6   scroll.  Hold on.  Take your time on that one.

7   Let me know when you're ready for the next

8   screen.

9       A.   Oh, my, yes, that's an e-mail to my

10   family.

11       Q.   (BY MR. LAMPING)  Yeah.  This is a memo

12   or an e-mail or a communication of some sort

13   dated June 14th of 2004?

14       A.   Yeah, it might not have been an e-mail

15   back then.  Okay, go ahead.

16       Q.   And is that your signature that appears

17   down at the bottom of that letter?

18       A.   It is.

19       Q.   And is this the notice or the

20   communication that we referred to earlier, where

21   you essentially resigned as President of

22   Brendamour Moving & Storage?

23       A.   It is.

24       Q.   And then if you would kindly go to the

25   next page of the exhibit.

Page 84

1              MR. FINNEY:   The next page of

2      Exhibit 1, the Fifth Third Bank memo?

3              MR. LAMPING:   The Fifth Third Bank

4      memo.

5         A.   That's my signature.

6         Q.   (BY MR. LAMPING)   And is that the

7      signature of your wife Joan?

8         A.   Yes, it is.

9         Q.   And this is a letter that you sent to

10     Fifth Third Bank that's dated June 15th, 2004?

11        A.   Correct.

12        Q.   What was your purpose in sending this

13     letter to Fifth Third Bank?

14        A.   My wife and I were -- did not want to be

15     on any of the checking accounts any longer

16     because we didn't want to be responsible for how

17     the company was running and how the funds were

18     paid and so on.

19        Q.   And at this point in time what concerns

20     did you have about how the company was being run

21     or how company funds were being used?

22        A.   Like I said earlier, I had a beautiful

23     mother, and I could go on for as long as you

24     want, my father was a good father, and outside of

25     business he made and lost more fortunes than you

Page 85

1    could count, and I didn't -- he helped out, mom

2    and him bought the company, and I just didn't

3    want to be part of the way they did not include

4    me in what was going on, and it was just time for

5    me to step down.

6        Q.   Other than the fact that you weren't

7    being included, were there any other reasons why

8    you sent a letter to Fifth Third Bank asking you

9    to be removed from the bank accounts?

10       A.   Oh, I had resigned as President and an

11   officer of the company, so I shouldn't have been

12   on the checking accounts any longer.

13       Q.   Okay.  And then what I think is going to

14   be last exhibit, it should have been e-mailed to

15   you all, is Mr. Brendamour's Interrogatory

16   Answers.

17            MR. LUEPKE:  Yes, I have received

18   it.

19       Q.   (BY MR. LAMPING)  And Chris, Julie, have

20   you received that?

21            MR. FINNEY:  Present, and it's up

22   on the screen.  Do you want him to read the whole

23   thing before you ask him questions or do you want

24   him to ask questions about it?

25       Q.   (BY MR. LAMPING)  You know what, I'm not

Page 86

1  going to tell him what he should read or not

2  read.  My question is going to be whether there's

3  anything in here that he needs to correct or

4  modify.

5              MR. FINNEY:  You need to read that.

6       A.   I'm a slow reader.

7       Q.   (BY MR. LAMPING)  Why don't we do this.

8  I don't think I'll have too many questions after

9  that.  Why don't we take a short break.

10      A.   Can you let me read it?  I'll read it as

11 quick as I can.

12              MR. LAMPING:  I don't want to rush

13 you, sir.  If your counsel is advising you to

14 read the whole document, then that's his

15 prerogative, so why don't we take a very short

16 break I'll collect my notes and --

17              (Exhibit 4 was marked by the

18 reporter for identification.)

19      A.   I prefer to keep going.  I have a wife

20 that had a procedure she found out about

21 yesterday from last week, and she had another

22 procedure or a test yesterday, and she's waiting

23 for results.

24      Q.   (BY MR. LAMPING)  Well, you know what,

25 sir, I'm not the one who is insisting that you

1  read every document.

2      A.   I'm just asking to -- let me, I'll read

3  it, I'll read it very quickly and we'll continue.

4  Okay, I'll just skip through it.  Okay.

5      Q.   Mr. Brendamour, you have been given an

6  opportunity to review what's been marked as

7  Exhibit 4.  Do you understand Exhibit 4 to be

8  written answers that you provided to some

9  interrogatories that were served in this case?

10     A.   Yes.

11     Q.   And are your answers to these

12 interrogatories still true and correct to the

13 best of your knowledge?

14     A.   To the best of my knowledge, they are.

15     Q.   Okay.  Anything that you think you need

16 to add or revise or are they good as is?

17     A.   I think you've asked a lot of good

18 questions, and I have done my best to answer them

19 today.

20     Q.   Okay.  Let me take a 2-minute break just

21 to go over my notes and I will likely be wrapping

22 up.  Is that all right with everyone?

23     A.   Yes.

24              THE VIDEOGRAPHER:  Going off the

25 record.  This ends Media 2.  The time is 12:26

Page 88

1    p.m.

2                      (Recess)

3              THE VIDEOGRAPHER:   Going back on

4    the record.   This begins Media 3.   The time is

5    12:30 p.m.

6         Q.   (BY MR. LAMPING)   Mr. Brendamour, just

7    one more quick follow-up.   We talked about

8    accessorial charges earlier.   Do you remember

9    talking about that?

10        A.   I do.

11        Q.   Do you have any recollection of

12   Mayflower raising the commission rate that it

13   charged on accessorial services?

14        A.   No, I don't.

15        Q.   Okay.   Mr. Brendamour, I really

16   appreciate your time this morning, I apologize

17   for some of the technical difficulties, but at

18   this time I don't have any more questions.

19        A.   Okay.

20              MR. FINNEY:   Thank you.   We

21   appreciate it.

22              Julie is going to convene, I guess.   Are

23   you going to go right away to Paul Owens or what

24   are we doing?

25              MR. LAMPING:   No, we're going to do

Page 89

1  Paul at I guess 2:00 o'clock Central, 3:00

2  Eastern.

3            MR. FINNEY:  3:00 Eastern.  Okay,

4  great.  Julie have you got that under control?

5  Are you going to be here for that, Mike, then?

6            THE WITNESS:  I don't think so.

7            THE VIDEOGRAPHER:  Would you like

8  me to go ahead and read us off the record?

9            MR. LAMPING:  Yes.

10            THE VIDEOGRAPHER:  We are off the

11  record at 12:32 p.m. and this concludes today's

12  testimony given by Michael Brendamour.  The total

13  number of media used was 3, and will be retained

14  by Veritext.

15            MR. LAMPING:  One more housekeeping

16  matter.  We will go ahead and e-mail marked

17  copies of the exhibits to counsel at our earliest

18  convenience.

19            MR. FINNEY:  Thank you, everyone.

20            THE VIDEOGRAPHER:   For Thompson

21  Coburn, I have standing orders.  Is anyone else

22  wanting to order a video on this one?

23            MR. LUEPKE:  Yes.  Brendamour and

24  Paul Owens would like a copy of the video.

25            THE VIDEOGRAPHER:  I'm sorry, and

```
                                            Page 90
 1   who was that speaking again?
 2                MR. LUEPKE:  Counsel on behalf of
 3   Brendamour and Paul Owens.
 4                THE VIDEOGRAPHER:  And which firm
 5   is that?
 6                MR. LUEPKE:  Hein Schneider.
 7                THE VIDEOGRAPHER:  Okay, thank you.
 8   Would you want to add syncing of the transcript
 9   on your video?
10                MR. LUEPKE:  No, we don't know
11   that.
12                THE REPORTER:  And did you want the
13   exhibits, as well?
14                MR. LUEPKE:   I believe counsel
15   said that they will e-mail us copies of the
16   exhibits, and that's fine with us, so I don't
17   need that from you, Ms. Corbett.
18                THE REPORTER:  Sure, no worries,
19   and is he reading and signing?
20                MR. FINNEY:  We would like to read
21   and sign, yes.
22                MR. LAMPING:  And I don't think we
23   need a copy of the video yet.  We'll just take an
24   E-Tran on the transcript, yeah.
25                THE VIDEOGRAPHER:  Was that
```

1    Mr. Lamping speaking?

2                    MR. LAMPING:  Yes, it was.

3                    THE VIDEOGRAPHER:  Okay, so you

4    want to hold off on your video for now?

5                    MR. LAMPING:  Yeah, yeah.

6                    MR. FINNEY:  And this is Chris

7    Finney.  We're not going to order a copy just

8    yet.

9              (Deposition ended at 12:32 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                          Page 92

1              C E R T I F I C A T E

2

3         I, Peggy E. Corbett, a Certified Court

4   Reporter of the State of Missouri, do hereby

5   certify:

6              That prior to being examined the

7   witness was by me duly sworn;

8              That said deposition was taken down by

9   me in shorthand at the time and place

10  hereinbefore stated and was thereafter reduced to

11  writing under my direction;

12             That I am not a relative or employee or

13  attorney or counsel of any of the parties, or a

14  relative or employee of such attorney or counsel,

15  or financially interested in the action.

16             WITNESS my hand and seal this 16th day

17  of November, 2023.

18

19

20       _____
         PEGGY E. CORBETT,
21       CCR No. 143, RDR, CRR

22

23

24

25
```

Page 93

1                              Veritext Legal Solutions
                                    1100 Superior Ave
2                                       Suite 1820
                                  Cleveland, Ohio 44114
3                                 Phone: 216-523-1313
4    November 28, 2023
5    To: Mr. Finney
6    Case Name: Mayflower Transit, Llc v. Brendamour Moving & Storage,
     Inc., Et Al.
7
     Veritext Reference Number: 6311599
8
     Witness:  Michael Brendamour        Deposition Date:  11/14/2023
9
     Dear Sir/Madam:
10
     The deposition transcript taken in the above-referenced
11
     matter, with the reading and signing having not been
12
     expressly waived, has been completed and is available
13
     for review and signature.  Please call our office to
14
     make arrangements for a convenient location to
15
     accomplish this or if you prefer a certified transcript
16
     can be purchased.
17
     If the errata is not returned within thirty days of your
18
     receipt of this letter, the reading and signing will be
19
     deemed waived.
20
21   Sincerely,
22
23   Production Department
24
25   NO NOTARY REQUIRED IN CA

Page 94

1                  DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 6311599
3          CASE NAME: Mayflower Transit, Llc v. Brendamour Moving &
     Storage, Inc., Et Al.
          DATE OF DEPOSITION: 11/14/2023
4          WITNESS' NAME: Michael Brendamour
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7          I have made no changes to the testimony
     as transcribed by the court reporter.
8
     _____          _____
9     Date                          Michael Brendamour
10          Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11     the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13          They signed the foregoing Sworn
               Statement; and
14          Their execution of this Statement is of
               their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                    _____
18                    Notary Public
19                    _____
                    Commission Expiration Date
20
21
22
23
24
25

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
          ASSIGNMENT REFERENCE NO: 6311599
3         CASE NAME: Mayflower Transit, Llc v. Brendamour Moving &
     Storage, Inc., Et Al.
          DATE OF DEPOSITION: 11/14/2023
4         WITNESS' NAME: Michael Brendamour
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Michael Brendamour
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 96

1                    ERRATA SHEET

         VERITEXT LEGAL SOLUTIONS MIDWEST

2              ASSIGNMENT NO: 6311599

3    PAGE/LINE(S) /        CHANGE        /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____        _____

20   Date                    Michael Brendamour

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                    _____

                      Notary Public

24

                      _____

25                    Commission Expiration Date

**[& - 7:58]**

| & | | | |
|---|---|---|---|
| **&** 1:7 2:16,18 4:15 5:19 13:10 17:4 18:2 20:13 30:23 31:23 32:12 36:4 37:6,24 38:19 39:3 41:18 42:11 44:15 49:24 50:10,16 52:6 56:14 57:21 59:18,23 60:11,17,21 67:21 68:2 71:18 83:22 93:6 94:3 95:3 | **11/14/2023** 93:8 94:3 95:3 **1100** 93:1 **11:19** 41:15 **11:24** 78:12 **1200** 1:23 2:10 **12:30** 88:5 **12:32** 89:11 91:9 **14** 11:4 **143** 92:21 **14th** 1:21 4:4 **15** 45:9 56:2 **15th** 84:10 **16th** 92:16 **1820** 93:2 **1977** 20:23 **1981** 21:3 **1985** 21:4 **1991** 21:5,6 25:7 | **2005** 20:3 32:16,17 36:23 41:19 44:5 56:3 **2015** 20:3 32:25 **2020** 43:24 44:18 56:4 **2023** 1:22 4:4 92:17 93:4 **216-523-1313** 93:3 **22** 61:7 **2244** 2:19 **225** 1:22 2:9,14 **24960** 92:19 **25** 30:21 **28** 93:4 **2:00** 89:1 | **42** 12:6 13:12 **4270** 2:13 **44114** 93:2 **45245** 2:14 **4:23** 1:6 4:18 **4th** 78:12 |

| 0 | | | |
|---|---|---|---|
| **00708** 1:6 4:18 **03** 26:22 **06** 36:23 **07** 36:23 | | | |

| 1 | | | |
|---|---|---|---|
| **1** 3:9 4:12 15:15 41:10 68:15 70:2 82:25 83:1,5 84:2 **10** 7:19 11:6 32:19 **10/4/23** 3:10 **100** 46:21 **10:21** 4:1,3 | | | |

| 2 | | | |
|---|---|---|---|
| **2** 3:10 41:14 48:15 71:8,13 78:11 80:23,25 87:20,25 **20** 23:14 27:12 44:25 46:4 52:4 55:14 94:16 95:22 96:22 **2002** 26:22 **2004** 44:5 83:13 84:10 | | | |

| 3 | | | |
|---|---|---|---|
| **3** 3:11 81:4,9 81:12,16 88:4 89:13 **30** 45:2 **300** 45:14 **314.552.6000** 2:5 **33** 33:1 | | | |

| 4 | | | |
|---|---|---|---|
| **4** 3:12 62:21 86:17 87:7,7 **40** 58:21 **40s** 58:8 | | | |

| 5 | | | |
|---|---|---|---|
| **5** 3:4 29:24 41:7 55:25 **50** 58:21 **500** 21:3 **50s** 58:8 **513.943.5669** 2:15 **513.943.6655** 2:11 | | | |

| 6 | | | |
|---|---|---|---|
| **6** 16:2 55:25 **63101** 2:5 **63105** 1:23 2:10 **6311599** 93:7 94:2 95:2 96:2 **63144** 2:19 **65** 11:15 **68** 3:9 | | | |

| 7 | | | |
|---|---|---|---|
| **7** 11:5 **70** 58:7 **71** 3:10 **72** 9:3 **77** 28:11 **7:58** 71:15 | | | |

| **8** |
|---|
| **81** 3:11 |
| **86** 3:12 |
| **9** |
| **91** 33:20 |
| **92** 3:5 |
| **9th** 71:15 73:25 |
| **a** |

**a.m.** 4:1,3
  41:11,15 71:15
  78:12
**above** 28:1
  93:10
**absolutely**
  19:12 24:19
  28:25
**absurd** 79:3,8
**accepts** 38:16
**accessorial**
  27:13,15,16
  28:3,7,23
  52:23 88:8,13
**accessorials**
  27:6,9,21
**accommodate**
  8:3 9:21
**accomplish**
  93:15
**accordance**
  94:5 95:5
**account** 42:7
  67:4 68:6
**accountant**
  19:18,21 27:10

**accountants**
  26:21
**accounting**
  13:18 26:18
  27:12 33:16
  37:11 53:4
**accounts** 20:8
  84:15 85:9,12
**accurate** 48:2
  81:22 82:20
**accurately**
  32:14 33:12
**acknowledge**
  59:16 75:7,10
  94:11 95:16
**acknowledged**
  75:9 79:15
**act** 52:16 67:15
  94:14 95:20
**action** 4:25
  92:15
**activities** 44:14
**actually** 17:5
  31:6 44:7 49:6
  73:17 75:8
  76:24
**add** 87:16 90:8
**addition** 11:10
  11:10
**additional**
  27:18
**address** 17:22
**administer**
  4:24

**admit** 19:14
  79:21
**admitted** 19:12
  35:13 63:5
**advising** 86:13
**affected** 38:13
**affidavit** 3:11
  16:21,24 36:9
  80:18 81:19,21
  82:17,21 83:2
**affiliated** 24:25
**affiliations** 5:5
**affixed** 94:15
  95:21
**age** 58:7
**agency** 31:24
  31:25 32:3,13
  33:10,13,21
  42:11,15,21
  43:12
**agent** 18:24
  21:4,12 25:19
  25:20 28:15
  29:4 30:16,19
  47:25
**agents** 21:1
  25:21 31:21
  32:13 33:11
  47:11 56:19
**ago** 6:3 30:21
  41:17 46:5
  73:14,24
**agree** 4:11 7:14
  24:10 28:13
  56:11 57:7,10

**78:25
**agreed** 35:5
  61:21
**agreement**
  21:14 32:20
**ahead** 8:14,15
  9:2 63:21 77:2
  77:24 78:7
  80:17,25 81:6
  83:5,15 89:8
  89:16
**al** 1:8 4:16
  20:22,25 58:1
  71:19 93:6
  94:3 95:3
**alive** 54:6
**allegation** 42:9
  42:12,20,23
  43:10
**allegations**
  14:13 15:8,22
  16:5,16 17:9
  18:8
**alleged** 36:2,5
**alluded** 64:4
**amazon** 50:22
  51:8,12,14
  68:4
**amends** 21:12
**amounts** 41:17
**answer** 7:13,23
  8:5,13,15,17
  13:5,5 16:10
  17:20 21:23
  24:9 34:5,16

37:21 72:2,14
76:20 77:21
87:18
**answered**
52:11 65:10
66:1
**answers** 85:16
87:8,11
**anybody** 12:4
26:17 55:20
62:18,25 63:10
**anyway** 43:18
56:10
**apologize** 88:16
**apparently**
78:7
**appear** 94:11
95:15
**appearance** 5:4
**appearances**
5:5
**appearing** 2:2
2:7,16
**appears** 83:16
**appended**
95:11,18
**applicable**
22:16
**appreciate**
12:25 19:9
30:2 33:5 71:6
88:16,21
**approaching**
58:7

**area** 37:21
**argue** 58:3
**argued** 62:4
**argument** 58:6
**arrangements**
93:14
**art** 25:6,7,9,13
**aside** 70:1
**asked** 16:20
39:5 42:1
43:23 51:19
52:10 61:5,10
61:16 63:8,9
65:10 87:17
**asking** 8:20
9:23 10:12
13:6 17:10
22:12 26:9
29:6,8 50:3,5
55:2,11,12
60:16 75:10,16
76:22 77:14
85:8 87:2
**assignment**
94:2 95:2 96:2
**associated**
15:11 18:4
28:23 29:2
51:12 59:21
**assume** 15:7
16:3,7 67:18
75:1
**assumes** 34:12
35:3

**assuming** 8:16
21:10,20 42:6
**assure** 38:15
**attached** 95:7
**attention** 22:19
72:6
**attorney** 5:6
11:22 30:12
61:6 66:20,21
92:13,14
**attorney's** 61:5
**attorneys** 12:21
36:18 39:10,18
60:14 61:2
**audio** 4:10
**authorize**
95:11
**authorized**
4:24
**automatically**
71:9
**available** 93:12
**ave** 93:1
**avoided** 29:15
**aware** 17:9
33:13 42:19,22
63:15 64:3,14
64:17
**awhile** 76:6,22

**b**

**b** 3:7
**back** 9:1 19:2
20:14 21:13
23:15,16 33:19
34:23 35:25

37:9 38:11
39:25 40:2
41:13,19 48:16
49:3,11,17
51:19 76:20
77:7 83:15
88:3
**backed** 20:4
**bank** 2:4 20:8
84:2,3,10,13
85:8,9
**bars** 26:16
**based** 18:11
**basically** 45:3
54:16
**basis** 35:1,6
60:20
**bates** 3:11
**battery** 47:22
48:5
**beautiful** 37:14
84:22
**begging** 62:4
**beginning** 5:6
16:19 46:14
61:4
**begins** 41:14
88:4
**behalf** 1:19
5:19 90:2
**belief** 22:23,25
37:24 38:18
59:3 60:20
**believe** 11:18
16:14 18:12,14

**[believe - call]**                                            Page 4

20:11 30:20
34:7 62:13
90:14
**believed**  11:18
**believes**  39:3
**best**  7:15 9:5
51:10,16,21
82:18,19 87:13
87:14,18
**bet**  69:11
**beth**  2:21
**bethany**  4:21
48:9
**beyond**  80:6
**big**  11:15 52:20
**bill**  61:16
**billed**  53:5
**billing**  19:22
39:19
**bills**  35:22
**bit**  13:8 62:4
73:14 76:6
**blame**  75:2
78:19
**blamed**  64:18
**blaming**  79:13
**blamping**  2:6
**bless**  25:16,16
**blood**  58:2
**bmay**  73:3
**board**  26:23
**bond**  2:18
**bonus**  15:19
45:14

**book**  31:20
**books**  18:10
**bottom**  70:17
70:20 71:13
83:17
**bought**  21:3,4
25:8 33:20
43:17 44:17
85:2
**boulevard**  2:13
2:19
**box**  50:22 51:8
51:12,15 68:4
**boy**  26:15
**break**  8:2,5
41:1 70:13
86:9,16 87:20
**brendamour**
1:7,19 2:7,16
2:17 3:3,10
4:13,15 5:12
5:12,19,19,21
6:6,7,10 12:22
13:10 14:1,5
14:25 17:4
18:2,23 19:2
20:13 22:10,21
25:25 29:8
30:23 31:2,23
32:11 36:4
37:6,24 38:4,5
38:6,11,19
39:3,22 41:16
41:18 42:10
44:15,23 49:24

50:10,16 52:5
52:6 56:13,18
56:19,20 57:21
59:18,23 60:11
60:17,20 67:2
67:8,11,20,21
67:22 68:1,2,6
68:12 69:13
71:12,18 73:18
74:4 79:10
81:15 83:22
87:5 88:6,15
89:12,23 90:3
93:6,8 94:3,4,9
95:3,4,13
96:20
**brendamour's**
60:14 66:21
85:15
**brendamour's**
3:12
**brentwood**
2:19
**brian**  2:3 5:9
6:3
**brief**  41:12
**bring**  15:4
22:19 30:3
35:21 74:10,13
**brings**  69:15
**brother**  11:14
11:21,23 12:7
62:11
**brotherly**  12:1

**brothers**  11:13
12:2 18:22
20:6 23:12
32:18 33:1
39:21 43:17,20
44:8 54:8
59:25 61:4,11
61:13,24 62:13
62:15 65:6,9
65:11,19 66:2
66:7
**brought**  24:3
74:12
**building**  46:8
**built**  23:14
**business**  15:17
24:8 28:11
44:25 49:23
56:14 57:8,21
59:17 84:25
**buy**  11:25
43:20
**buyout**  45:10

**c**

**c**  2:1 92:1,1
**c.a.**  71:17
**ca**  93:25
**call**  6:7 14:11
32:21 36:16
39:13 42:2
64:4,9,13,14,18
65:9 66:3,5,8
66:10 74:23
93:13

**[called - company]** Page 5

called  9:8 18:15
  24:20 44:22
  67:2 72:12
  73:11,15
calls  36:17 80:2
  80:8
camera  4:7
cancel  10:24,25
  20:21,21
cancelled  18:23
candy  26:15
care  12:7
career  21:8
  27:5 32:8
careful  15:3
carried  12:8
carry  27:22
case  1:6 4:18
  6:4 16:5,8
  38:12 39:10
  42:10,13 60:12
  60:24 81:18,19
  87:9 93:6 94:3
  95:3
cases  30:17,19
  61:7
catch  46:12
caution  10:11
  13:2,3
ccr  1:20 92:21
central  4:3 57:8
  57:21 89:1
certain  20:4
  70:23

certificate  3:5
  95:11
certification
  94:1 95:1
certified  92:3
  93:15
certify  92:5
chain  3:10
  71:13
chance  34:4
change  95:8
  96:3
changed  73:4
changes  94:7
  95:7,9
charge  27:17
  27:18 33:16,19
charged  41:5
  88:13
charges  15:10
  17:5 18:3 23:9
  27:10,14 28:4
  28:7,23 29:2
  30:15,24 33:25
  34:2 88:8
check  42:7
checking  20:8
  84:15 85:12
chest  13:1
children  15:4
choose  8:13
chose  62:6
chris  2:11 10:7
  10:16 17:14,14
  17:15 29:11

30:7 61:9,17
  62:5,6,8 65:25
  67:14 79:1,1,6
  85:19 91:6
christine  2:3
  69:2 81:6
christmas
  45:14
christopher  2:8
  5:11
chuck  26:25
  31:8 51:24
  52:4
cincinnati  2:14
  6:12
civil  94:5 95:5
claim  43:1
clarify  7:23
  17:18,19 52:13
clean  18:17,18
  19:1
clear  15:7 40:2
  42:19 47:24
  50:4 55:2,3
  60:2
cleveland  93:2
clients  64:9
close  80:23,24
closed  45:7
  68:8
coaching  30:2
coburn  2:4
  89:21
collect  86:16

collected  15:18
  45:13 47:6
colloquy  29:15
come  18:17,18
  19:1,3 21:14
  70:6 73:16
coming  58:20
commenced  4:1
comment  24:22
commission
  88:12 94:19
  95:25 96:25
communicated
  79:25 80:13
communication
  83:12,20
communicati...
  10:4,15 16:4
companies
  11:23 24:4
  42:2 59:8
company  11:20
  11:24 12:5
  13:22 15:23
  20:7,10 21:5
  21:15 23:13,14
  24:25 26:7,20
  27:2 29:6
  32:18,18 33:2
  35:18 37:1,4
  37:10,18 39:20
  39:22 44:4
  45:1,13 46:7
  46:14,19 50:18
  50:23 53:14

**[company - dad]**

54:7,9,9 56:23
57:4 58:4,19
59:1,4,5,7,25
61:20 67:1
84:17,20,21
85:2,11
**company's**
56:5 57:9
59:20 61:22
**complained**
57:23
**complaint**
17:13 25:25
43:1 75:3
**completed**
93:12
**component**
50:13
**computer**  9:3
32:1,5 47:22
53:18
**concentrate**
8:25
**concentrated**
39:6
**concerns**  84:19
**concludes**
89:11
**conclusion**  80:3
80:8
**conducted**  4:5
4:19
**conference**
18:21 39:15
49:9,15 73:3

74:18,23,23,25
**confidential**
10:15
**confirm**  40:5
**connection**  4:7
50:8
**contact**  46:18
**context**  17:12
**continue**  4:10
59:14 87:3
**contract**  32:20
32:23 43:22
**control**  89:4
**controlled**
47:11
**convene**  88:22
**convenience**
69:10 89:18
**convenient**
93:14
**conversation**
12:3 15:25
61:1 63:1
**conversations**
9:25 10:6
11:11 12:2,8
14:9 15:1
16:15 39:8
62:17 63:2
65:8
**copies**  9:16
71:10 89:17
90:15
**copy**  69:3,5
89:24 90:23

91:7
**copying**  3:17
**corbett**  1:20
4:23 90:17
92:3,20
**cord**  48:18
**corporate**
12:20
**correct**  33:22
36:6 37:6,7
44:3,9,10 46:3
58:24,25 59:23
71:12 73:6
75:6 82:17
84:11 86:3
87:12
**corrections**
95:17
**correctly**  73:5
78:20
**costing**  39:24
**counsel**  4:14
5:4 7:4 8:2
9:17 10:5 13:3
14:8 16:4,7,20
40:6,20 62:18
63:2 66:13
71:10 86:13
89:17 90:2,14
92:13,14
**counsel's**  17:22
**count**  85:1
**counted**  33:16
**county**  94:10
95:15

**couple**  22:22
52:21
**course**  15:13
25:9 27:11
39:18 40:13
54:7 62:8
79:24
**court**  1:1 3:17
4:17,22 5:7 7:5
79:5 80:21
92:3 94:7
**cover**  32:6
**covered**  7:4
**covid**  44:1
**cpa**  11:22
26:22
**criminal**  61:7
**critical**  22:13
**crr**  92:21
**cruise**  10:24
**cschlegl**  2:6
**csr**  1:20
**currently**  6:10
13:10
**customer**  46:19
47:3
**customers**  45:4
46:24 47:1
50:16
**cv**  1:6 4:18

**d**

**d**  3:1
**dad**  20:3,6
32:17,23 37:13
37:15,17 44:8

**[dad - duty]**

44:21 54:6,6
**damn**  79:6
**data**  52:16 55:5
55:15
**date**  26:12
32:17 43:23
93:8 94:3,9,19
95:3,13,25
96:20,25
**dated**  73:25
83:13 84:10
**dave**  11:14
**david**  45:1
**day**  1:21 15:15
44:14,14 50:24
92:16 94:16
95:22 96:22
**days**  11:6 74:3
93:17
**dear**  93:9
**debt**  42:4
**decided**  56:24
59:1
**decision**  57:11
**deed**  94:14
95:20
**deemed**  93:19
**defendant**  2:7
2:16 3:12,14
**defendants**  1:9
**department**
93:23
**depending**
30:18

**depends**  4:6
**depo**  68:10,11
**deposition**  1:18
3:9 4:1,5,13,19
6:14,24 9:25
10:19 16:5,8
40:5,22 67:16
69:9,15 79:2,5
81:4,16 82:23
91:9 92:8 93:8
93:10 94:1,3
95:1,3
**describe**  44:13
**described**  15:9
**description**  3:8
**devastating**
11:3
**developed**  36:4
63:4
**died**  32:25
**difference**
29:21
**different**  28:7
28:14 31:3
52:7 58:19
60:22 61:9
**difficulties**
88:17
**digging**  26:1
**dinner**  64:5
**directed**  3:14
**direction**  57:12
92:11
**directly**  55:23

**directories**
32:3
**disability**  12:5
13:13,24 40:10
**disagreement**
57:6
**disclose**  10:4
**disclosing**
10:15
**disconnecting**
27:19
**discovery**  3:16
**discuss**  75:17
**discussed**  53:25
64:7 74:7
75:22
**discussion**  48:8
49:10 70:5
**discussions**
15:21 40:16
57:20
**dishonest**  23:19
**dismiss**  81:17
**dispatcher**
19:18 53:2
54:25,25
**dissenting**
58:11
**distance**  45:5
47:16
**distribution**
3:17
**district**  1:1,1
4:17,17

**dividends**
15:19
**division**  1:2
4:18
**doctors**  11:5
**document**  9:19
70:3,6 71:7
86:14 87:1
**documents**
9:11 74:10,12
74:13
**doing**  7:9 19:19
31:13 55:9
56:18,19,20
57:3,4 58:4
59:9,10 64:25
67:17 70:14
88:24
**dollars**  35:25
**driver**  20:24
58:1
**drivers**  54:24
55:3
**drop**  38:12
**dropped**  14:25
20:6 21:12
38:4
**dryer**  27:20
**due**  36:19
**duly**  5:22 92:7
**duty**  17:11
20:10

**[e - familiar]**                                                          Page 8

| e |
|---|

**e** 1:20 2:1,1 3:1
3:7,10 9:16
69:1,3,5 70:1,3
70:7,16,16,21
70:25 71:13,14
71:22 72:8,19
72:20,22,23,25
73:8,25 74:4
76:1,25 78:11
78:13,16,24
79:13,24 80:5
80:12,18,19,25
81:6,15 83:9
83:12,14 85:14
89:16 90:15,24
92:1,1,3,20
**earlier** 16:15
24:22 45:12
59:16 60:10
64:4 72:8
83:20 84:22
88:8
**earliest** 89:17
**eastern** 1:1,2
4:17,18 89:2,3
**easy** 7:16
**edmund** 5:21
6:6 14:5
**efficiently** 13:8
**either** 12:8 16:1
34:23 50:11
67:20 69:6
70:11

**elicit** 10:10
**embarrassing**
40:23
**employed** 45:8
45:11
**employee** 55:13
67:21 92:12,14
**employees**
45:15
**encourage** 13:4
**ended** 37:19
68:23 91:9
**endless** 28:6
**ends** 41:10
48:15 87:25
**engineer** 11:24
**enter** 21:17
**entered** 15:11
17:5 29:3
30:15 34:2,24
53:11 54:13
55:15 95:9
**entering** 20:12
25:21 30:18,24
33:25 47:13
51:22 52:8,16
55:5
**enters** 34:4
**entire** 45:9 94:5
95:5
**entirety** 45:25
**equally** 33:3
**errata** 93:17
95:7,10,18
96:1

**essentially**
51:20 83:21
**established**
63:23
**estate** 15:16
37:16,17 61:8
**et** 1:8 4:16
71:19 93:6
94:3 95:3
**everybody** 9:2
21:14 35:17
36:7 38:1
53:21 54:17
56:1 63:6
**everyone's**
69:10
**evidence** 35:4
**exact** 43:23
**examination**
3:4 5:24
**examined** 92:6
**example** 55:21
**except** 80:12
**excluding** 63:1
**executed** 95:10
**execution**
94:14 95:19
**executive** 44:5
50:11
**exhibit** 3:9,10
3:11,12 9:8,12
9:15 68:10,13
68:15,20 70:2
70:7,15,24
71:8,8,13 77:1

78:11 80:19,20
80:23,24 81:3
81:4,7,8,8,12
81:16,17 82:25
83:1,5,25 84:2
85:14 86:17
87:7,7
**exhibits** 9:9,18
36:8 70:14
89:17 90:13,16
**expect** 20:20
**expiration**
94:19 95:25
96:25
**expressly** 93:12
**extra** 27:21
**eye** 6:19

| f |
|---|

**f** 2:18 92:1
**fact** 24:11 36:8
39:17 41:18
60:24 85:6
**facts** 35:4 65:5
**factual** 60:20
**fair** 7:23 8:6,7
8:18 10:16,17
16:17 23:24
40:7 41:2
43:13,14 45:25
59:5,6 63:25
64:2
**familiar** 31:17
33:10 42:12
67:1 82:8,10
82:12

**[familiarize - global]**                                    Page 9

**familiarize**
  81:24
**family** 38:13
  83:10
**far** 39:3 51:13
  58:11
**father** 20:1,2
  84:24,24
**federal** 79:4
**fees** 60:12,18
  60:19,21 61:5
  61:20
**felt** 61:25
**fifth** 20:8 84:2
  84:3,10,13
  85:8
**figure** 38:25
  39:1
**filed** 4:16 10:1
  23:24 24:16
  26:6 81:18
**finally** 66:23
**financial** 56:4
**financially** 5:1
  92:15
**find** 15:14 26:1
  39:16 64:20
**fine** 6:9 8:3
  14:11 17:19,21
  65:1 90:16
**finger** 63:14
**finish** 49:6
  65:24 76:1
**finished** 7:12
  7:13

**finney** 1:22 2:8
  2:9,13 5:11,11
  5:16 8:9,12,14
  16:10 17:7,16
  17:24 18:6
  21:21,24 22:1
  22:3,7,10,14,17
  23:1 25:24
  29:5,17,20,23
  30:8 34:11,18
  35:5 41:3
  42:25 43:5
  48:16,21 49:11
  50:2 52:10
  56:16 57:13
  60:6 61:9,22
  63:7,17,20
  64:8,12,15
  65:10,21 66:6
  66:16,24 67:7
  67:12 68:17,21
  69:20,24 70:6
  70:12,21 72:1
  72:4,14,24
  75:15,17 76:4
  76:10,15,18
  77:4,8,13,16,19
  78:1,5,22
  80:22 81:2,10
  81:23 82:2,6,8
  82:12 83:4
  84:1 85:21
  86:5 88:20
  89:3,19 90:20
  91:6,7 93:5

**finneylawfir...**
  2:11,15
**firm** 1:22 2:9
  2:13 4:23 10:7
  61:23 90:4
**first** 5:22 34:11
  46:5 51:24
  66:22 68:12
  70:21 71:13
  82:3
**five** 52:3
**focus** 57:8,21
**folks** 10:7 55:4
  55:15,20
**follow** 8:13
  26:13 31:21
  88:7
**follows** 5:23
**foregoing**
  94:13 95:18
**forensic** 26:1
**forgot** 30:12
**form** 22:9,15
  22:25 24:20
  30:7 79:2,7
**formed** 18:1
**forms** 38:16
**fortunes** 84:25
**forward** 19:7
**found** 36:20
  46:10 53:13
  66:23 67:5
  73:9 86:20
**foundation**
  38:23 50:20

  56:17 57:14
**four** 13:21 52:3
**fraud** 79:16,22
  80:1,8
**fraudulent**
  15:10
**free** 94:14
  95:20
**full** 6:5 12:5
  13:12 40:10
  51:3
**fun** 10:25
**funds** 84:17,21
**furniture** 28:18

**g**

**gears** 66:25
**geez** 36:23
**generally** 8:10
  15:7 28:13
  71:21
**generated** 47:3
  47:5
**genesis** 36:2
**gentleman**
  26:25
**getting** 36:17
**give** 17:8 21:25
  44:10 57:24
  81:23
**given** 6:24 37:3
  52:6,19 60:5
  87:5 89:12
**gives** 43:23
**global** 21:4

**[go - hold]** Page 10

go   4:11 7:2
 8:14,15 9:2
 10:11 14:17
 23:3 40:2
 48:10,12 60:9
 61:8 63:20
 71:11 75:25
 76:5,20 77:2
 77:24 78:7
 80:17,25 81:6
 83:5,15,24
 84:23 87:21
 88:23 89:8,16
goes   14:2,5,23
 58:16
going   4:3 6:20
 7:25 8:20 9:6
 9:17,23 10:12
 11:16,17 14:16
 19:14 23:13,22
 24:18 25:11
 26:4 37:9,17
 39:9,11 40:24
 41:9,13 42:16
 48:14,17,24
 51:19 57:11
 61:5 64:20
 68:10,12,23
 69:3 70:2,23
 71:7 76:5,19
 76:22 77:19,20
 77:21 80:19
 81:3,6,7 83:1
 85:4,13 86:1,2
 86:19 87:24

88:3,22,23,25
 89:5 91:7
good   4:2 6:1
 14:19 22:7,7
 23:17 34:4
 45:20 47:8
 53:14 84:24
 87:16,17
goods   28:19,20
 31:11 46:2
 57:24 58:13,15
 59:5,9,15
gosh   20:2 27:18
 28:17 50:22
 56:15
government
 36:15
grandchildren
 15:5
granddaughters
 10:23
grandkids
 10:23
great   10:23
 49:22 66:24
 89:4
grimes   12:14
 16:23 18:15
 20:12 22:24
 23:4 64:1,6,22
 64:23,24
ground   7:3
guarantee
 35:11

guess   23:23
 27:24 52:21
 73:13 88:22
 89:1
guessing   19:1
 35:8,20
gugino   2:12
 5:13 49:7
gum   22:20
guys   39:17
 49:12 54:19
 70:3

**h**

h   3:7
half   35:24
 74:17
hand   24:17
 92:16
handle   28:16
 45:3 47:25
 52:19
handled   26:23
 27:12 52:14
happen   36:22
 73:20 75:8
happened
 10:13 11:14
 40:9 74:1
happening
 59:24 61:17
happy   8:3 9:21
hard   53:15
haul   27:10 28:2
 56:22

hauling   28:19
he'll   76:22
healthy   62:22
hear   12:18 48:4
 48:6 49:12,20
 49:21 65:14
 75:24
heard   4:8 15:13
 18:12 41:25
 42:18 60:22,25
 63:10,19 67:8
 67:11
heavily   58:13
hein   2:18 90:6
help   13:7 42:3
helped   85:1
helper   20:23
 37:19 57:25
helping   25:3
 62:7
henry   2:18 5:18
 70:8
hereinbefore
 92:10
hey   79:1
hfl   2:20
history   14:18
hold   18:7,7,7
 21:21,22 25:24
 29:5 32:16
 34:11 42:11,15
 42:22 43:13
 49:7 63:8
 64:12 65:21
 83:6 91:4

**[hole - judge]**

**hole** 40:1
**home** 14:15
**honest** 14:19
  33:17,21
**hoping** 61:4
**hour** 40:25
  74:17
**house** 14:15
  56:23
**household**
  27:19 28:12,19
  28:20 31:11
  46:1,3,7,17
  47:8 56:21
  57:3,5,24 58:5
  58:13,15 59:4
  59:9,15
**housekeeping**
  89:15
**hsbattorneys....**
  2:20
**huh** 82:7
**hurting** 40:14

**i**

**icemaker** 27:20
**idea** 15:1 18:25
  19:6 23:21
  24:6 34:5
  38:21 43:11
  62:2 68:24
**identification**
  68:16 81:13
  86:18
**identified** 63:3

**identify** 83:1
**identity** 62:19
**ignoring** 73:2
**iii** 2:18
**ikea** 67:4
**imagine** 32:8
  53:6 57:4 60:4
  75:12
**important**
  24:11 36:10
**inadequate**
  68:25
**inappropriate**
  22:6
**include** 85:3
**included** 85:7
**including** 11:5
  35:22 55:15
  66:7
**incorporated**
  95:12
**infected** 14:22
**inflate** 17:5
**inflated** 18:3
  23:9 33:25
  34:2,25
**information**
  10:3 25:22,22
  32:14 33:12
  34:25 47:13
  51:22 52:8
  53:11 54:13
**informed** 40:17
**inherited** 32:19
  33:2

**initiator** 63:25
**inkling** 24:6
**input** 31:10,11
  31:15,16 35:10
  53:19
**inputted** 35:12
**inputting** 53:18
**inside** 37:15
**insisted** 12:16
**insisting** 86:25
**installed** 28:1
**instructed** 8:17
**instruction**
  8:14
**instructs** 8:12
**interest** 59:23
  73:1
**interested** 5:1
  56:8 92:15
**interests** 72:13
**interface** 29:7
**international**
  31:13 45:6
  56:20
**internet** 4:7
  44:20
**interrogatories**
  3:14 80:25
  87:9,12
**interrogatory**
  85:15
**intuitive** 58:25
**invoices** 47:3
**involve** 15:9
  48:1

**involved** 14:20
  20:9 21:9 24:7
  27:24 37:11,20
  38:1 40:12
  46:1 52:7
  58:13 62:9
**involving** 51:8
  68:3
**irs** 36:5,15 37:9
  41:19
**ish** 56:3
**issue** 3:15
  24:15 41:22
**ivy** 2:13

**j**

**jack** 40:13
**january** 11:1
**jeff** 14:6,10,12
  14:21 15:22
  40:11 54:21,21
**jeffrey** 14:5
**joan** 84:7
**job** 7:16 15:16
  19:25 22:17
  31:14 37:12
  45:3,18,19
  46:25 52:14
  53:10,16,17,17
  53:19
**jobs** 19:23
  45:24 46:13,16
**join** 74:19
**joined** 74:21
**judge** 8:11
  22:19 30:3

**[julie - lawsuit]**                                          Page 12

**julie** 2:12,15
  5:13 10:6,16
  25:2 39:16
  62:8 66:11
  69:22 71:1
  77:11 85:19
  88:22 89:4
**july** 71:15
  73:25
**jumped** 30:12
**june** 83:13
  84:10
**jurisdictional**
  3:15

**k**

**keep** 32:16
  40:17 52:22
  77:19 86:19
**kept** 39:17
  59:24
**kids** 10:22
**kind** 13:7 18:21
  21:13 31:20,25
  36:16 41:1
**kindly** 83:24
**kinds** 50:24
**kiosk** 24:4
**kiosks** 50:25
  58:19
**knew** 15:14
  16:22,25 18:23
  19:4,17 20:3
  23:4 24:18,23
  24:25 25:9,10
  26:11 27:9

51:20 62:1
**know** 7:11,13
  9:16,20 10:5,6
  10:21 12:13
  13:4 16:6
  17:10 18:16
  19:18,19,23
  20:20 23:5,12
  24:14,24 25:6
  25:10,14 26:5
  26:5,6,9,10,10
  28:4 29:14
  30:10,22 31:9
  31:19,25 33:15
  33:24 34:1,15
  35:11,14 36:17
  36:23 37:13
  38:1,9,17
  39:17 40:8,11
  40:14,18 41:22
  42:8,24 43:3
  43:12 45:9
  47:20,21 50:15
  51:7,13,14,20
  52:1 53:4 56:3
  56:7 57:16
  58:7,14,18
  59:7 62:1,22
  65:5 66:12
  67:13,16 68:13
  70:4 71:24
  72:2,2,6,7,15
  72:17 74:3
  76:2,12 77:22
  79:5 80:22

81:11 82:2
  83:7 85:25
  86:24 90:10
**knowledge**
  51:10,17,21
  53:7 57:19,19
  60:13 74:14
  80:7 81:22
  82:18,19 87:13
  87:14
**knowledgeable**
  27:5
**known** 26:19
  55:9 56:9,10
  64:24
**knows** 14:16,21
  20:3 26:4
  35:12 40:11
  50:21

**l**

**l.l.c.** 4:15 5:10
  67:2
**l4th** 83:13
**lack** 56:16
  57:13
**lacks** 38:22
**ladies** 47:17
  52:3 53:3
**lady** 11:4 35:9
  46:22 53:16
  65:12
**lag** 7:14
**lamping** 2:3 3:4
  3:17 5:9,9,25
  6:3 16:12

17:14,17,21,25
  21:23 22:1,5,8
  22:14,21 23:8
  26:8 29:11,19
  29:22 30:1,6
  30:11 34:16,20
  35:6 39:2 41:6
  41:16 43:9
  48:11,13,23,25
  49:4,13,20
  50:6 51:1
  52:12 57:1,16
  60:10 63:12,22
  64:16 65:18,24
  66:9,25 67:13
  67:19 68:19
  69:2,7,9,13,25
  70:8,19 71:2,6
  72:7,18,25
  75:16,20 76:3
  76:24 78:9
  79:1,9,21 80:9
  80:24 81:5,14
  82:1,16 83:11
  84:3,6 85:19
  85:25 86:7,12
  86:24 88:6,25
  89:9,15 90:22
  91:1,2,5
**landed** 67:4
**largest** 50:15
**law** 1:22 2:9,13
  13:14
**lawsuit** 10:1,14
  14:13 15:9,24

**[lawsuit - mail]** Page 13

16:16 17:2
23:24 24:15
26:6 36:2 38:3
40:4,21 75:13
**lawyers** 61:22
**learned** 46:23
47:21
**left** 20:1,25
**legal** 60:12,18
60:19,21 61:20
80:3,8 93:1
96:1
**legs** 41:2
**letter** 44:7,16
83:2,17 84:9
84:13 85:8
93:18
**letters** 20:5
**level** 39:12 44:5
**library** 31:12
45:5
**license** 15:17
37:16
**life** 15:6 21:7
56:25
**likely** 34:8,13
34:18,24 87:21
**limit** 22:8,15
30:6
**line** 7:6 8:12
27:10 28:2
55:23 74:23,25
95:7 96:3
**link** 68:22

**list** 14:23 58:16
**listed** 95:7,17
**listen** 13:4 22:4
23:1 29:11,14
29:16 50:2
65:16,21
**listening** 35:17
60:15
**listing** 95:7
**litigated** 79:4
**little** 9:5 13:7
41:17 46:9
73:14 76:5
**live** 6:11
**lived** 14:15
**lives** 14:15
**llc** 1:4 71:18
93:6 94:3 95:3
**llp** 2:4
**load** 54:20
**local** 24:2 45:4
45:19 47:18
53:5,5
**location** 93:14
**log** 68:21
**logistic** 24:3
28:19 46:15
52:23
**logistics** 2:17
5:20 15:12
18:4 27:23,24
28:13,17,22
29:3 30:15,25
45:22,24 46:8
49:25 50:8,13

50:16 51:7,23
52:9,17 56:12
56:23 57:8,20
58:4,12 59:2,7
59:10,17,21
67:2,9,11,22,23
68:1,2,6
**long** 8:1 21:2
27:22 41:3
45:5 47:16
73:23 74:16
75:23 84:23
**longer** 67:17
84:15 85:12
**look** 82:25
**looking** 8:24
47:18 49:14,15
69:14,17
**lost** 48:5 58:6
84:25
**lot** 7:20 10:20
11:8 13:1
23:16,17 25:3
26:1 31:10
53:14,15 58:22
78:23 87:17
**lots** 31:3 50:23
**louis** 1:23 2:5
2:10,19
**louisville** 18:16
19:3 23:3 60:1
65:3
**love** 12:1 65:14
66:14

**lovely** 40:1
**low** 47:22
**luepke** 2:18
5:18,18 35:3
38:22 50:19
69:4,8,11
70:10 79:17
80:2,5 85:17
89:23 90:2,6
90:10,14
**lunch** 70:13

**m**

**m** 2:12
**machines** 24:4
50:24 58:20
**madam** 93:9
**made** 15:23
24:22 42:13,21
42:23 43:1
57:11 84:25
94:7
**magazines**
26:16
**mail** 3:10 9:16
36:16 69:1,3,5
70:1,7,16,16,21
71:13,14,22
72:8,19,20,22
72:23,25 73:8
73:25 74:4
76:1,25 78:11
78:13,16 79:13
79:24 80:5,12
80:18,25 81:6
83:9,12,14

89:16 90:15
**mailed** 81:15
85:14
**mailing** 70:3
80:19
**mails** 70:25
78:24
**make** 7:16,20
8:15 10:14
13:14 21:12
27:14 40:2
41:4 43:19
54:23 60:2
62:7 71:9
78:10 93:14
**makes** 8:9
12:17
**making** 37:1
38:7 57:20
58:3,4
**malloy** 45:1
**man** 35:9 53:17
53:20
**management**
54:18
**manager** 13:18
14:4 44:23
**managers**
13:15
**managing** 45:3
**manual** 31:15
31:18,19,24
32:1,2,7,7,13
33:10,13

**manually** 54:13
55:5
**mark** 68:10
70:2
**marked** 68:15
70:23 71:7,8
71:10 80:21
81:3,12,16,17
83:5 86:17
87:6 89:16
**marks** 71:9
**material** 58:16
**matter** 4:14
49:1 89:16
93:11
**mayflower** 1:4
4:15 5:10
11:18 12:19,20
14:22,24 15:9
15:11 17:6
18:5,19,21
19:2 20:15,20
20:23 21:1,1,5
21:7,9,13
23:10,15,16
24:1 25:8,21
25:23 26:19,24
27:7 28:15
29:7 30:16,18
30:25 31:15,17
31:21 32:15,21
32:24 33:12,20
33:21,25 35:1
35:22,24 37:20
37:25 38:8,11

38:15,20,24
39:4 45:6 47:5
47:6,6,10,11,14
47:19 48:1,2
50:21 51:23
52:8,16 53:12
54:14 55:6,16
56:19 58:2
59:8 63:13,24
64:1 65:6
71:18 73:10
78:18 88:12
93:6 94:3 95:3
**mayflower's**
63:16 64:17
66:20
**mean** 20:2,22
23:5,15 27:20
28:18 32:5
35:8 39:14
46:21 50:21,22
54:16,16,17
58:15,21,24
59:19 60:4
74:5
**means** 5:16
42:24 43:11,12
71:24 72:6
**mechanical**
11:24
**media** 4:12
41:10,14 48:15
87:25 88:4
89:13

**meeting** 16:23
64:22 65:6,13
65:15 73:2,7
73:13,17,18,22
74:1,7,11,16,20
75:2,11,22
**memo** 83:11
84:2,4
**mental** 11:7
**mentioned** 13:9
45:12 53:24
**meramec** 1:23
2:9
**met** 18:15 19:3
74:4
**michael** 1:18
2:7 3:3,9,12
4:13 5:21 6:6
12:22 14:1
89:12 93:8
94:4,9 95:4,13
96:20
**middle** 6:18
8:23 9:2 49:3
78:15
**midwest** 96:1
**mike** 5:12,12
21:21 29:21
50:2 60:6 63:7
64:25 70:22
76:8 82:2 89:5
**million** 35:25
**mind** 32:16
48:21 52:22

minus  62:21
minute  65:19
  66:17 67:1
  70:4 81:24
  87:20
minutes  6:2,2
  41:7
missouri  1:1
  4:17 92:4
misstates  35:4
  80:5
mo  1:23 2:5,10
  2:19
modify  86:4
mom  37:14
  44:8 85:1
moment  49:17
money  13:15
  15:19 20:14
  23:16 35:18
  36:5,11,19
  37:1 38:7
  41:19 45:13
  58:3,4
month  64:5
months  16:2
morning  4:2
  6:1 8:9 88:16
mother  84:23
motion  81:17
move  9:1 27:19
  31:12,13 46:7
  47:16,18 56:25
  60:3

moves  24:3
  28:15 45:4,5,5
  45:5,7,19,19
  46:3,3,17,17
  47:2,12 53:5
  56:12,21
moving  1:7
  2:16 4:15 5:19
  13:10 17:4
  18:2 20:13
  30:23 31:23
  32:12 36:4
  37:6,19,24
  38:19 39:3,22
  41:18 42:11
  44:15 49:24
  50:10,16 52:6
  56:14 57:4,21
  59:18,23 60:11
  60:17,21 67:21
  68:2 71:18
  83:22 93:6
  94:3 95:3
multi  70:16
multiple  52:14
  52:18

**n**

n  2:1 3:1
name  4:21 6:1
  6:5 12:22
  13:25 14:1,4
  20:7 34:2 39:7
  39:15 52:2
  59:12 65:3
  66:18,18,22

68:6 73:15
  93:6 94:3,4,15
  95:3,4,21
names  14:22
  31:5,7 40:13
  50:22 51:4,24
nash  20:22,25
  58:1
nearby  35:10
necessarily
  48:1
need  8:1 11:25
  15:5,5 17:7,22
  21:24 22:19
  24:9 26:3,5
  49:16 51:17
  78:23 86:5
  87:15 90:17,23
needed  12:13
  42:3 58:15,18
  58:19 75:24
needs  86:3
neglected  36:14
never  12:17
  13:17 14:18,19
  15:14,17,18
  16:22,22,25
  18:9 23:25
  26:19 27:1,4
  27:23 37:5
  41:25 42:1,2
  43:18 64:21
  66:6 68:8 72:5
  73:11

new  28:18
  32:20,23
notary  93:25
  94:10,18 95:15
  95:23 96:23
note  3:17 4:4
  9:6
notes  74:6,9
  86:16 87:21
notice  1:21 3:9
  36:16 68:11
  69:10,15 83:19
noticing  5:6
notion  21:16
november  1:21
  4:4 44:18
  92:17 93:4
number  4:18
  46:9,11,12
  89:13 93:7
numbers  95:7
numerous  59:8

**o**

o'clock  89:1
oath  4:24 5:23
  6:17,17 24:14
  63:23
object  79:2,7
  80:2,7
objection  8:10
  8:15 10:9
  17:15,22 21:22
  35:3 38:22
  50:19 52:10
  56:16 57:13

| | | | |
|---|---|---|---|
| **objections** 3:13 | **ohio** 6:12 25:8 | **once** 25:24 | **owens** 2:17 |
| 5:2 22:6,9,15 | 33:20 93:2 | 27:11 | 5:20 10:1 |
| 30:6 79:8 | **okay** 6:8,19 8:8 | **open** 32:7 | 16:16 19:11 |
| **obstructionist** | 9:1,2,14,22 | **opened** 45:7 | 20:11 21:16,18 |
| 29:13 | 13:20 14:7,12 | **operating** 38:6 | 22:11,23 23:3 |
| **obviously** 11:8 | 16:3,14 17:3 | **operations** 57:9 | 24:23,24 34:4 |
| 14:21 16:9,19 | 17:18,25 19:9 | **opinion** 18:2 | 34:7,14,24 |
| 17:13 23:17 | 19:15 21:16 | 38:18 | 35:15 36:24 |
| 33:19 | 24:12,22 26:13 | **opportunity** | 37:5,8 40:7,20 |
| **occurred** 59:22 | 27:13 28:5 | 87:6 | 50:14 51:11,17 |
| **october** 78:12 | 30:4,22 33:8 | **ops** 56:18 | 54:15 55:8,21 |
| **offer** 58:11 | 33:23 34:7 | **order** 30:19 | 55:22,24 60:12 |
| **office** 13:17 | 40:19 41:8 | 47:6 67:6 | 60:18,21 61:2 |
| 24:1,2 31:11 | 42:16 43:9,15 | 89:22 91:7 | 63:3,5,13 64:5 |
| 37:15 41:24 | 43:25 44:13 | **orders** 24:2,2 | 64:18,21 71:14 |
| 45:4,19 46:3 | 48:6 49:4 52:5 | 31:16 45:18 | 72:9,19,22 |
| 46:17 47:17 | 53:9,23 54:17 | 47:8,9 51:15 | 73:1,7,18 74:1 |
| 52:20 54:18 | 61:19 63:22 | 52:23 89:21 | 74:4,8,13 75:2 |
| 55:13,18,25 | 64:3,16 65:4 | **original** 20:25 | 75:21 78:11 |
| 74:18 93:13 | 67:10,12,16 | **originally** | 79:12,15,25 |
| **officer** 44:5 | 68:10 69:13,19 | 62:14,20 63:15 | 80:12 88:23 |
| 85:11 | 70:15 71:24,25 | **originated** | 89:24 90:3 |
| **offices** 1:22 | 72:16,18 75:20 | 51:15 | **owes** 37:25 |
| 35:9 | 76:9,13 77:10 | **origination** | 38:19 39:4 |
| **official** 94:15 | 77:24 78:4,8 | 64:19 | **own** 11:23 33:1 |
| 95:21 | 78:15 80:17 | **outcome** 5:1 | 46:11 61:14 |
| **oh** 2:14 12:22 | 82:5,25 83:15 | **outside** 14:7 | **owned** 21:5 |
| 19:12 27:18 | 85:13 87:4,4 | 37:13 62:18 | 32:19 |
| 28:25 31:3 | 87:15,20 88:15 | 84:24 | **owner** 37:5 |
| 36:23 43:3 | 88:19 89:3 | **owed** 20:14 | 50:11 56:3 |
| 46:21 47:18 | 90:7 91:3 | 23:15 35:18,18 | 67:21 |
| 56:15 67:10 | **old** 12:6 | 35:24 36:5,12 | **ownership** |
| 72:5,16 83:9 | **older** 12:7 | 36:13 37:10 | 59:22 |
| 85:10 | **oldest** 13:21 | 41:18 | |

[p - physically]                                                                    Page 17

**p**

**p**  2:1,1,8
**p&l**  19:21
**p.m.**  88:1,5
  89:11 91:9
**package**  73:10
**packer**  20:23
  58:1
**packing**  27:10
  58:16
**page**  3:2,8
  27:15 43:20
  70:16 76:11,12
  76:14 77:22
  78:10 82:3,9
  83:25 84:1
  95:7 96:3
**paid**  23:15,16
  27:7,8 28:3
  35:25 39:20,21
  39:22 42:4,6
  84:18
**paperwork**
  12:21 66:18
**paragraph**
  43:2 78:16
**parents**  40:14
**part**  7:17 9:12
  11:19 12:24
  13:13,17 24:7
  27:1 47:8
  52:24 53:9
  54:7,8,11,12
  55:7 56:13
  61:11 62:6

63:1,11 72:8
85:3 95:9
**participants**
  4:7
**particular**  80:7
**parties**  4:11
  92:13
**party**  4:25
  11:15 79:20
**passed**  26:25
  52:4
**paul**  2:17 5:20
  10:1 12:12,13
  12:16 16:20
  18:15,16,22,25
  19:1,16,19,21
  20:18,20,20
  21:10,11 23:3
  23:5,6,13,17
  24:5,23 25:4
  26:22,22 27:11
  34:4,14 35:8
  35:12,13,18
  36:11,14,20
  38:10,25 39:2
  39:5,6,13,14,20
  41:25 42:4,6
  46:6,7,10
  50:14 53:7,21
  53:22,24 54:3
  54:4,9,19,21
  55:1,14,19
  56:1 57:15,17
  58:14 59:25
  63:5 64:21

65:1,2,7,14
72:12,12 73:23
77:7,12,25
78:11 79:19
88:23 89:1,24
90:3
**paul's**  41:24
  74:18
**pay**  19:2 20:14
  21:13 35:21
  36:15 37:2,9
  38:4,8,11 61:5
  62:3,6 72:5
**paycheck**  15:18
  45:14
**paying**  36:21
  36:25 39:20,23
  60:11,17,18,21
  61:16,20
**payment**  18:19
  20:13 21:17
  22:24 38:3,10
  38:16
**payroll**  67:6
**pays**  36:11
**pc**  2:18
**pdf**  9:16
**peggy**  1:20
  4:23 7:6 92:3
  92:20
**peggy's**  7:16
**pending**  8:4
**people**  11:21
  18:8 26:21
  31:3 33:17,17

40:3,3,5 52:7
52:15,18,21
53:15 54:18,19
56:1
**percent**  32:19
  33:2 46:21
**percentage**
  38:8
**percents**  27:6
**perfect**  79:19
**performance**
  56:5
**period**  18:20
  44:10 45:9,17
**permission**
  61:16
**person**  12:12
  14:19 20:19
  21:9 34:2,8
  37:14 52:14,18
  53:4,10 62:19
  63:3
**personal**  57:19
**personally**
  39:23 61:3
  94:11 95:15
**persons**  62:19
**phone**  36:16,17
  42:2 64:9
  74:22,24 93:3
**physical**  11:7
  73:18
**physically**
  53:11

**piano** 27:22
**piece** 9:7
**pittsburgh** 67:4
  68:7,7
**pivot** 57:12
  59:1
**pivoting** 58:12
**place** 4:11
  12:10 15:2,13
  31:12 43:16
  44:2 61:15
  73:13 92:9
**placed** 78:18
**plaintiff** 1:5,20
  2:2 4:14 6:4
**plaintiff's** 3:9
  3:13
**plan** 18:19
  20:13 21:17
  22:25 38:3,11
**planning** 10:25
  21:19
**platform** 9:12
  68:20 71:8
**play** 67:22
**plaza** 2:4
**please** 4:4 5:3,7
  6:4 9:3 22:8
  25:17 29:16
  31:5 49:18
  60:8 67:24
  68:13 69:4
  70:4 93:13
**plug** 48:18

**plugged** 48:4
**point** 8:1 9:14
  9:19 23:15,20
  23:22,23 31:1
  31:22 32:11
  33:7,9 42:10
  42:21 46:18
  49:22 50:6
  52:2 56:12
  57:1,7,7 60:13
  61:25 62:10
  84:19
**pointe** 2:13
**pointed** 63:14
**poorly** 7:19
**pops** 68:13
**position** 17:3
  18:1 23:21
  63:13,16 64:17
  73:4
**possible** 7:16
**practice** 23:22
**precise** 29:19
**precision** 29:17
**prefer** 86:19
  93:15
**preferred**
  59:13
**preparation**
  9:24 82:22
**prepare** 10:19
**prerogative**
  86:15
**preschool** 12:6

**presence** 14:8
  59:14 78:18
**present** 5:4
  57:18 85:21
**president** 20:7
  44:4 83:21
  85:10
**pretty** 24:11
**prevent** 6:21,22
**prices** 51:11
**pricing** 51:7,16
**primarily**
  50:12 58:12
  59:4
**primary** 28:14
  45:16 46:18
**prior** 92:6
**privy** 67:3
**probably** 8:8
  16:1 30:11,20
  32:1,2 34:23
  38:6 81:7
**problem** 7:17
**problems** 9:13
**procedure**
  86:20,22 94:5
  95:5
**procedures**
  11:5
**proceeding** 5:3
**process** 25:20
**production**
  93:23
**profitability**
  59:20,21

**profitable** 59:3
  59:17,19
**profits** 35:21
**propose** 21:19
**provide** 10:3
**provided** 68:25
  87:8
**providing** 6:14
  25:22
**public** 94:10,18
  95:15,23 96:23
**publish** 9:8,15
  68:11,12
**publishing**
  80:20
**pulled** 68:20
**purchased**
  32:17 93:16
**purpose** 84:12
**purposes** 81:4
**pursuant** 1:21
**put** 16:20 38:2
  42:11,22 43:12
  46:9 47:9
  49:16 53:2
  56:21 66:21
**putting** 42:14

**q**

**quality** 4:6,6
**question** 7:12
  7:19,21 8:4,5
  8:13,16,17
  10:2,8,9 13:5,5
  13:6 17:11,20
  23:2 26:4,13

**[question - regarding]**                                                    Page 19

| | | | |
|---|---|---|---|
| 29:12,14,16 | **rather**  7:23 | **really**  7:11 | 88:4 89:8,11 |
| 30:5,9,10 33:5 | **rdr**  1:20 92:21 | 53:16 88:15 | 95:9 |
| 33:7 34:6,17 | **reached**  20:12 | **reason**  9:10 | **recorded**  4:9 |
| 34:19 37:21 | 22:24 | 18:17 33:1 | 4:13 65:13 |
| 38:16 42:17,25 | **read**  9:11,15,20 | 58:25 95:8 | 66:10,22 |
| 50:4 51:19 | 17:13 18:7,12 | 96:3 | **recording**  4:6 |
| 60:5,7,7,8 63:8 | 25:2 31:6,24 | **reasons**  20:4 | 4:10 65:16 |
| 63:9,18,20 | 32:6,7 34:22 | 36:3 56:24 | 66:13 |
| 64:13 65:22,25 | 35:16,17 36:7 | 85:7 | **red**  50:22 51:8 |
| 66:8,16,24 | 43:2 51:4 56:9 | **recall**  41:20 | 51:12,15 68:4 |
| 67:8,12,14,15 | 56:10 66:19 | 51:25 | 77:7,12 |
| 69:20 72:15,16 | 69:19,19 70:22 | **receipt**  93:18 | **reduce**  42:3 |
| 72:24 76:25 | 71:5 73:4 76:4 | **receive**  56:5 | **reduced**  92:10 |
| 77:15,16,21 | 76:16,19,19 | 70:4 72:10 | **refer**  14:9 |
| 78:6 86:2 | 77:1,6,20 | **received**  25:25 | **reference**  93:7 |
| **questions**  8:21 | 78:20,24 81:24 | 70:9,11 73:9 | 94:2 95:2 |
| 9:24 10:10,13 | 82:21,24 85:22 | 85:17,20 | **referenced** |
| 22:12 29:18 | 86:1,2,5,10,10 | **receiving**  72:20 | 93:10 94:11 |
| 76:14,21,23 | 86:14 87:1,2,3 | **recently**  73:3 | 95:15 |
| 79:6 85:23,24 | 89:8 90:20 | 74:2 | **referred**  22:22 |
| 86:8 87:18 | 94:5,6,12 95:5 | **receptionist** | 44:22 83:20 |
| 88:18 | 95:6,17 | 46:23 | **referring**  17:1 |
| **quick**  86:11 | **reader**  86:6 | **recess**  41:12 | 19:11 23:9 |
| 88:7 | **reading**  49:3 | 88:2 | 25:21 73:7 |
| **quickly**  87:3 | 69:12,14 76:1 | **recognize** | 80:10 |
| **quit**  56:18,19 | 76:21 77:9,17 | 81:18 | **reflect**  74:6 |
| **quite**  62:4 | 77:18 90:19 | **recollection** | **reflected**  75:3 |
| | 93:11,18 | 43:6,8 79:14 | **refresh**  79:14 |
| **r** | **reads**  79:19 | 88:11 | **regarding** |
| **r**  2:1 92:1 | **ready**  11:12 | **record**  4:3,12 | 12:13 16:4 |
| **rabbit**  40:1 | 49:12 76:7 | 5:6 6:2,5 8:11 | 25:23 32:14 |
| **raising**  88:12 | 77:4 78:2,3 | 34:13 41:10,14 | 40:4 47:14 |
| **ran**  20:24 | 82:6 83:7 | 48:8,12,15,20 | 51:22 52:17 |
| 23:14 26:20 | **real**  15:16 | 48:24 49:10 | 55:6,16 56:5 |
| **rate**  88:12 | 37:16,17 61:7 | 70:5 87:25 | 57:20 62:18 |

**[registered - salesperson]**                                                                    Page 20

| | | | |
|---|---|---|---|
| **registered** 48:2 | **reporting** | 51:11,22 55:5 | 80:17,18 81:10 |
| **reimburse** | 15:10 23:22 | 62:14,20 79:16 | 81:14 87:22 |
| 18:19 | 24:15 25:19,20 | 79:18,20,22 | 88:23 |
| **related** 4:25 9:7 | 32:14 54:14 | 80:1,13 84:16 | **role** 49:25 |
| **relative** 92:12 | **reports** 53:21 | **responsive** 33:4 | 67:22 68:1 |
| 92:14 | 54:3,21,25 | **restate** 50:3 | **roll** 49:12 |
| **remember** | 55:13 56:1,4 | **result** 37:25 | **room** 49:9,15 |
| 28:11 33:15 | **represent** 6:3 | 38:20 | 58:15,17,18,19 |
| 36:11,13,14 | 36:19 | **results** 86:23 | 58:22 73:3 |
| 66:15 72:20 | **represented** | **retained** 89:13 | 74:18 |
| 74:5,17 75:18 | 61:21 | **retention** 3:17 | **ross** 30:3 |
| 75:19,19,20 | **representing** | **retire** 12:1 | **roughly** 27:11 |
| 80:4,15,16 | 4:21 | 56:25 | **rule** 31:20 |
| 88:8 | **request** 95:9,11 | **retired** 10:22 | **rules** 7:3 22:9 |
| **remotely** 4:19 | **required** 22:9 | 21:6,6 65:2 | 22:16 94:5 |
| 7:10 | 22:16 33:11 | **returned** 93:17 | 95:5 |
| **removed** 85:9 | 93:25 | **review** 87:6 | **run** 84:20 |
| **repeat** 25:17 | **requires** 10:2,3 | 93:13 94:1 | **running** 47:22 |
| 67:24 79:18 | **resignation** | 95:1 | 54:7,8 84:17 |
| **rephrase** 17:24 | 44:16 45:10 | **revise** 87:16 | **runs** 54:9 |
| **replies** 71:22 | **resigned** 44:3 | **right** 6:18 7:2 | **rush** 86:12 |
| **report** 33:12 | 83:21 85:10 | 7:18 8:23,24 | **ryan** 14:1,2,10 |
| 53:20 54:18,19 | **resigning** 44:8 | 9:9,21 10:18 | 14:12,14 15:22 |
| 54:20 55:21,23 | **resolved** 41:22 | 14:10 23:18 | 62:22 |
| **reported** 12:19 | **response** 10:9 | 24:17 26:10 | |
| 23:10 53:21 | **responses** 3:12 | 30:3,13 33:17 | **s** |
| 54:3,24 55:7 | **responsibilities** | 33:18 41:6 | **s** 2:1 3:7 95:8,8 |
| 55:12,19,22 | 31:23 45:16,21 | 43:10 44:6 | 96:3 |
| **reporter** 3:17 | 45:23 46:1 | 47:7 49:19 | **sales** 19:25 |
| 4:23 5:7 7:5 | 49:23 | 54:24 61:10 | 20:10,24 37:12 |
| 48:9 68:16 | **responsibility** | 66:3 67:15,19 | 44:23 45:4,21 |
| 80:21 81:13 | 50:7 78:19 | 68:11 69:2,25 | 46:1,9,11,11 |
| 86:18 90:12,18 | **responsible** | 71:15,19,23 | 50:13 |
| 92:4 94:7 | 30:24 33:24 | 72:4 75:1,4,25 | **salesperson** |
| | 47:13 50:12 | 78:9 79:6,8,9 | 15:16 19:23 |
| | | | 26:14 44:19,20 |

**[salesperson - sold]**

44:24 45:8,17
50:12 56:3
58:1
**sat** 23:25
**save** 78:23
**savings** 39:24
**saw** 12:22 31:6
35:20 66:18,18
**saying** 17:8
18:11 42:8
75:5 79:20
**says** 5:15 25:4
32:13 33:10,13
38:24,25 43:1
47:22 65:14
72:19 73:19
74:1 78:25,25
**scheme** 19:5,6
19:10 24:19,24
25:1,11 33:23
35:13,15 36:3
36:3 37:25
38:20 47:9
52:25 53:9
54:11,12 55:7
55:10,17 62:14
62:20 63:4,11
63:15,25 64:6
64:19 75:3,7
75:13 80:10,14
**schlegl** 2:3
**schneider** 2:18
90:6
**school** 26:16

**scope** 80:6
**scott** 40:13
**scouts** 26:15
**screen** 4:8 8:23
9:9,12 68:14
69:6 81:11
83:8 85:22
**scroll** 76:7,10
76:12 77:22
78:2 82:3 83:6
**scutti** 2:21 4:21
**seal** 92:16
94:15 95:21
**search** 8:22
**searching**
10:21
**second** 8:22
49:7 75:5
**sector** 59:15
**see** 31:24 42:3
66:14 69:5
78:15 83:2,4
**seeing** 68:17
**seems** 58:24
**seen** 4:8 18:9
18:12 36:5
43:18 69:18,21
69:24
**sell** 27:9 45:18
45:18,19,24
46:6,13
**send** 32:2 70:13
71:4
**sending** 84:12

**senior** 44:23
**sense** 7:21
**sent** 17:2 20:5,5
32:3 43:22
44:7,16 69:22
71:1 72:23
73:11 77:11,12
83:3 84:9 85:8
**served** 11:3
87:9
**services** 88:13
**set** 51:7,16 67:6
70:1
**setting** 51:11
**settling** 10:22
**shape** 24:20
**share** 9:8,12
68:20 71:8
80:20
**shared** 53:25
**sheet** 95:7,10
95:18 96:1
**short** 41:1,4
86:9,15
**shorthand** 92:9
**show** 43:10
**side** 27:23,24
46:8 57:24
58:12
**sign** 90:21
**signature** 83:16
84:5,7 92:19
93:13
**signed** 16:21
32:20,22,23

94:13 95:18
**significant**
56:13 59:14
**signing** 90:19
93:11,18
**simple** 67:7
**sincerely** 93:21
**single** 15:15
**sir** 6:1,24 10:18
12:25 33:4,9
34:17,20 35:7
38:16 40:24
49:20 55:11
60:16 86:13,25
93:9
**sit** 17:25 22:22
28:21 29:2
30:13,22 34:1
35:14 37:23
38:17 42:20
51:1,6
**sits** 35:9
**sitting** 17:8
18:6 61:9
70:23
**situation** 11:9
12:9,24
**skip** 87:4
**slow** 86:6
**small** 55:25
**software** 29:10
**sold** 11:19
19:23 24:1,1,2
24:2 26:15,16
47:1 59:25

**solutions** 93:1
  96:1
**somebody**
  12:19,20 31:7
  42:7 47:20
  55:22 65:16
  66:10,20
**son** 13:21,24
  14:3 40:9,12
  54:21,21
**sons** 11:16 12:4
  13:10,21 40:8
  40:19 62:21,22
**sorry** 17:7
  79:17 89:25
**sort** 8:11 9:7
  48:1 57:11
  59:15 83:12
**soul** 10:21
**sound** 44:6
**source** 60:13
**south** 1:23 2:9
  2:19
**speak** 7:10
**speaking** 11:8
  22:5 28:14
  79:8 90:1 91:1
**specific** 26:12
  33:14
**specifically**
  15:22 52:15
  68:3
**specify** 26:3,11
**speculation**
  34:15

**spent** 21:7
**spoke** 22:11
**spotlight** 49:17
**st** 1:23 2:5,10
  2:19
**standing** 89:21
**start** 32:6 48:6
  70:17,18,19
  76:22
**started** 20:22
  25:8 26:20
  36:17 46:8,10
  56:12 57:25
  59:10 77:9
**starting** 46:6
  46:14
**state** 5:3,5 6:4
  92:4 94:10
  95:15
**stated** 6:1
  73:23 78:17
  92:10
**statement**
  34:12 42:11,15
  42:21 43:13
  79:12 94:13,14
  95:19,19
**statements**
  19:22 26:24
**states** 1:1 4:16
  73:1 75:14
  78:16
**stating** 16:21
**stay** 8:24 48:20
  48:24,25

**step** 85:5
**stop** 16:10 22:2
  29:13 77:2
  79:7
**stopped** 52:2
  56:20 57:3
  59:9
**stops** 27:25
**storage** 1:8
  2:17 4:16 5:19
  13:11 17:4
  18:3 20:14
  30:23 31:23
  32:12 36:4
  37:6,24 38:19
  39:4 41:18
  42:11 44:15
  49:24 50:11,17
  52:6 53:5 57:3
  57:5,22 58:17
  58:17 59:18,23
  60:11,17,21
  67:21 68:3
  71:19 83:22
  93:6 94:3 95:3
**storage's** 56:14
**store** 21:5
**straight** 24:9
  55:23
**stretch** 41:1
**strike** 62:12,25
**strong** 27:1
**struggling**
  35:19

**stuck** 23:25
**stuff** 25:3 34:5
  77:7
**subject** 71:17
  71:22
**submit** 18:3
**submitted** 3:17
  81:19
**subscribed**
  94:10 95:14
  96:21
**successful**
  11:21,22
**sudden** 18:22
**suite** 1:23 2:10
  2:14 93:2
**sunday** 71:14
**superior** 93:1
**supposed** 29:3
  76:16
**sure** 10:14 13:2
  20:16 27:14
  31:20 40:2
  41:3 43:19
  44:3 48:13
  51:6 54:23
  59:11 60:2
  62:7,23 67:25
  69:7 71:9 76:3
  78:10 80:9
  82:1 90:18
**surprise** 11:2
  71:4
**swear** 5:7

**[switch - thread]**

**switch** 66:25
**swore** 24:17
**sworn** 5:22
  92:7 94:10,13
  95:14,18 96:21
**syncing** 90:8
**system** 15:11
  17:6 18:5
  23:10,11 25:23
  26:19 29:4
  30:16,25 32:15
  34:1,3 35:1
  47:5,10,15
  51:23 52:8,16
  53:12 54:14
  55:6,16 56:22
**systems** 59:9

**t**

**t** 3:7 92:1,1
**table** 60:7,8
  77:17
**take** 4:11 8:2
  14:22 40:25
  44:11 76:6,22
  77:8 79:2 83:6
  86:9,15 87:20
  90:23
**taken** 1:19 4:13
  11:6 17:17
  41:12 44:2
  63:13 92:8
  93:10
**takes** 12:7
**talk** 7:15 8:2
  20:12 22:24

**talked** 11:11,13
  12:12 14:7,12
  16:6,7 18:8
  20:19 21:10
  33:23 40:3,4,6
  40:20 41:17
  62:15 65:11,19
  66:1,4,6 75:12
  88:7
**talking** 17:12
  19:13 31:10
  41:20 43:8
  46:4 52:15
  53:8 64:8,10
  73:14 88:9
**tax** 36:19
**taxes** 35:19
  36:21,25 37:2
**team** 24:5
  46:25
**teamy** 50:22
**technical** 88:17
**technology**
  4:20 9:4,7
  68:24,25
**tell** 9:3 13:1
  17:11 23:4
  26:8 27:15
  31:5 36:24
  37:2 38:24
  40:24 47:7
  58:10 72:11
  76:6 78:2,22
  86:1

**telling** 6:21,23
  37:22
**tells** 35:10
**tendency** 7:10
**tenure** 31:1
  32:11
**term** 27:13
  28:9,12 42:18
  80:7
**terms** 51:15,16
**test** 86:22
**testified** 5:22
  16:14 19:20
  20:11 34:23
  60:10,16
**testify** 11:12
**testimony** 6:14
  6:17 24:13,14
  35:2,4,7 54:5
  54:10 55:4
  63:23 89:12
  94:6,7 95:6,9
  95:12
**thank** 9:1 69:8
  88:20 89:19
  90:7
**thing** 15:15
  18:23 20:2
  23:18 35:16,23
  38:1,9,12
  40:15 45:12
  62:16 65:2
  76:19,20 85:23
**things** 8:10
  10:13 23:17

26:1 27:7 36:1
  43:4 44:2 61:9
**think** 7:25 9:17
  13:6 16:24
  21:24 22:18
  24:10 25:5,12
  29:18 30:17
  34:13 35:17,19
  35:20 36:18
  37:3 39:9
  43:23 44:4,20
  44:23 45:11
  46:5,8,10 53:4
  53:24 57:6
  59:6,16 62:8,9
  64:3 68:5
  72:12,12,17
  85:13 86:8
  87:15,17 89:6
  90:22
**third** 20:8 33:1
  84:2,3,10,13
  85:8
**thirty** 93:17
**thompson** 2:4
  89:20
**thompsoncob...**
  2:6
**thompsoncob...**
  2:6
**thought** 10:21
  39:10
**thoughts** 12:24
**thread** 72:8
  77:2

**[three - under]**

**three** 62:22
**tim** 12:14,17
  16:23 18:15
  20:12 23:4
  64:1,6,22,23,23
**time** 4:4 5:3 8:1
  9:14,19 13:13
  18:20 20:1
  21:2 24:21
  26:6,7,15 31:1
  31:22 33:7,9
  35:24 37:2
  39:9 41:10,14
  42:10 44:10,15
  45:6,17 46:7
  49:22 50:6,17
  52:5,6,19
  56:12,24 57:2
  58:21 67:20
  73:11,24 75:5
  76:6 77:8
  78:17,23 83:6
  84:19 85:4
  87:25 88:4,16
  88:18 92:9
**timeframe** 17:8
  21:25 22:11
  50:3,4
**times** 8:9 22:22
  24:3 78:17
**title** 53:10
**titles** 53:16
**today** 6:7,14,17
  6:21,23 7:7,15
  8:1 9:18,24

10:19 11:12
13:2 15:2,14
16:6 17:9 18:1
18:6 19:8,13
22:23 24:17
26:5 28:10,21
29:2,8,10,12,25
30:14,20,22
32:1,6 33:24
34:1 35:14,17
37:23 38:17
40:18 42:20
43:11 45:12
51:2,6 54:8
60:15 69:16
73:24 80:11
82:23,24 87:19
**today's** 89:11
**together** 38:2
  39:1
**told** 21:18 25:5
  31:14 39:2
  53:18,19 60:23
  62:13,21,23
  64:21 66:9,13
  73:11 75:2
**toll** 11:7,7
**ton** 9:18
**took** 12:10
  15:13 19:24,24
  20:7 32:22
  43:16 56:23
  61:15 73:13
**top** 70:18 77:1
  77:3 78:10

**topic** 33:14
  64:6
**total** 46:7 89:12
**totally** 68:25
**trailers** 58:22
**tran** 90:24
**transaction**
  28:22,24 29:3
  68:8
**transactions**
  15:12 18:4
  25:23 30:15,25
  32:15 45:22
  46:2 47:14,25
  50:1,8,13 51:8
  51:12,23 52:9
  52:17 53:9
  54:11,12 55:6
  55:17 59:2,22
  67:23 68:2,3
**transcribed**
  94:7
**transcript** 90:8
  90:24 93:10,15
  94:5,12 95:5
  95:11,17
**transit** 1:4 4:15
  5:10 71:18
  93:6 94:3 95:3
**tried** 39:16,16
  68:21
**truck** 21:3
  54:24 55:3
**trucks** 14:23
  37:19 54:20

**true** 18:13,14
  56:11 58:9
  81:21 82:15,17
  82:20 87:12
**trust** 39:18
**truth** 6:21,23
  11:20 24:18
  37:22
**truthfully** 56:9
**try** 8:25 27:3
  30:13
**trying** 42:3
  46:12 52:13
  54:23
**turned** 24:5
**turning** 11:14
**two** 7:19 10:10
  12:4 13:9
  28:14 40:8
  51:24 74:19
**type** 56:4 68:9
**types** 8:10 28:7
  28:15,19
**typically** 28:16
**typing** 7:6

**u**

**uh** 82:7
**ultimately**
  44:17
**unable** 9:11,15
**under** 5:23
  6:16,17 22:9
  22:16 24:14
  63:23 89:4
  92:11

**understand**
6:13,16,19 7:5
7:8,22 9:4
14:14 15:8
18:15,18,20
19:16 25:12
28:21 29:12,20
34:10 40:10
42:14 52:13
63:6,12 65:12
71:21 87:7
**understanding**
20:17 25:15,19
27:16 29:1,9
29:25 30:14
32:10,12 48:3
61:19 67:25
**unigroup** 21:18
23:10 29:4
34:3,25 71:17
73:10
**unit** 4:12
**united** 1:1 4:16
28:15 47:10
59:8
**unload** 54:20
**upset** 44:21
61:13
**use** 28:10 39:7
80:9
**used** 27:13 28:2
28:9,12 32:3
46:9 68:7,8
84:21 89:13

**using** 4:19 19:5
46:11
**utilizing** 9:7
**utterly** 22:13

**v**

**v** 1:6 71:18
93:6 94:3 95:3
**vacation** 10:25
**vary** 52:19
**vaults** 58:17
**vending** 50:24
58:20
**veritext** 4:22,23
89:14 93:1,7
96:1
**vicki** 31:8
51:24 52:1
**video** 4:10,12
6:14 18:21
64:4 66:22
89:22,24 90:9
90:23 91:4
**videographer**
2:21 4:2,22
41:9,13 48:11
48:14,19,23
49:2,5,16
87:24 88:3
89:7,10,20,25
90:4,7,25 91:3
**videotaped**
1:18 5:17
**virtual** 4:20
**virtually** 4:5

**voice** 58:11
**vs** 4:15

**w**

**wait** 66:17
**waiting** 86:22
**waived** 93:12
93:19
**walk** 51:4
**walked** 41:24
**walking** 9:10
**want** 10:5,6,11
10:14 17:10
21:11 22:3
23:6 26:10,11
29:17 32:21
40:1,12 42:19
47:24 48:12,19
55:3 57:24
61:24 62:3
66:12 70:12,16
70:17,18 76:1
77:6 80:18
81:11 84:14,16
84:24 85:3,22
85:23 86:12
90:8,12 91:4
**wanted** 18:17
18:18 19:1
21:12 51:14
76:18
**wanting** 20:9
20:18 21:17
36:18 51:20
89:22

**wants** 76:4
78:6
**warehouse**
13:18 14:3
20:24 51:5
54:17,19
**warehouses**
51:3 58:23
**washer** 27:20
**watch** 61:12,17
**way** 17:3 18:17
24:20 35:21
38:17 72:19
85:3
**we've** 10:24
33:23
**weak** 26:18
**week** 40:17,17
86:21
**weekend** 11:15
**went** 12:21
20:24 36:20
40:1 59:25
65:9,20
**whatsoever**
49:25
**whelan** 25:6,7
25:9,10
**wife** 10:20 11:4
11:11,16 21:6
38:13 39:23
61:17 84:7,14
86:19
**witness** 1:19
3:2 4:8 5:8,14

**[witness - zoom]**                                                                      Page 26

5:22 30:2,5
41:4,8 43:3,7
48:17 49:8,14
49:17,19 64:11
67:10 68:19
69:22 70:25
71:3 72:3,5
76:9,13,16
77:6,9,15,18,24
78:4,8 80:4,6
82:5,7,10,14
89:6 92:7,16
93:8 94:1,4,11
95:1,4,15
**wives** 62:24
**woman** 53:20
**wonder** 12:17
**wondering**
  60:19
**wonky** 9:5
**word** 8:22 19:5
  28:2,10 42:1
  78:1 80:10
**worded** 7:19
**words** 28:1
  58:14
**work** 12:4
  13:10 15:20
  18:18 23:6
  37:13,17,18
  38:3,10 46:15
  46:16,24,25
  68:23
**worked** 13:22
  15:17 26:7

29:6,9,23
46:22,24 47:2
47:4,12 55:18
56:3 64:1
**working** 21:8
  53:15
**works** 13:13
  25:20 29:10,25
  79:5
**worries** 90:18
**wrapping**
  87:21
**write** 42:7
**writing** 16:21
  66:21 79:23
  92:11
**written** 25:4,13
  87:8
**wrong** 19:4
  55:12 63:24
  68:9
**wrote** 66:20
  77:7,12,25

| x |
|---|

**x** 3:1,7

| y |
|---|

**y'all** 25:5
**yeah** 19:2
  25:18 28:17
  30:8 41:24
  42:9 46:21
  48:22 50:23
  53:1 54:2,16
  56:22 57:23

59:19 71:2,20
80:15 83:11,14
90:24 91:5,5
**year** 11:5 43:20
  45:9
**years** 12:6
  13:19,23 19:24
  23:14 27:12
  29:7,24 30:21
  31:4,10 32:22
  44:2 45:1,2
  46:5,5,22 52:4
  52:21 55:14
  56:2 57:23
  58:7 61:7
  64:25 67:5
**yesterday**
  86:21,22

| z |
|---|

**zoom** 1:18
  68:23

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.