Page 1

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF MISSOURI
2        EASTERN DIVISION
3
4
   MAYFLOWER TRANSIT, LLC,    )
5                             )
          Plaintiff,          )
6                             )
   v.                         ) Case No. 4:23-cv-00708
7                             )
   BRENDAMOUR MOVING &        )
8  STORAGE, INC., et al.,     )
                              )
9         Defendants.         )
10
11
12
13
14
15       ZOOM VIDEOTAPED DEPOSITION OF PAUL
16 OWENS, a Witness, taken individually and as
17 Corporate Representative of BRENDAMOUR LOGISTICS,
18 LLC, pursuant to Federal Rule of Civil Procedure
19 30(b)(6) on behalf of the Plaintiff before
20 Peggy E. Corbett, CSR, CCR, RDR, pursuant to
21 Notice on the 14th day of November, 2023, at the
22 residence of the witness in Cincinnati, Ohio.
23
24
25

```
 1                A P P E A R A N C E S
 2   APPEARING FOR THE PLAINTIFF:
 3        Mr. Brian A. Lamping
          Ms. Christine Schlegl
 4        THOMPSON COBURN LLP
          One US Bank Plaza
 5        St. Louis, MO 63101
          314.552.6000
 6        blamping@thompsoncbourn.com
          cschlegl@thompsoncoburn.com
 7
     APPEARING FOR THE DEFENDANT MICHAEL BRENDAMOUR:
 8
          Ms. Julie M. Gugino
 9        FINNEY LAW FIRM INC
          4270 Ivy Pointe Boulevard
10        Suite 225
          Cincinnati, OH 45245
11        513.943.5669
          julie@finneylawfirm.com
12
     APPEARING FOR THE DEFENDANT BRENDAMOUR MOVING &
13   STORAGE, BRENDAMOUR LOGISTICS AND PAUL OWENS:
14        Mr. Henry F. Luepke, III
          HEIN SCHNEIDER & BOND PC
15        2244 South Brentwood Boulevard
          St. Louis, MO 63144
16        hfl@hsbattorneys.com
17   VIDEOGRAPHER:  Ms. Beth Scutti
18                     I N D E X
     WITNESS:                                         PAGE
19      PAUL OWENS
     EXAMINATION BY MR. LAMPING                          5
20   EXAMINATION BY MR. LUEPKE                          93
     EXAMINATION BY MS. GUGINO                          93
21   CERTIFICATE                                       105
22
23
24
25
```

```
                    E X H I B I T S
  NO.              DESCRIPTION                        PAGE

  EXHIBIT 5        Plaintiff'S Notice of              14
                   Deposition of Paul
                   Owens
  EXHIBIT 6        Plaintiff's Notice of              14
                   Corporate
                   Representative
                   Deposition
                   pursuant to Federal
                   Rule of Civil Procedure
                   30(b)(6)
  EXHIBIT 7        Plaintiff's Answers and            32
                   Objections to Paul
                   Owens' First Set of
                   Interrogatories
                   Directed to Plaintiff
                   on the Issue of
                   Personal Jurisdiction
                   over Paul Owens
  EXHIBIT 8        First Amended Complaint            96
  EXHIBIT 9        Excel spreadsheet                  71
  EXHIBIT 10       Paul Owens' Responses              77
                   to Plaintiff'S
                   Interrogatories
                   on the Issue of
                   Jurisdictional
                   Discovery
  EXHIBIT 11       Invoice, BRENDAMOUR                80
                   002553
  EXHIBIT 12       E-mail String,                     84
                   MAYFLOWER_0000006
  EXHIBIT 13       Text Chain,                        84
                   MAYFLOWER_0000008
  EXHIBIT 14       E-mail,                            85
                   MAYFLOWER_0000001
  EXHIBIT 15       Text Chain,                        86
                   MAYFLOWER_0000009
  EXHIBIT 16       Three memos beginning              94
                   MB000022
        E X H I B I T S (PREVIOUSLY MARKED)
  NO.              DESCRIPTION                        PAGE
  EXHIBIT 2        Previously Marked Exhibit          82
```

Reporter's Note: The original exhibits were submitted to the court reporter for copying and distribution with retention by Mr. Lamping thereafter.

Page 4

1           (Deposition commenced at 2:05 p.m.)
2                THE VIDEOGRAPHER:  Good afternoon.
3    We are going on the record at 2:05 p.m. Central
4    on November 14th, 2023.  Please note that this
5    deposition is being conducted virtually.  The
6    quality of recording depends on the quality of
7    camera and internet connection of participants.
8    What is seen from the witness and heard on screen
9    is what will be recorded.  Audio and video
10   recording will continue to take place, unless all
11   parties agree to go off the record.
12             This is Media Unit 1 of the video
13   recorded deposition of Paul Owens taken by
14   counsel for plaintiff in the matter of Mayflower
15   Transit, L.L.C. versus Brendamour Moving &
16   Storage, Inc. et al. filed in the United States
17   District Court, Eastern District of Missouri,
18   Eastern Division, Case Number 4:23-cv-00708.
19             This deposition is being conducted
20   remotely, using virtual technology.  My name is
21   Bethany Scutti representing Veritext, and I am
22   the videographer.  The court reporter is Peggy
23   Corbett from the firm Veritext.
24             I am not authorized to administer an
25   oath, I am not related to any party in this

1  action, nor am I financially interested in the
2  outcome.  If there are any objections to
3  proceeding, please state them at the time of your
4  appearance.
5          Counsel and all present will now state
6  their appearances and affiliations for the
7  record, beginning with the noticing attorney, and
8  then will the court reporter please swear in the
9  witness.
10         MR. LAMPING:  Brian Lamping and
11 Christine Schlegl for the plaintiff.
12         MR. LUEPKE:   Henry Luepke for Paul
13 Owens.
14         MS. GUGINO:  Julie Gugino for
15 Michael Brendamour.
16                  PAUL OWENS,
17 a Witness, being first duly remotely sworn,
18 testified under oath as follows:
19                  EXAMINATION
20 BY MR. LAMPING:
21     Q.   Good afternoon, Mr. Owens.
22     A.   Good afternoon.
23     Q.   My name is Brian Lamping.  You and I
24 have never met, but I am one on the attorneys
25 representing Mayflower in this case.  Will you

```
                                                       Page 6
 1   please state your full name for the record.
 2        A.   Paul Thomas Owens, II.
 3        Q.   And I'll do my best to call you
 4   Mr. Owens today, but if I slip up and call you
 5   Paul, will you forgive me?
 6        A.   Feel free to call me Paul if you would
 7   like.
 8        Q.   All right.  Mr. Owens, where are you
 9   physically located right now?
10        A.   Cincinnati, Ohio.
11        Q.   And where specifically, at a residence,
12   at an office?
13        A.   Yes, in my residence.
14        Q.   Okay.  I've just got to ask but is
15   anyone else in the room with you?
16        A.   No, sir.
17        Q.   Okay. And you are represented by
18   counsel here today who is in St. Louis; is that
19   right?
20        A.   I am represented by counsel.  I am
21   assuming that Bud is in St. Louis, yes.
22        Q.   Okay.  You understand that you are here
23   giving some testimony under oath related to a
24   lawsuit that my client filed a few months ago?
25        A.   Yes, sir.
```

```
                                                    Page 20
 1      Q.   Did Brendamour Logistics while it was an
 2   operating company do business under any d/b/a's?
 3      A.   No.
 4      Q.   And Mr. Owens, you are located in
 5   Cincinnati right now; is that right?
 6      A.   Yes.
 7      Q.   And is that where your full-time
 8   residence is?
 9      A.   Yes.
10      Q.   Can you walk me through your educational
11   background after high school?
12      A.   I have a Bachelor's degree in accounting
13   from Miami University of Ohio.
14      Q.   And what year did you obtain that
15   degree?
16      A.   Jimini, it would have been 1992 or '93,
17   and I apologize that I am not sure.
18      Q.   That's all right.
19      A.   I'm sure it's one of those two.
20      Q.   Okay.  When did you first go and work
21   for an entity that was affiliated or related to
22   the Brendamour let's sort of call it group of
23   companies?
24      A.   April 1st, 2003.
25      Q.   And what specific company did you go to
```

Page 44

1    A.   No.  Tim is a very good person.
2    Q.   Okay.  Now you said that the two
3  companies were separate.  I assume while you were
4  and are General Manager of Brendamour Moving &
5  Storage, you're primarily physically located in
6  Cincinnati, Ohio, right?
7    A.   Yes.
8    Q.   And you understand that Brendamour
9  Logistics was an agent of Mayflower?
10   A.   No.  Brendamour Moving & Storage is an
11 agent of Mayflower.
12   Q.   Oh, what did I say?
13   A.   You said Brendamour Logistics, yes, sir.
14   Q.   I'm sorry, I think we're done with
15 Logistics.  I don't have any more questions about
16 Logistics.
17   A.   I apologize.
18   Q.   And no, no, and I promise you I was not
19 trying to sneak something in there, but if I
20 refer to Logistics again for the rest of the day,
21 I beg your pardon.
22   A.   Okay.
23   Q.   Let me back up.
24   A.   It was just a little confusing.  Yes, I
25 am aware that --

Page 46

1  Brendamour Moving & Storage, did you ever have
2  occasion to come to Missouri to visit Mayflower?
3      A.   Once.
4      Q.   When was that?
5      A.   I don't know, right around sometime in
6  2005 would be my guess.
7      Q.   Okay.
8      A.   Yeah, I think it was 2005.
9      Q.   Okay.  In order for, kind of switching
10 gears a little bit, in order for the scheme to
11 work, somebody had to enter transaction data into
12 the Mayflower system, correct?
13     A.   Yes.
14     Q.   While the scheme was on-going, who was
15 responsible for doing that?
16     A.   The -- again, I have never personally
17 logged into the Mayflower system, so I don't
18 know.  I don't know the intricacies of how it
19 worked, but people, I provided in the discovery
20 the systems that have had access, but as I'm
21 recalling the names were Terry Harrell, Rianna or
22 Ri, George, and then Art Whalen, and then Chuck
23 Wolfe did, as well, until he passed away in 2012.
24     Q.   Obviously, we've established that the
25 owners of Brendamour didn't know about the

Page 49

1   Q. And what do you recall telling them
2   about the schemes?
3   A. I just basically made them aware of the
4   situation and I mean that was pretty much it.
5   Q. Who else other than you, Doug and Dave
6   was present during the meeting?
7   A. Just us.
8   Q. How did they react when you told them
9   about the scheme?
10  A. Well, as you can imagine, first and
11  foremost it's not very simple to understand for
12  someone who is not well versed in the Mayflower
13  process, so there was some, you know, there was a
14  significant amount of initial difficulty in
15  understanding, and then there was also a
16  significant level of, you know, whatever word
17  you'd want to use, anger, disappointment,
18  somewhere in there, and that was pretty much it.
19  Q. And you, in your position as general
20  manager, you were well versed in the Mayflower
21  agency reconciliation process, fair?
22  A. Other than the fact that I had never
23  logged into the Mayflower system, correct.
24  Q. Yeah. You may not have logged into the
25  system, you may not have actually entered in some

1  of the charges, but you understood generally how
2  entering the inflated charges is part of the
3  scheme would benefit Mayflower Moving & Storage.
4       A.   Yes, I understood how it would have
5  benefitted the company.
6       Q.   If it would have hurt the company,
7  obviously, you wouldn't have done it, fair?
8       A.   Correct.
9       Q.   After your meeting with Doug and Dave
10 Brendamour, did you talk to anyone else about the
11 scheme before you went and met with Tim Grimes?
12      A.   I spoke to Doug and Dave again the next
13 business -- as I recall, the first meeting was on
14 a Friday, the next one was on a Monday, and
15 during that meeting, and it might have been the
16 first meeting, I'm not sure, but as I recall it,
17 there was a second meeting and at that point it
18 was decided that I would call and reach out to
19 Tim to try to schedule a meeting, with the
20 objective again to make them aware of the
21 situation, gain his knowledge and expertise in
22 how to best interact with Mayflower regarding the
23 situation, and then to hopefully lay the
24 groundwork to move forward in an on-going
25 business with Mayflower.

Page 56

1  can't answer it with a "yes" or "no" answer, but
2  technically, yes; however, a major impact to this
3  was in September, roughly September of 2016,
4  Mayflower started taking a percentage against
5  those particular billing codes that we are
6  speaking which essentially caused the numbers to
7  go, for lack of a better word, wild.
8      And so that played a role in it getting
9  what ended up being out of hand. We had,
10 essentially we were, we have actually, so if you
11 take the charges out, the charges out that we put
12 through, you know, the inaccurate charges that we
13 put through, we actually paid Mayflower more over
14 this period of time than what they would have
15 earned.
16     Q.   Yeah, no, I understand that's your
17 position, but I guess what I'm getting at, and I
18 think you've acknowledged it, but if you go from,
19 if you look at 2010 to 2023 as a spectrum, the
20 scheme grew in scale over time and really grew in
21 scale after the accessorial percentages changed
22 in 2016?
23     A.   Right, it did, but there was also, it
24 would be important to note that at that point
25 cash wasn't changing hands.

Page 57

1  Q.  I understand.
2  A.  Brendamour, the company, was sending
3  money back to Mayflower at that point and
4  essentially dwindling what would have been, you
5  know, the earned difference if you will.
6  Q.  Okay. So was your decision to go and
7  talk to Doug and Dave Brendamour and then
8  ultimately talk to Tim Grimes based on the fact
9  that the scheme was essentially getting out of
10 control as you put it?
11 A.  Yes, in essence, yes.
12 Q.  All right. So and I think I covered
13 this, but I just want to make sure, the Luxottica
14 Lenscrafters accounts, the charges that were
15 agreed upon with the customer were accurately
16 entered into the Mayflower system; is that right?
17 A.  Yes, and Mayflower, the Mayflower
18 invoice was sent to the customer and the customer
19 paid Mayflower.
20 Q.  Perfect, all right, and you've led me to
21 kind of my next topic, which is for the -- in a
22 given transaction, when it's logged into the
23 system, initially am I correct that Mayflower
24 will generate an invoice?
25 A.  Yes.

Page 60

1  A. Okay.
2  Q. Who decided the inflated amount that was
3  represented to Mayflower, how was that amount
4  determined?
5  A. Well, we were aware of what the, in
6  short, we were aware of what the numbers needed
7  to be, and so we made the numbers what they
8  needed to be.
9  Q. Precisely. So when you say you knew
10 what the numbers needed to be, you knew what the
11 value of that transaction needed to be to have an
12 offset on an agency statement that would work in
13 Brendamour Moving & Storage's favor?
14 A. For a period of time, and then there
15 came a time where we started basically paying the
16 monies back. So at some, you know, at that point
17 we were making it so that there was a specified
18 shortfall.
19 Q. So is it your testimony that at some
20 point, the scheme started benefitting Mayflower?
21 A. Well, the -- okay, so during the time,
22 during the timeframe that we were in a, basically
23 borrowing money from Mayflower if you will,
24 Mayflower on earned revenue, not inflated
25 revenue, but earned revenue made about $3 million

1 dollars on our work.
2          So I would argue, you know, and we would
3 not have had the work, we could not have serviced
4 the work without capital.  So I am unaware of
5 Mayflower's financial statements, and how they
6 published them and all of those kind of things.
7 So for me to speak on the impact of the
8 inaccurate entries, I cannot do that.
9          But on the act of securing the business
10 and servicing the business, yes, I would say that
11 had we not done this, we would not have had the
12 business, and Mayflower would not have earned
13 that money.
14     Q.   Well, in fairness, there are a lot of
15 different ways that a company can obtain capital,
16 fair?
17     A.   Yes.
18     Q.   And do you ever remember saying to
19 Mr. Grimes that the way this scheme worked, was
20 essentially like using Mayflower as a bank?
21     A.   I have used that, not just to
22 Mr. Grimes, but to others, as well.
23     Q.   Okay.
24     A.   However, however, please realize that I
25 am doing that merely to expedite the curve of

Page 64

1 the record, this begins Media 2. Time is 3:49
2 p.m.
3     Q.    (BY MR. LAMPING) All right, Mr. Owens,
4 of the transactions that were mis-reported in the
5 Mayflower system as part of the scheme, were all
6 of those real transactions or were any of them
7 just completely fabricated?
8     A.    I believe you're asking if there were
9 any order numbers in their entirety that were
10 fabricated; is that correct?
11    Q.    Correct.
12    A.    No; every order that was entered was an
13 actual order.
14    Q.    Okay, and with respect to the false
15 information that was entered into the Mayflower
16 system, did you start with an actual order and
17 then inflate the services provided on that order
18 to get to the inflated number?
19    A.    Yes, using specific billing codes, three
20 specific billing codes, yes.
21    Q.    And what were those three specific
22 billing codes?
23    A.    As I stated earlier, I don't have them
24 committed to memory. I was not the one doing
25 the -- making the entries. I'm sorry.

Page 93

1  Q.  Okay.
2  A.  And those items, the one invoice that
3  you showed me earlier as an example, all of those
4  items are rolled up into that number.
5  Q.  Okay.  All right, Mr. Owens, I
6  appreciate your time this afternoon.  At this
7  time, I have no more questions.
8           MR. LUEPKE:  Julie, do you have any
9  questions.
10          MS. GUGINO:  Yeah, I do have a few
11 questions, but I didn't know if you wanted to ask
12 any questions, Henry.
13                EXAMINATION
14 BY MR. LUEPKE:
15 Q.  My only question, Mr. Owens, is these
16 transactions that you discussed, the actions that
17 you took, did you take any of these actions or
18 engage in any of these transactions in any role
19 other than as General Manager of Brendamour
20 Moving & Storage?
21 A.  No.  Everything that I -- that was done
22 here was done as a part of my role as the General
23 Manager of Brendamour Moving & Storage.
24 Q.  I have no further questions.
25                EXAMINATION