## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MAYFLOWER TRANSIT, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:23CV708 JAR |
| ) | |
| BRENDAMOUR MOVING & STORAGE, ) | |
| INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants Paul Owens and Michael Brendamour's Motions to Dismiss. ECF Nos. 45 and 48. Plaintiff filed its responses in opposition and requested to conduct jurisdictional discovery as it relates to the Court's personal jurisdiction over Defendants Owens, Brendamour and Brendamour Logistics, LLC. The Court ordered that limited jurisdictional discovery for this matter was appropriate and ordered the parties to complete this discovery by December 1, 2023, and to file any supplemental evidence and arguments on the personal jurisdiction issues raised in Defendants' Motions to Dismiss by December 22, 2023. ECF No. 65. After limited discovery was completed, Plaintiff filed a voluntarily dismissal of its claims and causes of action against Defendant Brendamour Logistics, LLC. ECF No. 79. Defendants Michael Brendamour [ECF No. 78] and Paul Owens [ECF No. 82] filed a supplement in support of their respective motions, and Plaintiff filed its supplement in opposition [ECF No. 81]. These Motions are now fully briefed and ready for disposition. For the reasons set forth below, Defendant Michael Brendamour's Motion will be granted because the Court lacks jurisdiction over him pursuant to Federal Rule of Civil Procedure 12(b)(2), and Defendant Paul Owens's Motion will be granted in part and denied in part.

**Background and Facts**

On May 31, 2023, Plaintiff Mayflower Transit, a Missouri limited liability company, filed this action against Defendants Brendamour Moving & Storage, Inc. ("Brendamour Moving"), Brendamour Logistics, LLC, Paul Owens ("Owens") and Michael Brendamour ("Brendamour"). Plaintiff's allegations against Defendants relate to their fraudulent scheme to defraud Plaintiff through Unigroup's billing and reconciliation process.

Plaintiff's Amended Complaint [ECF No. 8] alleges the following, in pertinent part:

UniGroup, one of the nation's largest household goods and logistics organizations, is a cooperative association that delivers transportation solutions for its customers and members, like Plaintiff, including back-office administrative and other support services and systems for its subsidiaries. Plaintiff's agents book hundreds of "moves" every day, which primarily consist of household/residential moves and commercial/logistics transportation services.

<u>Billing and Reconciliation Process</u>

A logistics move typically involves transportation and fuel charges, as well as charges for services provided at origin and destination, typically referred to as "accessorial" charges. In a typical logistics move, the agent receives 93.5% of certain accessorial service revenue as the service provider, and Plaintiff retains 6.5% of that revenue as the carrier of record. For all transactions, the agent is responsible for entering accurate transaction data into the UniGroup system, which includes all customer charges for service, and the customer should be invoiced the same amount that is entered in the system for Plaintiff's transaction. For most transactions, Plaintiff handles the billing and collects revenue directly from the customer. However, for "direct bill" transactions, the agent handles the billing and collects the entire invoiced amount directly from the customer.

UniGroup's billing and reconciliation process for Plaintiff varies depending on whether Plaintiff or the agent handles the billing and collection. When a Plaintiff handles the billing and collection, Plaintiff immediately books 100% of the invoiced amount as revenue and records the appropriate expense. Approximately 93.5% of invoiced accessorial revenue is reflected as an expense and reflects the agent's share. Plaintiff pays that share to the agent through a credit on the agent's agency statement. Plaintiff will then generate an invoice for the transaction, record an account receivable for the transaction, and send an invoice to the customer. The customer will then pay Plaintiff, and it collects the receivable.

When the agent handles the billing and collection in a "direct bill" transaction, Plaintiff still books 100% of the cost of the transaction as revenue and records the appropriate amounts based on varying agent commissions applicable to a shipment. This includes 93.5% of the invoiced accessorial service revenue, and Plaintiff pays the agent's share through a credit on its agency statement. Plaintiff will also generate the invoice and record an account receivable, but the agent sends the invoice to the customer. The customer should then pay the agent directly, though Plaintiff does not know when or if payment occurs. After 45 days, the agent is charged back 100% of the invoiced amount that the agent was supposed to have collected through a debit on its agency statement. UniGroup will typically settle, on a weekly basis, the amounts owed to the agent and amounts owed to Plaintiff based on the net debits and credits on the agency statement. This results in a payment either from Plaintiff, through UniGroup, to the agent if there is a credit balance, or from the agent to Plaintiff, through UniGroup, if there is a debit balance.

<u>Defendants' Fraudulent Scheme</u>

Over the years, Defendant Brendamour Moving, an Ohio Corporation, has migrated from the household goods moving business into the logistics industry, and its primary customers

include several national kiosk-based distribution companies. Brendamour Moving claims to have installed 10,000+ kiosks, or similar items, each year since 2005, including over 30,000 in the last two years. The services offered for the kiosk deployment process include site sourcing, site surveys, site preparation, warehousing, and other services.

Beginning in approximately 2005, Plaintiff alleges that Defendants started a fraudulent scheme (the "scheme") to manipulate the agency statement billing and reconciliation process in their favor to avoid or minimize debit balances owed to Plaintiff. Plaintiff claims that Brendamour Moving entered inflated customer charges in the UniGroup system to reflect a higher amount than actually billed by Brendamour Moving. By inflating the customer charge, Brendamour Moving generated enough expenses through credits to itself to outpace the debit balances owed to Plaintiff for prior transactions. Plaintiff further alleges that Brendamour Moving also placed its settlement process indefinitely "on hold," so that rather than settling cash transactions routinely taking place between Brendamour Moving and Plaintiff, the parties continued to operate based on the running balance of debits and allegedly fraudulent credits on the agency statement. Plaintiff alleges that the scheme allowed Brendamour Moving to wrongfully retain millions of dollars that otherwise should have been paid to Plaintiff through the agency statement reconciliation process.

Additionally, Plaintiff through UniGroup paid Brendamour Moving more than $500,000 in incentive payments between 2012 and 2023, which were mostly based on overstated revenues. Brendamour Moving's alleged fraud also caused Plaintiff to believe its logistics business was performing significantly better than it was actually performing, leading Plaintiff to make certain capital investments that it would not have made if Brendamour Moving accurately reported its revenue information.

Owens's Confession

Owens, an Ohio resident, is the Chief Operating Officer, General Manager, and Controller of Brendamour Moving. In April 2023, Owens contacted a Regional Sales Manager for UniGroup and requested an in-person meeting, who offered to meet him in Louisville, Kentucky. On April 23, 2023, the meeting occurred at a restaurant in Louisville. Another Brendamour Moving employee, Art Whalen, also attended the meeting. During the dinner, Plaintiff alleges that Owens confessed to the scheme and admitted that it has continued almost without interruption since 2005. Plaintiff further alleges that Owens stated that then-owner Michael Brendamour, an Ohio resident, developed the scheme in 2005, which he helped Brendamour Moving implement with the assistance and cooperation of Whelan and Brendamour Logistics. Plaintiff alleges that Owens said Brendamour implemented this scheme because Brendamour Moving owed money to the Internal Revenue Service (IRS) and Plaintiff at the time. After the meeting, UniGroup management immediately reached out to Brendamour Moving and requested financial books and records, which Brendamour Moving was obligated to provide to Plaintiff under the Agency Agreement. Plaintiff claims that Brendamour Moving only provided Plaintiff with limited information, obfuscating the full extent of its fraud.

Accordingly, Plaintiff filed this action alleging Fraud (Count I) and Civil Conspiracy (Count II) against all Defendants, Conversion (Count III) and Breach of Contract (Count V) against Brendamour Moving, and Unjust Enrichment (Count IV) against Brendamour Moving and Brendamour.

Defendants Owens and Brendamour now move to dismiss Plaintiff's Amended Complaint because the Court lacks personal jurisdiction over them pursuant to Federal Rule of

Civil Procedure 12(b)(2). Defendant Owens argues that even if the Court finds it has jurisdiction over him, Plaintiff still fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## Legal Standards

Personal Jurisdiction

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must plead 'sufficient facts to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state.'" *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (quoting *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011)). Plaintiff's prima facie showing must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citations omitted). The Court views the evidence in a light most favorable to Plaintiff and resolves factual conflicts in Plaintiff's favor; however, Plaintiff carries the burden of proof, and that burden does not shift to Defendants. *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).

Personal jurisdiction may be either general or specific. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). "General jurisdiction[1] exists where a defendant is essentially at home in the forum state, whereas specific jurisdiction covers defendants less intimately connected with a State, but only as to a narrower class of claims, namely those that arise out of or relate to the defendant's contacts with the forum." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022). "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a

---

[1] Here, there is no dispute that Brendamour and Owens are not subjected to general jurisdiction in Missouri as Ohio residents.

defendant's actions within the forum state, while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 (8th Cir. 2011).

Specific, or "conduct-linked," personal jurisdiction can be exercised by a federal court in a diversity suit only if authorized by the forum state's long-arm statute and permitted by the Due Process Clause of the Fourteenth Amendment. *Id.* (emphasis added). These are separate inquiries, and both must be met to allow personal jurisdiction over a foreign defendant. *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475–76 (8th Cir. 2012). Missouri's long-arm statute authorizes personal jurisdiction over defendants under several categories including over defendants who transact business or commit a tort within the state. Mo. Rev. Stat. § 506.500.1(1), (3). The categories in the long-arm statute, such as transacting business or making a contract, are construed broadly "to provide for jurisdiction, within the specific categories enumerated in the statute, to the full extent permitted by the Due Process Clause." *State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. banc 1984).

Due process requires that there be "sufficient minimum contacts between a defendant and the forum state so that jurisdiction over a defendant with such contacts may not offend traditional notions of fair play and substantial justice." *Aly v. Hanzada for Import & Export Co., LTD*, 864 F.3d 844, 849 (8th Cir. 2017) (citations and internal quotation marks omitted). Sufficient minimum contacts exist when "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980) (citations omitted). In assessing

7

Defendant's reasonable anticipation, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). Importantly, the relationship between Defendant and the action must arise out of contacts that he creates with the forum state, and contacts between Plaintiffs and the forum state do not satisfy this inquiry. *Id*.

In assessing Defendants' minimum contacts with the forum state, the Court must consider five factors: "1) the nature and quality of contacts with the forum state; 2) the quantity of the contacts; 3) the relation of the cause of action to the contacts; 4) the interest of the forum state in providing a forum for its residents; and 5) convenience of the parties." *Fastpath,* 760 F.3d at 821 (quoting *Dever v. Hentzen Coatings*, 380 F.3d 1070, 1073-74 (8th Cir. 2004)). Courts give "significant weight to the first three factors." *Id.* The third factor speaks to the particular question of specific jurisdiction. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir. 1996). The fourth and fifth factors "carry less weight and are not dispositive." *Downing v. Goldman Phipps*, PLLC, 764 F.3d 906, 912 (8th Cir. 2014) (quoting *Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006)). "In judging minimum contacts, a court properly focuses on the relationship among the defendant, the forum, and the litigation." *Enterprise Rent-A-Car Co. v. U-Haul Int'l, Inc.*, 327 F. Supp. 2d 1032, 1036 (E.D. Mo. 2004) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

<u>Failure to State a Claim</u>

Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a pleading fails to state a claim upon which relief can be granted, an opposing party may move to dismiss it. *See* Fed. R. Civ. P. 12(b)(6). The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing the litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). This court "accepts as true the complaint's factual allegations and grants all reasonable inferences to the non-moving party." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (citations omitted).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, Plaintiff's obligation to provide the grounds of its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. *Iqbal*, 556 U.S. at 678.

**Discussion**

Defendant Brendamour

Here, Plaintiff alleges that Owens told Unigroup's representative that Brendamour initiated the scheme at issue here, which in turn was a tortious act that harmed Plaintiff, a Missouri corporation. Plaintiff claims these factors support personal jurisdiction because the Court can exercise jurisdiction over a corporate officer who has actual or constructive knowledge of and participates in a fraud. Defendant argues that this single allegation to support Brendamour's involvement in the alleged fraud was directly rebutted by Owens's deposition testimony, produced during the limited jurisdictional discovery stage. Plaintiff argues that whether Brendamour has knowledge of the scheme is a factual conflict that must be resolved in its favor at this stage of the proceeding.

The Court begins with the allegations in Plaintiff's Amended Complaint that relate to Brendamour, which are as follows:

> During the dinner, Owens confessed to the above-described fraudulent scheme. Owens stated that *then-owner Michael Brendamour developed the fraudulent scheme beginning in 2005*, which Owens then helped Brendamour Moving implement, with the assistance and cooperation of Art Whelan and Brendamour Logistics. *Michael Brendamour did* so, according to Owens, because Brendamour Moving owed money to the IRS and Mayflower at the time.

ECF No. 8 at ¶ 32 (emphasis added).

The Court next looks to the affidavits and exhibits submitted by the parties in their supplemental motions. The only support Plaintiff supplements as to Brendamour is an interrogatory answer where it described the following instance:

> On May 25, 2023, another video conference was held between representatives of Mayflower and representatives of [Brendamour Moving & Storage, Inc.]. Bob McCabe, Valerie Pacer, and Mark Volansky attended from Mayflower; James Brendamour, Doug Brendamour, Paul Owens, David Brendamour, Jim Ferris (attorney), and a paralegal (Nancy, last name unknown) attended on behalf of [Brendamour Moving & Storage,

10

> Inc.]. *Owens again confirmed he helped [Brendamour Moving & Storage, Inc.] enter invalid and inflated revenue amounts into UniGroup's system and that the scheme began at the direction of [Defendant Brendamour].*

ECF No. 81-3 at ¶ 7 (emphasis in original).

Moving to Brendamour's supplement, he attaches the deposition testimony of Owens taken on November 14, 2023, confirming, under oath, that Brendamour had nothing to do with the scheme as set forth in the Amended Complaint. For instance, in one excerpt, Owens's testimony is as follows:

> Q. You are aware, and we'll get into some of the details in a bit, you are aware that at least according to Tim Grimes, you pointed the finger at Mike Brendamour as being one of the originators of the scheme. You are aware that Tim Grimes has made representations under oath that that's what you told him?
>
> A. I am aware of what I read in those documents, whether the legal part of it, I don't know, but I am aware of what I read in the documents.
>
> Q. And you adamantly deny telling Mr. Grimes that Mike Brendamour had any role in the scheme, fair?
>
> A. *I am certain that Mike Brendamour had no role in the scheme.* I would not have told not only Tim that, but anyone that. However, you know, I also, that meeting at this place took place 7 months ago, but *at no point, regardless to the meeting, at not point was Mike Brendamour aware of this.*
>
> Q. Okay, but, and this is an important point, so I just want to make sure we're very clear, I know you've testified that Mike Brendamour was not involved. As you sit here today do you have any recollection of telling Tim Grimes that Mike Brendamour was involved in the scheme?
>
> A. *No. At no point have I said that to anyone.*

ECF No. 78-1 at 41:16-42:20 (emphasis added).

Another portion of Owens's testimony confirms that he and Whalen were the only individuals involved in the scheme:

> Q. Who was involved in the decision to pursue the scheme?
>
> A. You know, in my position as the General Manager of the company, I was mainly

11

> involved. The mechanics of doing that, I have never logged onto the Mayflower system, so the mechanics of doing so involved a conversation with an employee, but you know.
>
> Q. And which employee was that?
>
> A. Art Whalen, or Arthur Whalen, sorry.
>
> Q. So is this just something that you and Art came up with in 2010, or was there anyone else involved?
>
> A. No, there was not.

*Id.* at 40:2-24.

Owens continued to confirm the lack of Brendamour's involvement in the scheme in the following two excerpts:

> Q. At any point in time before this lawsuit was filed, are you aware of Mike Brendamour knowing about the scheme?
>
> A. No, absolutely not.

*Id.* at 41:9-15.

> Q. So was Mike Brendamour involved in any way with the over-reporting scheme that as alleged in plaintiff's Complaint?
>
> A. No, he was not.

*Id.* at 96:24-97:2.

Owens also confirmed that he never gave financial statements to Brendamour and that he never confirmed Brendamour's involvement in the May 25, 2023, video conference mentioned in Plaintiff's Supplement above. *Id.* at 99:21-100:8, 101:8-19.

Although "[t]he evidentiary showing required at the prima facie stage is minimal," *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) (internal quotation marks omitted), the "showing must be tested, not by the pleadings alone, but by the affidavits and exhibits" supporting or opposing the motion, *Dever,* 380 F.3d at 1072 (internal quotation marks omitted).

12

Plaintiff has failed to meet its burden to make a prima facia showing that personal jurisdiction exists as required. Both of Plaintiff's allegations linking Brendamour to the scheme are directly refuted by the testimony and affidavit of Owens. Jurisdictional discovery has failed to establish any facts that support jurisdiction over Brendamour. Based on this determination, the Court also finds that the first three factors, the nature, quality, and quantity of Brendamour's contacts with the state of Missouri, are insufficient for the Court to exercise personal jurisdiction over him. Plaintiff does not allege any factual allegation to support "minimal contacts" with Missouri. Without prima facia support connecting him to the scheme, there is nothing that shows he has "contacts, ties or relations" to the forum state. Additionally, Brendamour attested in his affidavit that he was president of Brendamour Moving until 2004 when he resigned from his leadership role. ECF No. 48 at pg. 13-14. He held an ownership interest in and worked for the company until 2020 in sales of household goods and was not involved in special product accounts, including kiosks. *Id*. Brendamour swears that he does not conduct business in Missouri or own a residence, sell goods or contract there. *Id.* at pg. 13. The Amended Complaint and jurisdictional discovery clearly supports that Defendant Brendamour Moving started the scheme to manipulate the agency statement reconciliation process to defraud Plaintiff, but there is no factual support to establish that Brendamour engaged in the alleged fraudulent activity to connect him to have engaged in "some act by which [he] purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King,* 471 U.S. at 475.

      For the fourth factor, while Missouri certainly has an interest in providing its residents with a forum, that interest "cannot make up for the absence of minimum contacts." *Digi–Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.,* 89 F.3d 519, 525 (8th Cir. 1996). The same is

13

true of the last factor, party convenience. Therefore, this Court cannot exercise personal jurisdiction over Brendamour as due process requires that a cause of action arise out of or relate to his conduct in a forum state; here, the facts fail to support that Defendant's conduct is sufficient.

Plaintiff also argues that it properly has personal jurisdiction over Brendamour under the "effects test" set forth in *Calder*, 465 U.S. 783. This test "allows the assertion of personal jurisdiction over non-resident defendants whose acts are performed for the very purpose of having their consequences felt in the forum state." *Johnson*, 614 F.3d at 796 (8th Cir. 2010) (quoting *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390–91 (8th Cir. 1991)). More specifically, the "effects test" provides that:

> [A] defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state].

*Id.* (citation omitted).

The *Calder* test is used "merely as an additional factor to consider when evaluating a defendant's relevant contacts with the forum state," and is construed narrowly, meaning that "absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction." *Id.* at 796–97. The *Calder* test does not alter the assessment of Brendamour's contacts with Missouri. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* It is clear that Plaintiff suffered its injury in Missouri, but as stated above, Plaintiff has not made a prima facia showing that Brendamour was involved in the scheme, or any tortious or intentional acts, that were "uniquely or expressly" aimed in Missouri. In sum, the Court finds that Plaintiff failed to show that Brendamour could "reasonably anticipate being haled into

court" in Missouri, and the Court lacks personal jurisdiction over him.[2] *See World-Wide Volkswagen*, 444 U.S. at 286.

<u>Defendant Owens</u>

*Personal Jurisdiction*

The essence of Plaintiff's claims against Owens is that he committed a tortious act, to wit, confessing his involvement and responsibility for the scheme that caused injuries to Plaintiff in Missouri. For instance, Plaintiff's Amended Complaint alleges that, Owens, the Chief Operating Officer, General Manager, and Controller of Brendamour Moving, admitted to the fraudulent scheme against Plaintiff in April 2023. The Amended Complaint further alleges that Owens's confessed that Brendamour Moving owed money to the IRS and Plaintiff when the scheme was initiated years ago, and the scheme had continued almost without interruption since 2005. During the limited jurisdictional discovery stage, Owen's deposition testimony on November 14, 2023, showed that he again confessed to the scheme. As addressed s*upra*, Owens admitted that he was the person "mainly involved" in the scheme as the General Manager, and his direct report, Whalen, logged the inflated customer information into the system at Owen's direction. The Amended Complaint and jurisdictional discovery support, for the purposes of this Order, that Defendant Owens engaged in the scheme with Brendamour Moving to manipulate the agency statement reconciliation process to defraud Plaintiff. The Court notes that an individual is not protected from liability simply because the acts constituting the tort "were done in the scope and course, and pertained to, the duties of his employment." *Curlee v. Donaldson*, 233 S.W.2d 746, 754 (Mo. App. 1950). If the rule were otherwise, "the agent of a corporation could shield

---

[2] Because the Court finds that due process does not permit the exercise of specific personal jurisdiction over Brendamour, it will not address the applicability of Missouri's long-arm statute.

himself from liability for almost every kind of wrong, provided he was acting in the capacity of agent...." *Boyd v. Wimes*, 664 S.W.2d 596, 598 (Mo. Ct. App. 1984). Under Missouri law,[3] corporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong. *Id.* Plaintiff's claims against Owens are in his individual capacity.

Using the Eighth Circuit's five factor test to examine whether Owen's contacts are sufficient, it appears this Court does have personal jurisdiction over him. For the first and second factors, the nature and quality of Owens's contacts appear substantial. Plaintiff alleges that Owens, the Chief Operating Officer, General Manager, and Controller of Brendamour Moving, had actual knowledge of the tortious wrongful conduct in Missouri to Plaintiff and that he knowingly participated in it. Plaintiff is a Missouri corporation, with its principal place of business in Fenton, Missouri. Owens admitted that he travelled to Plaintiff's office in Missouri on behalf of Plaintiff, which is around the time the scheme is alleged to have commenced. ECF No. 46-1 at pg. 1. Third, the cause of action is directly related to his commission of a tortious act against Plaintiff. Fourth, Missouri has an interest in providing a forum for its residents, especially in a lawsuit where its residents were harmed by a tortious act, like alleged here. Fifth, even if Owens is inconvenienced by an action in Missouri, the other factors heavily outweigh inconvenience as he could have reasonable foreseen that his actions would have consequences in Missouri. These allegations are sufficient to assert personal jurisdiction over Owens. His activities and contacts with the state of Missouri are sufficient to meet the state long-arm requirements and the Due Process requirements of the Fourteenth Amendment. As a result, the

---

[3] Since this action was brought pursuant to this Court's diversity of citizenship jurisdiction, 28 U.S.C. § 1332, Missouri State Law applies to the substantive issues. *Winthrop Res. Corp. v. Stanley Works*, 259 F.3d 901, 904 (8th Cir. 2001).

Court finds that Plaintiff has made a prima facie showing of personal jurisdiction by alleging facts sufficient to support a reasonable inference that Owens can be subjected to jurisdiction within the state of Missouri.

*Failure to State a Claim*

Plaintiff claims Fraud (Count I) and Civil Conspiracy (Count II) against Owens, and he contends Plaintiff fails to state a claim upon which relief can be granted as to each of these counts.

The Court first addresses Plaintiff's civil conspiracy claim. The parties agree that to make a prima facie showing of a claim for civil conspiracy, Plaintiff must present evidence showing: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in further of the conspiracy; and (5) the plaintiff was thereby damaged. *Western Blue Print Co. LLC v. Roberts*, 367 S.W.3d 7, 22 (Mo. banc 2012). Here, Plaintiff cannot make such a showing because "[t]here can be no conspiracy between an agent and a principal." *Mika v. Central Bank of Kansas City*, 112 S.W.3d 82, 94 (Mo. App. 2003). Plaintiff initially argued that because Brendamour Logistics was a defendant in this case, it was allowed to bring this claim. However, after jurisdictional discovery was completed, Plaintiff voluntarily dismissed its claims against Brendamour Logistics. "[T]he general rule holds that a corporation cannot conspire with its own employees." *Id.* It is undisputed that Owens is an employee of Brendamour Moving & Storage. As a matter of law, he could not have conspired with Brendamour Moving & Storage. *Id.* Therefore, Count II as to Owens will be dismissed.

Moving to the fraud claim against Owens, Plaintiff must "state with particularity the circumstances constituting fraud or mistake" to survive a motion to dismiss. Fed. R. Civ. P. 9(b). If a plaintiff alleges that a systematic practice of fraud exists, like in this case, a plaintiff "must

17

provide some representative examples of [defendant's] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors." *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006). Put a different way, the pleader must generally set forth the "who, what, when, where, and how of the misconduct charged." *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) (internal quotation marks and quoted cases omitted). However, "[h]ighly specific allegations" are not required under Rule 9(b), especially when the claim relies on facts that are known only to the defendants. *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 921 (8th Cir. 2001).

Owens argues that Plaintiff fails to plead fraud with required particularity to satisfy the Rule 9(b). The Court disagrees. Plaintiff's Amended Complaint alleges the following: Defendants started the fraudulent scheme in 2005 and manipulated the agency statement reconciliation process in their favor to avoid or minimize debit balances owed to Plaintiff by entering inflated customer charges in the UniGroup system to reflect a higher amount than actually billed by Brendamour Moving. ECF No. 8 at ¶¶ 21-27, 37-42. Plaintiff further alleges that Brendamour Moving also placed its settlement process indefinitely "on hold" to avoid settling cash transactions, and the scheme allowed Brendamour Moving to wrongfully retain millions of dollars that otherwise should have been paid to Plaintiff. *Id.* at. ¶¶ 25-27. In April 2023, Owens, the Chief Operating Officer, General Manager, and Controller of Brendamour Moving, confessed to a Unigroup representative that he helped Brendamour Moving implement the scheme. *Id.* at ¶ 32. Owens also admitted that with the assistance and cooperation of Whelan, the scheme has continued almost without interruption since 2005. *Id.* Owens said that he believed the scheme was implemented because Brendamour Moving owed money to the IRS and Plaintiff at the time. *Id.*

The Court finds that these factual allegations sufficiently encompass the "who"—Defendants Brendamour Moving and Owens; the "what"— the agency statement reconciliation process and inflated customer charges; the "where"—the Unigroup system; the "when"—2005 to April 2023, and the "how"—by entering inflated customer charge to reflect a higher amount than actually billed by Brendamour Moving to avoid or minimize debit balances owed to Plaintiff and placing the settlement process indefinitely "on hold" to further avoid paying Plaintiff what it was entitled to. Presuming that these facts are true and granting reasonable inferences in Plaintiff's favor, its allegations of fraud as to Owens are sufficiently pled at this stage of the proceeding.

## Conclusion

For the reasons set forth above, the Court will grant Defendant Michael Brendamour's Motion to Dismiss for lack of jurisdiction and will grant in part and deny in part Defendant Paul Owens's Motion to Dismiss.

Accordingly,

**IT IS HEREBY ORDERED** that the exercise of personal jurisdiction over Defendant Michael Brendamour does not comport with due process, and Defendant Brendamour Motion to Dismiss is **GRANTED** [ECF Nos. 48 and 78].

**IT IS FURTHER ORDERED** that Defendant Paul Owens's Motion to Dismiss is **GRANTED in part and DENIED in part** [ECF Nos. 45 and 82] and Count II will be dismissed as to Defendant Owens only.

Dated this 28th day of March, 2024.

                                                 **JOHN A. ROSS**
                                               **UNITED STATES DISTRICT JUDGE**