

## AGENCY AGREEMENT

**THIS AGREEMENT**, made and entered into by and between MAYFLOWER TRANSIT, LLC ("Mayflower"), with its principal place of business located at One Mayflower Drive, Fenton, Missouri 63026, operating as a common carrier, contract carrier, freight forwarder and freight broker pursuant to authorities issued by the U.S. Department of Transportation ("DOT"), various state regulatory agencies, or as otherwise permitted by law, hereinafter referred to as the "Carrier," and the party whose name is set forth on Page 7 hereof, hereinafter referred to as the "Agent."

**WITNESSETH**:

That, in consideration of the mutual covenants and agreements hereinafter to be kept and performed by the parties hereto, the Carrier hereby appoints the Agent, except as herein provided, as its non-exclusive agent solely for the purposes hereinafter set forth, and the Agent accepts such limited appointment subject to the following terms and conditions, namely:

1. **DEFINITIONS**:

   When used in this Agreement:

   A. "Carrier" shall mean Mayflower, its parent corporation and any corporation or entity which is or may be under the common ownership or control of either of them, including subsidiaries or affiliates or their respective successors and assigns.

   B. "Carrier Policy(ies)" shall mean such rules, regulations, procedures and directives issued by the Carrier or directives and decisions of the Carrier's Board of Directors, whether now existing or as may be issued or amended from time to time during the term of this Agreement, all of which are or shall be adopted and incorporated herein by reference.

   C. "Foreign Commerce" shall mean Transportation Services offered or provided by the Carrier or by the Agent outside the borders of the continental United States, including, but not limited to, Mexico, Hawaii and Alaska.

   D. "Interstate Commerce" shall mean Transportation Services offered or provided by the Carrier or the Agent between a state and a place in another state, or within a state to the extent classified as interstate by a regulatory authority or court, including shipments from points in the United States to Canada and from points in Canada to the United States, but excluding Foreign Commerce.

   E. "Pooling Plan" shall mean the plan of the Carrier, as amended or modified from time to time, approved or accepted by the DOT or appropriate authority with respect to Transportation Services in Interstate or Foreign Commerce, and/or a plan adopted by the Carrier in addition to or in lieu of the Pooling Plan, which plan may cover any and all incidents of Transportation Services.

   F. "Shipment(s)" shall mean goods or personal property of any type or character owned, in the possession of, or in control of a person, firm, partnership, corporation, or governmental entity, and which are transported by motor vehicle, rail, air or ship, intrastate commerce to the extent transported under Carrier operating authorities, Interstate Commerce or Foreign Commerce under Carrier Policies, including, but not limited to, household goods, general commodities, show-and-display exhibits, special commodities and electronic equipment.

   G. "Transportation Service(s)" shall mean each and every service now or hereafter offered and provided by the Carrier or the Agent to the general public, private shippers or to any and all branches of the federal government and state and local governments covering the transportation and services related thereto of Shipments in intrastate commerce to the extent transported under Carrier operating authorities, Interstate Commerce or Foreign Commerce, whether by motor vehicle, air, rail or sea. This definition shall include all forms by which such transportation may be arranged including brokerage, forwarding, relocation and all other third-party services of any type, character or nature.

1

2. **RESPONSIBILITIES OF THE AGENT ARE:**

A. To act as an agent of the Carrier from the address shown for the Agent on Page 7 of this Agreement (the "Location"), solely in matters within the scope of this Agreement, and to have no authority to act for the Carrier in any manner not specifically provided for herein. The Agent may not establish a sales office, office facility, branch office, warehouse or any other type of facility for any reason whatsoever at any location other than the Location unless prior written permission is first received from the Carrier; provided that this provision shall not be applicable to a business of the Agent unrelated to the scope, terms and conditions of this Agreement, unless the business is identified with the Carrier.

B. To solicit and participate in the rendering of Transportation Services in intrastate commerce to the extent transported under Carrier operating authorities, Interstate Commerce, or Foreign Commerce by the Carrier. Such Transportation Services include, but are not limited to, Shipments whether for the general public, private shippers or any governmental entity under either common carrier or non-common carrier arrangements.

C. Unless approved by the Carrier, to advertise the Transportation Services of the Carrier only at the Location set forth in this Agreement by the use of such approved advertising media as the Carrier and Agent shall agree, provided all such advertising shall be at the expense of the Agent.

D. To use the name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination owned by and/or used by the Carrier in connection with any advertising or solicitation as an agent for the Carrier, including the painting and lettering of vehicles belonging to or under the control of the Agent, provided the use of such name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination is strictly in accordance with Carrier Policies respecting use of the Carrier's name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination and advertising; and may not be used to promote the services of any entity other than the Carrier. It is recognized that the name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination is owned by the Carrier and at all times remains the property of the Carrier.

E. Subject to the Pooling Plan and Carrier Policies, the Agent may use its own operating authority as granted by the DOT or state agencies.

F. Any sale, change of control or form of business organization, transfer of ownership of the Agent, or change in ownership interest of the Agent shall be in accordance with Carrier Policies and shall not be effective until approved by the Carrier.

G. This Agreement is personal in nature. Any attempted transfer of this Agreement by operation of law or otherwise without the prior written consent of the Carrier is void and shall be a willful breach of this Agreement.

H. This Agreement, and/or any rights thereunder, including rights to any monies from the Carrier, shall not, under any circumstances, be the subject of a sale, security interest, lien, levy, attachment or execution, unless the Carrier shall have given the Agent prior written authorization to create such encumbrance.

I. The Agent shall at all times have in effect insurance coverage required by Carrier Policies. The Agent shall furnish the Carrier a certified copy of all required insurance policies in force, naming the persons insured and certifying that the coverage may not be cancelled, altered or permitted to lapse or expire without thirty (30) days advance written notice to the Carrier. Minimum requirements shall be that such insurance coverage shall name the Carrier as an additional-named insured and shall provide for a waiver of subrogation against the Carrier.

3. **THE DUTIES OF THE AGENT SHALL BE:**

   A.   To represent the Carrier in an active and aggressive manner in selling Transportation Services of the Carrier, provided that the Agent shall, in all of its solicitation activities, comply with Carrier Policies, federal and state laws, and the rules and regulations of the DOT and all other appropriate and applicable governmental agencies, and the effective tariffs and contracts of the Carrier.

   B.   To solicit Transportation Services for the Carrier.

   C.   To assist in the investigation and adjustment of claims for loss or damage to Shipments transported under the operating authority of the Carrier, provided that all such adjustments shall be made under the direction of and in accordance with Carrier Policies. The Agent shall participate in the investigation of any such claim only to the extent directed by the Carrier and shall not have authority to adjust or pay any claim except when authorized to do so by the Carrier. The Agent further agrees to comply with all claim handling and reporting policies of the Carrier and with the rules and regulations of the DOT or any other governmental agency having jurisdiction when such rules and regulations are applicable.

   D.   To assist, under the direction of the Carrier, in dispatching vehicles and to aid in prompt and efficient handling of the business of the Carrier.

   E.   To assist shippers in preparing Shipments, including, but not limited to, estimating weights and charges, obtaining signatures on contracts and other documents as may be required, and to generally perform other origin or destination services requested by the Carrier and/or the booking agent as may be required.

   F.   To keep accurate and detailed books, records and financial statements ("Records") that relate directly or indirectly to the performance of the Agent under this Agreement, which shall be kept and prepared in accordance with Carrier Policies, and the Carrier shall have the right at all times during normal business hours to inspect the Location and such Records.

   G.   To furnish accessorial services for the Carrier at the rates established by the Carrier.

   H.   To accept and process orders for the Carrier's Transportation Services, subject to acceptance by the Carrier. All such orders shall be written in strict compliance with Carrier Policies and the Carrier's applicable rates and charges, and the Agent shall be without authority to deviate therefrom.

   I.   To collect charges on prepaid Shipments booked by the Agent and show the charges as prepaid on the billing; to collect charges on COD Shipments; and to collect the remainder of any unpaid charges on prepaid Shipments hauled on the Agent's equipment, in cash, money order, certified check or other means of payment authorized by the Carrier prior to the unloading of the Shipments, except as provided in Paragraph 3J herein, and remit same promptly to the Carrier, in accordance with Carrier Policies.

   J.   To seek appropriate endorsement upon the freight bill, or upon the Carrier's direction, extend credit or direct that credit be extended for the payment of charges upon a Shipment booked, hauled or delivered by the Agent. Such credit is to be extended and charges are to be collected in compliance with Carrier Policies, the regulations of the DOT or any other governmental agency having jurisdiction over the Shipment. Where credit is extended on a Shipment by the Carrier as arranged by the Agent, the Agent assumes and guarantees the payment of charges upon such Shipment unless the Carrier has approved in advance the extension of credit for such Shipment.

   K.   To pay the cost of telephone calls or any other communications to the Carrier concerning the business of the Carrier or the Agent, in accordance with Carrier Policies.

3

    L.    To assist the Carrier by preparing all necessary documents required by Carrier Policies or by the DOT or other governmental body having jurisdiction over the Transportation Services and to promptly deliver said documents to the Carrier.

    M.    To promptly relay to the Carrier any communications pertaining to the transportation of Shipments.

    N.    To provide space for, and services in connection with, the storage-in-transit of Shipments in custody of the Carrier at rates and charges established by the Carrier.

    O.    To promptly furnish the Carrier such financial or other information as may be required by Carrier Policies, the rules and regulations of the DOT or other governmental agency having jurisdiction when such rules and regulations are applicable.

    P.    To appoint an origin or destination agent when the Agent is at a point other than point of origin or destination and the Agent is not prepared to perform the necessary origin Transportation Services as described in Paragraph 3E for a shipper; and the Agent agrees the Carrier will divide the appropriate compensation in accordance with Carrier Policies.

    Q.    To appoint an agent of the Carrier as origin agent when the Agent secures an order involving a Shipment originating from the warehouse of an agent of the Carrier; and the Agent agrees the Carrier will divide the booking compensation in accordance with Carrier Policies.

    R.    To register with the Carrier all Shipments in Interstate Commerce and Foreign Commerce strictly in accordance with the Pooling Plan and Carrier Policies.

    S.    To provide to van operators qualified labor to assist in the packing, loading or unloading of Shipments in accordance with Carrier Policies at rates established by tariffs, the Pooling Plan or Carrier Policies.

**4.    THE DUTIES OF THE CARRIER SHALL BE:**

    A.    To compensate the Agent for Transportation Services rendered in accordance with Carrier Policies and the Pooling Plan, including paying to the Agent a commission on Shipments booked by the Agent or upon Shipments concerning which the Agent has performed Transportation Services, which are accepted and serviced by the Carrier at rates established by Carrier Policies.

    B.    To compile and render statements to the Agent in accordance with Carrier Policies, which statements shall include all debits and credits, and to remit to the Agent the net credit balances shown thereon in accordance with Carrier Policies. As requested by the Carrier, the Agent agrees that within forty-eight (48) hours after receipt of a statement the Agent shall remit to the Carrier the net debit balances shown thereon.

    C.    To furnish the Agent, at the Agent's cost, necessary forms for the booking and processing of Shipments to be handled by the Carrier.

    D.    To keep the Agent informed as to applicable rates and charges of the Carrier and as to applicable Carrier Policies.

    E.    To provide Transportation Services for all Shipments booked by the Agent and accepted by the Carrier in suitable equipment and as promptly as operating conditions will warrant.

    F.    To reasonably undertake the collection of advanced charges for Transportation Services performed and paid for by the Agent for Shipments accepted by the Carrier for Transportation Services, and to remit same to the Agent, provided the Agent properly incurred such charges earned or advanced.

    G.    To pay the cost of communications to the Agent concerning the business of the Carrier.

      H.    To establish rates and charges for the rendering of Transportation Services. Such rates and charges as are subject to the jurisdiction of the DOT or other governmental agency shall be established by the Carrier in conformity with the laws and regulations applicable to such rates and charges.

5. **GENERAL PROVISIONS:**

      A.    The Agent hereby recognizes the Carrier's property right and interest in the Carrier's name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination used by the Carrier. The license granted the Agent hereunder to use the same shall be a limited license, personal in scope and nature to the Agent, and shall cease with the termination of this Agreement, without any right, title or interest accruing to the Agent to use such thereafter.

      B.    The Carrier and Agent agree that each of them is an independent business and that each is an independent employer. Further, the Carrier and Agent agree that the scope, power and authority of the Agent to represent the Carrier is limited to those matters within the scope of this Agreement, and the Agent shall have no right, power or authority to act for or on behalf of the Carrier in any manner not specifically provided for herein. In addition, the Carrier and Agent intend and agree that all persons utilized by the Agent in performing services hereunder shall be deemed to be employees of the Agent or as having an independent-contractor status with the Agent, but not the Carrier. The parties agree that they have not established a partnership, cooperative, joint venture, franchise or any other business relationship. The parties further agree that, except to the extent specifically set forth in this Agreement, the Agent shall have no right, power or authority to act for or to obligate the Carrier in any manner or form.

      C.    The Agent shall not act in any other capacity for, nor sell or attempt to sell the Transportation Services of any other entity other than the Carrier or the Agent unless, and except as, such relationship is authorized or restricted by Carrier Policies. The term "other entity" includes, but is not limited to, common or contract carriers, forwarders, brokers, relocation companies or services, shipper's agents or any other carrier or third-party service. The Agent shall not undertake such representation either directly or indirectly, personally or through any other entity, including, but not limited to, through any subsidiary or affiliated corporation, partnerships, trust arrangements or in any other manner wherein the Agent or the individual in control of or owning any interest in the Agent, has effective control of such other entity, except that the Carrier shall not adopt a Carrier Policy with respect to Foreign Commerce which shall prohibit an agent from selling or attempting to sell agent services.

      D.    The Agent will not, as the name or style of any business which the Agent conducts, controls, has an interest in or is connected with, whether as an individual, a partner, a trustee, an officer or stockholder, use the name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination used by the Carrier or any name, terms or designs which, in the sole opinion of the Carrier, are so similar thereto that such may be taken for or confused with the Carrier in whole or in part, directly or indirectly.

      E.    The Agent has no more authority as to the Carrier than what is expressed in this Agreement and the Agent will not hold himself out, whether by advertising, by direct or indirect communication whether oral or written, or by any other means or manner, as having any greater authority than herein set forth or as occupying any different or broader relationship with the Carrier than that of an agent limited in authority when acting on behalf of the Carrier, solely in the performance of the duties imposed upon the Agent as expressly provided for herein.

      F.    The Agent will not, when operating pursuant to any certificate or permit issued to the Agent by the DOT or any other governmental agency or operating other than as an agent for the Carrier in accordance with this Agreement and Carrier Policies, cause to be conveyed to any third party the impression or belief nor make the express or implied representation that the Agent is then acting on behalf of the Carrier.

G. Both parties agree that it is necessary to establish certain high standards in general operating policies for the benefit of its customers and the Agent further agrees to accept assessments made from time to time by the Carrier in maintaining said standards.

H. The Agent agrees to contribute to the general advertising fund of the Carrier in accordance with Carrier Policies.

I. It is understood that all sums collected by the Agent for all services performed by the Carrier or in the name of the Carrier immediately become the property of the Carrier, and the Agent receives such sums only as an agent of the Carrier and not in its own right, in accordance with Carrier Policies.

J. Upon the termination of this Agreement, by cancellation or otherwise, the Agent shall discontinue the use of the Carrier's name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination and shall surrender and return to the Carrier all forms, advertising material and manuals furnished by the Carrier. If the Agent shall fail, neglect or refuse to discontinue the use of the Carrier's name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination, or any one or more of them, within thirty (30) calendar days after such termination (except as to telephone listing and advertisements in telephone directories which shall be terminated with the next issue of the publication in which they appear), the Agent shall pay to the Carrier for such failure, neglect or refusal, liquidated damages as hereinafter provided for each and every day beyond such thirty (30) calendar-day period during which it failed, neglected or refused to discontinue the use or misappropriation of any such name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination, together with the costs, including attorneys' fees of enforcing this provision. It is expressly agreed between the parties that the exact amount of damage which will be sustained by the Carrier in event of the failure of the Agent to comply with the foregoing will be difficult, if not impossible, to determine and that the sum of Two Hundred Fifty Dollars ($250.00) per day is agreed to between the Carrier and Agent for the purpose of liquidating the amount of the Agent's liability to the Carrier and not as a penalty.

K. The Carrier may terminate this Agreement for any cause, or without cause, upon ten (10) calendar days' prior notice in writing to the Agent, provided however, that in the event of acts of gross misconduct or willful breach of this Agreement by the Agent, the Carrier may terminate this Agreement immediately upon notice to the Agent. This Agreement may be terminated by the Agent for any cause, or without cause, upon ninety (90) days' prior written notice to the Carrier. Any notice provided for in this paragraph shall be deemed to have been given the day it shall be delivered personally or deposited in the United States mail, certified, postage prepaid, addressed to the party entitled to receive such notice at the principal place of business of such party, as the address of the principal place of business of such party shall have been furnished by it to the other.

L. Upon the giving or receipt by the Carrier of notice of termination, the Carrier is authorized to withhold any sums which may be due the Agent, pending the Carrier's final accounting of and adjustments to any such balances. The Carrier shall render such final accounting and make all adjustments to such balances no later than one hundred and eighty (180) days from the effective date of termination of this Agreement. At the time the Carrier renders such final accounting and has made all adjustments, the Carrier shall remit to the Agent or the Agent shall remit to the Carrier, as the case may be, any sums which may be due. Until the Carrier renders such final accounting, the Agent shall have no interest in or right and title to any monies which may be due from the Carrier. As part of the final accounting and adjustment, the Carrier reserves for itself, and for any of its subsidiaries or affiliates, the right to set off amounts due the Agent by the Carrier and/or the Carrier's subsidiaries or affiliates against amounts due from the Agent or any subsidiaries or affiliates of the Agent to the Carrier and/or the Carrier's subsidiaries or affiliates; provided further, the Carrier shall not be required to pay any amount to the Agent in the event of termination of this Agreement until the Agent has satisfied all amounts owed to the Carrier and/or any of the Carrier's subsidiaries or affiliates.

M. The Agent will indemnify the Carrier against, hold it harmless from and promptly reimburse it for, any and all payments of monies (fines, damages, settlement amounts, expenses,

6

attorneys' fees, court costs, judgments and the like), by reason of any claim, demand, tax, penalty or judicial or administrative investigation or proceeding arising from any actual or claimed occurrence involving the Agent or any act, omission or obligation of the Agent or anyone associated or affiliated with the Agent or acting on behalf of the Agent. At the election of the Carrier, the Agent shall also defend the Carrier against the same. The Carrier shall have the right, through counsel of its choice, to control any matter to the extent it could directly or indirectly affect the Carrier.

N. This Agreement shall be interpreted in accordance with the laws of the State of Missouri. The Carrier and Agent agree that, except as hereinafter provided in Paragraph 5Q hereof, the United States District Court for the Eastern District of Missouri shall be the exclusive forum for the resolution of any dispute arising from or under this Agreement.

O. The remedies provided in this Agreement are nonexclusive, and its provisions are severable.

P. It is understood that as to such Transportation Services as are subject to the jurisdiction of the DOT, all arrangements between the Carrier and Agent shall conform to the laws and regulations applying to such Transportation Services including the Pooling Plan and Carrier Policies.

Q. The Agent agrees that in consideration of the agreement by the Carrier to license the use by the Agent of the Carrier's name, logo, trademark, service mark, trade name, trade dress or design of lettering and color combination and as a further inducement for the Carrier to execute this Agreement, the Agent agrees that the Carrier shall have the sole right, power and authority within its discretion to approve or disapprove the appointment of its agents, the location of such agents, and the arrangements through which agent conducts business on behalf of the Carrier. Further, the Agent, by and through the execution of this Agreement, agrees and consents that the Carrier shall have the sole right, power and authority to resolve any and all disputes covering the appointment of its agents, the location of its agents, disputes between and among its agents involving the business of the Carrier or the manner in which the Agent conducts business on behalf of the Carrier and the Agent shall be bound by the determination of the Carrier in such matters.

R. This is the entire Agreement between the Carrier and Agent and supersedes all previous agreements between the parties. No change in this Agreement shall be valid unless made in writing and signed by both parties. No failure to require strict performance or to exercise any right or remedy hereunder will preclude requiring strict performance or exercising any right or remedy in the future. Any notice required to be given by one party to the other will be effective hereunder when and only when placed in writing and delivered personally or deposited in the United States mail, certified, postage prepaid to the appropriate party.

This Agreement has been executed in multiple copies, with at least one copy for each party, and all said executed copies shall be deemed originals.

IN WITNESS WHEREOF, the parties have executed this Agreement this _25th_ day of _AUGUST 25_, 200_8_.

**AGENT:**

M777   **BRENDAMOUR MOVING & STORAGE, INC.**
2630 Glendale-Milford Road
Cincinnati, OH 45241

By: _____
Signature
Title: _CHAIRMAN/CEO_

**CARRIER:**

**MAYFLOWER TRANSIT, LLC**
One Mayflower Drive
Fenton, Missouri 63026

By: _____
Signature
Title: DIRECTOR BUSINESS DEVELOPMENT

7