UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MAYFLOWER TRANSIT, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:23CV708 JAR |
| | ) |
| BRENDAMOUR MOVING & STORAGE, | ) |
| INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff Mayflower Transit, LLC's Motion for Partial Summary Judgment on its breach of contract claim [ECF No. 106] and on Defendant Brendamour Moving & Storage, Inc.'s Cross-Motion for Partial Summary Judgment on the same claim [ECF No. 112]. These Motions are fully briefed and ready for disposition.

**I.      Background and Facts**

Plaintiff Mayflower Transit, LLC ("Mayflower"), a subsidiary of UniGroup, C.A. ("UniGroup") based in Fenton, Missouri, provides transportation services as a motor carrier. [ECF No. 94 at 1]. Defendant Brendamour Moving & Storage, Inc. ("Brendamour Moving"), based in Cincinnati, Ohio, is a warehousing, moving, and storage company, and acted as an agent of Mayflower from 1991 until May 31, 2023. [*Id*. at 2].

In 2008, Mayflower and Brendamour entered into an Agency Agreement requiring Mayflower to "compile and render statements to [Brendamour Moving] in accordance with Carrier Policies, which shall include all debits and credits, and to remit to [Brendamour Moving] the net credit balances shown thereon." [ECF No. 108-1 at 4]. In turn, "[Brendamour Moving] agrees that within forty-eight (48) hours after receipt of a statement [Brendamour Moving] shall remit to

1

[Mayflower] the net debit balances shown thereon." [*Id*.].

The above-referenced Carrier Policies are defined by the Agency Agreement as "such rules, regulations, procedures and directives issued by [Mayflower] or directives and decisions of [Mayflower's] Board of Directors, whether now existing or as may be issued from time to time during the term of this Agreement, all of which are or shall be adopted and incorporated herein by reference." [ECF No. 108-1 at 1]. The Policies set out that "[e]ach agency is expected to monitor weekly statement balances and remit payment to clear any debit balances prior to the next statement closing." [ECF No. 108-3 at 20]. The Policies also make agents like Brendamour Moving responsible for recording "accurate information." [*Id*. at 15].

When Mayflower handles the billing and collection with agents, "Mayflower immediately books 100% of the invoiced amount as revenue and records the appropriate expense, which is based on varying agent commissions applicable to a shipment. Approximately 93.5% of invoiced accessorial revenue is reflected as an expense (reflecting the agent's share of the revenue). Mayflower pays that share to the agent through a credit on the agent's agency statement. Mayflower will then generate an invoice for the transaction, record an account receivable for the transaction, and send an invoice to the customer. The customer will pay Mayflower, and Mayflower collects the receivable." [ECF No. 94 at 4]. "Typically, weekly, UniGroup will settle the amounts owed to the agent and amounts owed to Mayflower based on the net debits and credits on the agency statement, resulting in a payment either from Mayflower (through UniGroup) to the agent (if the agent has a credit balance) or from the agent to Mayflower (through UniGroup) (if the agent has a debit balance)." [*Id*. at 4-5].

During its agency relationship with Mayflower, Brendamour Moving reported inflated sales amounts that it never billed to nor collected from any customers. [ECF No. 114 at 1]. By

2

doing this, Brendamour Moving obtained from Mayflower credits to its agency account in amounts greater than the actual sales order it had received from customers. In this way, Brendamour Moving was essentially able to borrow funds. Relying on no-commission accessorial services, Brendamour Moving received the inflated credits to its agency account without incurring any corresponding debits for any commission or retention on the inflated sales it reported. [ECF No. 113 at 4].

In 2016, "Mayflower started automatically debiting Brendamour Moving's agency account for a 6.5% commission on what – until that time – had been the no-commission accessorial sales that Brendamour Moving had been relying on." [*Id*. at 5]. As a result, the system automatically debited "Brendamour Moving for a 6.5% commission on sales that had never occurred and on revenues that Brendamour Moving had never billed for or received." [*Id*. at 6]. The "6.5% retention on accessorial sales had a compounding effect on the amounts required to offset the weekly debit balance in Brendamour Moving's agency account with Mayflower." [*Id*.]. "The more that Brendamour Moving would report as an inflated accessorial sale, the more that the UniGroup Agency Account System would debit as a retention to Brendamour Moving's agency account. And the more that would be debited as a retention to Brendamour Moving's agency account, the more that Brendamour Moving would . . . inflate its accessorial sales amounts." [*Id*.].

In April 2023, Paul Owens and Arthur Whalen from Brendamour Moving contacted and met with Timothy Grimes from UniGroup to discuss the inflated accessorial sales and the compounding effect on the amounts required to offset the weekly debit balance. Brendamour Moving then met with Mayflower concerning the same issue. [*Id*. at 7]. On May 18, 2023, Mayflower sent a letter to Brendamour Moving stating that the "agency statement for M777 Brendamour currently reflects a debit balance of $12,554,862,89 [sic] and has had a negative balance for three consecutive weeks. Please remit your payment via ACH immediately to ensure

3

it is received before the next statement cutoff." [ECF 108-6 at 1].

Under the Carrier Policies, requests for adjustments to distributions related to agency statement balances must be made "in writing" and within six months of the original distribution date. [ECF No. 108-3 at 19]. Brendamour Moving never made written requests for adjustments to its distributions within the applicable six-month time frames. However, Brendamour Moving asserts that it requested an adjustment when "Paul Owens and Arthur Whalen from Brendamour Moving contacted and met with Timothy Grimes from UniGroup and requested an adjustment to correct Mayflower's agency statement with Brendamour Moving and avoid what Brendamour Moving anticipated would eventually and mistakenly appear to be a debit balance on the agency statement." [ECF No. 111 at 12].

On May 31, 2023, Mayflower terminated its agency relationship with Brendamour Moving. [ECF No. 94 at 2]. On the same date, Mayflower filed this lawsuit. [ECF No. 1]. Mayflower has twice amended its complaint. In its Second Amended Complaint, Mayflower alleges the following: fraud (Count I) against Brendamour Moving and Paul Owens; conversion (Count II) against Brendamour Moving; unjust enrichment (Count III) against Brendamour Moving; and breach of contract (Count IV) against Brendamour Moving. [ECF No. 94 at 9-12].

On December 20, 2024, Mayflower filed a Motion for Partial Summary Judgment on Count IV, seeking to recover the debit balance charged to Brendamour Moving. [ECF No. 106]. On January 6, 2025, Brendamour Moving filed a Cross-Motion for Partial Summary Judgment on Count IV. [ECF No. 112]. The parties exchanged responses and replies, and the Motions are fully briefed.

**II.      Summary Judgment Standard**

"Summary judgment is proper where the evidence, when viewed in the light most favorable

4

to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 853 (8th Cir. 2000); Fed. R. Civ. P. 56(a). If there are factual disputes that may affect the outcome of the case under the applicable substantive law, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it relates to the legal elements of the claim. *Id.* A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.* "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252.

The non-moving party may not rely on allegations or denials but must substantiate its allegations with sufficient probative evidence that would permit a finding in its favor on more than mere speculation or conjecture. *Ball v. City of Lincoln, Nebraska*, 870 F.3d 722, 727 (8th Cir. 2017). Even if some factual dispute exists, if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the non-moving party, then there is no genuine issue for trial, and the movant is entitled to summary judgment. *Id*.

### III. Discussion

#### 1. Agency Agreement and Carrier Policies

Under Missouri law, a "breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010).

5

Mayflower argues that the Agency Agreement and Carrier Policies jointly form a binding contract in this matter. Mayflower refers to language in the Agreement mandating that Brendamour Moving "remit" to Mayflower the "net debit balances" shown on the agency statements. [ECF No. 108-1 at 4]. Mayflower also relies on the Carrier Policies, which it asserts have been incorporated into the Agreement, and which require Brendamour Moving "to monitor weekly statement balances and remit payment to clear any debit balances prior to the next statement closing." [ECF No. 108-3 at 20].

Brendamour Moving does not contest that the Agency Agreement is a binding contract between the parties. Rather, in its Response to Mayflower's Statement of Material Facts, Brendamour Moving indicates that the Carrier Policies cited by Mayflower are nonbinding in this case. Brendamour Moving states that the Policies "consist of unsigned, cherry-picked provisions that UniGroup – a non-party to the Agency Agreement – allegedly revised and adopted as of '04/19/2023,' more than fifteen (15) years after Brendamour Moving and Mayflower entered into their Agency Agreement." [ECF No. 111 at 9].

In its Memorandum in Support of its Cross-Motion for Partial Summary Judgment, however, Brendamour Moving concedes that the Agency Agreement "incorporates all of the Carrier Policies 'by reference,'" but argues that "[the Agreement] cannot be understood or fully appreciated without a review of all those Policies. Mayflower, however, has failed to submit all of the Carrier Policies with its Motion." [ECF No. 113 at 12].

The Court finds that the Carrier Policies are incorporated into the Agency Agreement by reference and together these documents constitute a binding contract, as the Agreement states that all the Policies "are or shall be adopted and incorporated herein by reference." [ECF No. 108-1 at 1]. *See Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo.

6

banc 2003) ("matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba"). Further, the Agreement unambiguously gives Mayflower the right to change the Carrier Policies, as it specifies that the Policies are "issued by [Mayflower] or directives and decisions of [Mayflower's] Board of Directors, whether now existing or as may be issued from time to time during the term of this Agreement." [ECF No. 108-1 at 1]. An update to the Policies, therefore, "does not constitute a change in the agreement" requiring Brendamour Moving's "written consent." *Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC*, No. 4:11CV1299 RWS, 2014 WL 793732, at *1 n.1 (E.D. Mo. Feb. 27, 2014), aff'd, 784 F.3d 1183 (8th Cir. 2015) (internal quotations marks omitted).

Regarding the absence of the complete Carrier Policies, under Missouri law, "summary judgment is appropriate [in a contract case] where the language of the contract is clear and unambiguous, such that the meaning of the portion of the contract in issue is so apparent that it may be determined from the four corners of the document." *Missouri Consol. Health Care Plan v. BlueCross BlueShield of Missouri*, 985 S.W.2d 903, 908 (Mo. App. W.D. 1999) (internal citations and quotation marks omitted). The portion of the Carrier Policies in evidence is clear and unambiguous, and the Court does not need to reach beyond them to decide this dispute.

**2. Mayflower's Performance Under the Contract**

Mayflower maintains that it performed pursuant to the contract because it "tracked debits and credits—including credits based on Brendamour Moving's reported transaction amounts and debits based on commissions due Mayflower on Brendamour Moving's reported transaction amounts—on Brendamour Moving's agency statement in accordance with applicable Carrier Policies." [ECF No. 108 at 2]. Brendamour Moving appears to question whether Mayflower performed under the contract, asserting that Mayflower failed to submit evidence of its weekly

7

agency statements whereby Mayflower allegedly tracked debits and credits as directed by the Carrier Policies. [ECF No. 111 at 9].

Brendamour Moving, however, may not rely on a mere allegation that Mayflower failed to perform under the contract, but must substantiate its allegation with sufficient probative evidence that would permit such a finding on more than conjecture. *See, e.g., Ball*, 870 F.3d at 727. Mayflower, meanwhile, has presented evidence of its performance. Theresa Dawkins, Senior Director of Finance at UniGroup, affirmed in a Declaration that Mayflower tracked debits and credits as stipulated in the Carrier Policies. [ECF No. 108-5 at 2]. Moreover, in its Answers and Objections to Mayflower's First Set of Interrogatories, Brendamour Moving explained that via the "Mayflower Credit System," Mayflower "continued to send [Brendamour Moving] funds for the posted amounts." [ECF No. 108-4 at 19]. Accordingly, the Court finds there is no genuine dispute whether Mayflower performed pursuant to the parties' contract.

### 3. Brendamour Moving's Breach of the Contract

Mayflower argues that Brendamour Moving breached the parties' contract by failing to pay its debit balance to Mayflower. Specifically, Mayflower alleges that Brendamour Moving violated the express requirement of the Agency Agreement that Brendamour Moving "shall remit" to Mayflower "the net debit balances shown" on the agency statement. [ECF No. 108-1 at 4]. Moreover, Mayflower contends that Brendamour Moving failed to "monitor weekly statement balances and remit payment to clear any debit balances prior to the next statement closing" as required by the Carrier Policies. [ECF No. 108-3 at 20].

In response, Brendamour Moving argues that the above-referenced provision in the Agreement is ambiguous because it identifies a duty of Brendamour Moving in a section under a heading concerning "THE DUTIES" of Mayflower. [ECF No. 108-1 at 4]. Further, Brendamour

8

Moving maintains that these debit balances reflect a 6.5% retention or commission Mayflower charged on inflated sales amounts Brendamour Moving never billed for or collected from customers. Brendamour Moving avers that it never agreed to Mayflower's decision in 2016 to start charging a 6.5% retention or commission on accessorial sales, which led to the large debit balance. Brendamour Moving cites the Agreement, which states that "[n]o change in this Agreement shall be valid unless made in writing and signed by both parties." [ECF No. 108-1 at 7]. As Brendamour Moving did not agree to the policy of 6.5% retention on accessorial sales, it argues that the charges leading to the debit balance are invalid. Because neither the Agency Agreement nor the Carrier Policies mention "retention" or "commission" to be charged on any sales, Brendamour Moving argues that it has no duty to clear the debit balance at issue.

Additionally, Brendamour Moving points out that Mayflower has failed to submit all of the Carrier Policies with its Motion and argues that the Court is not in a position to determine that Brendamour Moving is obligated to pay Mayflower without reviewing the Policies in total. Since the portions of the Agency Agreement and Carrier Policies in evidence do not include language requiring Brendamour Moving to pay Mayflower commission on "fictitious sales," Brendamour Moving contends that it has no duty to pay the debit balance on the agency statement.

At certain points, Brendamour Moving has also stated that during its agency relationship with Mayflower, it never let its agency statement go to a debit balance. [ECF No. 111 at 12]. However, it has been inconsistent on this issue. In its Response to Mayflower's Statement of Material Facts, Brendamour Moving avers that "Mayflower's agency statement with Brendamour Moving showed no debit balance owed to Mayflower until after Brendamour Moving requested an adjustment to the agency statement in April of 2023." [ECF No. 111 at 6,

9

7-8]. Brendamour Moving does not deny that in May 2023, while the agency relationship was still in place, Mayflower requested payment of the debit balance on Brendamour Moving's agency statement. [*Id*. at 10]. And in its Reply to Mayflower's Response to its Cross-Motion for Partial Summary Judgment, Brendamour Moving states that the "added commission on these 'fictitious' sales drove up the debit balance shown as unpaid on Brendamour's agency statement. By 2023, that debit balance exceeded $23 million." [ECF No. 125 at 3].

Brendamour Moving does not contest that Mayflower prepared an agency statement in November 2024 reflecting a significant debit balance, but rather points out that under the Agency Agreement, Mayflower must "render statements" to Brendamour Moving and that its duty to "remit" payment to Mayflower only follows after "receipt of a statement" with "net debit balances shown thereon." [ECF No. 108-1 at 4]. As Mayflower did not render or otherwise provide the November 2024 agency statement, Brendamour Moving is ostensibly taking the position that it has no duty to pay the debit balance shown on that statement. [ECF No. 111 at 13]. Further, "Mayflower has failed to produce with its Motion the weekly agency statements of the alleged debit balances owed by Brendamour Moving under the terms of the Agency Agreement," so Brendamour Moving indicates that there is a lack of evidence that it breached their contract based on any particular failure to clear the debit balance. [*Id*. at 16].

Mayflower, however, has provided contrary evidence in the form of the letter dated May 18, 2023, which noted that the agency statement reflected a negative debit balance for three consecutive weeks and requested immediate payment from Brendamour Moving to clear the balance. [ECF No. 108-6 at 1]. Mayflower maintains that the letter is additional evidence that it requested payment of the debit balance on Brendamour Moving's agency statement before the termination of the parties' relationship on May 31, 2023. [ECF 108 at 3].

10

The Court finds that Brendamour Moving breached the parties' contract by failing to remit payment to Mayflower to clear the debit balance accumulated on its agency statement. The Agency Agreement and the Carrier Policies both clearly require Brendamour Moving to pay debit balances. Even if the debit balance was wrong, or if Brendamour Moving objected on the belief that the charges were not consistent with the Agreement, there was a process in place to request adjustments to distributions. Because Brendamour Moving never requested an adjustment in writing, the obligation to pay the debit balance pursuant to the Agreement must be enforced.

Brendamour Moving avers that since the debit balance stemmed from Mayflower's sole decision in 2016 to begin charging a 6.5% retention on accessorial sales, it has no duty to clear the debit balance. As discussed above, however, Mayflower's changes to the Carrier Policies are not tantamount to changes to the Agency Agreement itself, so Brendamour Moving's written consent to retention on accessorial sales was not necessary. The Agreement merely states that Brendamour Moving "shall remit" to Mayflower "the net debit balances shown" on the agency statements. The language is clear and unambiguous. "When a contract is unambiguous, the intent of the contract is discerned solely from the contract's language." *Arbors at Sugar Creek Homeowners Assn. v. Jefferson Bank & Tr. Co., Inc.*, 464 S.W.3d 177, 183 (Mo. banc 2015). The duty to remit debit balances is not invalidated by an added retention on accessorial sales; rather, the Agreement only concerns itself with the duty to remit debit balances as a matter of course. As these are sophisticated parties that negotiated the Agreement, the Court will hold the parties to their bargain and give effect to the parties' intent by enforcing the promise to pay debit balances regardless of whether they were caused by an added retention on accessorial sales.

The argument that the above-referenced provision in the Agency Agreement is

ambiguous because it identifies a duty of Brendamour Moving in a section under a heading concerning "THE DUTIES" of Mayflower is without merit. Headings and titles "are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947).

Further, Brendamour Moving is unpersuasive in its contention that the Court cannot determine whether Brendamour Moving must pay the debit balance without considering all of the Carrier Policies. For the reasons explained above, the Court does not need to review the Policies in their entirety to resolve a dispute governed by provisions in the Agreement and Policies that are already in evidence. Brendamour Moving was afforded an opportunity to provide any missing provisions of the Policies that negate its duty to pay the debit balance. Brendamour Moving failed to submit such evidence, and accordingly the Court will proceed to decide the Motion and Cross-Motion based on the submitted portion of the Policies.

Likewise, Brendamour's suggestion that there is no evidence of a debit balance on the agency statement during the period of the agency relationship with Mayflower is unavailing. Setting aside the apparent contention that debit balances on agency statements issued after the termination of the parties' relationship are somehow illegitimate, Brendamour Moving has acknowledged multiple times that a debit balance existed prior to the termination. [*See* ECF No. 111 at 6, 7-8, 10; ECF No. 125 at 3]. The Court finds that even in the light most favorable to Brendamour Moving, the evidence indicates no genuine issue of material fact whether there is a debit balance on the agency statement or whether Brendamour Moving breached the parties' contract by neglecting to clear the debit balance as mandated by the Agency Agreement and Carrier Policies. As a matter of law, therefore, Mayflower is entitled to judgment on Count IV of

its Second Amended Complaint.

### 4. Mayflower's Damages

The Carrier Policies provide that agents maintaining "a debit balance for five consecutive weeks will be subject to an interest charge on subsequent week's agency statements at a rate of prime plus 3% with a minimum charge. If the debit balance situation persists for ten weeks, the interest charge will increase to prime plus 6% with a minimum charge." [ECF No. 108-3 at 20]. According to Mayflower, Brendamour Moving's debit balance continues to accrue interest under the Agency Agreement, despite the termination of the parties' agency relationship in May 2023. The most recent agency statement produced by Mayflower in November 2024 indicates that Brendamour Moving has a debit balance of $26,593,065.22. [ECF No. 108 at 4].

Mayflower acknowledges that Brendamour Moving may not have actually provided services and may not have invoiced third parties on the so-called fictitious sales. Yet Mayflower asserts that Brendamour Moving was actually paid for providing these services. "For every transaction Brendamour Moving reported into Mayflower's system, Mayflower recorded 100% of the revenue and then paid Brendamour Moving roughly 94% of that revenue for services rendered through a credit to the agency statement." [ECF 116 at 11 n.5]. Given this context as well as the unpaid debit balance, Mayflower has established that it suffered damages as a result of Brendamour Moving's breach of contract.

The question thus turns to whether Mayflower has also established the amount of damages. Mayflower asks the Court to award $26,593,065.22, reflecting the amount on the November 2024 agency statement, plus interest accrued through the date of judgment. At this phase of the proceedings, the Court finds there is an issue of material fact as to the specific amount of damages. Under the Agency Agreement, Brendamour Moving's duty to "remit"

payment to Mayflower only follows as "requested by [Mayflower]" and "after receipt of a statement" with "net debit balances shown thereon." [ECF No. 108-1 at 4]. Brendamour Moving takes the position that Mayflower did not render or otherwise provide the November 2024 agency statement, and therefore it has no duty to pay the net debit balance shown on that statement. Moreover, under the Carrier Policies, Brendamour Moving had six months from the original distribution date to request adjustments related to agency statement balances. In addition, it is notable that in May 2023, when Mayflower last clearly requested payment of the debit balance directly from Brendamour Moving, it seemingly mistakenly placed a comma where there should have been a decimal ("The agency statement . . . reflects a debit balance of $12,554,862,89)." [ECF 108-6 at 1]. Assuming Mayflower intended to communicate a debit balance of $12,554,862.89, the Court observes that the significant jump to $26,593,065.22 is puzzling without additional information on Mayflower's calculation process. In light of these considerations and in the absence of clarifying information, the Court is restrained from awarding a specific amount of damages at this time. The appropriate amount of damages to be awarded to Mayflower as a result of Brendamour Moving's breach of contract will be determined at trial.

## IV.   Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Mayflower's Motion for Partial Summary Judgment [ECF No. 106] is **GRANTED in part** and **DENIED in part**. The request for partial summary judgment in Mayflower's favor on Count IV (Breach of Contract) is **GRANTED**, but the request for an award of $26,593,065.22 plus interest is **DENIED**. The appropriate amount of damages to be awarded to Mayflower as it relates to Count IV will be determined at trial.

**IT IS FURTHER ORDERED** that Brendamour Moving's Cross-Motion for Partial Summary Judgment on Count IV [ECF No. 112] is **DENIED**.

Dated this 3rd day of April, 2025.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE